## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

100REPORTERS, *et al.*,  )
)
*Plaintiffs,*  )
)
v.  )   Case No. 1:19-01753-RDM
)
U.S. DEPARTMENT OF STATE,  )
)
*Defendant.*  )
)

### SECOND DECLARATION OF ERIC F. STEIN

Pursuant to 28 U.S.C. § 1746, I, Eric F. Stein, declare and state as follows:

1.      I am the Director of the Office of Information Programs and Services ("IPS") of the United States Department of State (the "Department" or "State") and have served in this capacity since January 22, 2017.  Previously, I served as the Acting Director since October 16, 2016, and as the Acting Co-Director since March 21, 2016.  I am the State official immediately responsible for responding to requests for records under the Freedom of Information Act (the "FOIA"), 5 U.S.C. § 552, the Privacy Act of 1974, 5 U.S.C. § 552a, and other records access provisions.  As the Director of IPS, I have original classification authority and am authorized to classify and declassify national security information.  Prior to serving in my current capacity, I worked directly for State's Deputy Assistant Secretary ("DAS") for Global Information Services ("GIS") and served as a senior advisor and deputy to the DAS on all issues related to GIS offices and programs, which include IPS.

2.      The core responsibilities of IPS include:  (1) responding to records access requests made by the public (including under the FOIA, the Privacy Act, and the mandatory

1

declassification review requirements of the Executive Order governing classified national security information), by members of Congress, by other government agencies, and those made pursuant to judicial process such as subpoenas, court orders, and discovery requests; (2) records management; (3) privacy protection; (4) national security classification management and declassification review; (5) corporate records archives management; (6) research; (7) operation and management of the Department's library; and (8) technology applications that support these activities.

3.      I am familiar with the efforts of Department personnel to process the FOIA requests that are the subject of this litigation, and I am in charge of coordinating the agency's search and processing efforts with respect to those requests.  I make the following statements based upon my personal knowledge, which in turn is based upon information furnished to me in the course of my official duties.

4.      This declaration explains the Department's search for records responsive to Plaintiff's FOIA requests and the FOIA exemptions applied in processing the responsive records produced to Plaintiff.  Additionally, the plaintiffs in this matter identified to the Department and to the Court the withholdings in records responsive to its requests that it is challenging.  A *Vaughn* index provides a detailed description of that withheld information and the justifications for those withholdings.  *See* Exhibit A.  Finally, a declaration from Charles O. Blaha, the Director of the Office of Security and Human Rights within the Department's Bureau of Democracy, Human Rights, and Labor provides background on the Leahy Laws that are the subject of the FOIA requests at issue as well as the Department's Leahy vetting procedures.

## I.  ADMINISTRATIVE PROCESSING OF PLAINTIFFS' FOIA REQUESTS

### Request F-2017-17811

5.       On December 15, 2017, Reporters Committee for Freedom of the Press, on behalf

of 100Reporters and journalist Douglas Gillison ("Plaintiffs"), submitted a FOIA request via

facsimile to the Department seeking access to the following records:

> [A]ll records prepared, collected or maintained by the Department of State . . .
> pertaining to the **nomination** and/or **vetting** of foreign military and security
> personnel and/or units for U.S. training or assistance pursuant to statutes commonly
> known as the Leahy Laws. . . . These records . . . include but are not limited to the
> following:
>
> - All records consisting of, containing, or reflecting the names and any
>   other identifying information of foreign individuals and/or units vetted
>   by State Department personnel for U.S. training or assistance;
>
> - All entries in the State Department's International Vetting and Security
>   Tracking System, also known as INVEST, in any other similarly
>   dedicated, throughput/workflow management and knowledge
>   management systems used to process, document, track, or otherwise
>   record the vetting foreign individuals and/or units for U.S. training or
>   assistance, and all records these systems may contain;
>
> - Message traffic, cables and emails, or record-keeping copies, in which
>   State Department personnel or others U.S. government personnel
>   nominate specific foreign individuals and/or units for U.S. training or
>   other assistance;
>
> - Message traffic, cables and emails, or record-keeping copies, in which
>   State Department personnel consider or discuss specific foreign
>   individuals and/or units who have been nominated for U.S. training or
>   other assistance;
>
> - Message traffic, cables and emails, or record-keeping copies, in which
>   States Department personnel communicate a final determination of a
>   foreign individual's and/or unit's eligibility for U.S. training or other
>   assistance under the Leahy Laws;

3

- All documents in which the process of vetting specific units or individuals for their eligibility to receive United States training or assistance under the Leahy Laws is discussed;

- Decision memoranda in which the process of vetting specific units or individuals for their eligibility to receive United States training or assistance under the Leahy Laws is discussed and/or decisions to allow or deny assistance are discussed or recorded.

Plaintiffs' request covered the time period from January 1, 2014, until the date the Department began its searches. *See* Exhibit B.

6.      By facsimile dated January 2, 2018, Plaintiffs resubmitted their FOIA request from December 15, 2017, based on a conversation with the FOIA Requester Service Center in which they were told that the Department had no record of receiving the request.

7.      By phone call on February 27, 2018, IPS asked Plaintiffs to narrow their request to specific geographical regions and a more current time period.

8.      By email dated March 19, 2018, Plaintiffs informed IPS that they were willing to narrow the date range of their request to January 1, 2017, to the date the Department began its searches, and that they were willing to narrow the scope of their search to records from the INVEST system that are responsive to their original FOIA request for the following countries: Iraq, Afghanistan, Egypt, Colombia, Philippines, Cambodia, Mexico, and Bangladesh. *See* Exhibit C.

9.      By letter dated March 19, 2018, IPS formally acknowledged receipt of Plaintiffs' FOIA request and assigned it Case Control Number F-2017-17811.

10.      By email dated March 26, 2018, Plaintiffs submitted a status request asking for an estimated date of completion for request F-2017-17811.

11.     By email dated May 10, 2018, IPS informed Plaintiffs that there was presently a delay in the completion of FOIA and Privacy Act requests due to a backlog of approximately 10,600 cases.

12.     By letter dated July 19, 2018, Plaintiffs submitted an appeal for FOIA requests F-2017-17811 and F-2017-17860, stating that the Department had unlawfully failed to make a determination with respect to their requests within the statutory time limit.

13.     By letter dated August 23, 2018, IPS informed Plaintiffs that their FOIA requests were not subject to an administrative appeal as the Department had not denied any information in response to their requests.

14.     By email dated March 1, 2019, Plaintiffs submitted a further status request asking for an estimated date of completion for requests F-2017-17811 and F-2017-17860.

15.     By email dated April 16, 2019, IPS informed Plaintiffs that the FOIA Requester Service Center needed to conduct additional research on Plaintiffs' request and consult with other colleagues, and would follow up with Plaintiffs as soon as possible to provide an estimated date of completion.

16.     By letter dated January 17, 2020, IPS informed Plaintiffs that the Department had located 14 responsive documents. All 14 documents were released in part as Microsoft Excel spreadsheets, the format in which Plaintiffs had requested them.

17.     By email dated January 24, 2020, the Department, through DOJ counsel, informed Plaintiffs that two of the documents in the January 17, 2020 production were inadvertently released without redactions of information exempt from disclosure under FOIA Exemption 7(F), which applies to law-enforcement information whose disclosure would

endanger the life or physical safety of an individual.  *See* Exhibit D.  The two documents at issue

were spreadsheets corresponding to Leahy vetting in Egypt and in Iraq.  The Department asked

that Plaintiffs delete or destroy all copies of the two documents and explained that it would re-

release corrected versions of the documents.

18.     By email dated February 10, 2020, after extended discussions about the reasons

for and basis of the Department's request, Plaintiffs' counsel stated by email:  "[DOJ has] not

provided a legal basis for the State Department to insist that our clients destroy or return any

records they obtained from the agency in response to their FOIA request, and we do not believe

there is any legal basis for the agency to make such an extraordinary request.  That said, we have

provided the additional information, below, to our clients and we understand they intend, in good

faith, to take this information into consideration when determining how, if at all, to use the Iraq

and Egypt spreadsheets released to them on January 17 in connection with their reporting."  *See*

Exhibit D.

19.     By email dated February 19, 2020, the Department, through DOJ counsel, sent

Plaintiffs a corrected version of the spreadsheet corresponding to Leahy vetting in Egypt.

20.     By email dated April 9, 2020, the Department, through DOJ counsel, sent

Plaintiffs a corrected version of the spreadsheet corresponding to Leahy vetting in Iraq.

### Request F-2017-17860

21.     On December 15, 2017, Reporters Committee for Freedom of the Press, on behalf

of Plaintiffs, submitted a FOIA request via facsimile to the Department seeking access to the

following records:

> •     Copies of all guides, manuals, instructions or directions pertaining to the
>       vetting of foreign military and security personnel and/or units under statutes

commonly known as the Leahy Laws provided by the Bureau of Democracy, Human Rights and Labor at the U.S. Department of State ("State Department") to State Department staff and/or to U.S. embassies, consulates, missions, or other foreign posts from January 1, 2014 to the date on which processing of this request commences; and

- The "Report on Government Police Training and Equipping Programs" submitted to Congress pursuant to §1235(c) of the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 and copies of all "Reports on Government Police Training and Equipping Programs" submitted to Congress in subsequent fiscal years.

Plaintiffs' request covered the time period from January 1, 2014, until the date the Department began its searches. *See* Exhibit E.

22.     By letter dated December 27, 2017, IPS acknowledged receipt of Plaintiffs' FOIA request and assigned it Case Control Number F-2017-17860.

23.     By letter dated July 19, 2018, Plaintiffs submitted an appeal for FOIA requests F-2017-17811 and F-2017-17860, stating that the Department had unlawfully failed to make a determination with respect to their requests within the statutory time limit.

24.     By letter dated August 23, 2018, IPS informed Plaintiffs that their FOIA requests were not subject to an administrative appeal as the Department had not denied any information in response to their requests.

25.     By email dated March 1, 2019, Plaintiffs submitted a further status request asking for an estimated date of completion for requests F-2017-17811 and F-2017-17860.

26.     By email dated April 16, 2019, IPS informed Plaintiffs that the FOIA Requester Service Center needed to conduct additional research on Plaintiffs' request and consult with other colleagues, and would follow up with Plaintiffs as soon as possible to provide an estimated date of completion.

7

27.     By letter dated October 15, 2019, IPS informed Plaintiffs that the Department had completed processing of five documents responsive to the request.  The Department released four documents in full and one document in part.

28.     By letter dated November 15, 2019, IPS informed Plaintiffs that the Department had completed processing of an additional 20 documents responsive to the request.  The Department released 13 documents in full, released 4 documents in part, and withheld 3 documents in full.

29.     By letter dated December 13, 2019, IPS informed Plaintiffs that the Department had completed processing of an additional 36 documents responsive to the request.  The Department released 15 documents in full, released 8 documents in part, and withheld 13 documents in full.

30.     By letter dated January 17, 2020, IPS informed Plaintiffs that the Department had completed processing of an additional 11 documents responsive to the request.  The Department released 9 documents in full and released 2 documents in part.

31.     By letter dated February 18, 2020, IPS informed Plaintiffs that the Department had completed processing of an additional five documents responsive to the request.  The Department released two documents in full and released three documents in part.

32.     By letter dated July 14, 2020, IPS informed Plaintiffs that upon further review of six documents previously processed in connection with Plaintiffs' request, it had determined that one document may be released in full and five may be released in part.  The Department therefore re-released those six documents with updated withholdings.

8

33.     Following the parties' pre-motion conference on October 8, 2020, the Department informed Plaintiffs' counsel via email dated October 22, 2020, that it would re-review its withholdings made pursuant to FOIA Exemption 5 to determine whether additional, non-exempt information could be segregated for release.

34.     By letter dated November 16, 2020, IPS informed Plaintiffs that upon further review, it had determined that four documents previously withheld in full may be released in part and that information formerly withheld from five documents previously released in part may be released.  The Department therefore re-released those nine documents with updated withholdings.

35.     By letter dated December 8, 2020, IPS informed Plaintiffs that upon further review, it had determined that two documents previously marked as non-responsive were in fact responsive to Plaintiffs' request.  The Department released one of those two documents in full and withheld the other in full.

36.     By letter dated December 17, 2020, IPS informed Plaintiffs that upon further review, it had located five attachments to documents previously released to Plaintiffs.  The Department released two of those documents in part and withheld three in full.

37.     By letter dated December 31, 2020, IPS informed Plaintiffs that upon further review, it had determined that one document previously withheld in full may be released in part. The Department therefore re-released that one document with updated withholdings.

## II.  THE SEARCH PROCESS

38.     When the Department receives a FOIA request, IPS evaluates the request to determine which offices, overseas posts, or other records systems within the Department may

9

reasonably be expected to contain the records requested.  This determination is based on the description of the records requested and requires a familiarity with the holdings of the Department's records systems, applicable records disposition schedules, and the substantive and functional mandates of numerous Department offices and Foreign Service posts and missions.

39.     Each office within the Department, as well as each Foreign Service post and mission, maintains files concerning foreign policy and other functional matters related to the daily operations of that office, post, or mission.  These files consist generally of working copies of documents, information copies of documents maintained in the Central Foreign Policy Records collection, and other documents prepared by or furnished to the office in connection with the performance of its official duties, as well as electronic copies of documents and e-mail messages.

40.     IPS determined that the Department's Bureau of Democracy, Human Rights, and Labor ("DRL") was reasonably likely to have documents responsive to Plaintiffs' request F-2017-17811 and that the following Department bureaus were reasonably likely to have documents responsive to Plaintiffs' request F-2017-17860:  DRL, the Bureau of Counterterrorism ("CT"), and the Bureau of International Narcotics and Law Enforcement Affairs ("INL").  IPS concluded that no other components or records systems were reasonably likely to maintain documents responsive to Plaintiffs' requests, and that the tasked components searched all files reasonably likely to contain relevant documents.

41.     When conducting a search in response to a FOIA request, the Department relies on the knowledge and expertise of the employees of each bureau/office/post to determine the files and locations reasonably likely to house responsive records and the best means of locating

10

such records, as those employees are in the best position to know how their files are organized.

Likewise, those employees are also in the best position to determine which search terms would

yield potentially responsive records because they are most knowledgeable about the organization

of the records systems in use.

### Bureau of Democracy, Human Rights, and Labor

42.     DRL promotes democracy, human rights, the rule of law, and labor rights

internationally.  DRL strives to ensure the reflection of these concerns in all areas of U.S. foreign

policy.  The Office of Security and Human Rights ("SHR") is the component within DRL

responsible for managing and conducting the Department's Leahy vetting procedures.

### Request F-2017-17811

43.     A Leahy Advisor in SHR, who was knowledgeable of both the FOIA request at

issue and SHR's records systems, conducted a search of the International Vetting and Security

Tracking ("INVEST") database, the primary workflow management tool and official system of

record for Leahy vetting at the Department.  The INVEST database was searched using the

following separate search terms:  "Iraq"; "Afghanistan"; "Egypt"; "Mexico"; "Colombia";

"Philippines"; "Cambodia"; or "Bangladesh."  The date range of the search was January 1, 2017,

to August 16, 2019, the date on which the search was conducted.

### Request F-2017-17860

44.     A Leahy Advisor in SHR, who was knowledgeable of both the FOIA request at

issue and SHR's records systems, conducted a search of DRL's shared electronic drive using the

following separate search terms:  "Manuals"; "Guides"; "Instructions"; or "Directions."  The

date range of the searches was January 1, 2010, to August 12, 2019, the date on which the

searches were conducted.  No paper records were searched as this office does not maintain paper files that would be responsive to this request.

### Bureau of International Narcotics and Law Enforcement Affairs

45.     INL works to keep Americans safe at home by countering international crime, illegal drugs, and instability abroad.  INL helps countries deliver justice and fairness by strengthening their police, courts, and corrections systems.  These efforts reduce the amount of crime and illegal drugs reaching U.S. shores.

### Request F-2017-17860

46.     A Cross-Functional Acting Team Lead in INL's Office of Knowledge Management ("KM"), who was knowledgeable of both the FOIA request at issue and KM's records systems, conducted a search of his unclassified email records, his individual electronic drive, and the office shared electronic drive using the separate search terms:  "Leahy guide"; "Leahy manual"; "Leahy instructions"; "Leahy directions"; or "Report on Government Police Training and Equipping Programs."  The date range of the searches was August 1, 2017, the date on which he began working on matters implicated by the request, to August 7, 2019, the date on which the search was conducted.  No paper records were searched as his office does not maintain paper files that would be responsive to this request.

47.     A Foreign Affairs Officer in KM, who was knowledgeable of both the FOIA request at issue and KM's records systems, conducted a search of his unclassified email records and his individual electronic drive using the separate search terms:  "Leahy guide"; "Leahy manual"; "Leahy instructions"; or "Leahy directions."  The date range of the search was

12

October 2, 2017, the date he began his current position, to August 6, 2019, the date on which the search was conducted.

48.     A Program Support Specialist in KM, who was knowledgeable of both the FOIA request at issue and KM's records systems, conducted a search of her unclassified email records and the office's shared electronic drive using the separate search terms "Leahy guide"; "Leahy manual"; "Leahy instructions"; "Leahy directions"; or "Report on Government Police Training and Equipping Programs."  The date range of the search was January 1, 2011, to August 7, 2019, the date on which the search was conducted.

49.     A Program Manager in KM, who was knowledgeable of both the FOIA request at issue and KM's records systems, conducted a search of his unclassified email records—including archived .pst files—and the office's shared electronic drive, using the separate search terms: "Leahy guide"; "Leahy manual"; "Leahy instructions"; "Leahy directions"; or "Report on Government Police Training and Equipping Programs."  The date range of the search was January 1, 2011, to August 7, 2019, the date on which the search was conducted.  The Program Manager did not search paper records as he does not maintain paper files that would be responsive to this request.

## The Bureau of Counterterrorism

50.     CT forges partnerships with non-state actors, multilateral organizations, and foreign governments to advance the counterterrorism objectives and national security of the United States.

13

**Request F-2017-17860**

51.     The Deputy Director in CT's Office of Programs ("CT/P"), who was knowledgeable of both the FOIA request at issue and CT/P's records systems, conducted searches of her classified and unclassified email records, her unclassified individual electronic drive, and the office's shared electronic drive.  Her office's shared electronic drive is organized regionally.  Her individual electronic drive and the office's shared electronic drive were searched using the following separate search terms:  Leahy; "Leahy guide"; "Leahy manual"; "guidance on vetting"; Skelton; "Report on Government Police Training and Equipping Program"; "Danen" (the last name of the INL officer who circulated the report for clearance in May 2016); or "Report on Police Training."  She also manually reviewed her email records maintained in sub-folders titled:  "legal issues"; "implementers"; and "admin", as well as in her "Sent" items for any documents responsive to the subject FOIA request.  The date range of the searches was September 2015, the date the Deputy Director began in her position, to August 12, 2019, the date on which the search was conducted.  No paper records were searched as her office does not maintain paper files that would be responsive to this request.

### III.  FOIA EXEMPTIONS CLAIMED

52.     I have been informed that Plaintiffs have represented to the Court that they plan to challenge only the Department's withholdings made pursuant to FOIA Exemptions 5 (except for attorney client privilege), 6 (except of email addresses), 7(C), 7(E), and 7(F), 5 U.S.C. §§ 552(b)(5), (b)(6), (b)(7)(C), (b)(7)(E), (b)(7)(F).  The discussion in this section is therefore limited to only those 50 documents and withholdings that remain in dispute between the Parties.

14

## FOIA Exemption 5 – Litigation Privileges

53.     5 U.S.C. § 552(b)(5) states that the FOIA does not apply to

. . . inter-agency or intra-agency memoranda or letters which would not be available
by law to a party other than an agency in litigation with the agency . . . .

54.     Exemption 5 thereby protects from disclosure information that is normally

privileged in the civil discovery context, including information that is protected by the

deliberative process, attorney-client, attorney work product, and presidential communications

privileges.

55.     As detailed in the attached *Vaughn* Index, the Department withheld information in

40 of the documents at issue under FOIA Exemption 5 pursuant to the deliberative process

privilege.  The deliberative process privilege protects the confidentiality of candid views and

advice of U.S. Government officials in their internal deliberations related to policy formulation

and administrative direction.  The information the Department withheld pursuant to the

deliberative process privilege reflects the internal exchange of ideas and recommendations that

occurred when government officials were formulating strategies for official action pertaining to

certain prominent policy decisions, particular related to the Leahy vetting process.  For example,

the Department withheld as deliberative several documents, memoranda, and other materials that

are in an uncleared, draft form, as well as email communications reflecting the contents of those

draft materials, including several drafts of the Department's Leahy Vetting Guide (Docs. 1–5, 7–

10, 12–16, 23, 45, and 48–49).  Those records predate any final version of the documents being

drafted and reflect the drafters' preliminary thoughts about what information should be contained

in those final versions.

*100Reporters, et al. v. U.S. Dep't of State*
Case No. 19-cv-01753
Second Stein Declaration

56.     Additionally, the Department withheld privileged information relating to inter- and intra-agency deliberations about ongoing Leahy vetting being conducted as to specific individuals and units—including discussions about derogatory information located as to specific individuals or units and about whether those individuals and units should be cleared to receive assistance or rejected pursuant to the Leahy vetting process—as well as deliberations about various factors the Department can or should consider when conducting Leahy vetting; discussions of the internal processes by which individuals are vetted and/or remediated following a negative determination; consideration of whether particular law enforcement units should be subject to Leahy vetting; and recommendations for adapting and managing the Department's Leahy vetting processes in the future (Docs. 6, 11, 13, 15–16, 19, 23–24, 28–43, and 50). Particularly given the heightened sensitivity of those deliberations, which implicate whether credible evidence exists that certain individuals or units have been implicated in gross violations of human rights ("GVHR"), it is of paramount importance that officials be able to engage in open and frank discussions without fear that their preliminary analysis and recommendations could become public.

57.     Finally, the Department withheld from two documents (Docs. 14 and 50) guidance prepared for Department officials in conveying policy decisions to foreign government officials and to the press.  That guidance predates any statements actually given to the foreign governments or media outlets, since the official statement would constitute the Department's final policy on how to communicate with the foreign government or media.  Furthermore, that guidance is deliberative since it reveals preliminary suggestions about how to communicate details of Department policy decisions to external entities.

*100Reporters, et al. v. U.S. Dep't of State*
Case No. 19-cv-01753
Second Stein Declaration

58.     The information contained in these materials includes details of internal

Department and interagency discussions held in the course of formulating U.S. Government

policy and directing executive branch action.  Those discussions involve highly sensitive subject

matters implicating complex legal and policy issues and are both predecisional and deliberative.

The highly sensitive nature of these issues and communications underscores the likelihood that

substantial harm would result from disclosure of the withheld information, including by chilling

the open and frank exchange of comments and opinions that occurs between both Department

and executive branch officials at these critical times; revealing the internal development and

implementation of Department and executive branch policies and procedures surrounding the

Leahy vetting process; harming the interagency exchange of candid information and advice

during critical decision-making processes; risking public confusion to the extent these

deliberations constituted in-process exchanges held prior to any final decision-making occurred;

and severely hampering the ability of responsible Department officials to formulate and carry out

executive branch programmatic objectives.

59.     The withheld information is, accordingly, exempt from release under Exemption

5, 5 U.S.C. § 552(b)(5), pursuant to the deliberative process privilege.

### FOIA Exemption 6 – Personal Privacy

60.     5 U.S.C. § 552(b)(6) states that the FOIA does not apply to

. . . personnel and medical files and similar files the disclosure of which would
constitute a clearly unwarranted invasion of personal privacy . . . .

61.     Courts have interpreted the language of Exemption 6 broadly to encompass all

information that applies to an individual without regard to whether it was located in a particular

type of file.  Inasmuch as information withheld under FOIA Exemption 6 identifies a specific

*100Reporters, et al. v. U.S. Dep't of State*
Case No. 19-cv-01753
Second Stein Declaration

individual, a personal privacy interest exists in the information.  I am required, therefore, to

determine whether there exists any public interest in disclosure and, if a public interest is

implicated, to weigh any such interest against the privacy interest to determine whether

disclosure would constitute a clearly unwarranted invasion of personal privacy.

62.     In this case, the Department withheld information in 27 challenged documents

pursuant to Exemption 6, as detailed in the attached *Vaughn* Index, in order to protect the

personal privacy interest of individuals.  More specifically, the Department withheld the names

of foreign law enforcement officers who were being vetted pursuant to the Leahy Laws (Docs. 6,

11, 17–18, 26, 31–43, and 45–49).  Release of those individuals' names within the context of

Leahy vetting procedures would associate them publicly with inquiries into possible GVHRs—

even in cases when the officers were not involved in any derogatory incidents and/or when the

officers themselves were unaware they were being vetted—and would therefore constitute an

unwarranted invasion of personal privacy in much the same way that associating an individual

with an ongoing criminal investigation would invade their personal privacy even if, and perhaps

especially if, the individual is ultimately cleared of any personal wrongdoing.  On the other side

of the balance, while there is public interest in the fact that Leahy vetting is being conducted

properly and that the U.S. Government is providing assistance to particular countries, there is

less public interest, if any, in the names of specific law enforcement officers being vetted.

Notably, the Department has withheld pursuant to Exemption 6 only information that would

divulge the identities of the individuals undergoing vetting—all other non-exempt information

related to the vetting process has been released.  That information provides Plaintiffs with all of

the information needed to evaluate the Department's performance of its statutory duties under the Leahy Laws.

63.     The Department also withheld Department official's personal phone numbers from four of the released documents (Docs. 11, 19, and 28–29), since the release of that information could reasonably be expected to harm the official's personal privacy and there is no public interest in that phone number.

64.     Finally, the Department withheld from one document (Doc. 45) details about autopsies performed of certain deceased individuals.  Release of that information would constitute an unwarranted invasion of the personal privacy interests held by the deceased individuals' surviving family members by providing sensitive and personal details about the circumstances surrounding those individuals' deaths.

65.     As to all of the information withheld pursuant to FOIA Exemption 6, I have concluded that (1) an individual has a privacy interest in the information withheld; and (2) disclosure of the information would not serve the "core purpose" of the FOIA, *i.e.*, it would not disclose information about "what the government is up to."  Accordingly, I have determined that the privacy interests in the withheld information clearly outweigh any public interest in disclosure of such personal information.

## FOIA Exemption 7 – Law Enforcement Information

66.     FOIA Exemption 7 protects from disclosure all "records or information compiled for law enforcement purposes" that could reasonably be expected to cause one of the six harms outlined in the Exemption's subparts.  5 U.S.C. § 552(b)(7).  Before an agency can invoke any of

the harms enumerated in FOIA Exemption 7, it must first demonstrate that the records or

information at issue were compiled for law enforcement purposes.

67.    The law to be enforced for FOIA Exemption 7 purposes includes administrative,

regulatory, civil, and criminal law.[1]  Records pertaining to routine agency activities can qualify

for FOIA Exemption 7 protection when those activities involve a law enforcement purpose.

Although the records must be created for some law enforcement purpose, there is no requirement

that the matter culminate in actual administrative, regulatory, civil, or criminal enforcement

proceedings.

68.    I have reviewed all 36 of the documents assigned Exemption 7 withholdings and

have determined that they all originate out of the Department's enforcement of the Leahy Laws

and that the release of the withheld information could reasonably be expected to disclose

sensitive law enforcement information.  Thus, the records at issue in this case serve law

enforcement purposes and therefore meet the threshold requirement of FOIA Exemption 7.

### FOIA Exemption 7(C) – Personal Privacy

69.    5 U.S.C. § 552(b)(7) states in relevant part that the FOIA does not apply to

> records or information compiled for law enforcement purposes, but only to the
> extent that the production of such law enforcement records or information . . .
> (C) could reasonably be expected to constitute an unwarranted invasion of personal
> privacy.

70.    FOIA Exemption 7(C) is the law enforcement counterpart to Exemption 6 and

protects the privacy interests of all persons mentioned in law enforcement records.

---

[1]    *Ctr. for Nat'l Policy Review on Race & Urban Issues v. Weinberger*, 502 F.2d 370, 373 (D.C. Cir. 1974)
(holding that an administrative determination has the "salient characteristics of 'law enforcement' contemplated" by
Exemption 7 threshold requirement); *see also Church or Scientology Intern. v. I.R.S.*, 995 F.2d 916, 919–20 (9th
Cir. 1993) (finding the D.C. Circuit's reasoning in *Weinberger* persuasive).

20

Exemption 7(C) provides protection for law enforcement information the disclosure of which

"could reasonably be expected to constitute an unwarranted invasion of personal privacy."

5 U.S.C. § 552(b)(7)(C).  Exemption 7(C) protects the privacy interests of any third party

mentioned in law enforcement records, unless there is an overriding public interest in disclosure.

*See Schrecker v. DOJ*, 349 F.3d 657, 661 (D.C. Cir. 2003).  As a general rule, "third party

identifying information contained in law enforcement records is categorically exempt from

disclosure."  *See Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 896 (D.C.

Cir. 1995).  By omitting the word "clearly" from the language of Exemption 7(C) and lowering

the risk-of-harm standard from "would" to "could reasonably be expected to," the exemption is

broader in the law enforcement context.  *See U.S. Dep't of Justice v. Reporters Comm. for

Freedom of Press*, 489 U.S. 749, 756 (1989).  As described in the appended *Vaughn* Index, the

Department withheld identifying information of law enforcement officers that were the subject of

Leahy vetting under Exemption 7(C).

71.     The Department is required to balance the privacy interests of the individuals

whose information appears in the records against any public interest in disclosure.  As the

Supreme Court noted in *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489

U.S. 749, 780 (1989), "as a categorical matter . . . a third party's request for law enforcement

records or information about a private citizen can reasonably be expected to invade that citizen's

privacy."  Later court decisions have found that those privacy interests also extend to foreign

nationals, in addition to private citizens.  *See, e.g., Graff v. FBI*, 822 F. Supp. 2d 23, 34

(D.D.C. 2011).  The invasion of an individual's right to privacy is balanced with the extent to

which the information in question would inform the general public about the U.S. Government's

performance of its mission to enforce federal criminal and civil statutes, as well as administrative rules and federal regulations.

72.     The Department's Exemption 7(C) withholdings cover the names of foreign law enforcement officers who were being vetted pursuant to the Leahy Laws (Docs. 6, 11, 17–18, 26, and 31–49).  As already noted above with regard to Exemption 6, release of those individuals' names within the context of Leahy vetting procedures would associate them publicly with inquiries into possible GVHRs—even in cases when the officers were not involved in any derogatory incidents and/or when the officers themselves were unaware they were being vetted—and would therefore constitute an unwarranted invasion of personal privacy in much the same way that associating an individual with an ongoing criminal investigation would invade their personal privacy even if, and perhaps especially if, the individual is ultimately cleared of any personal wrongdoing.  On the other side of the balance, while there is public interest in the fact that Leahy vetting is being conducted properly and that the U.S. Government is providing assistance to particular countries, there is less public interest, if any, in the names of specific law enforcement officers being vetted.  Notably, the Department has withheld pursuant to Exemption 6 only information that would divulge the identities of the individuals undergoing vetting—all other non-exempt information related to the vetting process has been released.  That information provides Plaintiffs with all of the information needed to evaluate the Department's performance of its statutory duties under the Leahy Laws.

73.     In each instance where the Department withheld information under Exemption 7(C), I determined that the individual privacy interests outweighed the public interest in disclosure and all non-exempt information has been reasonably segregated and released.

22

**FOIA Exemption 7(E) – Law Enforcement Techniques and Procedures**

74.     FOIA Exemption 7(E) protects from disclosure law enforcement information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).

75.     The Department withheld certain documents and information under FOIA Exemption 7(E) because disclosure would reveal information about law enforcement techniques used by the Department to assess whether individuals and units are eligible for assistance under the Leahy Laws (Docs. 6–11, 19–23, 25, and 27).  Specifically, the Department withheld information about the sources from which it gathers potentially derogatory information; the systems and workflow procedures the Department employs in conducting Leahy vetting; the officers at each Post who have access to the INVEST database; the Department's methods for assessing and evaluating the credibility of those sources; the Department's internal procedures for determining whether vetted individuals and units were involved in potentially derogatory incidents as well as whether remediation should occur following a negative determination; the circumstances in which Leahy vetting is or is not required and specific units that are or are not subject to Leahy vetting; special vetting rules and restrictions applied to particular Posts in certain countries; State's internal procedures for determining which units rejected pursuant to the Leahy Laws would be named in a publicly-available list in accordance with the Leahy Laws' reporting requirements; and internal recommendations and advice from Department officials for better managing those processes.  The release of these details—none of which are well-known to

23

the public[2]—could reasonably be expected to risk circumvention of the law, by allowing individuals and units that are either seeking or that expect to one day require Leahy approval to see what specific information is given more or less weight in assessing eligibility for assistance.

76.    These law enforcement techniques and procedures implicate concerns about the U.S. Government's ability to properly comply with its regulatory obligations; to ensure that U.S. Government funding is not directed to units of foreign security forces where there is credible information implicating that unit in the commission of GVHRs; and to maintain relationships with and obtain information from foreign governments and foreign government services. Revealing these techniques would divulge sensitive details regarding the management and application of the Leahy vetting and remediation processes, thus risking undermining the effectiveness of those measures in the future.  The details of these techniques and their utility in the context of these and similar investigations are not known to the general public.  Release of the nonpublic details of these techniques would nullify their effectiveness, risk circumvention of the Leahy Laws, and undermine the U.S. Government's interest in ensuring that training and assistance are furnished to units of foreign security forces credibly believed to have committed a GVHR.  With those details in hand, individuals and units could reasonably be expected to circumvent or abuse the Leahy vetting process and the procedures used for assessing remediation following a negative determination, thus compromising the effectiveness of those investigatory techniques.

---

[2]    While the protection of Exemption 7(E) is generally limited to techniques and procedures that are not well known to the public, even commonly known procedures may be protected from disclosure if the disclosure could reduce or nullify their effectiveness.

24

77.     Therefore, because disclosure of the information withheld pursuant to

Exemption 7(E) would disclose sensitive law enforcement techniques and procedures related to

the Leahy vetting process; impede the effectiveness of DRL, INL, and other law enforcement

agencies in enforcing the Leahy Laws; and could reasonably be expected to risk aiding in

circumvention of the law, the Department properly withheld that information pursuant to

Exemption 7(E), 5 U.S.C. § 552(b)(7)(E).

### FOIA Exemption 7(F) – Danger to Life or Physical Safety

78.     5 U.S.C. § 552(b)(7) states in relevant part that the FOIA does not apply to

records or information compiled for law enforcement purposes, but only to the
extent that the production of such law enforcement records or information . . .
(F) could reasonably be expected to endanger the life or physical safety of any
individual . . . .

79.     The Department has asserted Exemption 7(F) to protect information within its

INVEST database for the country of Egypt contained in the column titled "UNIT ALIAS"

(Doc. 43).  Public release of that information could reasonably be expected to endanger the life

or physical safety of multiple individuals, but the Department is unable to explain the reason why

that outcome could reasonably be expected without revealing classified information.

80.     The Department also asserted Exemption 7(F) to protect information within its

INVEST database for the country of Iraq that, if released, would constitute an official

acknowledgement that certain individuals sought training from the United States, were approved

for training from the United States, and/or lead units that have been considered or approved for

training from the United States (Doc. 44).  Release of that information would put those

individuals at increased risk of being targeted by ISIS or Iran-backed militias, and therefore

could reasonably be expected to endanger those individuals' lives and/or physical safety.

25

81.     For these reasons, the Department has properly withheld certain information

pursuant to Exemption 7(F), 5 U.S.C. § 552(b)(7)(F).

## IV.  SEGREGABILITY ANALYSIS

82.     State has conducted a line-by-line review of the documents at issue in this case

and has segregated and released all reasonably segregable, non-exempt information.  State

otherwise determined that no segregation of meaningful information in the documents could be

made without disclosing information warranting protection under the law.  In particular, prior to

briefing State conducted a supplemental review of each portion of information withheld under

Exemption 5, and made multiple re-releases intended to ensure that the information redacted

consists solely of discussions involving deliberations in which facts are inextricably intertwined

with deliberative discussion, opinions, and policy recommendations, such that disclosing any

such information, and how they are presented, would reveal the thought processes of State

deliberations.  Thus, I have determined that the disclosure of such information would reveal the

nature and substance of agency deliberations.


\* \* \*

*100Reporters, et al. v. U.S. Dep't of State*
Case No. 19-cv-01753
Second Stein Declaration

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, and that the accompanying *Vaughn* Index is true and correct.


Executed this ____6th____ day of January 2021, Washington, D.C.



_____

Eric F. Stein


27