## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**100REPORTERS**

and

**DOUGLAS GILLISON**

          Plaintiffs,

    v.

**DEPARTMENT OF STATE**,

       Defendant.

Case No. 1:19-cv-1753

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Katie Townsend
Adam A. Marshall
Gunita Singh
THE REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310
Email: ktownsend@rcfp.org
Email: amarshall@rcfp.org
Email: gsingh@rcfp.org

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................... 1

BACKGROUND AND PROCEDURAL HISTORY .................................................................. 2

LEGAL STANDARDS ............................................................................................................... 7

ARGUMENT ............................................................................................................................... 8

    I.  Defendant has conducted an inadequate search for records in response to the First
        Request .................................................................................................................. 8

    II. Defendant is improperly withholding records pursuant to the deliberative process
        privilege under Exemption 5. ............................................................................... 11

        A.   Defendant has failed to show that withheld material is predecisional. ................... 11

        B.   Defendant has failed to show that withheld material is deliberative ...................... 13

        C.   Defendant has failed to demonstrate that its deliberative process privilege
              withholdings comply with the Act's foreseeable harm provision .......................... 16

    III. Defendant has failed to meet the threshold requirement for withholding records under
         Exemption 7 ........................................................................................................... 18

    IV. Defendant is improperly withholding records under Exemptions 6 and 7(C) ............... 20

        A.   Disclosure of the withheld names would not constitute a clearly unwarranted
              invasion of personal privacy. .................................................................................. 21

        B.   The public interest in disclosure vastly outweighs any privacy interest that may
              exist. ........................................................................................................................ 23

    V. Defendant is improperly withholding material under Exemption 7(E). .......................... 26

    VI. Defendant has improperly moved for summary judgment with respect to its Exemption
         7(F) withholdings—a claim which is moot and not appropriate for judicial review. .... 29

CONCLUSION ........................................................................................................................... 31

## TABLE OF AUTHORITIES

**Cases**

*Albuquerque Publ'g Co. v. Dep't of Justice*, 726 F. Supp. 851 (D.D.C. 1989)............................ 27

*Alvarez v. Smith*, 558 U.S. 87 (2009).......................................................................................... 29

*Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504 (D.C. Cir. 2011) ......................... 8

*Azmy v. Dep't of Defense*, 562 F. Supp. 2d 590 (S.D.N.Y. 2008) ................................................ 31

*Bartko v. Dep't of Justice*, 167 F. Supp. 3d 55 (D.D.C. 2016) .................................................... 30

*Brinton v. Dep't of State*, 636 F.2d 600 (D.C. Cir. 1980)............................................................ 14

*Campbell v. Dep't of Justice*, 164 F.3d 20 (D.C. Cir. 1998), *as amended* (Mar. 3, 1999)...............
.................................................................................................................................. 7, 10, 18, 21

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980)...................... 11, 13

*Ctr. for Investigative Reporting v. Customs & Border Prot.*, 436 F. Supp. 3d 90 (D.D.C. 2019) ...
............................................................................................................................................. 16

*Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001) .......................... 11

*Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989) ........... 7, 21

*Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989) ................................................................. 8

*Dep't of the Air Force v. Rose*, 425 U.S. 352 (1976) ................................................................... 7

*DiBacco v. Dep't of the Army*, 926 F.3d 827 (D.C. Cir. 2019) .................................................... 10

*Elec. Privacy Info. Ctr. v. Dep't of Justice*, 82 F. Supp. 3d 307 (D.D.C. 2015)........................... 19

*Ford v. West*, Civ. A. No. 97-1342, 1998 WL 317561 (10th Cir. June 12, 1998)........................ 30

*GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375 (1980)................................................... 23

*Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 243 F. Supp. 3d 155 (D.D.C.
   2017) .............................................................................................................................. 13, 14

*Heffernan v. Azar*, 317 F. Supp. 3d 94 (D.D.C. 2018) ................................................................ 12

*Heily v. Dep't of Defense*, 896 F. Supp. 2d 25 (D.D.C. 2012) .................................................... 29

*Ibrahim v. Dep't of State*, 311 F. Supp. 3d 134 (D.D.C. 2018) .................................................. 28

*Jaffe v. Cent. Intelligence Agency*, 573 F. Supp. 377 (D.D.C. 1983) .......................................... 26

*Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93 (D.D.C. 2019) ....... 16, 17, 18, 29

*Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108 (D.C. Cir. 2004)................................... 20

*Judicial Watch, Inc. v. Dep't of Justice*, No. 19-CV-800 (TSC), 2020 WL 5798442 (D.D.C. Sept.
   29, 2020) ............................................................................................................ 16, 17, 25, 29

*Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141 (D.C. Cir. 2006)............................. 11

*Krikorian v. Dep't of State*, 984 F.2d 461 (D.C. Cir. 1993) ....................................................... 10

*Larson v. Dep't of State*, 565 F.3d 857 (D.C. Cir. 2009)................................................. 8

*Lazaridis v. Dep't of State*, 934 F. Supp. 2d 21 (D.D.C. 2013).................................... 18

*Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224 (D.C. Cir. 2008)................................... 21

*Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26 (D.C. Cir. 2002)....................................... 21

*Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873 (D.C. Cir. 1989) ........................... 21

*Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975)..................... 12, 13, 14

*North Carolina v. Rice*, 404 U.S. 244 (1971) ............................................................... 30

*Parker v. Exec. Office for U.S. Att'ys*, 852 F. Supp. 2d 1 (D.D.C. 2012).................................... 20

*Pratt v. Webster*, 673 F.2d 408 (D.C. Cir. 1982)........................................................ 18, 19

*Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195 (D.C. Cir. 2014)............................................................. 19

*Reporters Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 877 F.3d 399 (D.C. Cir. 2017).................................................................................. 8, 10

*Sea Shepherd Conservation Soc'y v. Internal Revenue Serv.*, 208 F. Supp. 3d 58 (D.D.C. 2016) ............................................................................................ 19

*Tax Analysts v. Internal Revenue Serv.*, 294 F.3d 71 (D.C. Cir. 2002) ................................ 19

*Taxation With Representation Fund v. Internal Revenue Serv.*, 646 F.2d 666 (D.C. Cir. 1981) . 14

*Truitt v. Dep't of State*, 897 F.2d 540 (D.C. Cir. 1990)...................................................... 8

*Valencia-Lucena v. Coast Guard*, 180 F.3d 321 (D.C. Cir. 1999) ................................. 8

*Vaughn v. Rosen*, 523 F.2d 1136 (D.C. Cir. 1975) ................................................... 13, 14

*Weisberg v. Dep't of Justice*, 705 F.2d 1344 (D.C. Cir. 1983)........................................ 7

*Wilderness Soc'y v. Dep't of Interior*, 344 F. Supp. 2d 1 (D.D.C. 2004)................................... 12

**Statutes**

22 U.S.C. § 2378d.............................................................................................. 1, 3, 19

22 U.S.C. § 2378d(d)(7) ................................................................................... 4, 27

5 U.S.C. § 552 ....................................................................................................... 1

5 U.S.C. § 552(a)(4).............................................................................................. 7

5 U.S.C. § 552(a)(8)................................................................................. 2, 8, 16, 25

5 U.S.C. § 552(b)(5) ........................................................................................... 11

5 U.S.C. § 552(b)(6) ........................................................................................... 20

5 U.S.C. § 552(b)(7) ............................................................................. 18, 20, 26, 28

**Other Authorities**

Letter from Henry C. Johnson, Jr., United States Representative, et al., to John F. Kerry, Secretary of State (Feb. 17, 2016), https://perma.cc/DQ2V-QFJP ............................................ 4

Megha Rajagopalan, *How US Dollars Are Helping The Philippines' Bloody Drug War*, BuzzFeed News (Nov. 28, 2016), https://perma.cc/9ABA-9AFH .............................................. 4

U.S. Dep't of State & Broadcasting Bd. of Governors, Office of the Inspector Gen., *Inspection of Embassy San José, Costa Rica* (May 2012), https://www.stateoig.gov/system/files/191959.pdf ............................................................................................................................ 23

U.S. Dep't of State, Office of the Inspector Gen., *Inspection of Embassy Bern, Switzerland* (May 2020), https://www.stateoig.gov/system/files/isp-i-20-21.pdf................................................. 23

**Rules**

Fed. R. Civ. P. 56(a) ....................................................................................................................... 7

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case concerns two requests submitted by 100Reporters and journalist Douglas Gillison (collectively, "Plaintiffs"), to the U.S. Department of State ("State" or "Defendant") pursuant to the Freedom of Information Act ("FOIA" or the "Act"), 5 U.S.C. § 552, for records concerning the government's compliance with the "Leahy Laws"—statutes that prohibit the United States from providing assistance to individuals and security forces abroad that have committed gross human rights violations, *see* 22 U.S.C. § 2378d.  Plaintiffs submitted their FOIA requests against a backdrop of documented violations of the Leahy Laws—situations where the United States afforded training, ranging from martial arts to Advanced Attack Helicopter maintenance, to foreign persons and security units responsible for shocking crimes, including murder, kidnapping, and torture.  Through their FOIA requests, Plaintiffs seek information that will further their already extensive reporting about the State Department's role in ensuring that the Leahy Laws are complied with.  More than three years after Plaintiffs' requests were submitted, however, Defendant has yet to satisfy its obligations under FOIA.

As detailed herein, Defendant has failed to conduct a sufficient search for one discrete set of records sought by Plaintiffs:  namely, the "Report on Government Police Training and Equipping Programs," submitted to Congress pursuant to section 1235(c) of the Ike Skelton National Defense Authorization Act for Fiscal Year 2011, and all such "Reports on Government Police Training and Equipping Programs" submitted to Congress in subsequent fiscal years.  In addition, Defendant has:  (1) improperly withheld material that is not predecisional, not deliberative, or is neither, pursuant to the deliberative process privilege of Exemption 5; (2) improperly withheld records pursuant to Exemption 7 that it has failed to demonstrate were compiled for law enforcement purposes; (3) improperly withheld, categorically, the names of all

foreign personnel who have undergone Leahy vetting pursuant to Exemptions 6 and 7(C), even though there is only a *de minimis*—if any—privacy interest in this information that is easily outweighed by the powerful public interest in obtaining it; and (4) improperly withheld information about State's implementation of the Leahy Laws pursuant to Exemption 7(E).  And, as to each of these withholdings, Defendant also has failed to establish its compliance with FOIA's foreseeable harm provision, as required by the 2016 amendments to the Act.  5 U.S.C. § 552(a)(8)(A)(i).  Finally, Defendant has improperly moved for summary judgment on its Exemption 7(F) claims, which are moot because it has already released the information in question to Plaintiffs.

For the reasons set forth below, Plaintiffs respectfully request that the Court grant partial summary judgment in Plaintiffs' favor.[1]

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiff 100Reporters is a nonprofit investigative news organization whose mission is to report on corruption and to promote transparency and good government.  Pls.' SMF ¶ 30.  Plaintiff Douglas Gillison is a journalist and former reporter for 100Reporters.  *Id*. ¶ 29; Gillison Decl. ¶ 9. He is currently a senior investigator for The Sentry, an investigative and policy organization that tracks dirty money tied to human rights abuses and corruption in African nations.  *Id*. ¶ 2.

---

[1]     Plaintiffs do not challenge Defendant's application of Exemption 6 to phone numbers and email addresses of State Department officials, or to details about autopsies performed on certain deceased individuals.  Plaintiffs also do not challenge Defendant's withholding of twelve records reflected in Defendant's *Vaughn* Index, ECF No. 25-5, as Doc. Nos. 2–5, 7–10, 13, 15, and 48–49.  Finally, Plaintiffs do not challenge the adequacy of Defendant's search for records responsive to Plaintiffs' Second Request (Request 2017-F-17811).

*The Leahy Laws*

The "Leahy Laws"—named for their original sponsor, Senator Patrick Leahy—consist of two provisions: one applicable to the State Department (the "State Leahy Law") and one to the Department of Defense. The State Leahy Law, codified in the Foreign Assistance Act of 1961, prohibits any unit of the security forces of a foreign country from receiving U.S. assistance if the Secretary of State has "credible information" that the unit has committed a gross violation of human rights. 22 U.S.C. § 2378d. This prohibition does not apply, however, if the Secretary of State determines and reports to specified congressional committees that the government of the foreign country "is taking effective steps to bring the responsible members of the security forces unit to justice." *Id.*

The State Department has developed procedures for vetting individuals and units in order to comply with the State Leahy Law (hereinafter, "Leahy Vetting"). *See generally* Singh Decl. Ex. A. Representatives of United States agencies that are sponsoring assistance or training for foreign personnel must first submit vetting requests to State Department embassy or consulate staff; State personnel then screen prospective recipients of assistance by searching various sources of information for credible evidence of gross violations of human rights. *See, e.g.*, *id.* at 24, 22. If a candidate passes that initial screening process, in most cases, the individual's or entity's information is sent to State Department headquarters for further vetting by State's Bureau of Democracy, Human Rights, and Labor, as well as the relevant geographic bureau, where a final determination to reject, suspend, or approve assistance is made. *See id.* at 28–29. As part of its Leahy Vetting, the State Department uses a system known as the International Vetting and Security Tracking ("INVEST") system to process and document vetting requests and results. *See, e.g.*, *id.*

3

State makes publicly available the identities of units deemed ineligible for U.S. training or assistance on the basis of credible evidence that those units or individuals have committed human rights violations.  22 U.S.C. § 2378d(d)(7); *see, e.g.*, Singh Decl. Ex. I.  However, there is little transparency with respect to other individuals and entities who undergo vetting as a prerequisite to obtaining U.S. aid.  For example, on February 17, 2016, eleven members of Congress sent a letter to then-Secretary of State John Kerry to request information about the application of the Leahy Laws in Israel and Egypt, noting "a disturbing number of reports of possible gross violations of human rights by security forces in Israel and Egypt—incidents that may have involved recipients, or potential recipients, of U.S. military assistance."  Letter from Henry C. Johnson, Jr., United States Representative, et al., to John F. Kerry, Secretary of State (Feb. 17, 2016), https://perma.cc/DQ2V-QFJP.

Plaintiffs—a nonprofit news organization and journalist—have documented a number of violations of the Leahy Laws in the course of their investigative reporting.  *See, e.g.*, Gillison Decl. ¶¶ 5–12.  For example, Plaintiffs' investigations uncovered that U.S. aid flowed freely to Cambodian officials who shot villagers at close range and used live fire to disperse crowds and burn villagers' homes in a series of forced evictions.  *See id.* Ex. 1.  Other journalists have reported that the U.S. has continued to provide training to police units in the Philippines that were responsible for gruesome extrajudicial killings.  *See* Megha Rajagopalan, *How US Dollars Are Helping The Philippines' Bloody Drug War*, BuzzFeed News (Nov. 28, 2016), https://perma.cc/9ABA-9AFH.

*Procedural History*

On December 15, 2017, Plaintiffs submitted two FOIA requests to the State Department.  Pls.' SMF ¶ 31.  The first of those requests (the "First Request") sought the following:

• Copies of all guides, manuals, instructions or directions pertaining to the vetting of foreign military and security personnel and/or units under statutes commonly known as the Leahy Laws provided by the Bureau of Democracy, Human Rights, and Labor at the State Department to State Department staff and/or to U.S. embassies, consulates, missions, or other foreign posts from January 1, 2014 to the date on which processing of this request commences; and

• The "Report on Government Police Training and Equipping Programs" submitted to Congress pursuant to §1235(c) of the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 and copies of all "Reports on Government Police Training and Equipping Programs" submitted to Congress in subsequent fiscal years.

Pls.' SMF ¶ 32.

Plaintiffs' second request sought the following records, from January 1, 2014 onward (the "Second Request"):

• All records consisting of, containing, or reflecting the names and any other identifying information of foreign individuals and/or units vetted by State Department personnel for U.S. training or assistance;

• All entries in the State Department's International Vetting and Security Tracking System, also known as INVEST, in any other similarly dedicated throughput/workflow management and knowledge management systems used to process, document, track, or otherwise record the vetting [of] foreign individuals and/or units for U.S. training or assistance, and all records these systems may contain;

- Message traffic, cables and emails, or record-keeping copies, in which State Department personnel or other U.S. government personnel nominate specific foreign individuals and/or units for U.S. training or other assistance;

- Message traffic, cables and emails, or record-keeping copies, in which State Department personnel consider or discuss specific foreign individuals and/or units who have been nominated for U.S. training or other assistance;

- Message traffic, cables and emails, or record-keeping copies, in which State Department personnel communicate a final determination of a foreign individual's and/or unit's eligibility for U.S. training or other assistance under the Leahy Laws;

- All documents in which the process of vetting specific units or individuals for their eligibility to receive U.S. training or assistance under the Leahy Laws is discussed; and

- Decision memoranda in which the process of vetting specific units or individuals for their eligibility to receive U.S. training or assistance under the Leahy Laws is discussed and/or decisions to allow or deny assistance are discussed or recorded.

Pls.' SMF ¶ 33.

Defendant failed to provide determinations as to either of Plaintiffs' two requests within the statutory timeframe. Compl. ¶ 48. On March 19, 2018, Plaintiffs agreed to narrow the scope of the Second Request to records from the INVEST system from January 1, 2017 onward for the following countries: Iraq, Afghanistan, Egypt, Mexico, Colombia, Philippines, Cambodia, and Bangladesh. Pls.' SMF ¶ 34. Plaintiffs initiated this action on June 17, 2019. *See* Compl. Thereafter, Defendant made thirteen productions of records to Plaintiffs, nine of which occurred

between October 15, 2019, and July 14, 2020.  Pls.' SMF ¶¶ 35, 37, 39.  Determining that dispositive motion practice was necessary, on September 23, 2020, and September 30, 2020, respectively, the parties filed their pre-motion for summary judgment notices with the Court.  *See* ECF Nos. 19–20.  Following these notices, Defendant made four additional productions to Plaintiffs.  Pls.' SMF ¶¶ 35, 43, 44.  On January 6, 2021, Defendant moved for summary judgment as to the sufficiency of its search for records and the propriety of its withholdings.  *See* ECF No. 25.

## LEGAL STANDARDS

FOIA was enacted to create an enforceable, statutory right of "access to official information long shielded unnecessarily from public view."  *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted).  As the Supreme Court has explained, the "core purpose" of FOIA is to increase "public understanding of the operations or activities of the government." *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 775 (1989) (citation omitted).

Summary judgment may be entered in favor of the government in a FOIA action only if the agency "show[s] that there is no genuine issue of material fact, even when the underlying facts are viewed in the light most favorable to the requester."  *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983) (internal quotations and citation omitted); Fed. R. Civ. P. 56(a).  To meet that burden, the agency must establish that it has fully discharged its statutory obligations, including that its withholdings are proper under one or more of FOIA's enumerated exemptions. *Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998), *as amended* (Mar. 3, 1999); 5 U.S.C. § 552(a)(4)(B).  With respect to the adequacy of an agency's search for records in response to a FOIA request, an agency fulfills its obligations under the Act "if it can demonstrate beyond

material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (citation omitted).  With respect to an agency's withholdings, "[c]onsistent with the Act's goal of broad disclosure," FOIA's exemptions must be narrowly construed, *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989), and an agency's affidavits in support of its withholdings must "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted).  In addition to demonstrating that an exemption applies, following Congress's 2016 amendments to FOIA, the agency must also demonstrate that it "reasonably foresees that disclosure would harm an interest protected by" the cited exemption, or that disclosure is prohibited by law.  5 U.S.C. § 552(a)(8)(A)(i).

## ARGUMENT

I.     **Defendant has conducted an inadequate search for records in response to the First Request.**

"An agency is required to perform more than a perfunctory search in response to a FOIA request." *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011).  To "fulfill[] its obligations under FOIA," an agency must "demonstrate beyond material doubt that its search was 'reasonably calculated to uncover *all* relevant documents.'"  *Valencia-Lucena*, 180 F.3d at 325 (emphasis added) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)).  Summary judgment for an agency as to the sufficiency of its search is "inappropriate if a review of the record raises substantial doubt as to the search's adequacy, particularly in view of well defined requests and positive indications of overlooked materials." *Reporters Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 877 F.3d 399, 402 (D.C. Cir. 2017) (cleaned

up) (citations omitted).

Here, Defendant has failed to conduct an adequate search for the following set of records responsive to Plaintiffs' First Request: the "'Report on Government Police Training and Equipping Programs' submitted to Congress pursuant to §1235(c) of the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 and copies of all 'Reports on Government Police Training and Equipping Programs' submitted to Congress in subsequent fiscal years." Pls.' SMF ¶ 32. According to Defendant, its search located one draft report responsive to this request, which it withheld in full, *see* Def.'s *Vaughn* Index Doc. 1, and no final reports, *see* Def.'s *Vaughn* Index.[2] In conducting its search, Defendant reviewed only the records of State's Bureau of Democracy, Human Rights, and Labor, the Bureau of Counterterrorism, and the Bureau of International Narcotics and Law Enforcement Affairs. Pls.' SMF ¶ 54; Second Stein Decl. ¶ 40.

It is undisputed that at least one such "Report on Government Police Training and Equipping Programs" was submitted from State to Congress in FY 2016. Pls.' SMF ¶ 56; Singh Decl. Ex. K. That report was "provided as requested by [a] House [of Representatives] Report . . . accompanying H.R. 1735, the National Defense Authorization Act for Fiscal Year (FY) 2016[.]" *Id*. In addition, the referenced House Report states that it sought "an update" from State "to the report submitted in 2012 on U.S. Government police training programs," *id*.—which indicates that at least one other final report responsive to Plaintiffs' request exists, *see* Vogus Decl. Ex. 1. Yet, while the offices State searched may be reasonably likely to contain such reports in draft form, *final* reports transmitted to Congress are likely to be found elsewhere, including in the Bureau of

---

[2]    If the identified record was, in fact, the record transmitted to Congress, then that record clearly would no longer qualify as a "draft"; it would constitute a final record and would be ineligible for protection under Exemption 5. *See infra* pp. 11–12 (discussing the withholding of record C06808035 under the deliberative process privilege).

Legislative Affairs.  *See* Pls.' SMF ¶ 55;  Singh Decl. Ex. J (describing the role of one office within the Bureau of Legislative Affairs as being "responsible for the Department's liaison with Members and Committees of the U.S. House of Representatives. It facilitates . . . outreach to oversight Committees, and communication between the House of Representatives and the Department.").

It is well-settled that if an agency has reason to know that certain locations may house responsive documents, it is obligated under FOIA to search them.  *See, e.g.*, *Campbell*, 164 F.3d at 28; *Krikorian v. Dep't of State*, 984 F.2d 461, 468 (D.C. Cir. 1993).  Given that the reports sought by Plaintiffs were requested by Congress and expressly intended for review by specified House and Senate committees—and that their submission to Congress was reflected in the *very text* of Plaintiffs' reasonably described request, *see* Vogus Decl. Ex. 1—State's limiting of its search to the three above-mentioned offices was insufficient.  Further, summary judgment for an agency "must be denied 'if a review of the record raises substantial doubt' about the search's adequacy, 'particularly in view of well defined requests and positive indications of overlooked materials.'"  *DiBacco v. Dep't of the Army*, 926 F.3d 827, 832 (D.C. Cir. 2019) (citation omitted); *Reporters Comm.*, 877 F.3d at 402.  Here, there are not just "positive indications of overlooked materials," but definitive proof that the records requested exist.  *See* Pls.' SMF ¶ 56; Singh Decl. Ex. K.

Accordingly, summary judgment for Defendant as to the sufficiency of its search for records in response to Plaintiffs' First Request should be denied, and summary judgment in favor of Plaintiffs granted.

## II.     Defendant is improperly withholding records pursuant to the deliberative process privilege under Exemption 5.

FOIA Exemption 5 permits agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The threshold requirement is that the records in question qualify as inter-agency or intra-agency memoranda. *Id.* If that threshold requirement is met, the agency must show that the information is (1) attorney-client privileged; (2) attorney work-product; or (3) falls within the scope of the deliberative process privilege. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980). Here, Defendant has improperly invoked the deliberative process privilege with respect to twenty-eight records, identified in its *Vaughn* Index as Documents 1, 6, 11–12, 14, 16, 19, 23–24, 28–44, 45, 50.

The purpose of the deliberative process privilege "is to enhance 'the quality of agency decisions' by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (internal citations omitted). In concluding that a document is subject to the privilege, courts look to whether it is (1) "predecisional"—*i.e.*, whether it was generated before the adoption of an agency policy—and (2) whether it is "deliberative"—*i.e.*, whether it reflects "the give-and-take of the consultative process." *Coastal States*, 617 F.2d at 866.

### A.     Defendant has failed to show that withheld material is predecisional.

A record is predecisional only if it is "generated before the adoption of an agency policy." *See, e.g.*, *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 151 (D.C. Cir. 2006) (citation omitted). Moreover, "even if [a] document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal States*, 617 F.2d at 866. Thus, if an agency

chooses to adopt or incorporate by reference material previously shielded by the deliberative process privilege in a final opinion or public facing position, that material can no longer be withheld.  *See Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 161 (1975).  With respect to agency "drafts," the burden is on the agency to demonstrate that they have not been subsequently adopted and, therefore, remain within the scope of the privilege.  *See, e.g.*, *Heffernan v. Azar*, 317 F. Supp. 3d 94, 125 (D.D.C. 2018); *Wilderness Soc'y v. Dep't of Interior*, 344 F. Supp. 2d 1, 14 (D.D.C. 2004).

Here, Defendant is withholding two documents designated as "drafts" without specifying whether those records or portions thereof have been adopted as the agency's final position or policy.  *See, e.g.*, Def.'s *Vaughn* Index Doc. 1 (stating that record C06808035 "predates *any* final memorandum sent to DoD"[3] (emphasis added)); *id.* Doc. 45 (stating that record C06808467 "predates *any* final letter sent to" the United Nations Office on Drugs and Crime (emphasis added)).  These incomplete descriptions ignore the doctrine of agency adoption, leaving the Court unable to determine whether the record or portions thereof have lost their predecisional status.  Defendant bears the burden of demonstrating that records designated as drafts have not subsequently been adopted, which would eliminate their predecisional status, *see, e.g.*, *Heffernan*, 317 F. Supp. 3d at 125; it has failed to do so here.

Further, as to several records, Defendant has not demonstrated that material it has withheld was ever predecisional to begin with.  Specifically, in justifying its categorical withholding of entire columns of "notes" from fourteen Excel spreadsheets generated from the INVEST system, Defendant argues that such material is predecisional because the "notes about the status of Leahy

---

[3]     As discussed *supra* at 9, Defendant maintains the final version of the referenced draft report, rendering it incumbent upon the agency to examine whether any elements of the withheld in full draft have lost their predecisional status.

vetting for the individual in the corresponding row . . . [are] *generally* entered before any final decision about eligibility."   Def.'s *Vaughn* Index Docs. 31–44 (emphasis added).   Yet, the deliberative process privilege "can *never* apply" to records that "explain agency action already taken or an agency decision already made, [or that] constitute 'final dispositions.'"   *Sears*, 421 U.S. at 153–54 (emphasis added).   Defendant's generalized assertion regarding withheld "notes" does not demonstrate that they are, in fact, predecisional.   Moreover, given that the stated purpose of the "notes about the status of Leahy vetting for the individual in the corresponding row" is to "assist[] the Department in tracking and reaching a final decision about that individual's eligibility for U.S. training and assistance," Def.'s *Vaughn* Index Docs. 31–44, it is highly likely that some— if not all—of that information has been adopted by the agency, or otherwise reflects a "final decision" of the agency that must, as discussed above, be disclosed.

B.      Defendant has failed to show that withheld material is deliberative.

To be within the deliberative process privilege, a record must play "a direct part of [a] deliberative process in that it makes recommendations or expresses opinions on legal or policy matters."   *Vaughn v. Rosen*, 523 F.2d 1136, 1143–44 (D.C. Cir. 1975).   "[T]he agency has the burden of establishing what deliberative process is involved, and the role played by the documents [at] issue in the course of that process."   *Coastal States*, 617 F.2d at 868.   Thus, the agency must show,

> for *each* contested document withheld in part or in full[:] (1) what deliberative process is involved, (2) the role played by the documents in issue in the course of that process, and (3) the nature of the decisionmaking authority vested in the office or person issuing the disputed document[s], and the positions in the chain of command of the parties to the documents[.]

*Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 243 F. Supp. 3d 155, 168 (D.D.C. 2017) (internal quotation marks and citations omitted).   Opinions and interpretations which

embody an agency's effective law and policy may not be withheld under the privilege, as such records are not deliberative.  *See Sears*, 421 U.S. at 161.

Here, Defendant has failed to demonstrate that several of the records it is withholding in full and in part are deliberative.  For instance, as discussed above, Defendant has categorically withheld entire columns of "notes" in fourteen Excel spreadsheets corresponding to Leahy Vetting conducted for persons in eight countries.  Def.'s *Vaughn* Index Docs. 31–44.  Yet, the *only* information Defendant provides about the nature of these "notes" is that their disclosure would "reveal[] information pertinent to the Department's decision-making process with respect to Leahy vetting."  *Id*.  This statement provides no information, whatsoever, about the specific deliberative process purportedly at stake, or the role these notes purportedly play in that process.  *Cf. Hardy*, 243 F. Supp. 3d at 168.  Similarly, record C06808463, Def.'s *Vaughn* Index Doc. 12, is described as "discuss[ing] resources available to both Department officials and the public about the Leahy Laws and related vetting procedures, and comment[ing] on proper procedure for the Leahy vetting process."  *Id*.  That description indicates that the record, far from "mak[ing] recommendations or express[ing] opinions on legal or policy matters," *Vaughn*, 523 F.2d at 1143–44, simply discusses or "promulgate[s] . . . an established policy of an agency."  *Brinton v. Dep't of State*, 636 F.2d 600, 605 (D.C. Cir. 1980).  To the extent record C06808463 merely discusses the agency's positions of law or policy it is not entitled to protection and must be disclosed.

Further, because the deliberative process privilege's fundamental purpose is to protect the quality of deliberations integral to the development of agency policy, *see, e.g.*, *id.* at 604, it does not "protect communications that *implement* an established policy of an agency."  *See, e.g.*, *Taxation With Representation Fund v. Internal Revenue Serv.*, 646 F.2d 666, 677 (D.C. Cir. 1981) (emphasis added); *Brinton*, 636 F.2d at 605.  Yet, here, Defendant is withholding information from

14

four records pursuant to the deliberative process privilege that appear to do nothing more than reflect an application of preexisting agency policy, in contrast to reflecting that policy's development.  Specifically, records C06808271, C06808449, C06808457 and C06808655, Def.'s *Vaughn* Index Docs. 6, 11, 23, and 29, consist of email chains applying the Leahy Vetting process to various units and personnel.  Those withholdings are improper.

The State Department has a detailed, comprehensive policy that dictates how it conducts Leahy Vetting prior to approving the provision of training or other assistance to foreign personnel; that policy outlines, *inter alia*, who must be vetted and how information about gross violations of human rights ("GVHRs") is determined to be credible.  Pls.' SMF ¶ 46; *see, e.g.*, Singh Decl. Ex. A–C (2017 Guide to Leahy Vetting, Leahy Law Fact Sheet, and Introduction to Leahy Vetting Policy, respectively).  The State Department's Leahy Vetting policy provides definitions and common examples of GVHRs,[4] explains how to identify a particular "unit" for Leahy Vetting purposes, and lists indicators of "credible information" of GVHRs.  *See id.* Ex. C. For instance, "[w]hen assessing whether information [about an alleged GVHR] is credible," agency personnel consider the "reliability of the reporting source," "[c]orroborative information to confirm part or all of the allegation," the "[h]istory of unit and known patterns of abuse," and other material factors.  *Id.* Ex. B.  Accordingly, Defendant's withholding of material that it asserts would, if disclosed, "reveal[] the status of the Department's decision-making process regarding" GVHRs within a unit in Tajikistan, for example, Def.'s *Vaughn* Index Doc. 29, is improper.  Even assuming it is predecisional, such material is not deliberative; it merely reflects application of preexisting, clearly defined State Department policy.

---

[4]    The most common types of GVHRs are torture, extrajudicial killing, forced disappearance, and rape under color of the law, all of which are defined in the Vetting Policy Course.  Singh Decl. Ex. C.

C.      Defendant has failed to demonstrate that its deliberative process privilege withholdings comply with the Act's foreseeable harm provision.

Under FOIA's foreseeable harm provision—added to the Act in 2016—an agency is *prohibited* from withholding records that fall within one of the Act's discretionary exemptions unless "the agency reasonably foresees that disclosure would harm an interest protected by [that] exemption." 5 U.S.C. § 552(a)(8). Where an agency "fails to meaningfully connect the harm of discouraging frank dialogue to the information withheld, relying on boilerplate statements to justify its withholdings," those showings do not pass muster under the foreseeable harm provision. *Judicial Watch, Inc. v. Dep't of Justice*, No. 19-CV-800 (TSC), 2020 WL 5798442, at *4 (D.D.C. Sept. 29, 2020); *see also Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 100–01 (D.D.C. 2019) (rejecting "boiler plate language to justify the redactions" under foreseeable harm provision).

Here, Defendant does not *even address* the foreseeable harm standard in its briefing to the Court. And its generic, conclusory assertions of purported harm set forth in its declarations are patently inadequate to satisfy the requirements of the foreseeable harm provision. *See* Second Stein Decl. ¶ 58. Indeed, paragraph 58 of the Second Stein Declaration offers little more than a laundry list of interests that the deliberative process privilege is, generally, intended to serve; it neither ties any of those interests to any particular withholding in this case, nor does it explain why the disclosure of any particular withheld document or portion thereof would result in harm to that interest. *See, e.g.*, *Ctr. for Investigative Reporting v. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (explaining that when an agency proffers "claims of foreseeable harm [that] consist of 'general explanations' and 'boiler plate language,'" they "do not satisfy the foreseeable-harm requirement" (citation omitted)).

16

For example, State posits, as to *all* of the materials it has withheld under the deliberative process privilege, that disclosure would "chill[] the open and frank exchange of comments and opinions that occurs between both Department and executive branch officials at these critical times" or "harm[] the interagency exchange of candid information and advice during critical decision-making processes," making no distinction among all of its withholdings.  Second Stein Decl. ¶ 58.  Likewise, it asserts that disclosure would "reveal[] the internal development and implementation of Department and executive branch policies and procedures surrounding the Leahy vetting process," *id.*, but fails to identify what, if any, harm would result therefrom.  These generalized assertions untethered to the content of any particular record at issue do not comport with what FOIA requires.  *See, e.g.*, *Judicial Watch*, 375 F. Supp. 3d at 100–01 (reminding the agency that in light of the foreseeable harm provision's "heightened standard for an agency's withholdings," it needed to show *why* "disclosure is likely to discourage frank and open dialogue as to the *specific withholdings*" (emphasis added)).

Reading the Second Stein Declaration alongside Defendant's *Vaughn* Index does nothing to shore up Defendant's inadequate attempt to demonstrate compliance with the foreseeable harm provision.  Each entry in Defendant's *Vaughn* Index for a document—excluding spreadsheets— withheld pursuant to the deliberative process privilege contains boilerplate, generalized allegations of speculative harm.  *See* Def.'s *Vaughn* Index Docs. 1, 6, 11–12, 14, 16, 19, 23–24, 28–30, 45, 50 (alleging that "[d]isclosure of [the redacted information] could reasonably be expected to chill the open and frank discussions").  These rote claims are untethered to the *specific* withholdings at issue and are facially insufficient.  *Cf. Judicial Watch*, 2020 WL 5798442, at *4 ("[The agency] fails to meaningfully connect the harm of discouraging frank dialogue to the information withheld, relying on boilerplate statements to justify its withholdings.").   The agency's categorical

Exemption 5 withholdings within the fourteen Excel spreadsheets fare no better. *See* Def.'s *Vaughn* Index Docs. 31–44 ("Disclosure *could* reasonably be expected to make Department officials less likely to make interim notes while conducting Leahy vetting, which would foreseeably harm the effectiveness and efficiency of the Leahy vetting process." (emphasis added)). Indeed, "[i]f the mere possibility that disclosure discourages a frank and open dialogue was enough for the exemption to apply, then Exemption 5 would apply whenever the deliberative process privilege was invoked regardless of whether disclosure of the information would harm an interest protected by the exemption." *Judicial Watch*, 375 F. Supp. 3d at 100–01.

Accordingly, summary judgment for Defendant as to its Exemption 5 withholdings should be denied, and summary judgment in favor of Plaintiffs should be granted.

## III.   Defendant has failed to meet the threshold requirement for withholding records under Exemption 7.

An agency withholding records under Exemption 7 must demonstrate, as a threshold matter, that the records were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). When an agency "specializes in law enforcement, its decision to invoke [E]xemption 7 is entitled to deference." *Campbell*, 164 F.3d at 32. However, "courts often accord different treatment to Exemption 7 claims from different agencies[,]" applying "more exacting scrutiny of Exemption 7 claims by agencies whose principal function is not law enforcement, [which] is well-grounded in congressional purpose [and] common sense[.]" *Pratt v. Webster*, 673 F.2d 408, 416–17 (D.C. Cir. 1982); *see also Lazaridis v. Dep't of State*, 934 F. Supp. 2d 21, 37 (D.D.C. 2013) ("Since [the State Department] is not a law enforcement agency, its claim that records were compiled for law enforcement purposes is entitled to less deference than that of a law enforcement agency."). Records "compiled for law enforcement purposes" typically reflect "investigations" relating "to the enforcement of federal laws or to the maintenance of national security," *Pratt*, 673 F.2d at 419–

20, or involve "proactive steps designed to prevent criminal activity and to maintain security," *Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 203 (D.C. Cir. 2014) (citation omitted).

Here, State has redacted the following from thirty records pursuant to Exemption 7: (1) names of individuals who have undergone Leahy Vetting and (2) descriptions of the process for conducting and evaluating that research. Def.'s *Vaughn* Index. Docs. 6, 11, 17–23, 25–27, 31–47, 50. The *only* argument made by State that these records it has withheld, in part, fall within the ambit of Exemption 7 is its claim that they "originate out of the Department's enforcement of the Leahy Laws." Second Stein Decl. ¶ 68. But Leahy Vetting cannot "fairly be characterized as an enforcement proceeding." Def.'s Br. 13 (quoting *Sea Shepherd Conservation Soc'y v. Internal Revenue Serv.*, 208 F. Supp. 3d 58, 79 (D.D.C. 2016)). The State Leahy Law prohibits the United States from providing training and assistance to certain foreign actors under certain circumstances; it is not a criminal law, nor does it involve the imposition of civil or any other type of penalty. *See* 22 U.S.C. § 2378d; *cf. Elec. Privacy Info. Ctr. v. Dep't of Justice*, 82 F. Supp. 3d 307, 318 (D.D.C. 2015) (explaining that records "generated in the course of investigating [an] unauthorized release of classified material . . . were quite obviously related to the [agency's] law enforcement duties to enforce criminal laws and to protect against national security threats"). As such, records related to the process of Leahy Vetting simply are not eligible for protection under Exemption 7.

To be clear, if the conclusory assertion in the Second Stein Declaration satisfied the threshold requirement for Exemption 7, it is hard to know what records of an agency within the executive branch—whose constitutional role it is to enforce laws enacted by Congress—would *not* constitute records "compiled for law enforcement purposes[.]" *Cf. Tax Analysts v. Internal Revenue Serv.*, 294 F.3d 71, 77 (D.C. Cir. 2002) ("If courts accept a mixed-function agency's

claims of 'law enforcement purpose' without thoughtful consideration, the excessive withholding of agency records which Congress denounced and sought to avoid . . . might well result." (citation omitted)); *compare Parker v. Exec. Office for U.S. Att'ys*, 852 F. Supp. 2d 1, 11 (D.D.C. 2012) ("The only evidence the agency offers to support [its] contention . . . is a single sworn statement that '[a]ll information at issue in this case was compiled for law enforcement purposes.' This conclusory statement is not sufficient[.]" (citation omitted)), *with* Second Stein Decl. ¶ 68.

Because Defendant has not—and cannot—demonstrate that the thirty records it has withheld, in part, pursuant to Exemption 7 were compiled for law enforcement purposes, summary judgment should be entered in Plaintiffs' favor as to those withholdings.

## IV.    Defendant is improperly withholding records under Exemptions 6 and 7(C).

Even assuming, *arguendo*, that State is permitted to invoke Exemption 7 as to its withholdings—which it is not—State has unlawfully invoked Exemption 7(C) and Exemption 6[5] to categorically withhold the names of all foreign persons who have undergone Leahy Vetting from twenty-two records.  Def.'s *Vaughn* Index Docs. 6, 11, 17–18, 26, 31–47.  FOIA Exemption 6 applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes" to the extent that their disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id.* § 552(b)(7)(C).

With respect to Exemption 6, the D.C. Circuit has made clear that there is a "presumption

---

[5]    The language of the balancing test applicable under Exemption 6 differs from that of Exemption 7(C) in that the latter omits the word "clearly" from the required showing.  Plaintiffs nevertheless address the exemptions together because (1) State asserts them in tandem, and (2) the D.C. Circuit "has deemed the privacy inquiry of Exemptions 6 and 7(C) to be essentially the same," *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1125 (D.C. Cir. 2004).

in favor of disclosure [that] is as strong as can be found anywhere in the Act." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (citation and internal quotation marks omitted). Given the "presumption of openness inherent in FOIA," *Campbell*, 164 F.3d at 33, Exemption 6 permits withholding *only* if "disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest," *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989). In determining what constitutes a "substantial" privacy interest, the Court must "balance the individual's right of privacy against the basic policy of opening agency action to the light of public scrutiny." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 31–32 (D.C. Cir. 2002) (citation and internal quotation marks omitted). Similarly, under Exemption 7(C), "a court must balance the public interest in disclosure against the interest Congress intended the Exemption to protect." *Reporters Comm.*, 489 U.S. at 776.

Here, State's assertion of Exemptions 6 and 7(C) to categorically withhold the names of personnel who have undergone Leahy Vetting is improper. If there is any privacy interest at all in the names of persons who have undergone Leahy Vetting, it is *de minimis*, and clearly outweighed by the public interest in disclosure.

A.  Disclosure of the withheld names would not constitute a clearly unwarranted invasion of personal privacy.

When an individual security force member is nominated for U.S. training or assistance, State vets that individual, as well as his or her unit. Singh Decl. Ex. B. The vast majority of sources consulted during the Leahy Vetting process are public. Pls.' SMF ¶ 47; Singh Decl. Ex. A at 17 (explaining that the Bureau of Democracy, Human Rights, and Labor "vets all nominees against reputable *NGO and other unclassified sources*," according to the State Department's 2017 Leahy Vetting Guide (emphasis added)); *id.* at 45 (encouraging personnel conducting Leahy Vetting to use different search terms when looking up information on Google); *id.* at 64

21

("Depending upon the history, demographics, and nature of local security forces, searching the *Internet and open sources* can help speed up the turnaround time at State in Washington, DC." (emphasis added)).   Defendant has not—and could not—show that the release of names of individuals who have undergone Leahy Vetting implicates any meaningful privacy interests. *Compare* Second Stein Decl. ¶ 65 (attributing a "privacy interest [to] the information withheld"), *with* Singh Decl. Exs. H, M (illustrating consultation of a publicly available report to identify GVHRs, where that public report contains the names of foreign officers involved in a violent incident resulting in the tainting of their unit).

Where Defendant does attempt to identify a privacy interest in the name of an individual who has undergone Leahy Vetting, it does so by suggesting that release of the name "would associate them publicly with inquiries into possible GVHRs—even in cases when the officers were not involved in any derogatory incidents and/or when the officers themselves were unaware they were being vetted—and would therefore constitute an unwarranted invasion of personal privacy in much the same way that associating an individual with an ongoing criminal investigation would invade their personal privacy[.]"  Second Stein Decl. ¶ 62.  That argument is without merit.  First, Leahy Vetting is conducted in *all* cases where an individual or unit is nominated for U.S. training or assistance.  Pls.' SMF ¶ 49; Singh Decl. Ex. B ("When an individual security force member is nominated for U.S. assistance, the Department vets that individual as well as his or her unit."); Singh Decl. Ex. G ("The Department of State is responsible for vetting foreign security units and individuals sponsored by any U.S. Government entity for training, travel, or other assistance-related activities," and candidates "*cannot be trained*[] absent a non-derogatory report[.]"

(emphasis added)).[6]  Much in the same way a new job or rental unit will often require a background

check for a new hire or lessee—and unlike investigating a suspect in the context of a criminal

investigation—the requirement to vet an individual under the Leahy Laws applies as much to

Swiss units as it does to Cambodian ones.  *See* U.S. Dep't of State, Office of the Inspector Gen.,

*Inspection of Embassy Bern, Switzerland*, at 6 (May 2020),

https://www.stateoig.gov/system/files/isp-i-20-21.pdf.  Simply put, there is no stigma associated

with Leahy Vetting.

B.   The public interest in disclosure vastly outweighs any privacy interest that may exist.

When Congress enacted FOIA, its "attention . . . was primarily focused on the efforts of

officials to prevent release of information in order to hide mistakes or irregularities committed by

the agency."  *GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375, 385 (1980) (citation omitted).

Numerous documented violations of the Leahy Laws render it clear beyond cavil that the process

is plagued by mistakes and irregularities.  For this reason, the public interest in the information

sought by Plaintiffs significantly outweighs any privacy interest that may exist.

Plaintiffs' work to date underscores the public's interest in the names of individuals

required to be vetted as a prerequisite to receiving U.S. training or other assistance.  Colonel Seng

Phok of Cambodia's Royal Gendarmerie was among the commanding officers whose men "burned

80 houses" to the ground to forcibly evict villagers from their homes in Spean Ches, Preah

Sihanouk Province, Cambodia.  Gillison Decl. Ex. 1.  Yet, the U.S. Embassy in Cambodia "could

---

[6]    *See, e.g.*, U.S. Dep't of State & Broadcasting Bd. of Governors, Office of the Inspector Gen., *Inspection of Embassy San José, Costa Rica*, at 10 (May 2012), https://www.stateoig.gov/system/files/191959.pdf (explaining that "Department of State and Department of Defense-funded training and equipment *can only* be provided to properly vetted entities and individuals," and that even though it is unlikely that Costa Rican trainees, for example, have committed human rights violations, they *still* must be vetted (emphasis added)).

find 'no credible information' connecting Col. Phok to any gross violation of human rights and granted him preliminary approval to attend training in counterterrorism," despite his commanding role in the Spean Ches incident in which the military also "inflicted gunshot wounds at close range, [and] used live fire to disperse crowds." *Id*. In Kbal Hong, a small village also in Preah Sihanouk Province, Rear Admiral Hing Puth Dara commanded his soldiers to burn down homes and beat unconscious a man taking his sick child to the doctor, *see id.* Nevertheless, Puth Dara was also approved by the Embassy to receive training from the U.S. Coast Guard in advanced maritime operations. *Id*. These examples are emblematic of the revelations that can *only* take place if members of the press and public have access to the names of individuals subject to Leahy Vetting—a fact that Defendant ignores. *See* Second Stein Decl. ¶ 62 ("[W]hile there is public interest in the fact that Leahy vetting is being conducted . . . there is less public interest, if any, in the names of specific law enforcement officers being vetted.").

It is precisely because each nominee for U.S. training and assistance is vetted for GVHRs—regardless of country or affiliation—that State subjects hundreds of thousands of prospective recipients of such aid to Leahy Vetting each year. Pls.' SMF ¶ 50; Singh Decl. Ex. D at 12 (noting that from 2011 to 2017, State's vetting workload increased by forty-two percent to a total of 214,566 Leahy Vetting applications, while only nine employees and contractors were responsible for vetting those cases). That such a large volume of Leahy Vetting applications are processed by a comparatively small number of State employees and contractors—far from indicating that public oversight is unwarranted—only highlights the strong public interest in information that will enable the public to ensure that State is adequately ensuring compliance with its statutory duties. Obtaining the names of individuals who have been subject to Leahy Vetting is thus the very mechanism that allows Plaintiffs to scrutinize State's compliance with the Leahy Laws, Gillison

Decl. ¶ 13; that a seasoned investigative journalist and newsroom can use the requested records to examine and illuminate State's compliance with the Leahy Laws—for, indeed, it is just as important for the public to see that the agency is complying with its statutory mandate as it is to document violations—amply supports the immense public interest in disclosure.

Because Defendant has not—and cannot—demonstrate that the withheld names qualify for protection under Exemptions 6 and 7(C), they should be released, and the Court need not address the agency's failure to comply with the foreseeable harm provision. *See* 5 U.S.C. § 552(a)(8)(A). However, even assuming, *arguendo*, that the withheld material implicates more than a *de minimis* privacy interest that outweighs the strong public interest in favor of its disclosure—which it does not—these names would still be required to be disclosed under the Act's foreseeable harm provision, *see id.* State has not demonstrated that reasonably foreseeable harm—in the form of unwarranted invasion of privacy—would result from disclosure of the names of individuals who have undergone Leahy Vetting. *See, e.g.*, Blaha Decl., ECF No. 25-4, ¶ 14 ("[R]eleasing the names of vetted individuals *could* expose those individuals to harassment and retaliation either by making public their affiliation with a unit that may be receiving assistance from the U.S. Government or by implicitly tying them to the possible commission of GVHRs." (emphasis added)). To be sure, "[i]t is not enough for an agency to speculate that harm *could* result from disclosure." *Judicial Watch*, 2020 WL 5798442, at *3 (emphasis added). For this reason, too, Defendant has not met its burden to demonstrate that these withholdings are lawful.

Thus, Defendant's withholding of the names of individuals who have undergone Leahy Vetting violates FOIA, and summary judgment should be granted in favor of Plaintiffs as to those withholdings.

## V.      Defendant is improperly withholding material under Exemption 7(E).

Even assuming, *arguendo*, that Defendant's Exemption 7(E) withholdings are of records "compiled for law enforcement purposes"—which, for the reasons set forth in Section III, *supra*, they are not—those withholdings are improper under FOIA.  Exemption 7(E) applies only to those records that, if released, "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law[.]" 5 U.S.C. § 552(b)(7)(E).  Exemption 7(E) encompasses "information regarding obscure or secret techniques," and protects "documents which assertedly relate to law enforcement procedures *not known to the public*."  *Jaffe v. Cent. Intelligence Agency*, 573 F. Supp. 377, 387 (D.D.C. 1983) (emphasis added).

Here, Defendant is improperly withholding information under Exemption 7(E) from ten records.[7]  Def.'s *Vaughn* Index Docs. 6, 11, 19–23, 25, 27, 50.  Specifically, Defendant has withheld, *inter alia*, records regarding how the agency researches GVHRs, *see* Def.'s *Vaughn* Index Docs. 6, 11 (noting that records C06808271 and C06808449 contain "information about the sources from which the Department gathers potentially derogatory information"); information about processes used to assess whether individuals and units have been remediated, such that they may be eligible for assistance after the commission of GVHRs, *id.* Docs. 19, 27 (discussing records C06808201 and C06808607); information about when names must be submitted for Leahy Vetting, *id.* Docs. 20–21, 23 (discussing records C06808202, C06808205, and C06808457); "information about how the Department conducts Leahy vetting," *id.* Doc. 22 (discussing record

---

[7]      Plaintiffs do not challenge State's withholding of records reflecting "the systems and workflow procedures the Department employs in conducting Leahy vetting; the officers at each Post who have access to the INVEST database."  Second Stein Decl. ¶ 75.

C06808392); "common forms of GVHRs," *id.* Doc. 25 (discussing record C06808549); and information about which "units rejected pursuant to the Leahy Laws would be named in a publicly-available list," *id.* Doc. 50 (discussing record C06808186).  These withholdings are improper under clear D.C. Circuit precedent holding that Exemption 7(E) "pertains to investigative techniques and procedures *generally unknown to the public*."  *Albuquerque Publ'g Co. v. Dep't of Justice*, 726 F. Supp. 851, 857 (D.D.C. 1989) (emphasis added) (citations omitted).

As discussed *supra* at 15, State follows a comprehensive, detailed policy to conduct Leahy Vetting in accordance with the State Leahy Law, and that policy—both its broad contours and the details of its implementation—are well known to the public.  *See, e.g.*, Singh Decl. Exs. A–C; *id.* Ex. A at 64 (encouraging reliance on the "Internet and open sources" to conduct Leahy Vetting); *id.* at 17 (explaining that the agency "vets all nominees against reputable NGO and other unclassified sources"); *id.* at Appendix G (providing the agency's official policy on remediation); Singh Decl. Ex. H (showing Leahy vetters relying on a published report from the Bolivian ombudsman in researching GVHRs at the hands of Bolivian national police); Singh Decl. Ex. L (showing Leahy vetters relying on published United Nations reports in researching GVHRs committed by units within Tajikistan's Ministry of Interior); *see also* 22 U.S.C. § 2378d(d)(7) (mandating that State make publicly available the names of units deemed ineligible for U.S. aid on the basis of credible evidence that those units or individuals therein have committed human rights violations).

In the State Department's Leahy Vetting Policy Course, "designed for direct-hire USG employees and contractors who are involved in implementing Leahy-applicable assistance for foreign security force personnel and units," Singh Decl. Ex. C, and publicly available online, Singh Decl. ¶ 9 ample information is provided about State's policies for implementing Leahy vetting,

27

ranging from what constitutes a credible source of information to which individuals and units must be vetted, *see id.* Simply put, State's claim that its withholdings under Exemption 7(E) are proper "because [the withheld information] reveals information about law enforcement techniques used by the Department to assess whether individuals and units are eligible for assistance[,]" Def.'s *Vaughn* Index Docs. 6, 11, 20–22, is meritless. *Compare id.* (describing the "techniques" at issue as law enforcement tools), *with* Singh Decl. Ex. A at 45 (endorsing "[g]eneral Google search tips" for conducting vetting). Far from "disclosing sensitive law enforcement techniques," *Ibrahim v. Dep't of State*, 311 F. Supp. 3d 134, 144 (D.D.C. 2018), these records do little more than discuss publicly available information and must be disclosed.

State asserts that "[r]evealing these techniques would divulge sensitive details regarding the management and application of the Leahy vetting and remediation processes, thus risking undermining the effectiveness of those measures in the future . . . [and that] [r]elease of the nonpublic details of these techniques would nullify their effectiveness[.]" Second Stein Decl. ¶ 76. But the notion that a member of a foreign security force who has committed an extrajudicial killing—ostensibly concerned with evading prosecution by his government—would instead be preoccupied with "circumvent[ing] the procedures used for conducting Leahy vetting" is incredulous. Def.'s *Vaughn* Index Docs. 6, 11, 20, 23, 25, 27. The process of Leahy Vetting, which entails reviewing primarily public information for evidence of gross human rights abuses, is simply not a law enforcement technique or procedure—let alone one whose disclosure could lead to circumvention of the law. *See* 5 U.S.C. § 552(b)(7)(E). As such, Exemption 7(E) does not apply to the records at issue.

Because Exemption 7(E) does not apply to the records at issue, the Court, once more, need not address the agency's failure to comply with the foreseeable harm provision. Assuming,

*arguendo*, however, that Defendant's Exemption 7(E) claims are proper—which they are not—its withholdings would still be improper under the foreseeable harm provision.  Defendant is required to describe the "link between [the asserted] harm and the specific information contained in the material withheld," *Judicial Watch*, 375 F. Supp. 3d at 101, which it has not done.  The Stein Declaration attempts to argue that "[w]ith those details in hand, individuals and units could reasonably be expected to circumvent or abuse the Leahy vetting process," Second Stein Decl. ¶ 76, but given that detailed information about the process of Leahy Vetting is already public, State's claims do not meet its burden under the foreseeable harm standard given that it only proffers "generic and nebulous articulations of harm."  *Judicial Watch*, 2020 WL 5798442, at *3 (citation omitted).

Because Defendant has unlawfully withheld information about the Leahy Vetting process under Exemption 7(E), summary judgment for the agency is improper as to those redactions and should be granted in favor of Plaintiffs.

**VI.    Defendant has improperly moved for summary judgment with respect to its Exemption 7(F) withholdings—a claim which is moot and not appropriate for judicial review.**

A claim is moot when it presents no live, justiciable controversy.  *Alvarez v. Smith*, 558 U.S. 87, 92 (2009) (explaining that a case is moot when there is "no longer any actual controversy between the parties").  FOIA claims have been dismissed as moot when the records in dispute have been turned over to the requester.  *See, e.g.*, *Heily v. Dep't of Defense*, 896 F. Supp. 2d 25 (D.D.C. 2012).

Here, Defendant's Exemption 7(F) claims are moot because State has already released the information to Plaintiffs.  On January 17, 2020, Defendant produced fourteen Excel spreadsheets to Plaintiffs containing data from State's INVEST system.  Pls.' SMF ¶ 37.  In the spreadsheets

containing data relating to Egypt and Iraq, State redacted the names of all individuals who had

undergone Leahy Vetting, as well as their job titles and ranks, citing Exemptions 6 and 7(C), *id.* ¶

38.  One week later, State claimed certain data produced to Plaintiffs in those records "may contain

information that should have been redacted under FOIA Exemption 7F[.]"  Second Stein Decl.,

Ex. D, ECF No. 25-8.  Now, Defendant asks the Court to grant summary judgment in its favor as

to these records.  However, Defendant's Exemption 7(F) claims as to Documents 43 and 44,

respectively, are moot because Plaintiffs already have the information that State belatedly decided

to assert is exempt from disclosure under Exemption 7(F), and there is no relief the Court is able

to issue as to those records.[8]

Defendant mischaracterizes Plaintiffs' argument with respect to Documents 43 and 44.

Def.'s Br. 22 ("Contrary to Plaintiffs' assertion, the Department's inadvertent release of this

information did not constitute a waiver of the Department's ability to invoke [Exemption 7(F).]").

Defendant's invocation of Exemption 7(F) as to those documents is moot, because even *if* the Court

determines that State could have properly withheld information it released pursuant to Exemption

7(F), such a ruling would not "affect the rights of litigants in th[is] case."  *North Carolina v. Rice*,

404 U.S. 244, 246 (1971).  Thus, the cases Defendant cites, which all discuss the applicability of

the waiver doctrine, are inapposite.  *See* Def.'s Br. 22.  Specifically, Defendant cites *Ford v. West*,

Civ. A. No. 97-1342, 1998 WL 317561, at *3 (10th Cir. June 12, 1998), and *Bartko v. Department

of Justice*, 167 F. Supp. 3d 55 (D.D.C. 2016), which speak *only* to the inability of FOIA plaintiffs

to argue that inconsistent or inadvertent redactions preclude the government from releasing the

---

[8]     Defendant's re-released spreadsheet for Iraq, Def.'s *Vaughn* Index Doc. 44, contains
additional redactions under Exemptions 6 and 7(C), for, *inter alia*, the names of units that
underwent Leahy Vetting, Pls.' SMF ¶ 41; Defendant's claims as to those redactions are moot, as
well, for the reasons set forth herein.

same or similar information in *future* productions.  Defendant also cites *Azmy v. Department of Defense*, 562 F. Supp. 2d 590 (S.D.N.Y. 2008), for the proposition that inadvertent disclosure of classified information does not declassify it, although there are no classified records at issue in this case.

Because Defendant's Exemption 7(F) claims are moot, Plaintiffs respectfully request that this Court deny Defendant's motion for summary judgment as to those claims.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion for summary judgment in part and enter partial summary judgment in favor of Plaintiffs.

Dated: February 12, 2021

*/s/ Katie Townsend*
Katie Townsend
DC Bar No. 1026115
Adam A. Marshall
DC Bar No. 1029423
Gunita Singh
DC Bar No. 1601923
THE REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310
Email: ktownsend@rcfp.org
Email: amarshall@rcfp.org
Email: gsingh@rcfp.org

*Counsel for Plaintiffs*