THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **100REPORTERS**<br><br>and<br><br>**DOUGLAS GILLISON**<br><br>       Plaintiffs,<br><br>   v.<br><br>**DEPARTMENT OF STATE,**<br><br>       Defendant. | Case No. 1:19-cv-1753 |

<u>**DECLARATION OF GUNITA K. SINGH**</u>

I, Gunita K. Singh, declare as follows:

1.      I am a legal fellow at the Reporters Committee for Freedom of the Press ("RCFP" or "Reporters Committee"), a position I have held since February 2019.  I am one of the RCFP attorneys representing 100Reporters and Douglas Gillison ("Plaintiffs") in this matter.

2.      I make this declaration in support of Plaintiffs' Cross-Motion for Partial Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment.  I have personal knowledge of the matters stated in this declaration.

3.      Between October 15, 2019, and November 16, 2020, the United States Department of State ("Defendant") made seven productions of PDF records to Plaintiffs, in which Defendant asserted FOIA Exemptions 5, 6, 7(C), and 7(E) to withhold records and portions thereof.

4.      On January 17, 2020, Defendant produced fourteen Excel spreadsheets to Plaintiffs reflecting the contents of Defendant's International Vetting and Security Tracking ("INVEST")

system for the countries of Iraq, Afghanistan, Egypt, Colombia, Philippines, Cambodia, Mexico, and Bangladesh.  Defendant asserted FOIA Exemptions 5, 6, and 7(C) to withhold portions of these spreadsheets, including the columns for names, job titles and ranks.

5.      On February 19, 2020 and April 9, 2020, Defendant's counsel produced to Plaintiffs different versions of the INVEST Excel spreadsheets for the countries of Egypt and Iraq, respectively.  The re-released Egypt spreadsheet contained additional redactions of information previously released to Plaintiffs on January 17, 2020, for which Defendant asserted Exemption 7(F); the re-released Iraq spreadsheet contained additional redactions of information previously released to Plaintiffs on January 17, 2020, for which Defendant asserted Exemptions 6, 7(C), and 7(F).

6.      On November 19, 2020, Plaintiffs' counsel emailed Defendant's counsel stating that several records produced to Plaintiffs were missing responsive attachments.  On December 8, 2020, and December 17, 2020, Defendant produced to Plaintiffs the missing attachments.  On December 31, 2020, Defendant attempted to transmit another production, but input incorrect email addresses; Defendant delivered that production to Plaintiffs' counsel on January 11, 2021.

7.      Attached hereto as **Exhibit A** is a true and correct copy of record C06808549, released to Plaintiffs on January 17, 2020.

8.      Attached hereto as **Exhibit B** is a true and correct copy of the U.S. Department of State's Leahy Law Fact Sheet, reproduced from https://www.state.gov/key-topics-bureau-of-democracy-human-rights-and-labor/human-rights/leahy-law-fact-sheet/.

9.      Attached hereto as **Exhibit C** is a true and correct copy of the U.S. Department of State's Introduction to Leahy Vetting Policy Course, obtained from https://www.state.gov/wp-content/uploads/2020/06/PP410_INVEST_v2.1.pdf.

10.     Attached hereto as **Exhibit D** is a true and correct copy of a 2018 U.S. Department of State Office of Inspector General report (excluding appendices) titled "Inspection of the Bureau of Democracy, Human Rights, and Labor," obtained from https://www.stateoig.gov/system/files/isp-i-19-11_1.pdf.

11.     Attached hereto as **Exhibits E** and **F** are true and correct copies of webpages found on the Department of State Bureau of Democracy, Human Rights, and Labor's website, obtained from https://www.state.gov/about-us-bureau-of-democracy-human-rights-and-labor/ and https://www.state.gov/key-topics-bureau-of-democracy-human-rights-and-labor/programs/thematic-programming-priorities/, respectively.

12.     Attached hereto as **Exhibit G** is a true and correct copy of excerpts of a 2010 U.S. Department of State Office and Broadcasting Board of Governors Office of Inspector General report titled "Report of Inspection" for Embassy Nicosia, Cyprus, obtained from https://www.stateoig.gov/system/files/146147.pdf.

13.     Attached hereto as **Exhibit H** is a true and correct copy of a portion of record C06808181, released to Plaintiffs on July 14, 2020.

14.     Attached hereto as **Exhibit I** is a true and correct copy of a webpage found on the Department of State Bureau of Democracy, Human Rights, and Labor's website, obtained from https://www.state.gov/public-release-of-foreign-security-forces-units-ineligible-for-assistance-pursuant-to-the-state-leahy-law/.

15.     Attached hereto as **Exhibit J** is a true and correct copy of a webpage found on the Department of State Bureau of Legislative Affairs' website, obtained from https://www.state.gov/office-of-house-affairs/.

16.     Attached hereto as **Exhibit K** is a true and correct copy of a portion of a report (excluding accompanying data) obtained from http://defenseassistance.org/reports/265?rn=265.

17.     Attached hereto as **Exhibit L** is a true and correct copy of a portion of record C06808655, released to Plaintiffs on December 13, 2019.

18.     Attached hereto collectively as **Exhibit M** is a true and correct copy of excerpts of a report obtained from https://www.defensoria.gob.bo/uploads/files/informe-defensorial-sobre-los-hechos-de-agosto-de-2016-conflicto-por-demandas-de-los-cooperativistas-mineros.pdf and a certified translation thereof.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of February 2021 in Washington, D.C.

/s/ Gunita K. Singh

Gunita K. Singh

# EXHIBIT A

SENSITIVE BUT UNCLASSIFIED

CLEAR DOD

RELEASE IN PART B7(E)

# 2017  LEAHY VETTING GUIDE

## A GUIDE

## TO IMPLEMENTATION AND BEST PRACTICES

SENSTIVE BUT UNCLASSIFIED

Case 1:19-cv-01753-RDM  Document 26-3  Filed 02/12/21  Page 7 of 196

SENSITIVE BUT UNCLASSIFIED

# Table of Contents

| | |
|---|---|
| Foreword | 4 |
| Introduction | 4 |
| Key Terms | 5 |
| Questions Concerning Applicability of the Leahy Law | 15 |
| Procedures and Responsibility by Organization | 15 |
| Leahy Vetting Processes | 20 |

INVEST
INVEST Submission Timeline
Processing at Post
Processing at the State
Workflow for Vetting Starts in Home Country
If Derogatory Information Is Found at Post
Dispute Resolution at Post

Selecting Proper Outcome in INVEST
If Derogatory Information Found in Washington

| | |
|---|---|
| Working with Partner Countries | 31 |

Duty to Inform Host Governments
Making Public Rejected Units
Fast Track
Equipment Vetting
Proactive Unit Vetting
Rules of Practice

B7(E)

SENSTIVE BUT UNCLASSIFIED

Case 1:19-cv-01753-RDM  Document 26-3  Filed 02/12/21  Page 8 of 196

SENSITIVE BUT UNCLASSIFIED

Appendices                                                 45

A  Text of Leahy Laws
B  More About INVEST
C  Best Global Leahy Practices for Post
D  Leahy FAQ
E  ALDAC from Deputy Secretary
F  Unit Information
G  Joint DoD-DOS Policy on Remediation
H  Notification of Failure to Vet
I  DoD Exception NDAA 2015
J  9 FAM Leahy Vetting Guidance

SENSITIVE BUT UNCLASSIFIED

## FOREWORD

Respect for human rights is a core principle of the United States and a principal goal of U.S. foreign policy. The United States advances human rights when providing security assistance to foreign countries and international organizations.

This guide describes how section 620M of the Foreign Assistance Act (FAA) and Section 362 of Title 10 of the U.S. Code, hereafter referred to as the Leahy Laws, should be implemented. It defines key terms, sets forth updated procedures, and provides guidance to the field, our interagency partners, and to United States-based policymakers who plan, resource, vet, and execute training or assistance to foreign security forces.

The Department of State intends to update the electronic version of this guide periodically when warranted to reflect any changes in how the Leahy Law is written or implemented. This guide, however, is not designed to provide comprehensive answers to every contingency or specific situation that you may encounter during the programming and vetting processes. For more guidance, contact your regional Leahy point of contact (POC) or refer to the Leahy vetting portal page on the Bureau of Democracy, Human Rights, and Labor's (DRL) intranet Leahy vetting portal page:

http://drl.j.state.sbu/lv/default.aspx

## INTRODUCTION

Section 502B (a)(3) of the FAA directs the President to "formulate and conduct international security assistance programs in a manner which will promote and advance human rights and avoid identification of the United States, through such programs, with governments which deny to their people internationally recognized human rights and fundamental freedoms, in violation of international law or in contravention of the policy of the United States …." In addition, the FAA and the annual appropriations acts that fund foreign assistance contain specific legislative provisions restricting certain foreign assistance, for example by requiring that determinations or certifications be made with respect to the human rights situation in a given country. Thus, State's decisions on the provision of security assistance take into account both legal restrictions and policy imperatives.

SENSTIVE BUT UNCLASSIFIED

4

SENSITIVE BUT UNCLASSIFIED

Among these provisions is the Leahy Law, which restricts the furnishing of assistance under the FAA or the Arms Export Control Act (AECA) "to any unit of the security forces of a foreign country if the Secretary of State has credible information that such unit has committed a gross violation of human rights." This provision was added to the FAA in 2007; prior to that time, a substantially similar provision was enacted annually in each appropriations act since 1997. DoD's Leahy Law codified at 10 U.S.C. § 362, similarly restricts assistance provided under DoD authorities. Over the years, State has developed practices and guidance on implementation of the Leahy Laws that addresses the required elements for compliance with the law and policy guidance used by State and broadly applies to DoD to ensure that our security assistance programs are properly aligned with our foreign policy goals, which include human rights concerns. The full text of both laws is at Appendix A.

The Leahy Law aims to incentivize foreign governments to take action to bring to justice those members of security forces who have committed gross violations of human rights (GVHRs) by cutting off assistance to units that have been implicated in such offenses. If the foreign government strongly desires U.S. Government assistance, cutting off the unit alleged to have been involved may lead said government to undertake an investigation and bring those responsible to justice.

## **KEY TERMS**

### **Gross Violation of Human Rights**

Among other terms, State and DoD Leahy Laws do not define what constitutes a "gross violation of human rights." Consequently, State has historically looked to definitions in other sections of the FAA, including sections 116 and 502B, for guidance on the meaning of the term that is instructive in the understanding and application of GVHR under the Leahy Laws. For example, section 502B provides that "the term 'gross violation of internationally recognized human rights' includes torture or cruel, inhuman, or degrading treatment or punishment, prolonged detention without charges and trial, causing the disappearance of persons by the abduction and clandestine detention of those persons, and other flagrant denial of the right to life, liberty, or the security of person."

For the purposes of Leahy vetting, the four most common forms of GVHR are:

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

- torture
- extrajudicial killing
- enforced disappearance
- rape under the color of law

## Torture[1]

Torture is an act that intentionally inflicts severe mental or physical pain or suffering for such purposes as obtaining information or a confession, as punishment, to intimidate or coerce, or for any reason based upon discrimination of any kind, when inflicted by, at the instigation of, or with the consent of a public official or other person acting in an official capacity, or where such a person has prior awareness of the activity constituting torture and breaches a legal responsibility to intervene to prevent it.  Torture can only be committed against individuals in the offender's custody or physical control.

"Severe mental pain or suffering" means prolonged mental harm caused by or resulting from:

(1) the intentional infliction or threatened infliction of severe physical pain or suffering;

(2) the administration, or threatened administration, of mind altering substance or other procedures calculated to disrupt profoundly the senses or the personality;

(3) the threat of imminent death; or

(4) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other

---

[1] This definition of torture is from Article 1 of the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, to which the United States and 157 other countries are party.  The language of the Article is simplified slightly here for ease of application; the text of that Article states that torture is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence (meaning where a government official has prior awareness of the following activity and breaches a legal responsibility to intervene to prevent it) of a public official or other person acting in an official capacity.  It does not include pain or suffering arising from, inherent in or incidental to lawful sanctions."

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED

procedures calculated to disrupt profoundly the senses or the personality.  This threat may be directed against family, friends, or other loved ones.

A breach of applicable legal procedural standards does not automatically constitute torture. Additionally, pain or suffering arising from a lawful sanction does not generally constitute torture.  For example, use of lawful and appropriate force during a lawful arrest would generally not be considered torture.

## Extrajudicial Killing[2]

An extrajudicial killing (EJK) is a deliberate killing of an individual, carried out under color of law (see below), and not authorized by a previous judgment pronounced by a regularly constituted court after a trial affording all requisite fair trial and appeal guarantees.

## Enforced Disappearance[3]

An enforced disappearance (colloquially referred to as a "forced disappearance") is when government officials, or groups acting on behalf of the government, or with the government's direct or indirect support, consent, or acquiescence (meaning where a government official has prior awareness of the following activity and breaches a legal responsibility to intervene to prevent it):  (a) arrest, detain, or abduct a person, or otherwise deprive a person of liberty, and (b) subsequently refuse to disclose that person's fate,

---

[2] The State definition of extrajudicial killing is derived from the Torture Victim Protection Act of 1991 (28 USC 1350), which defines an extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation."

[3] State derives its definition of enforced disappearance from the Declaration on the Protection of All Persons from Enforced Disappearance, proclaimed by the U.N. General Assembly as a body of principles for all States in resolution. The Declaration provides that an enforced disappearance takes place when "persons are arrested, detained or abducted against their will or otherwise deprived of their liberty by officials of different branches or levels of Government, or by organized groups or private individuals acting on behalf of, or with the support, direct or indirect, consent or acquiescence of the Government, followed by a refusal to disclose the fate or whereabouts of the persons concerned or a refusal to acknowledge the deprivation of their liberty, which places such persons outside the protection of the law."

SENSITIVE BUT UNCLASSIFIED

7

SENSITIVE BUT UNCLASSIFIED

whereabouts, or deprivation of liberty, (c) thereby placing the person outside the protection of the law.

## Cruel, Inhuman, or Degrading Treatment or Punishment

Neither the Foreign Assistance Act, in sections 116 and 502B, nor the Convention Against Torture (CAT) define cruel, inhuman, or degrading treatment or punishment (CIDTP). [4] Whether an act constitutes CIDTP involves a fact-specific inquiry undertaken on a case-by-case basis by State; such issues infrequently arise in the context of Leahy vetting.  If a Post encounters an issue that may meet the definition of CIDTP, it should seek information and guidance from its regional POC and the DRL/Office of Security and Human Rights (SHR), in consultation with State's Office of the Legal Adviser (L).

## Rape Under Color of Law

State's policy considers rape committed under color of law a GVHR.   See the next section.

## Color of Law

In order for a security force unit to commit a GVHR under the Leahy Laws, that unit must be acting under color of law, meaning that the unit or members of the unit must be acting, or appear to be acting, in their capacity as a security force.  Whether an action took place under color of law is a fact-specific inquiry.  A criminal act committed by a member of a security force unit who was not acting under color of law would not constitute a GVHR. However, actions under color of law can include actions taken by a unit or member of a unit that are beyond the bounds of that unit's lawful authority and actions taken while "off duty" when a unit or member of a unit is acting or appears to be acting in the capacity as a security force.  There are a number of factors that are relevant to assessing whether an off-duty or out-of-scope action was under color of law, including:  whether the perpetrators were in uniform; whether the perpetrators are acting out-of-uniform at the direction of a security force unit; whether the actions are conducted with impunity (i.e., without fear of

---

[4] The United States, in its reservation to Article 16 of the CAT, states that it views the article as applicable to conduct that constitutes "cruel, unusual and inhumane treatment" that would be prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the U.S. Constitution.

SENSITIVE BUT UNCLASSIFIED

IED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

government sanction or prosecution); whether the perpetrators used weapons provided by their unit; whether the action implicitly or explicitly invoked the threat of sanction by the unit; or whether the victims were likely to understand that the acts were being carried out by the unit. If a Post believes that it is a close call whether an act was committed under "color of law," Post should seek guidance from their regional POC and DRL/SHR, sending them all relevant information.

## Credible Information

Under the State Leahy Law, no assistance authorized under the Foreign Assistance Act or the Arms Export Control Act "shall be furnished … to any unit of the security forces of a foreign country if the Secretary of State has credible information that such unit has committed a gross violation of human rights." Under the DoD Leahy law, DoD funds may not be used for "any training, equipment, or other assistance for a unit of a foreign security force if the Secretary of Defense has credible information that the unit has committed a gross violation of human rights."[5] The DoD Leahy Law also requires DoD to give "full consideration. . . to any credible information available to the Department of State relating to human rights violations by such unit."

State has interpreted the term "credible information" to mean information that is sufficiently believable that a reasonable person would rely on such information in their decision making process. The application of the standard does not require a fact finder actually to conclude that a security force unit has committed a GVHR. The term "credible information" has appeared in other provisions of law and is a low evidentiary standard. State has not required, for example, that the standard of credible information establish the evidentiary standards of "proof beyond a reasonable doubt" or "a preponderance of the evidence." The Joint Explanatory Statement accompanying the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999 (P.L. 105-277) stated that "the conferees do not intend that the evidence must be admissible in a court of law" to be credible.

No single factor should be considered determinative on its own. A credibility determination with respect to a particular piece of information is a judgment call based on

---

[5] Codified at 10 U.S.C. § 362.

UNCLASSIFIED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

Case 1:19-cv-01753-RDM  Document 26-3  Filed 02/12/21  Page 15 of 196

SENSITIVE BUT UNCLASSIFIED

all the facts and circumstances relevant to that piece of information. Information from a single source can be found to be credible, and corroboration from additional sources is not required. Information which appears credible on its face can be rebutted by equally credible contrary information. When concerns about the credibility of an allegation arise, Post should make efforts to obtain supplemental information, including from foreign government sources, where appropriate. For example, if credible reporting from the U.S. Defense Attaché or an established human rights organization indicates that a unit or individual was involved in a GVHR, that information may be deemed not credible if there is other credible reporting that the unit was in another place at the time of the violation or otherwise was not involved in the occurrence.

State conveyed its guidance on assessing credible information in 14 State 77718. The following factors should be considered, weighing both the credibility of a source and the veracity of an allegation:

a)    Past accuracy and reliability of the reporting source as well as original source, if known;

b)    How the source obtained the information (e.g., personal knowledge obtained by a witness, witness interviews collected by a non-governmental organization (NGO), descriptions collected from government records, etc.);

c)    Known political agenda of a source (both reporting source and/or original source, if known) which might lead to bias in reporting;

d)    Corroborative information to confirm part or all of the allegation;

e)    Information that contradicts part or all of the allegation;

f)    History of unit and known patterns of abuse/professional behavior;

g)    Level of detail of the GVHR allegation, including detail in identification of the GVHR, perpetrator (or link to an operational unit), and victim.

The Leahy Law states that the Secretary of State shall establish procedures to facilitate receipt of information "from individuals and organizations outside the United States Government" and to "routinely request and obtain such information from the Department

SENSITIVE BUT UNCLASSIFIED

C06808549 IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

of Defense, the Central Intelligence Agency, and other United States Government sources."

It is useful to compare information from various sources when making a decision.   The reliability of reports from media sources and NGOs varies.

## Security Forces

Generally speaking, any organization or entity authorized by a State to use force – including, but not limited to, the power to search, detain, and arrest – would be considered a security force. All active duty members of the military are considered to be members of a security force unit, regardless of their military specialty or function.  Security forces could also include units of law enforcement, State-authorized militias, prison guards, customs police, border police, tax police, very important persons (VIP)-protection details, armed game wardens, gendarmerie, and the coast guard.  Examples of persons who may *not* be considered security forces include:  government bureaucrats; prosecutors (except in rare cases where they have law enforcement authority); judges; civilian members of NGOs, international organizations or task forces not comprised of military or police forces; non-enlisted information technology (IT) support staff; forensic laboratory workers, and personnel performing a clerical function related to a security force who are administratively separate from other units with the power to arrest, detain, or otherwise use force.   However, if the funding source is DoD's Regional Defense Combatting Terrorism Fellowship Program (CTFP), all participants who are foreign military officers, ministry of defense officials, or security officials must be vetted under the Leahy Law.  Civilians who are in a position to give orders to security forces, such as a mayor to a police commissioner, should be vetted, also.

Posts should seek guidance from the SDO/DATT in county, the regional bureau and DRL/SHR Leahy-vetting POCs in Washington if assistance is needed in determining whether an individual qualifies as a security force member.

## Unit

SENSTIVE BUT UNCLASSIFIED

11

C06808549 IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

The Leahy Law restricts assistance to a "unit" of the security forces of a foreign country if the Secretary has credible information that such unit has committed a GVHR.  This restriction does not apply to the whole of a foreign government's military, police, or other security forces, but rather to specific component units within those forces.  The Senate report accompanying the Fiscal Year (FY) 2002 Appropriations Act notes that it intended the term "unit" to be "construed as the smallest operational group in the field that has been implicated in the reported violation."

In practice, if State has credible information that security forces from a particular organizational unit has committed a GVHR, it has considered the entire unit ineligible for assistance unless State can establish that the incident was the responsibility of a subordinate unit (e.g., a particular company in a battalion) or that one or more subordinate units likely could not have been involved in the incident (e.g., a company that was operating in an area distant from the location of the incident or whose functions make it factually unlikely that it participated in the incident, such as a motor pool, quartermaster, or other separate support unit).  It is a best practice that post routinely seeks additional information, even after a determination of ineligibility, in order to determine what units were responsible for a GVHR and avoid rendering other units ineligible.  See also "Granularity of Unit Information" below and Appendix G.

## Commit

As a general matter the term "commit" means to carry out or to perpetrate.  This term clearly applies when members of a security forces unit directly carry out GVHR (e.g., commit an extrajudicial killing or torture individuals).  State also has applied the term to those who give the orders to engage in such violations.

Due to the fact-specific nature of such inquiries, State will review on a case-by-case basis whether units will be considered to have committed a GVHR when they had knowledge that a GVHR was committed by subordinate units.  Mere knowledge alone is not sufficient to establish that a unit with such control committed a GVHR; State must have credible information that such unit took actions (or failed to take actions) which resulted in the GVHR.

There are a number of other scenarios where a close examination of the facts would be necessary to determine whether the conduct rises to the level that the unit would be viewed

UNCLASSIFIED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

as committing a GVHR. This could include situations where a unit did not perpetrate the GVHR but was involved in some type of supporting role knowing that the GVHR would occur.

Information regarding security forces deployed in joint operations or task forces, or operating outside their normal unit structure, are generally dealt with on a case-by-case basis, as they require examination of the available facts.

## Remediation, Fundamentally Different Unit, New Unit, and Resumption of Assistance

The remediation process, as defined in section 620M(b) of the FAA and subsequent interagency policy, enables State and DoD to resume assistance to a unit for which there is credible information of having committed a GVHR because the host government has taken appropriate accountability measures. In addition to remediation, it is possible that the unit is a new unit or has changed so fundamentally that it is no longer considered to be the same unit that once committed a GVHR. In February 2015, State and DoD issued a Joint Policy on Remediation and the Resumption of Assistance Under the Leahy Laws that provides additional guidance on the provisions listed below. More information on this policy is available in Appendix G.

## Remediation

Sub-section (b) of Section 620M ("Limitation on Assistance to Security Forces") of the Foreign Assistance Act of 1961, as amended, states:

> EXCEPTION. –The prohibition in subsection (a) shall not apply if the Secretary determines and reports to the Committee on Foreign Relations of the Senate, the Committee on Foreign Affairs of the House of Representatives, and the Committees on Appropriations that the government of such country is taking effective steps to bring responsible members … to justice.

Sub-section (b) of Section 362 of Title 10 of the U.S. Code states:

> Exception.—The prohibition in subsection (a)(1) shall not apply if the Secretary of Defense, after consultation with the Secretary of State, determines that the government of such country has taken all necessary corrective steps, or if the

SENSITIVE BUT UNCLASSIFIED

equipment or other assistance is necessary to assist in disaster relief operations or other humanitarian or national security emergencies.

## Appropriate Accountability Measures

This term merges the concept of "effective steps to bring the responsible members to justice" with "all necessary corrective steps." Appropriate accountability measures would generally include a thorough investigation and, if warranted, impartial trial (judicial or administrative adjudication) and appropriate sentencing or comparable administrative actions. Sentencing or comparable administrative actions must be appropriate and proportional to the misconduct committed, taking into account the legal, judicial, and administrative systems of the foreign government.

## Fundamentally Different Unit

This term applies when a current unit is found to be fundamentally different from a unit that previously committed a GVHR. Changes in role and membership must both be assessed in making this determination:

(a) Changes in the role of security force unit would consider factors such as:

1. function (operational purpose and activities of the unit);
2. reporting structure (institutional oversight of the unit);
3. leadership (how the unit is commanded and by whom);
4. culture (including professionalism and absence of impunity);

(b) Changes in membership (requires a complete turnover of personnel since the time of the GVHR).

Other circumstances at the national level may exist that contribute to the determination whether a security force unit is new or fundamentally different.

## New Unit

SENSTIVE BUT UNCLASSIFIED

14

C06808549 IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

A new unit, by definition, will not have been implicated in any past GVHR.  State will assess the below factors to determine whether the unit is a new unit:

(a)    The unit must not have significant numbers of the same personnel who were assigned to a pre-existing unit implicated in GVHR;

(b)    The Departments must not be in possession of credible information that the unit's current members, including its commanders, have committed GVHR;

(c)    The unit must serve legitimate institutional, organizational, or operational purposes.  Renaming a previously existing unit for the purpose of circumventing remediation for prior suspected GVHR is not an acceptable means of meeting the "new unit" standard.

## QUESTIONS CONCERNING THE APPLICATION OF THE LEAHY LAW

Questions that pertain to interpretation of State policy or the law should be directed to DRL/SHR and the relevant geographic regional bureau (referred hereafter as the regional bureau), which will coordinate with L and other bureaus as needed.  In the case of interpretation of the law for DoD -funded activities, vetters should consult the Office of the Under Secretary of Defense for Policy (OUSD(P))/Stability and Humanitarian Affairs (SHA) and the Joint Staff (J5) Deputy Directorate for Global Policy and Partnerships (DD-GPP) via the appropriate defense official at Post.  Use the link in the International Vetting and Security Tracking (INVEST) bulletin on 2014 DoD Leahy Law Change and Implementing Guidance to launch an email to the current personnel.  This bulletin is available at the DRL intranet Leahy vetting portal page http://drl.j.state.sbu/lv/default.aspx.

## PROCEDURES AND RESPONSIBILITIES BY ORGANIZATION

### Chief of Mission Authority

The Chief of Mission (COM) has the responsibility and authority to direct, supervise, and coordinate all U.S. Government executive branch official operations, activities, and employees in a specific country or U.S. Mission to an International Organization (IO). This authority, the COM authority, is specifically defined in National Security Decision Directive 38, the President's Letter of Instruction to COMs, and relevant legislation.  The

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED

Chief of Mission implements U.S. foreign policy in a country through the U.S. embassy country team.

Country Teams

The U.S. embassy country team assigns a single POC in the mission with responsibility for oversight of, and compliance with, vetting procedures, and a back-up. Typically, the POC is in the Political Section. The Political Section and Senior Defense Official office should be part of the Leahy vetting team, regardless of where the POC works. The human rights reporting officer, principal POCs, and back-ups will have the supervisor role in INVEST.

Develop a written standard operating procedure (SOP) for Leahy Vetting. The SOP should be coordinated with all relevant sections of the mission, including the Senior Defense Official, approved by the Deputy Chief of Mission (DCM), and cleared by DRL/SHR and the respective regional bureau. Post should contact DRL/SHR and the respective regional bureau for guidance and assistance on developing an SOP.

The official system of record and medium for conducting Leahy vetting is the INVEST system, which replaced cable-based vetting in 2010 and 2011. All Posts must enter units and individuals, subject to Leahy vetting, proposed for training or assistance in INVEST and check names against internal U.S. embassy files (including those of all agencies at Post), databases, and other sources of information including NGO and media reporting and report the results to State in Washington, DC, in INVEST. Assistance may not commence until State in Washington, DC, sends final results and approves the case in INVEST. Posts in Fast Track countries (see below) will check names against the internal U.S. embassy files of agencies at Post and whatever sources Post finds helpful for the process. Posts in Fast Track countries do not receive final notification messages.

Report to State in Washington, DC, any human rights violations or abuses involving security forces – units or individuals – via cable or intelligence channels and by entering the data in INVEST as such acts come to light.

Familiarize host governments with statutory requirements and of any restrictions on assistance programs. Ensure host governments are able to provide the information necessary to vet individuals and units in a timely fashion.

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED

When there is credible information of a GVHR, encourage governments to take appropriate remediation measures, including (1) investigation; (2) judicial or administrative adjudication; and (3) as appropriate, sentencing or comparable administrative actions.

State Department

    1. Bureau of Democracy, Human Rights, and Labor (DRL)

DRL/SHR is the DOS lead contact for Leahy vetting policy and workflow issues. DRL/SHR develops, maintains, and controls access to the INVEST system; manages the vetting workflow; vets all nominees against reputable NGO and other unclassified sources; establishes, maintains, and refines vetting guidance in coordination with the regional and relevant functional bureaus (the Bureau of International Narcotics and Law Enforcement (INL), the Bureau of Political-Military Affairs (PM), the Bureau of Counterterrorism and Countering Violent Extremism (CT), etc.); and coordinates with the regional and functional bureaus to assess and develop consensus regarding the credibility of GVHR allegations.

    2. Regional Bureaus

Regional bureaus, jointly with DRL, develop Leahy policy and manage the vetting process.  Regional action officers serve as the lead for their bureau and respective embassies on all Leahy vetting issues and policy matters and act as the liaison between regional Posts and DRL/SHR on all Leahy issues.  Regional action officers utilize the classified Next Generation Trident (NGT) system, which is a customizable, web-based research and analysis data repository, which includes reporting from across the intelligence community (IC).  They assess derogatory information in coordination with DRL, Post, the relevant country desk, the Bureau of Intelligence and Research (INR), and others, as appropriate, to reach consensus on the credibility of information regarding GVHR; advise bureau senior officials on derogatory information found; make assistance recommendations when policy implications are to be considered; and coordinate regional bureau response when derogatory information is found.  All Leahy approvals require agreement by both DRL and the relevant regional bureau.

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

The DRL intranet home Leahy vetting portal page has a document showing the principal POC in each regional bureau if a question arises about who coordinates vetting in a particular country.

*http://drl.j.state.sbu/lv/default.aspx*

3. Functional Bureaus

Functional bureaus plan security assistance to military and police forces, manage program activities, and ensure that activities are compliant with current legal and policy requirements. To the extent that they have knowledge of the security forces they are working with, the functional bureaus will provide such information to the appropriate Leahy POC at the relevant post, DRL/SHR, and the regional bureaus, when needed, as part of the vetting process and help ensure that vetting is being conducted based on the source of funds rather than the implementing agency. For example, International Narcotics Control and Law Enforcement (INCLE) funds appropriated for the Office to Monitor and Combat Trafficking in Persons (J/TIP) projects might be given to an IO, an NGO, or another U.S. Government department or agency for implementation. These organizations must coordinate with the appropriate U.S. embassy where they are implementing projects to ensure security forces are Leahy vetted.

The functional bureaus must ensure that participants in events involving security force members coming from a number of countries, such as activities arranged by the United Nations Office of Drugs and Crime in Vienna, are vetted in the home country of their unit. The DRL intranet home Leahy vetting portal page has a document showing the principal POC in each regional bureau if a question arises about who coordinates vetting in a particular country. http://drl.j.state.sbu/lv/default.aspx

The functional bureaus must plan, evaluate, and promote efforts for remediation, including offering assistance to bring to justice those responsible.

4. The Office of the Legal Adviser (L) advises State on the application of statutory provisions to State programs.

5. Leahy Working Group

UNCLASSIFIED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

Case 1:19-cv-01753-RDM Document 26-3 Filed 02/12/21 Page 24 of 196
IED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

The Leahy Working Group (LWG) is a body of representatives from each of the bureaus, which collaborate to implement Leahy vetting, including: DRL, the six regional bureaus, the Special Representative for Afghanistan and Pakistan (SRAP), PM, INL, INR, and L, and, as appropriate, DoD. This working group will meet quarterly, or more frequently as needed.

## Defense Department

### 1. Combatant Commands

The Combatant Commands name a POC for implementation of the DoD Leahy Law.

They work closely with the Joint Staff regional directorates to determine effective security cooperation and engagement programs, giving particular attention to determining in advance of planning which units are not likely to present serious human rights issues.

### 2. Joint Staff

The Joint Staff's Deputy Directorate for Global Policy and Partnerships (DD-GPP) is the Joint Staff lead for policy issues related to the Leahy Law. As such, it:

- Serves as the interface between OSD and the Combatant Commands for the generation of policy guidance and oversight of the implementation of the DoD Leahy Law.
- Serves as the Joint Staff and Combatant Command representative at all Remediation Review Panels and Senior Remediation Review Panels.
- Solicits feedback from the Combatant Commands to determine more effective ways to implement the law.

### 3. OSD

The OUSD(P) provides policy guidance and oversight of implementation of the DoD Leahy Law. The OUSD(P)/Stability and Humanitarian Affairs (OUSD(P)/SHA) is the DoD lead for policy issues related to the Leahy Law. Working closely with the Joint Staff and OUSD(P) regional offices, OUSD(P)/SHA develops, coordinates, and oversees implementation of the law for all DoD-funded assistance; evaluates and submits for decision all requests for waivers or exceptions under the DoD Leahy Law; and coordinates the congressional notification and reporting process within DoD. OUSD(P)/SHA will

UNCLASSIFIED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

Case 1:19-cv-01753-RDM Document 26-3 Filed 02/12/21 Page 25 of 196

convene and lead, for DoD, all Remediation Review Panels and Senior Remediation Review panels and provide advice to the DoD Components on requests for other exceptions and waivers to the law. OUSD(P)/SHA will be the primary interface for DoD with Congress on issues related to implementation of the DoD Leahy Law.

OUSD(P) also coordinates with the DoD General Counsel to ensure that DoD implementation is consistent with the law.

Finally, OUSD(P) identifies challenges to implementation of the law as they arise.

Other Agencies

Agencies implementing programs with funds subject to the Leahy Laws should name a POC and ensure that their program implementation staff is aware of the Leahy requirement and legal compliance with them under the direction and supervision of the Chief of Mission.

## **LEAHY VETTING PROCESSES**

## **INVEST**

For more detailed steps for processing at Post, see Appendix B.

The official system of record and medium for conducting Leahy vetting is the INVEST system. INVEST can be accessed only through SharePoint in the State OpenNet system to authorized users with a need-to-know. The INVEST system should replace most paper files at Posts by maintaining records electronically prior to being permanently archived. Any additional paper records necessary to demonstrate due diligence in vetting procedures must be maintained in accordance with State policy. DRL/SHR is the DOS lead for access to and assistance in using INVEST and workflow at Post.

INVEST is an official system of record. Only those names subject to Leahy vetting should be entered into the INVEST system. Creating fictitious or test cases or entering names not subject to Leahy vetting is not permitted.

### **INVEST submission timelines**

A minimum of 10 working days is required for Washington, DC-based personnel to vet. However, more lead time raises the probability of successfully vetting candidates in time for their training or assistance. Check with your regional bureau to find out how much lead time is required for a vetting request from your region. Short-fuse requests lessen domestic vetters' efficiency and jeopardize the timely provision of assistance. Posts can avoid the difficulty created by having to cancel or reschedule training by allowing adequate lead time. Posts are also encouraged to identify units with which they might like to work and vet them in advance before particular assistance is identified. If Post is preparing a particularly large number of cases, the Post POC should notify DRL and the regional bureau and determine whether more lead time will be required.

Posts should ensure that offices providing assistance are aware of the vetting timelines and abide by them. It is understood that expedited requests sometimes cannot be avoided and that State will try to complete such requests, recognizing that processing such requests will delay the response to other cases that were filed in a timely manner.

## Processing at Post

This section outlines State's-suggested workflow for Leahy vetting at overseas Posts. State recognizes that Posts vary widely regarding volume, other agency presence, and complexity of vetting. Questions on best practices, Post's standard operating procedure, and workflow can be directed to the regional bureau POC and DRL/SHR.

Posts should have more than one INVEST supervisor so that someone can back up the primary POC when needed. State recommends that all sponsoring offices have at least one INVEST approver or viewer. Post human rights reporting officers in POL should have an INVEST Supervisor role whether or not they conduct the day-to-day vetting. It is also a best practice to set up a collective email group for post INVEST Supervisors, Approvers, and Viewers and inform domestic vetting counterparts so that time-sensitive communications such as domestic vetters needing more detailed unit information or researching a report do not fall through the cracks.

Step 1: After an implementing or sponsoring office at Post (or elsewhere) has identified and proposed assistance and notified the appropriate office at Post, an office (hereafter referred to as sponsoring office) at Post identifies individuals or units subject to Leahy vetting.

C06808549 IED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

Step 2: The sponsoring office enters the relevant data into the INVEST excel batch template spreadsheet that will then be uploaded into INVEST. At some lower volume Posts, the lead Leahy POC creates the batches after sponsoring offices send a completed INVEST batch template spreadsheet.

Step 3: The lead Leahy vetting POC for Post (most commonly in the political section conducts mandatory INVEST document library and data base checks. The lead POC adjudicates cases previously not approved or eligible for "one year good for" matching. For Posts in Fast Track countries, lead vetters must conduct open-source Internet searches before completing batches. For Posts in non-Fast Track countries, this search is recommended but discretionary. Some Posts wish to find reports on the Web and provide their own assessment in advance prior to submitting them to State in Washington, DC.

Step 4: The lead POC emails relevant Post sections to complete the review of classified and unclassified files for credible information of a GVHR using INVEST's Email Sections functionality.

All political sections are involved in preparing the annual reports on human rights practices and thus must clear nominations subject to Leahy vetting. State considers CLASS (Consular Lookout and Support System) checks on individuals to be essential due diligence. Some Regional Security Officers (RSO)-run CLASS checks, but at most Posts Consular Sections (CONS) perform this function. Some vetting teams also have RSOs conduct a wider U.S. Government namecheck with the process explained in 11 State 120665 (transmitted secret, RSO channel). Otherwise, State defers to Post regarding which sections clear within the mission.

When vetting the name of a unit within a mission, State understands that not all sections maintain information about units but rather only maintain information about individuals. For example, CLASS only has information about individuals. No additional processing is possible by those sections for clearing a unit name. Other sections, such as sponsoring sections including DoD offices and the political section, would be expected to be familiar with units.

If credible derogatory information is found that an individual or unit has committed a GVHR or other disqualifying factors, that individual or unit must be denied clearance to participate in the program. If other disqualifying factors arise that do not constitute a

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

GVHR, Post, the regional bureau, and the functional bureau, depending upon the nature of the derogatory information, will make a policy determination on the case. Information about the nature of the offense must be entered into INVEST and the tainted individual or unit must be rejected or suspended in INVEST, depending on which action is more appropriate. Neither classified information nor the specific information in CLASS, however, can be put into INVEST.

For more detailed information on steps taken in the event derogatory information comes to light, see "If Derogatory Information Is Found During Vetting at Post" (p.25, below)

Step 5: Sections vetting names within the mission inform the Leahy vetting POC of the results of their searches. The Leahy vetting POC then enters the results in INVEST. If clearing sections also sponsor nominations and have users with an Approver role, they can enter section results in INVEST. Those clearing sections not sponsoring training do not need access to INVEST.

Step 6: The lead Leahy POC for Post completes a batch when Post vetting is finished. INVEST then forwards to State in Washington, DC (unless the Post is in a Fast Track country, in which case INVEST will stamp the batch approved).                    B7(E)

INVEST moves to the completed batch from Post vetters' "ToDo List" to their "Review List." Post can check the status of State-processing from the Review List.

Except for Posts in Fast Track countries (see below), Leahy vetting is complete only when the INVEST server sends system notification to Posts that State vetting is complete via email with a Final Results batch spreadsheet attached showing disposition of each member of the batch and a certification date. Training or assistance may not begin until that notification is received and disposition of participants indicates they are approved.

**Processing at the Department:**

Step 1: Once the batch is forwarded to State in Washington, DC, the regional bureau and DRL vetters will perform their respective searches. DRL vetters must conduct an open-source Internet search. A ClassNet search on InteLink is strongly recommended for DRL vetters, where appropriate. GEO (regional bureau) vetters must conduct searches using the

SENSITIVE BUT UNCLASSIFIED

C06808549 IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

Next Generation Trident (NGT) search engine.  Use of the INVEST internal search and Targeted Search tool is not required for Washington vetters.

Step 2:  Sometimes domestic vetters find information that requires Posts to assess or research the information.  In such cases, the domestic vetter will contact the Post lead Leahy POC to request additional information from the sponsoring offices.

Step 3:  If no derogatory information is found, DRL and the regional bureau will clear the batch and the regional bureau will take the Final Disposition action in INVEST, which triggers a system-generated email to post INVEST users depending upon their INVEST roles of batch completion with a Final Results spreadsheet attached showing disposition of each batch member.  Sponsoring offices must check that batch spreadsheet for rejections, suspensions, cancelations, or holds.  If vetting at the Washington, DC, level reveals derogatory information, see steps outlined in the section, "If Derogatory Information is Found in Washington."  Posts in Fast Track countries can generate a Final Results spreadsheet by retrieving the batch with the Batch Search administrative form.

After the Batch is Completed:

Step 4:  When the regional bureau vetter performs the Final Notification action, INVEST sends an email to certain Post users, depending upon their roles, and moves the completed batch from the Review List to ToDo Lists.  The Post POC and other users should remove the batch from their ToDo Lists.

**Workflow for Vetting Starts in the Home Country of the Unit**

Some domestic and overseas offices arrange training or assistance for individuals and units in multiple countries. Some sections in embassies have regional responsibility and arrange assistance for multiple countries.

State's policy is that Leahy vetting for units must originate in the home country of the unit nominated for assistance, or, for individuals, in the home country of the unit in which the individual is a security force member.

The citizenship of individuals is not the determining factor.  For example, if a New Zealand citizen is a member of an Australian security force, U.S. Embassy Canberra would

UNCLASSIFIED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

be the lead.  If a New Zealand security force member is seconded to an Australian security force unit on assignment of limited duration, U.S. Embassy Wellington would be the lead.

If offices or entities responsible for training or assistance identify individuals or units subject to Leahy vetting, the relevant vetting information must be sent to the U.S. embassy in the home country of the units or the individuals' units to initiate the Leahy vetting process.

To find the Leahy POC in a particular Post, consult the regional bureau's POC file at the DRL intranet Leahy vetting portal page.

*http://drl.j.state.sbu/lv/default.asp*  Please copy DRL-SHR @state.gov.

The sponsoring office should send a completed and validated INVEST batch template spreadsheet (available at the same URL) to the POC in the embassy.  Normally, the vetting Post should vet nominations received in this way.  When vetting is complete, it should forward the final notification email from INVEST to the inquirer.  If an NGO or IO is implementing a program with Leahy-applicable funds, the vetting Post should just inform the organization which names pass the vetting process and which do not rather than send the final results spreadsheet, which is "sensitive but unclassified" (SBU).

If the security force member is on detail to a diplomatic Post, such as defense attachés in Washington, DC, Posts should vet the individual but not the mission to which the member is assigned.

Any questions on home unit vetting can be directed to DRL/SHR and the relevant regional bureau.

**If Derogatory Information Is Found During Vetting at Post**

If Post finds credible information that a security force unit has committed a GVHR, Post should note in INVEST the nature and context of the derogatory information and upload any relevant documents and note the nature and context of the derogatory information.

If the information is sourced in the host country, the Post vetting team should assess it and make the determination.  If Post is unsure whether the derogatory information is credible, such as when the source is in another country, or whether the behavior would constitute a GVHR, Post is strongly recommended to add appropriate notes and supporting

SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

documentation, if available, to INVEST. It is also recommended that Post inform Washington-based vetters by email. Post could also use the INVEST "Request Guidance function." This function can also be used to alert State to a "hit" that Post has evaluated and discounted.

At this point, Post should either reject or suspend the case (See "Selecting the Proper Leahy Outcome in INVEST" section below) if it has not used "request Washington guidance" option. If the information is classified, the INVEST note should only indicate that classified information was found and provide the phone number of the office that found the information. Post should also set up folders available to cleared personnel with a role in Leahy vetting on a shared drive in ClassNet. Note that details of a consular _____ must not be entered into INVEST. Posts should not use the Request Guidance function for imprecise _____. See further guidance below.     B7(E)

## Dispute Resolution at Post

Post vetting teams, in consultation with Post senior management, should establish a process for resolving cases in which sponsoring offices push back on rejections or high-profile cases or sensitive ones involving classified or imprecise information or those with potential bilateral policy implications. For DoD-sponsored activities, the SDO/DATT or SCO should be included in the decision-making and dispute resolution processes. Most Posts have a committee chaired by the DCM and senior members of the Leahy vetting and Post security assistance team.



B7(E)

UNCLASSIFIED U.S. Department of State   Case No. F-2017-17860   Doc No. C06808549   Date: 01/16/2020

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

B7(E)

B7(E)

SENSTIVE BUT UNCLASSIFIED

27

C06808549 IED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

B7(E)

B7(E)

## Selecting the Proper Leahy Vetting Outcome in INVEST

Leahy vetters at Post and in Washington, DC, will record the outcome of each Leahy vetting case in the INVEST system.  The following options are available and should be selected in circumstances described below and in "INVEST Build 1.7 Release Bulletin-

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

RELEASED IN PART U.S. Department of State   Case No. F-2017-17860   Doc No. C06808549   Date: 01/16/2020

Post" and "INVEST Build 1.7 Release Bulletin-Domestic," available on the INVEST homepage and Leahy Document Library at http://drl.j.state.sbu/lv/default.aspx:

Approve.  Select "approve" when:

-- The unit, unit commander, or individual is assessed not to be credibly implicated in a GVHR or any other circumstances that would prevent approval on other policy grounds (e.g., restrictions related to a coup, terrorism, corruption, cases submitted retroactively, and others.  If in doubt, query the country team, regional bureau, and DRL-SHR@state.gov for assistance.)

-- A previously non-approved unit has been determined by State through the procedures established in the remediation policy to have met the necessary threshold for the resumption of assistance.  (See Appendix G.)  Cases can also be approved if new information leads State to conclude that the original information was not credible.  (INVEST users should reference the previously non-approved case in the INVEST case notes of the approved case to ensure that a complete and accurate record is maintained.)

Suspend.  Select "suspend" when:

-- Derogatory information on the nominated unit or individual exists, but the credibility of the information is not yet fully assessed, or other circumstances exist that prevent a final decision.  When suspending a case, INVEST users must select whether the preliminary derogatory information discovered is for GVHR or Non-GVHR/Policy such as terrorism, corruption, or other policy concerns.  Users should also select if the derogatory information applies to a nominated individual, unit, or both, and provide comments in INVEST.

Cancel.  Select "cancel" when:

-- The case cannot be completed for administrative reasons.  Reasons for "cancel" in INVEST are:  Assistance Canceled; Assistance start has passed; Duplicate Entry; Erroneous Data; Lack of Information to Initiate Vetting; Leahy Vetting not Required; or Other.  Users should also provide comments in INVEST to cancel.  Do not use cancel if derogatory information of any kind has been found.

Reject.  Select "reject" when:

UNCLASSIFIED U.S. Department of State   Case No. F-2017-17860   Doc No. C06808549   Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

-- Credible information exists that implicates the unit or individual nominated in a GVHR, and no other circumstances exist that allow approval, as described in the approval section above (e.g., a determination in accordance with the remediation policy that the perpetrators have been brought to justice).  In cases such as drug trafficking, terrorism, corruption, criminal activity, or similar illicit behaviors are suspected or confirmed, Post or the regional bureau can recommend rejection based on policy grounds.  In INVEST, users must select "reject," but in this case should choose Non-GHVR/Policy as the "hit" type.  Do not use reject in the case of unassessed, ambiguous, or unsubstantiated information or for administrative reasons of any kind.  Users should also specify whether the hit applies to an individual, unit, or both, and provide comments in INVEST.

## If Derogatory Information Is Found in Washington

After assessing the credibility of allegations discovered while vetting in Washington, DC, State will notify Post and, if necessary, solicit additional information and an investigation of the derogatory information.  If Post and Washington, DC, bureaus (and DoD in cases of DoD-funded assistance) are in agreement that the information is credible, the case will be rejected in INVEST.

In the vast majority of cases, Post, the regional bureau, DoD (for DoD-funded assistance), and DRL reach consensus about whether the case can be approved.  If the regional bureau is not satisfied with the outcome, then an Incident Review Team (IRT) request should be made, and DRL must respond to that request within two weeks.  The IRT should include, at the Office Director or Deputy Office Director level,  DRL/SHR, the regional bureau's Leahy action officer, the relevant DRL and regional bureau country officers, program officers from the sponsoring bureau (typically INL or PM), INR (for information and analysis purposes only), and an L attorney.  For DoD-funded training, a representative from DoD is invited to provide relevant factual information, but does not participate in coming to consensus.  However, DOS will consult with DoD throughout the decision process to ensure that all relevant information is available for DoD's separate decision process.  The IRT process usually requires several weeks and may require access to classified information in INR.  State may request Posts to contact the host nation for additional information as well.

Following each IRT meeting, DRL/SHR will draft a Statement of Conclusions and distribute it via email.  If warranted, once the IRT has reached a conclusion, a memo to

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

Assistant Secretaries and a cable to Post drafted by the regional bureau will provide the result of discussions and action to be taken (e.g., no further action necessary, demarche host government, suspend assistance, proceed with assistance, etc.). Results will be recorded in INVEST and appropriate action taken – normally approval or rejection.

If the IRT is unable to reach consensus, the issue in dispute will be referred to the Front Office level.

If a consensus is still not reached, a split decision memo may be sent to the lowest level State principal with oversight of the disagreeing bureaus. This will often be the Deputy Secretary. Once a decision is reached, DRL will update INVEST and include a summary of the review.

Appeal beyond the IRT is a very rare occurrence.

DoD-Funded Programs

State's only obligation when performing vetting for DoD programs is to provide DoD with pertinent derogatory information. DoD is responsible for compliance with the DoD Leahy Law and ultimately decides which units or individuals it will train with its funds. In practice, State makes recommendations to maintain consistency of practice and message.

DoD Leahy Law compliance issues for those DoD entities under COM authority will require the COM's approval. Posts' Leahy Vetting SOPs must define a process for dispute resolution and handling sensitive cases. Should a DoD-affiliated entity not under COM authority wish to proceed with training in a case where derogatory information has been discovered, the DoD entity must obtain DoD approval, including from DoD's Office of General Counsel. As per the DoD Leahy law, any decision by DoD to proceed with training despite a finding of derogatory information in the vetting process will be made only following consultations between State and DoD at the headquarters level in Washington. The Leahy Vetting team should ensure that the COM is fully and currently informed of any such effort, and the COM should provide State with all the facts known to the mission and his or her recommendation. Note that unlike the State Leahy Law, the DoD Leahy Law includes a waiver authority, but DoD has never exercised this authority.

SENSTIVE BUT UNCLASSIFIED

31

SENSITIVE BUT UNCLASSIFIED

# WORKING WITH THE PARTNER COUNTRIES

Building and maintaining productive relationships with partner country security force officials are critical to program success.  It is important for host countries to understand relevant U.S. law and what information is needed for compliance. The appropriate host government officials to engage on Leahy vetting topics vary from country to country and program to program.  Posts are best positioned to determine strategy.  Keeping appropriate senior officials abreast of changes in law revisions, policies, or country-specific issues is recommended.  Posts' contacts within the host country security forces often are able to provide additional information to limit the impact of derogatory information.  In addition, host-country cooperation will also be essential to provide information needed to determine whether a security forces unit restricted under the Leahy Law has been remediated.

Offices sponsoring training in countries with a history of human rights problems should take into account the human rights record of the security force units in their plans for training and other assistance.  Posts in such countries should seek to minimize open-ended invitations for the host government or security forces to nominate candidates, but instead provide the host government a short list of units/officers from which to do so.  By taking such steps at the outset, State will be able to engage units that are unlikely to have committed GVHRs.  Nominating offices should keep in mind that individuals who have committed GVHRs while in another unit may not receive training or assistance even if they are now in a unit that otherwise is eligible.  Likewise, units that are under a commander who committed GVHRs with a previous unit may not receive assistance for such time as that individual remains in command.

Posts may also consider best practices such as asking the partner government to:

• Submit alternate units and individuals in case primary candidates are not approved.

• Advise Post of units and individuals it intends to nominate for assistance over the next year.  This will allow Post and State in Washington, DC, to vet them proactively (see below) and steer the partner away from formal nomination if problems are identified.

• Ensure all required information for vetting is included in the initial submission and provide prompt responses to follow on questions.

SENSITVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549 IED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

• When possible, submit whole-named units rather than individuals.  In such cases, only the names of the unit and its commander need to be vetted.

• Ensure that personnel from units not included in the nomination do not attempt to attend an approved assistance event.

## Duty to Inform Host Governments

Section 620M(c) of the FAA provides:  "In the event that funds are withheld from any unit pursuant to this section, the Secretary of State shall promptly inform the foreign government of the basis for such action and shall, to the maximum extent practicable, assist the foreign government in taking effective measures to bring the responsible members of the security forces to justice."

14 State 77718 provides guidance on implementation of this provision.  If a unit is rejected in INVEST due to credible information of a GVHR, Posts should, within 60 days, inform the host government of the decision and report such notification via cable within 30 days of doing so.  DRL will reference these messages in INVEST to document compliance. The following information should be included:  date of the notification; unit from which assistance was withheld; title of host nation official notified; title of U.S. Government official making notification; any requests for additional guidance or resources from State; and any other information Post wishes to report.

Post will contact the regional bureau and DRL for additional guidance on ways to broach the subject of a denial of assistance to the host nation.

Post will, whenever practicable, provide the information on which the determination was based to the host government.  When sensitive sources and methods are involved, Posts may simply cite the text of section 620M(a) of the FAA as the basis for denial.

Cases rejected for non-GVHR reasons, suspended, canceled, on hold, or in Process Review in INVEST do not trigger the duty to inform.  In these circumstances, Posts may elect to notify host governments if useful for achieving Leahy objectives.

There is no "duty to inform" requirement in the DoD Leahy Law; the duty to inform applies solely to assistance authorized by the FAA or AECA.  Although it is not required, Posts may elect to notify in these cases as well.

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549  ED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

Post should advise the partner government of our willingness to assist in a credible effort to investigate and bring perpetrators to justice.

## Make Public Rejected Units

Section 620M(d)(7) of the FAA requires State to:

"make publicly available, to the maximum extent practicable, the identity of those units for which no assistance shall be furnished pursuant to [the Leahy Law]" (please see 13 STATE 3371).

This process is managed by State in Washington, DC, in coordination with relevant posts.

## Fast Track

Candidates from Fast Track countries must be vetted at Post but not by State in Washington, DC.  Fast Track is applicable to both State and DoD programs that are subject to Leahy vetting.  Countries approved for such Fast Track vetting status must:

• Have a record of respect for human rights and no serious systemic problems, including problems with impunity for past human rights violations.

• Have a longstanding history of respect for human rights such that it is not likely that there are gross violators of human rights in the countries' security forces.

• Be a functioning democracy.

If derogatory information arises about systemic or recurring human rights abuses in a Fast Track country, a country can be removed from the Fast Track list.  If a bureau wishes to nominate a country to add to the Fast Track list, it can write a justification and present it to DRL/SHR and, if DRL agrees, DRL/SHR will inform Post and provide instructions on how to adjust its workflow.  Host countries should not be advised of such decisions. Before adding a new country to the Fast Track list, DRL/SHR will consult with Congress.

The most recent list of  Fast Track countries can be found on the DRL intranet Leahy vetting portal page:  http://drl.j.state.sbu/lv/default.aspx

SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

## Equipment and Non-training Assistance Vetting

Units receiving equipment, technical support, or other non-training assistance provided by State and DoD must be screened in accordance with the Leahy law and State policy. Some Posts enter equipment and similar assistance into INVEST. The commander of the unit and the unit should be vetted when receiving assistance. Each individual member of a unit receiving equipment need not be vetted. Posts should direct questions on this topic to their regional and functional bureau Leahy POC and DRL/SHR, who will review and discuss with State (L), if appropriate.

## Proactive Unit Vetting

Posts can improve assistance planning efforts by implementing a forward-looking assistance and vetting strategy. This can be done by identifying and submitting units for vetting in advance of their specific training or assistance activity, including material assistance. Proactive vetting can help avoid last minute crises by identifying and resolving potential derogatory information. Extra lead time enables Posts to work with host governments to identify alternatives when credible information about a GVHR is found. In Posts where this practice is currently employed, the proactive model allows all entities to plan ahead. During the assistance planning phase, DRL, in collaboration with regional bureaus, can work with Posts to help identify security forces that are approved for receiving assistance. The proactive identification of units can help support development of engagement strategies that achieve broad security objectives while remaining compliant with the Leahy Law. It can also be useful to inform host governments about which units are permitted to receive assistance and which assistance might not be delivered until some hard-to-pinpoint time in the future.

INVEST 2.0 will provide more robust features for utilizing information on units developed either for particular assistance or through pro-active unit vetting.

SENSTIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED

## RULES OF PRACTICE

**Movement Between Units**:  In general, if one or more members of a unit, including the commander, are credibly implicated in a GVHR committed while in that unit, the unit and its members, including the commander, are restricted from applicable assistance until the government is taking effective steps to bring those responsible to justice in accordance with the Leahy Laws.  When individuals move to other units, there may be implications for the receiving unit's eligibility for assistance, depending on circumstances described here:

> **Personally Implicated Commander**:  If a unit commander is personally implicated in a GVHR, State policy is that a unit under his or her direct command and control is also restricted.  If such a commander moves from an otherwise eligible unit to a new unit or leaves the security forces altogether, units formerly under his or her command can become eligible for assistance.  For example, if commander X is personally implicated in torture during a 1980 civil war and commands unit Y, which was created in 2000, unit Y will be ineligible for assistance until commander X leaves.  After commander X leaves, if unit Y has not committed a GVHR, then unit Y can receive assistance again.

> **Personally Implicated Individual**:  If individual members of a unit are implicated in a GVHR, the unit they belong to at the time of the GVHR is generally considered restricted until the government is taking effective steps to bring those responsible to justice.  If a personally implicated individual moves to another unit, or leaves the security forces altogether, the unit they were a member of at the time of the GVHR generally remains restricted until the government takes effective steps to bring those responsible to justice or until the unit is fundamentally different.  If individuals not personally implicated in a GVHR are transferred into a tainted unit, even if the GVHR occurred before the transfer, the individuals are still ineligible due to being in the unit.  They will not be ineligible if they are later transferred to an untainted unit.

Should an organizational element larger than an individual unit be implicated in a GVHR, it is possible that additional information could focus responsibility on an individual unit.  Conversely, more information might identify elements of the larger formation that might be eligible for assistance.  For example, if a battalion is implicated in an EJK, additional

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549 IED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

information might identify the company responsible. In another example, if a battalion is involved in an EJK, additional information can identify companies not involved, such as companies stationed in a different location. In most military organizations, the company is generally the lowest level that can be implicated or exculpated. Also, for example, credible information identifies an intelligence organization as torturing detainees. However, further information might identify that a particular intelligence unit plays no role in interrogations, potentially making it eligible for assistance.

**Time Limits on the Prohibition**: The Leahy Law includes no time limitation on GVHRs. Post should look as far back as the searches or records lead. If any credible information exists that an individual or unit has engaged in GVHR, no matter how long ago, those individuals or units must be excluded from assistance until the requirements of the respective Leahy Laws are met.

**Derogatory Information Not Related to GVHR**: The Leahy law does not apply to conduct that does not constitute a GVHR. However, State does not ignore non-human rights-related derogatory information when found. If such information is found, the decision to continue assistance is a policy determination among Post, the functional bureau that provides funding, the regional bureau, and DoD for DoD-funded assistance. The policy decision may be not to provide the assistance. An individual may be determined by Post to be ineligible for U.S.-funded training or assistance for a wide variety of reasons unrelated to GVHR. Non-Leahy derogatory information can include: drug trafficking, terrorism, corruption, criminal activity, non-GVHR human rights issues that do not rise to the level of a GVHR, or similar behavior. State vetters may flag these non-Leahy-related hits for Post. If the sponsoring office wishes to proceed with the assistance, Post should follow the dispute and sensitive case-resolution process spelled out in its Leahy Vetting SOPs. In cases where the regional bureau disagrees with Post's determination to move forward with assistance, the regional bureau can make a policy recommendation for Post on the matter. If Post decides to proceed, it is recommended to add a note to the case in INVEST and send an email to the regional bureau and DRL-SHR. It is a best practice to notify Washington, DC (regional bureau POC, country desk, DRL/SHR and other relevant bureaus/agencies funding the assistance), when approval for non- Leahy determinations are made.

SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

**Unit Versus Individual Vetting:** Although the Leahy Law only addresses assistance to "units," it has been State policy to vet individuals identified for individual training in addition to the units to which they belong. Because assistance provided to individuals benefits their unit, the Leahy vetting process requires vetting the names of the home units of individuals receiving assistance or training. See the section on Proactive Vetting above and the paragraphs immediately below.

**Individuals:** Assistance to individuals, such as an IMET-funded individual officer training course in the United States, requires individual vetting (individual and name of home unit). Persons nominated by State or DoD to receive assistance as an individual must be vetted by name, in addition to vetting the name of his or her home unit. However, formally vetting the unit and its commander permits the unit to qualify for "One Year Good For" vetting.

**Units:** If multiple individuals identified for assistance or training come from the same existing unit, only the name of the unit (e.g., "66th Mechanized Infantry Battalion") and the name of the unit's commander need to be vetted. If multiple individuals planned to receive assistance or attend a training event come from multiple units, their home units should be formally "unit vetted" (i.e., vet the unit name and commander). The individuals need not be vetted separately unless Post wishes to do so due to local considerations.

Typically, the organizational level appropriate for unit vetting would equate to the battalion or squadron level and equivalent units. Lower organizational levels might be appropriate if derogatory information is found on the higher level unit and the desire is to narrow the scope of the allegations. However, this step would be done in consultation with DRL/SHR and the regional bureau.

For Joint Combined Exchange Trainings (JCETs), if the units participating in the exercise exist before and after the exercise, they should be unit vetted (unit name and commander). See the warning below about composite units. See the next section on units formed temporarily for a JCET.

Units receiving equipment and/or training to use the equipment or any other type of assistance-funded support, including maintenance and technical support or construction services, should be unit vetted (unit name and commander).

SENSITIVE BUT UNCLASSIFIED

NOTE: Unit vetting can save time compared to vetting many individuals, particularly if members from the same unit will be receiving training in subsequent months. Unit vetting is also consistent with the Leahy Laws. An added benefit is that unit and its individuals are eligible to be trained under the unit's "One Year Good For" policy. If Post knows it will be working with the same security force units repeatedly over the course of a year, it is encouraged to unit vet those units (name and commander) every year for as long as the cooperation might continue. Unit vetting in this way can reduce the number of last minute requests Posts might feel compelled to submit. See the caveat below about new or composite units.

**New and Composite Units:** A "composite unit" is one in which a number of people are temporarily drawn together from already-established units to form a new unit specifically for the purposes of the training/assistance. They may or may not be re-convened in the future for a special purpose. Sometimes a composite unit is formed temporarily for a JCET. More commonly, individuals from multiple units attend a training event.

Individuals coming from formally vetted units (submitted as unit vetting in INVEST with unit name and commander) in the preceding 12 months need not be vetted individually even if attending with individuals from other units. There are some Posts where a sponsoring office always works with the same formally vetted few units. Whether to vet the individuals in a composite activity or unit is up to Post.

At other times, new units are formed in reorganizations. Because newly formed units have no history to vet, individual members of a new unit must be vetted if the units from which they came have not been formally unit vetted within the past year (commander and unit name). The commander must also be vetted if not eligible for "One Year Good For" on his or her own.

In both instances, (a composite unit formed for a temporary purpose or a new permanent unit formed in a reorganization), those individuals whose home unit has not been formally vetted (commander and unit name in the preceding 12 months) must be vetted as individuals. Whether to vet individuals who come from formally vetted units (unit name and commander) is at Post's discretion given the history, nature, and demographics of the security forces in host country.

SENSITIVE BUT UNCLASSIFIED

C06808549 IED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

**Granularity of Unit Information:** To ensure that Leahy restrictions apply to the lowest operational unit, it is essential to obtain detailed information regarding units operating in areas where a GVHR is alleged to have occurred, the areas of responsibility of such units, and the units' exact identities. Lack of information as to which specific units committed a GVHR may result in broader ineligibilities for assistance.

Post should provide the smallest unit to receive assistance for vetting, no larger than a battalion for military units or a precinct for police units. In general, units should be between 300 to 800 members. This will provide the accuracy necessary to identify the destination of U.S. funds properly and prevent unnecessarily vetting a larger pool of candidates. Larger organizational names (brigade, division, regional police headquarters, etc.) help provide a good understanding of where the unit submitted for training falls in a given organizational structure.

In cases involving specialized units, such as uniquely identified higher headquarters units or training institutions, the branch of service might be useful to distinguish the unit name. Posts should enter it in INVEST's Unit Alias field.

Police, customs and border patrol forces, State-authorized paramilitary units, VIP protective services, and coast guards are commonly organized differently than military forces. For such units, location information is helpful (identifying a police station or precinct). Posts should work with host country counterparts to identify the appropriate uniquely identifiable organization element in such forces to enter into INVEST (e.g., precinct, region allocation).

The detail needed for unit identification may be unique to the country, security force, and unit type.

**Determining Whether an Individual Is Implicated in a GVHR:** Many people share the same name. Try to discern whether the individual named in the Web page or database is in fact the individual you are researching by using various clues. For example:

• Check for nationality. If the individual you are researching is an Argentine, and the Website has a suffix from another country (e.g. ".pe" for Peru or ".mx" for Mexico), it may be a different individual who happens to share the same name.

SENSITIVE BUT UNCLASSIFIED

• Check for profession.  If the individual you are researching is a police officer and the "hit" says that the person with the same name is a teacher, they may be different people who share the same name.

• Check for age.  Check the source to see if there is any hint as to the age of the person named therein, and see if there is at least a plausible possibility that the individual might have been involved.  For example, if the date of birth (DOB) of the person you are researching indicates that the person is 54 years old, and the website indicates that a person of the same name graduated from college in 1999, they are probably not the same person.

• Check parents' names.

**Vetting New Recruits:**  Most new recruits are assigned to training academies or boot camps and are not yet assigned to operational units.  Some will not pass their training and will not make it to active operational units.  For others, it might be several months before they complete their training and are assigned to a unit with which they will deploy.  The intention of the Leahy Laws is to prevent units that are credibly implicated in GVHR from benefitting from U.S. training or other assistance.  Consequently, as standard procedure, Posts that encounter new recruits in a U.S. Government-funded training program in an established training academy or organizational unit conducting training should vet the training academy or unit and its commander, but, subject to the criteria below, Post need not vet the new recruits individually by name.

Unit-level vetting of the training academy or organizational unit conducting training may be done annually under "One Year Good For," provided that the unit must be re-vetted if derogatory information comes to light during the year.  New recruits being trained at the training academy or by the organizational unit do not need to be vetted individually by name if the new recruit:

1. Is genuinely a new recruit (i.e., has never served in a security force before); and

2. Will not have reached his/her 24th birthday by the training date.

New recruits who do not satisfy both of these criteria must be vetted as individuals, in addition to the vetting of the name of the training academy or organizational unit conducting training (unless it was vetted in the past year).  For policy reasons, individuals

SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

who would otherwise be considered "new recruits" per the above criteria must be vetted as individuals if they had previously served in non-state-authorized militias.

Posts should inform host nation representatives who provide Leahy vetting information of our vetting criteria in the case of new recruits so that training centers are vetted as units, and only training candidates that meet the criteria for individual vetting (i.e., not genuine "new" recruits or over age 24) are submitted for vetting. This exception is at Post's discretion, but Post must inform the regional bureau and DRL/SHR if it does not want to use the exception, and explain why.

Posts should be alert for any situations where training candidates are presented as new recruits, but circumstances raise a question whether they are genuine new recruits. In such a case, Post should request additional information from the security force representatives proposing the candidates. If Post does not receive satisfactory clarification, it should report the matter to State in Washington, DC (DRL/SHR and its regional bureau).

**"One Year Good For" Vetting policy:** State and DoD both use a "One Year Good For" vetting policy. Under this policy, once a unit is vetted, that vetting remains valid for 12 months, based on the date vetting was completed in INVEST if no subsequent derogatory information is found. For instance, if an individual or unit is cleared for a training event, they are eligible for all additional training events that begin within one year of the date they were authorized in INVEST. It is preferable to add individuals and units each time a training event occurs and to match the cases in INVEST so that the database has a more complete record of all assistance given. However, if during this one-year period derogatory information becomes known on an individual or unit that could affect their favorable vetting status, they must be re-vetted.

INVEST data entry and "One Year Good For" pertaining to units:

Unit names vetted during individual checks do not automatically benefit from "One Year Good For" unless the commander of the unit is also vetted. In order for the "One Year Good For" to apply to the unit of an individual candidate, unit and commander INVEST cases should be created with the Unit Records tab of an INVEST batch template spreadsheet. Any vetting of units in the Unit Records section must include an INVEST case for both the unit and commander of the unit.

SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

When Post receives unit names that have been previously vetted by unit name and commander and are eligible for "One Year Good For," Posts should still enter the units in INVEST and state in case notes that the individual's unit was previously vetted, providing the batch number and certification date.

**Vetting Possible U.S. Citizens or Legal Permanent Residents (LPR):** Some members of foreign security forces have a claim to U.S. citizenship or LPR status. As a matter of policy, State does not vet U.S. citizens or LPRs, including dual nationals. Security force members with U.S. citizenship should not be entered into INVEST. If Post discovers evidence of U.S. citizenship or LPR status before the individual is entered into INVEST, remove the individual from the spreadsheet. If the individual has been put into INVEST when U.S. citizenship or LPR status is discovered, cancel the case and add a case note "possible claim to U.S. citizenship," or "possible LPR," as appropriate.

Rather than denying the nominee the opportunity for training or assistance, Post should formally vet the unit to which the nominee is assigned. In other words, vet the commander and the unit. Consistent with established unit-vetting policy, if the unit and commander clear, the individual can be trained. If State vetters in Washington, DC, find a case with evidence of U.S. citizenship, they must cancel processing and inform Post to create a new batch to vet the nominee's unit (unit name and commander, submitted as a unit request in INVEST) formally.

A security force member might have a claim to U.S. citizenship by birth abroad to one or both American parents, but that scenario is less likely to be known to Leahy vetters. Other security force member might be naturalized U.S. citizens. The practice described above for U.S. citizenship should be followed if it is discovered that the nominee is a naturalized U.S. citizen, or a U.S. citizen born abroad.

For more information, see 9 FAM 303.8-5(H) in Appendix I and the INVEST bulletin American Citizens and Leahy Vetting.

**IO and NGO Programs:** If the U.S. Government payment to the international organization is in the nature of a "grant" using FOAA or DODAA funds (e.g., a payment for a particular training event, program, or even long-term capacity building), compliance with Leahy is required. If the funding for the assistance to be provided comes from the U.S. Government general-assessed contribution to the organization (i.e., percentage paid

SENSITIVE BUT UNCLASSIFIED

43

C06808549 IED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

by all member States) or from voluntary contributions to the international organization, Leahy vetting is not required.   These funds are usually paid from the State Operations, Contributions to International Organizations (CIO) account, or from the Foreign Operations, International Organizations and Programs (IO&P) account.

Similarly, NGOs that implement programs with security forces, such as anti-trafficking in persons programs with security forces using grants from J/TIP, must work with Posts in the countries where they are operating to ensure security force trainees are Leahy-vetted. The Bureau of Administration, Office of the Procurement Executive, Grants Policy Directive No. 47 provides guidance on standard terms for grants to NGOs implementing programs with security forces.  *See also* the section above on vetting that must start in the home country of the unit.

If an NGO or international organization is implementing a program with Leahy-applicable funds, the Post doing the vetting should just inform the organization which names pass vetting and which do not rather than send the final results spreadsheet.

**Peacekeeping Operations (PKO):**  State policy is to conduct Leahy vetting of security forces that are deploying on multinational peacekeeping operations, if and when those forces are receiving FAA or DoD-funded assistance.  If an entire existing unit is being deployed, the unit and its commander should be vetted.  For military personnel, individuals of the rank of major and above, if deploying to a composite multinational unit or to a different unit, will be vetted as individuals (their names and the names of their home units).  Individuals below the rank of major do not need to be vetted unless they are in command of an operational unit.  For police personnel, individuals should be vetted (their names and the names of their home units) if in command of an operational unit.  However, any actions by units or individuals while deployed as part of a multinational force will be taken into account when the unit or individual returns to the command authority of their original country.

**Tips for Effective Unit Vetting:**

Try multiple searches with variations of the name, using the acronym, nickname, local language name, or English name of the unit.

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

Case 1:19-cv-01753-RDM Document 26-3 Filed 02/12/21 Page 50 of 196

SENSITIVE BUT UNCLASSIFIED

Try adding different search terms to narrow your search, such as: "human rights," "extrajudicial killing," "disappearance," "shot," etc.

When you've found derogatory information that is vague, unreliable, or otherwise limited, try to verify the information independently by performing additional searches on alternative terms related to the incident in order to uncover additional sources that may not mention the unit specifically.

General Google search tips are available at:
http://support.google.com/websearch/bin/answer.py?hl=en&answer=134479

C06808549 IED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

# Appendix A

## Text of the Leahy Laws

The State Leahy Law, Section 620M of the Foreign Assistance Act of 1961, as amended: "Limitation on Assistance to Security Forces," reads as follows:

(a) IN GENERAL. – No assistance shall be furnished under this Act or the Arms Export Control Act to any unit of the security forces of a foreign country if the Secretary of State has credible information that such unit has committed a gross violation of human rights.

(b) EXCEPTION. –The prohibition in subsection (a) shall not apply if the Secretary determines and reports to the Committee on Foreign Relations of the Senate, the Committee on Foreign Affairs of the House of Representatives, and the Committees on Appropriations that the government of such country is taking effective steps to bring responsible members to justice.

(c) DUTY TO INFORM. – In the event that funds are withheld from any unit pursuant to this section, the Secretary of State shall promptly inform the foreign government of the basis for such action and shall, to the maximum extent practicable, assist the foreign government in taking effective measures to bring the responsible members of the security forces to justice.

(d) CREDIBLE INFORMATION. The Secretary shall establish, and periodically update, procedures to

(1) ensure that for each country the Department of State has a current list of all security force units receiving United States training, equipment, or other types of assistance;

(2) facilitate receipt by the Department of State and United States embassies of information from individuals and organizations outside the United States Government about gross violations of human rights by security force units;

(3) routinely request and obtain such information from the Department of Defense, the Central Intelligence Agency, and other United States Government sources;

(4) ensure that such information is evaluated and preserved;

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

(5) ensure that when an individual is designated to receive United States training, equipment, or other types of assistance the individual's unit is vetted as well as the individual;

(6) seek to identify the unit involved when credible information of a gross violation exists but the identity of the unit is lacking; and

(7) make publicly available, to the maximum extent practicable, the identity of those units for which no assistance shall be furnished pursuant to subsection (a).

The DoD Leahy Law, found in Section 362 of Title 10 of the U.S. Code, reads as follows:

a) In General. –

(1) Of the amounts made available to the Department of Defense, none may be used for any training, equipment, or other assistance for a unit of a foreign security force if the Secretary of Defense has credible information that the unit has committed a gross violation of human rights.

(2) The Secretary of Defense shall, in consultation with the Secretary of State, ensure that prior to a decision to provide any training, equipment, or other assistance to a unit of a foreign security force full consideration is given to any credible information available to the Department of State relating to human rights violations by such unit.

(b) Exception. –

The prohibition in subsection (a)(1) shall not apply if the Secretary of Defense, after consultation with the Secretary of State, determines that the government of such country has taken all necessary corrective steps, or if the equipment or other assistance is necessary to assist in disaster relief operations or other humanitarian or national security emergencies.

(c) Waiver. –

The Secretary of Defense, after consultation with the Secretary of State, may waive the prohibition in subsection (a)(1) if the Secretary determines that the waiver is required by extraordinary circumstances.

SENSTIVE BUT UNCLASSIFIED

47

SENSITIVE BUT UNCLASSIFIED

(d) Procedures. –

The Secretary of Defense shall establish, and periodically update, procedures to ensure that any information in the possession of the Department of Defense about gross violations of human rights by units of foreign security forces is shared on a timely basis with the Department of State.

(e) Report. –

Not later than 15 days after the application of any exception under subsection (b) or the exercise of any waiver under subsection (c), the Secretary of Defense shall submit to the appropriate committees of Congress a report--

(1) in the case of an exception under subsection (b), providing notice of the use of the exception and stating the grounds for the exception; and

(2) in the case of a waiver under subsection (c), describing--

(A) the information relating to the gross violation of human rights;

(B) the extraordinary circumstances that necessitate the waiver;

(C) the purpose and duration of the training, equipment, or other assistance; and

(D) the United States forces and the foreign security force unit involved.

.

C06808549 IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

## Appendix B

## More About INVEST

*The following section gives more detailed information mainly for Post INVEST users. Vetters in Washington, DC, and others may find it helpful to understand INVEST processing more fully. INVEST users are encouraged to take the FSI Distance Learning course, PP410: INVEST: Leahy Vetting at Post. They must read and be familiar with the detailed instructions in the operational bulletins and announcements on the INVEST home page. The appendix contains graphic images of roles and workflow at Post and in State in Washington, DC.*



The INVEST system is available to authorized users through SharePoint on the State

SENSITVE BUT UNCLASSIFIED

49

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

intranet, DRL intranet home page, Leahy vetting portal
http://drl.j.state.sbu/lv/default.aspx.  Having an OpenNet account is required.  Access is
granted on a need-to-know basis only.  An existing INVEST supervisor may request
adding or removing users with the link on the right side of the INVEST home page or
DRL intranet home page, Leahy vetting portal.  Other requests should be sent to
DRL/SHR and INVESTProdSup-DG@state.gov .

To access the INVEST SharePoint Home Page:

1. Go to the URL: https://invest.j.state.sbu.

2. No extra log on is required.  However, INVEST works after accessing OpenNet
   with GO.  INVEST is not available with a State Blackberry.

---

No classified information of any kind may be entered into the INVEST system in any
manner, including as an attachment or written in a note.  If information is found either by
the regional bureau in its INR search or by DRL in ClassNet searching, the note should say
simply, "INR [or ClassNet] hit found.  Contact [office symbol & phone number]."  The
specific information in CLASS also must not be entered in an INVEST note due to the
confidentiality of visa records imposed by Section 222f of the Immigration and Nationality
Act.

---

INVEST is an official system of record.  Test or fictitious cases must not be created.  Only
names subject to Leahy vetting may be put into INVEST.

The INVEST system processes candidates in batches.  Each batch is associated with an
assistance event such as a training or equipment issue event that has a start date and an end
date, whether the event is a single training event or a series of training events.  For
example, if a military contingent is going to a U.S. military base for a series of training
events, that series should be entered as one training event, with a start date and an end
date, rather than as several events with separate dates for the various classes.

## A.    INVEST Roles at Post

INVEST system users at Post may have one of five roles.  FSNs can only hold the role of
Submitter or Submitter2.  Approvers, Supervisors, and Viewers must be cleared U.S.
citizens with a need-to-know.  A user can only be assigned to one Post.  Posts accredited to
more than one country should contact DRL/SHR for guidance.

SENSITIVE BUT UNCLASSIFIED

C06808549 IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

*Submitter*:  This is a data entry only role.  He or she can create batches by entering nominees and assistance data. The Submitter cannot assert that Posts' processing is complete, thereby launching Washington, DC, vetting or surf the database.  Submitters do not receive system notification when Washington, DC, vetting is complete.

*Submitter2:*  In addition to submitter's capability, the Submitter2 also can search the Internet, add notes, and attach documents.  The Submitter2 cannot thereby launch Washington, DC, vetting or surf the database.  Submitter2 users receive system notification when Washington, DC, vetting is complete.

*Approver:*  Same capabilities as Submitter2.  In addition, the Approver can launch emails to other embassy sections, enter the results, search INVEST's data base, and match cases under the "One Year Good For" policy.  The Approver has the system capability to determine when Post vetting is complete and send cases to State in Washington, DC, but whether he or she is permitted depends upon Post's SOP.  An approver must be a cleared U.S. citizen.  Approvers receive system notification when Washington, DC, vetting is complete.

*Supervisor:*  Has the same abilities as the Approver but can also assign levels of access to the Post INVEST system users.  The Supervisor also determines which embassy sections will be notified and enters corresponding email addresses for the messages.  Supervisors must maintain the Default Post Sections list as personnel rotate in the sections clearing names at Post.  The INVEST Supervisor is a role within the application, not necessarily a supervisor in the normal sense.  This role should be held by more than one person at Post for flexibility, such as the officer ultimately responsible to comply with Leahy-vetting requirements as well as the officer who manages day-to-day vetting.  A supervisor must be a cleared U.S. citizen.  Supervisors receive system notification when Washington, DC, vetting is complete.  State expects the lead Leahy POC, at least one back up, and the human rights reporting officer in the Political Section to be Post INVEST supervisors.

*Viewer:*  Can view cases in the database for prescribed region and funding sources and can add notes and make attachments.  The Viewer cannot enter or approve cases.  Viewers must be cleared U.S. citizens.  Viewers do not receive system notification when batches are complete.

B.  Processing INVEST Batches

SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549 IED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

## Step 1.  Enter the Relevant Data Into INVEST



Access the *Blank Forms* tab.  There are two ways to input assistance data into INVEST: 1) Create and upload an INVEST batch template spreadsheet (available at DRL intranet Leahy-vetting portal page http://drl.j.state.sbu/lv/default.aspx) or 2) manually enter a batch directly into INVEST.

When creating a batch in INVEST, mandatory fields are outlined in red.  They include:

1. At least one name field (include the individual's full name with only the last name in FULL CAPS).
2. Date of birth.
3. At least one place of birth field (besides country).
4. Country to search.
5. Unit type (military, police, or other).
6. Unit name.

**Country to Search:**  This should be the home country of the unit.  If an individual is born in a different country, then the country of birth must be the country in which he or she was

SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549IED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

born, which is necessary for CLASS checks, but the country to search would be the home country of the unit.  For example, a Tajik security force member who was born in Uzbekistan, would have Uzbekistan for country of birth, but Tajikistan for the country to search.

**Standard Practice for Entering the Names of Individuals:**  INVEST has five numbered fields for names.  Only one name should be entered per field.  Surnames only should be in ALL CAPS.  Due to the wide variety of names across regions, no single naming convention can be imposed for world-wide use.  Post vetting teams in consultation with consular sections should establish their own naming conventions suitable to their host country, including for names that might have more than five elements.  Washington, DC-based vetters in DRL and GEO regional offices may adopt naming conventions for Posts in their regions.

**Standard Practice for Entering Unit Names:**  The unit name should be fully spelled out in English.  In the "Unit Alias" field, it is also strongly recommended to list any aliases, acronyms, or native language appellations.

**Units and "One Year Good For":**  Units are eligible for the "One Year Good For" policy when a unit case and a corresponding commander case are created and vetted and there is no subsequent derogatory information found.  Unit and commander cases are displayed under the *Unit Records* section of INVEST.  An individual case vetted under the *Individual Records* section will not result in "One Year Good For" eligibility for the unit, despite the fact that the unit's name was vetted.  Even if a sponsoring office is eligible under "One Year Good For," the nominee should still be entered into INVEST.

When Post receives a request for an individual candidate who is in a unit that has already been vetted by unit name and the commander and is eligible for "One Year Good For," Posts should state in INVEST case notes that the individual's unit was previously vetted within the past year, and provide the batch number and certification date.  Prior to linking the current and previous cases in the system when utilizing "One Year Good For," Posts are required to conduct both the INVEST database and document library searches in case derogatory information was found subsequent to the previous approval.

**The Link Between Unit Cases and Unit Commanders:**  In the *Unit Records* section of the vetting batch screen, a unit case cannot be created without a corresponding case for the commander.  INVEST will automatically create a vetting case for the commander when a unit case is created.  Leahy-vetting policy requires rejecting or suspending a unit if its commander is rejected, and vice versa.  If "hits" are found for either the unit or

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549 IED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

commander, INVEST will reject both even if the vetter had selected "no hits" for one of them.  Post approvers or supervisors must make sure case notes are clear about the basis for the rejection.  For example, if a commander is rejected solely due to his association with a unit that is tainted for actions committed prior to his assuming command, he would not automatically carry the taint forward when he moves to a new command.  Similarly, if a unit commander is tainted by actions he took prior to assuming the current unit command, the unit will not remain tainted when the commander moves on to another assignment, but is tainted as long as the commander is in place.

## Step 3: Conduct Searches

1. Access the *ToDo List* (or *Custom ToDo List*) Tab and click on the batch to be vetted.

2. Conduct an **Internal Search** by clicking on the Internal Search button.



The Internal Search is actually a two-step process – a data base and document library.  The data base search happens automatically when a vetter selects the Internal Search icon. INVEST will display prior vetting instances for the unit or individual.  If the results show a matching case that has been approved within the last 12 months, then the candidate will be eligible for "One Year Good For" (*if* no derogatory information is found in the Document Library Search).  You can confirm if the individual is a match by clicking on the *Record ID* button.  Before linking the current and previous batch, the Post approver or supervisor must conduct the document library check (see 3 below).  If there is no derogatory information in the document library and the match is confirmed, click the *Match* button.  Perform Remove Empty Batch action when either there are no cases visible on the Batch Summary or if all the visible cases have been dispositioned with 12-Month-Good-For matching.  This will send the batch to View Final Results and allow you to generate a Final Results report.

SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

UNCLASSIFIED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020 B7(E)



C06808549 IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

If your search produces hits, save any relevant documents on a local drive, then attach them to the INVEST case and add an INVEST note, if warranted.

4.  The optional **Google Search** function is used by many Posts to perform a local language internet search to conduct a more thorough vetting.  Some Posts choose to do the searches out of diligence so that they can identify potential problems before sending the nominees to Washington, DC.  A few Posts, if they find derogatory information and assess that the report is not reliable, will put the link and their assessment in a case note then identify such cases using INVEST's Seek Washington Guidance action.  Such cases appear in yellow on DC vetters' batch summary screens.

5.  The **Targeted Search** is optional as well.  It includes a collection of prominent NGO and other human rights-related websites.

### Step 4: Email Sections



To launch emails to the other sections at your Post that vet candidates, click the *EMAIL SECTIONS* button.  They will get an email with a spreadsheet of the batch attached.  The spreadsheet has a tab for converting the data in the batch to a comma-delineated string permitting easier (⬚⬚⬚⬚⬚⬚).  Vetting teams should make sure their consular colleagues are aware of this feature.  Consequently, it is important for Post workflow to include Emailing Sections within INVEST.

B7(E)

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549 IED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

The email distribution list is managed by the Post INVEST Supervisor using the *Default Post Sections* administrative form.  As mentioned above, there is no one-size-fits-all formula regarding which Post sections to include in Post vetting.  It depends upon the demographics, history, and nature of security forces in different countries.  In INVEST, the Political Section check is the only world-wide mandatory check because all Posts must write an annual human rights report.  State considers CLASS (Consular Lookout and Accountability Support System) essential due diligence, which are conducted either by RSO or CONS.  Other options include:  DAO/DATT, DEA, DHS, LEGATT, NAS/INL, ODC, and/or POLMIL.

Personnel in other embassy sections that only check names but do not sponsor candidates for assistance do not need to be INVEST users.  Normally, the lead Leahy POC will enter the results of the other sections' name checks, though users with the roles of Approver and Supervisor permit this action.

Some Posts elect a different workflow model in which names are circulated within the mission outside of INVEST.  This is not the recommended work flow.  If Post does adopt this method, the approver or supervisor must list the sections that cleared in batch notes on every batch (e.g., cases in the batch cleared by CONS and RSO).

**Step 5: Completing Post Batch Processing**

After the Post sections have responded with their vetting results and their results have been entered, Post has five options:



Approve, reject, suspend, request guidance, or cancel.

 1. *Approve:*  If no derogatory information is found.

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549 RELEASED IN FULL U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

2. *Suspend:*  If derogatory information cannot be resolved prior to training.

3. *Reject:*  If Post believes that the individual is tainted by derogatory information about human rights-related or non-human rights-related activity and should not receive assistance based on legal or policy grounds.

4. *Request Guidance:*  If Post is unsure which of the above actions is appropriate for the case, _____.  See the Consular CLASS Hits and Leahy Vetting bulletin for more guidance.  Post may use this function to provide its assessment of derogatory information found in Internet searches, which domestic vetters might find in their searches.  Post may also use this if it cannot assess the veracity of derogatory information, such as media reports from a foreign source outside the country.

B7(E)

5. *Cancel* – Case cancelation is to be used only when processing on a case or batch must be stopped for administrative reasons, such as a nominee is withdrawn from a training event, a course is canceled, or data were incorrectly entered and they can no longer be edited.

The Suspend, Reject, Request Guidance, and Cancel actions will prompt the user to create an INVEST note once the *Update Section Data* button is clicked.  You may wish to add a note only after performing this function; otherwise, you will have to add an additional note to the database later.  Suspended, rejected, and canceled cases will be removed from the visible batch.

Clear the remaining cases by clicking the *Complete Batch* button.  The batch will then be forwarded on to State in Washington, DC, for vetting, unless Post is in a Fast Track country, in which case INVEST will stamp the batch "Approved."   It will appear on the ToDo Lists of the corresponding domestic vetters and move to the Review List of Post users.  Although the batches are on the Review List, Post users can see the status of cases by looking at the Messages column to see whether DRL or GEO have completed their processing.  After DRL and the regional bureaus complete their processing and the regional bureau performs the Final Notification action, the batch moves from the Post users' Review List back to the ToDo List.  After reviewing the batch, Post users should perform Remove Batch from ToDo List action.

## Step 8: After the Batch is Completed:

SENSITVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

When the batch has been vetted and the final disposition has been determined by State in Washington, DC, Post INVEST users with the role of Submitter2, Approver, or Supervisor will receive an email from the INVEST server with a spreadsheet attachment indicating the disposition of each member of the batch.  The batch will also return to the ToDo List. After reviewing the Final Notification batch to see disposition of the members of the batch, Post users should select Remove from the ToDo List action button to remove the batch from their list.  If there are cases pending derogatory review, Post will receive a second email once that review has been completed.  Posts in Fast Track countries will not get the system-generated email.  If they need a Final Results spreadsheet for the sponsoring office, they can retrieve the batch with the Batch Search administrative form and export the results to a spreadsheet.

INVEST Tabs



There are tabs across the top of the INVEST SharePoint site that house the tools needed to perform the majority of INVEST functions used during vetting:

1.  The **INVEST Home Page** features documents containing guidance on INVEST, as well as Leahy vetting policy and process.

2. The **Blank Forms** tab is used to create batches.

3. The **ToDo List** tab displays batches and some of the associated data.

4. The **Review List** tab displays batches that are waiting for action by someone else in the vetting process.

5. The **Administration Forms** tab allows users to run reports and perform certain administrative functions.

SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

6. The **Custom ToDo List** is useful for some viewers and Washington, DC-based vetters who have batches from multiple Posts and/or regions.

**Blank Forms:**  The Blank Forms tab is used to create a new INVEST batch.  There are two ways to create a batch:  1) Create and upload a batch spreadsheet, or 2) manually enter a batch directly into INVEST.



**ToDo List:**  Your ToDo List has batches that require action by you or someone in your office or Post.   Column lists can be sorted by clicking the column header or expanded by dragging the column border.  The **Custom ToDo List** is a different version of the ToDo List.  It performs all of the same functions, but also allows the user to filter data.



SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549 IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

All batches are given a priority of 9 (the lowest) except Derogatory Reviews and batches that have reached their Time Limit (class starts within 10 days) for Washington to vet. Those batches are given a priority of 1 (the highest) and appear in red text.

**Review List:**  The Review List page displays batches that are waiting for action by someone who has a different INVEST role such as a DRL or GEO Approver.  For example, for Posts, the Review List shows batches already completed at Post and in processing by State in Washington, DC.  For Washington, DC-based vetters, the ReviewList shows batches still in process at Posts. You can see where the batch is in the vetting process, but you cannot take action until it is back on *your* ToDo List.



What users see on the Review List depends on their role.

For example, for Posts, a batch that was completed at Post and is at State in Washington, DC, for processing will display on the Post Review List until the cases in it have been approved, rejected, or suspended.  Once Final Disposition action has been taken by the GEO vetter, INVEST will display the batch on the Post ToDo List so that Post is informed of the batch status in addition to sending email notification.

SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549 IED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

For Washington, DC-based vetters, the Review List shows cases still in process at the Posts in their region.

**Administrative Forms:**  The Administrative Forms allows the user to perform certain administrative functions within INVEST.  User roles determine which forms are available.

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

## Appendix C

## Best Global Leahy Practices for Posts

1)      Military and civilian security assistance planners at Post should be familiar with the units they are nominating. They should not only know their training and equipping needs, but also whether their human rights record or their commanders' will prevent them from passing the vetting process. They should not nominate individuals, units, or commanders about whom credible derogatory information is known. If credible information of a GVHR is discovered, they should try to obtain organizational charts and maps that will enable State to identify the smallest culpable unit to withhold assistance from, in keeping with the Leahy Laws. Offices sponsoring training should also inform their security agencies and corresponding domestic offices about Leahy vetting issues at their Post. Holding regular meetings and briefings between nominating agencies and Post vetting staff helps all parties remain up to date on policy and priority changes.

2)      Military and civilian security assistance planners at Post should identify units and individuals with which it plans to work in the next year and submit them for vetting early. Practically speaking, submitting requests with all required information early maximizes the chances that a vetting will go smoothly. Historically, more than 50% of batches are submitted with fewer days than the required lead time for processing. Many of those late submissions have incorrect or incomplete information. For example, for "unit" they show imprecise or general descriptors such as "Army" instead of a specific battalion, or "City Police" instead of a specific city and precinct. State cannot begin vetting until Posts provide all the required information.

3)      Host governments should understand the purpose and requirements of the Leahy laws, especially the requirement to restrict assistance until the government is taking effective steps to bring responsible members to justice. It is better to have these discussions before particular individuals and units are denied assistance rather than after. Engaging in a frank and robust discussion can help the host government understand the reasoning behind the requested information. Additionally, a discussion on how the U.S. Government can assist in efforts to bring responsible members to justice can also help make denied units eligible again. These discussions may help the host government develop preventive measures as well.

SENSITIVE BUT UNCLASSIFIED

C06808549 IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

4)     Security forces treating the population civilly contributes to political stability, good governance, and trust in public institutions. Posts should engage the host government's ministry of foreign affairs, justice sectors, and executive branch in addition to the security sector when GVHR come to light.  Security effectiveness is not just about having the most firepower, mobility, communications, and technology, but also accountability and respect for human rights.

5)     Posts should assist in the vetting process when derogatory information on a nominated unit or individual is discovered at State in Washington, DC.  Such information will likely require additional details that Post will be best-suited to provide.  If the information found by State in Washington, DC, is not considered credible by Post, then Post should explain why.  State policy is to focus restrictions on the smallest unit responsible.  If the allegation is considered credible, Post should use every effort, including consultation with the host government, to identify the smallest culpable unit. For example, if credible information shows a battalion might be implicated in a GVHR, Post should work with the host country to identify the responsible company rather than rendering the whole battalion ineligible for assistance.

6)     Depending upon the history, demographics, and nature of local security forces, searching the Internet and open sources can help speed up the turnaround time at State in Washington, DC.  Some Posts proactively make notes and attachments to cases or batches containing their assessment of information found, which they consider not credible or substantiated.

SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549 IED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

## Appendix D

## Frequently Asked Questions

1.  How much lead time does Post have to give DOS in Washington, DC, to vet lists of potential individuals and/or units? *(Please refer to "INVEST Submission Timelines, page 20.)*

2.  Who (what type of professional) must be vetted? *(Please refer to "Security Forces," page 11.)*

3. Must new recruits with no prior security force experience be vetted? *(Please refer to "Vetting New Recruits," page 40.)*

4.  Do Posts and DOS in Washington, DC, vet units only? Or do we have to vet individuals too? *(Please refer to "Unit vs. Individual vetting," page 37.)*

5. Within the security force structure, how do we know what constitutes the "unit" to be vetted? *(Please refer to "Unit vs. Individual vetting," page 37.)*

6. How do I account for movement between units when vetting? *(Please refer to "Rules of Practice", "Movement Between Units," page 35.)*

7.  What is the definition of "credible information" that an individual, unit, or commander has committed a gross violation of human rights? *(Please refer to "Credible Information," page 9.)*

8.  What constitutes a "gross violation of human rights?" *(Please refer to "Key Terms," page 5.)*

9.  What if other derogatory information not related to a human rights violation is uncovered? *(Please refer to "Derogatory Information not related to gross violations of human rights," page 36.)*

10.  When should an individual or unit be suspended in INVEST?  When should they be rejected? *(Please refer to "Selecting the Proper Leahy Vetting Outcome in INVEST," page 28.)*

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549 IED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

11.  What is "Remediation," and what constitutes taking "effective steps to bring responsible members to justice?" *(Please refer to "Remediation," page 12 and Appendix G, page 71.)*

12.  How far back in time do I have to go when looking for information regarding a gross violation of human rights? *(Please refer to "Time Limits on Prohibition," page 36.)*

13.  Does the Leahy law apply to equipment, donation of materials, or other non-training assistance? *(Please refer to "Equipment and Non-Training Assistance Vetting," page 34, and page 37.)*

14.  Which funding sources are subject to the Leahy Law and vetting? *(See page 5.  Please direct specific questions to DRL/SHR and your geographic regional bureau Leahy POC.)*

15.  What is the Leahy Working Group? *(Please refer to "Leahy Working Group," page 18.)*

16.  What is an Incident Review Team (IRT)? *(Please refer to page 29.)*

17.  What is Fast Track? *(Please refer to "Fast Track," page 33.)*

18.  Is vetting required when funding is provided through an IO or NGO? (*Please refer to page 17 and "IO and NGO Programs," page 42.)*

19.  If post (or State in Washington, DC) uncovers derogatory information during vetting for a DoDAA-funded training program, what are the responsibilities of the COM and State?  If DoD wishes to proceed with the training despite the derogatory information, does DoD have that authority*? (Please refer to "DOD Funded Programs," pages 29-31, and page 36.)*

20.  What sources of information should I use when vetting at post? *(Please refer to "Country Teams," page 15, and "Processing at Post," page 20.)*

21.  What are some tips for effective unit vetting? *(Please refer to "Tips for Effective Unit Vetting," page 43, and "Appendix H, Unit Information.")*

22.  If I uncover information that appears derogatory, how can I determine whether the person I am researching is the same person about whom I've just uncovered derogatory

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549 IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

information? *(Please refer to "Determining Whether an Individual is Implicated in a GVHR," page 39.)*

23.  How long is a completed and cleared vetting good for?  If an individual was just cleared last month for training A, and is now a candidate for training B, can I consider the individual pre-cleared, or does his or her name have to be re-submitted for a second vetting? *(Please refer to "One Year Good For"Vetting Policy, page 41.)*

24.  Which bureau within State is charged with ensuring compliance with Leahy vetting procedures? *(Please refer to "Procedures and Responsibilities by Organization," page 16.)*

25.  Which bureau within State is responsible for answering questions about the Leahy Amendment, INVEST, or vetting procedures? *(Please see Questions Concerning the Application of the Leahy Law, page 14.)*

26.  I have regional responsibilities from my overseas Post, arranging training for security forces in seven countries in my region.   May I take care of the vetting for them all from my Post? *(Please refer to page 17, "Workflow for Vetting Starts in Home Country of the Unit," page 23, and page 43.)*

27. My bureau is funding training and assistance for security forces in many countries in the coming weeks.  May I initiate the Leahy vetting from here in Washington? *(Please refer to "Workflow for Vetting Starts in Home Country of the Unit," page 23.)*

28.  I see that one of the nominees whom one of our training offices nominated was born in the United States.  Should I vet the individual? *(Please refer to Vetting Possible U.S. Citizens or Legal Permanent Residents (LPR)," page 42.)*

SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

# Appendix E

## ALDAC FROM DEPUTY SECRETARY

MRN:13 STATE 3371

Date/DTG: Jan 11, 2013 / 112010Z JAN 13

From: SECSTATE WASHDC

Action: TRIPOLI, AMEMBASSY IMMEDIATE; TUNIS, AMEMBASSY IMMEDIATE; KHARTOUM, AMEMBASSY IMMEDIATE; ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE IMMEDIATE

TAGS: PHUM, MASS, PINR, SNAR

Captions: SENSITIVE

Correction Reason: Updated drafter/approver/clearer information

Subject: LEAHY VETTING REQUIRED BEFORE TRAINING OR

SENSITIVE

FOR COM FROM DEPUTY SECRETARY BURNS

E.O. 13526: N/A
TAGS: PHUM, MASS, PINR, SNAR
SUBJECT: LEAHY VETTING REQUIRED BEFORE TRAINING OR
ASSISTANCE BEGINS - IT'S THE LAW (S/ES 201300331)

SENSITIVE BUT UNCLASSIFIED. PLEASE HANDLE ACCORDINGLY.

1. REFERENCES:

(A) 12 STATE 111904 (B) 12 STATE 039328

(C) 2012 Leahy Vetting Guide

SENSTIVE BUT UNCLASSIFIED

C06808549
IED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

1. (SBU) SUMMARY. The Leahy Law prohibiting the U.S. government from providing assistance or training to security forces units if the Secretary has credible information that they have committed a gross human rights violation was amended in December 2011 to include more stringent requirements (reftels A, B, and C).

Since the law's revision, the Department has developed and distributed new policies to implement these requirements, and is actively reviewing its Leahy vetting programs at Posts. In some cases, changes in our existing Leahy processes must be made and new procedures developed in order to fully comply with the revised Leahy Law. Through a new six-month Leahy improvement plan, the Department seeks further input from Posts on how to improve our compliance with the Leahy Law.

2. (SBU) The Department strongly supports the objectives of the Leahy Law and I am committed to its effective implementation. We also recognize the importance of implementing the December 2011 revisions to the law in a manner that permits us to continue assistance to security sector reform around the world. To that end, the Department maintains a robust vetting process for potential recipients of relevant assistance administered by the Bureau of Democracy, Human Rights, and Labor (DRL); regional bureaus; and Posts.

3. (SBU) Unfortunately, we recently have had a series of reports that Posts have proceeded with assistance or training subject to the Leahy Law prior to the completion of vetting, which in some cases resulted in training of persons or units for which there is credible information that they are implicated in serious human rights violations.

4. (SBU) I ask that each of you ensure that all U.S. government personnel at Post involved in the provision of assistance or training to security forces units are familiar with the requirements of the law and our vetting procedures, including informing host governments when training is denied, and ensure that your personnel apply them. I also ask that you put in place internal systems to ensure that no foreign security force individual or unit receives any form of U.S. assistance, including training, which is subject to Leahy vetting, prior to completion of the vetting process, as explained in the Leahy Vetting Guide (reftel C). (For Posts in non-Fast Track countries, Leahy vetting approval is obtained solely by receipt of a Final Results Report generated and forwarded to Posts by the DRL-administered International Vetting and Security Tracking (INVEST) system. For Posts in Fast Track countries, vetting is complete when Posts complete the batches following vetting within the mission. They do not receive a Final Results notification.) I have asked DRL Assistant Secretary Posner and regional assistant secretaries to monitor compliance on my behalf, and to keep me apprised of any concerns.

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549 IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

5. (SBU) As part of the Department's ongoing process to fully implement the new requirements of the Leahy Law, DRL is undertaking a six-month action plan to address the challenges involved. This will include increased training on Leahy standards and procedures, further procedural enhancements to help Posts and the Department better understand how the process is working generally and in particular cases, and the development of country- specific Leahy implementation plans in certain countries with significant assistance programs and/or Leahy challenges. DRL and regional bureau vetting offices will work with you and your staff to enable us to pursue our security priorities in a manner that is consistent with the Leahy Law and the important human rights it seeks to address.

6. (SBU) Your staff will find a comprehensive set of Leahy policy files at the DRL SharePoint home page, Leahy vetting section, including a recently revised Leahy Vetting Guide (reftel C) at http://drl.j.state.sbu/lv/default.aspx. If your Posthas particular questions, challenges, or needs, please contact DRL-MLGA-PM@state.gov.

7. (SBU) Minimize considered. CLINTON

Signature:   CLINTON

SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549 IED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

## Appendix F

## Unit Information

Only the *lowest organizational element capable of exercising command and discipline over its members* is the unit to be vetted.  Typically, this would equate to the *battalion level* and equivalent units, demonstrated by the lowest row on the below graph.  In order to identify the appropriate unit for vetting more accurately, a unit's larger organizational units should also be included in the INVEST *Unit Name* field.

| Unit Level Hierarchy – Increasing Specificity   ↓ | | | |
|---|---|---|---|
| Army | Air Force | Navy | Police |
| Division | Wing | Squadron | City or State |
| Brigade or Group | Group | Task Unit or Flotilla | Precinct |
| *Battalion* | *Squadron* | *Ship, boat, battalion* | *Sub-unit, SVU, squad* |

Specific examples of what unit information to include in INVEST are provided below:

| Batch ID | Case ID | Name | Unit Name |
|---|---|---|---|
| PHIL-258758 | 25864 | Al PAGUNIBANN | 123 Brigade, 2nd Infantry Battalion, Phil Army |
| IDSA-94713 | 96523 | Trevor SINISTYONO | 876 Airborne Infantry Battalion, 9th Infantry Brigade, Division 9, Army Strategic Reserve Command, Indonesian Army |
| UGAN-2356 | 43542 | John Smith | 'Z' Company, Tactical Response Department, Counter Terrorism Division, Uganda Police Force |
| UGAN-2675 | 86445 | Jane Doe | Tactical Response Unit, Counter Terrorism Division, Uganda Police Force |

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549IED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

## Appendix  G

## Joint Department of Defense (DOD) and Department of State (State) Policy on Remediation and the Resumption of Assistance Under the Leahy Laws

Summary:

This document provides policy guidance for DOD and State on remediation and the resumption of assistance to units under the DOD and State Leahy Laws.  It describes the steps required for a unit of the security forces of a foreign country that has been implicated in a gross violation of human rights (GVHR) to regain eligibility for DOD-funded and State-funded assistance.  Furthermore, it addresses the assessments the Departments will undertake to determine whether an implicated unit remains eligible, or can again be deemed eligible, for assistance.

Background:

The DOD Leahy Law provides that DOD appropriated funds may not be used for any training, equipment, or other assistance for the members of a unit of a foreign security force if the Secretary of Defense has credible information that the unit has committed a GVHR.  The DOD Leahy Law provides an exception to this restriction in cases where the Secretary of Defense, in consultation with the Secretary of State, determines that the government of such country has taken all necessary corrective steps.   The Department of Defense will provide notification to Congress not more than 15 days after the use of the exception.

The State Leahy Law provides that no assistance shall be furnished to any unit of the security forces of a foreign country if the Secretary of State has credible information that such unit has committed a GVHR.  The State Leahy Law provides for an exception to the overall prohibition if the Secretary of State determines and reports to Congress that the government of the country is taking effective steps to bring the responsible members of the security forces unit to justice.   The State law also provides that the Secretary of State shall promptly inform the foreign government of the basis for a decision not to provide assistance and shall, to the maximum extent practicable, assist the foreign government in taking effective measures to bring the responsible members of the security forces to justice.

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549 IED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

The term "appropriate remediation measures" will be used throughout the rest of the document and should be read to mean "all necessary corrective steps" for purposes of the DoD Leahy Law, and "effective steps" for purposes of the State Leahy Law.  The term "implicated" will be used throughout the rest of the document and should be read to mean units for which the Secretary of State or the Secretary of Defense has credible information that such unit has committed a GVHR.

Assessing Steps Toward Remediation:

Accurately identifying and thoroughly assessing information available regarding each GVHR and each responsible individual within a unit is critical to a subsequent determination whether the government is taking/has taken appropriate remediation measures.

When both Departments determine there is credible information that a unit has committed a GVHR, and a request is made for that unit to receive DOD-funded or State-funded assistance, the Departments will begin the process of assessing whether the partner nation is taking/has taken appropriate remediation measures.  This determination will focus on the three primary components of the remediation process: (1) investigation; (2) as appropriate, judicial or administrative adjudication; and (3) as appropriate, sentencing or comparable administrative actions.  The review process is described at Tab A.

The Departments may determine that a host government is taking appropriate remediation measures after all three components have concluded or while a component or components remain underway, if the process is deemed sufficiently credible.  Whether or not a determination has been made, the Departments reserve the option to restrict assistance to a unit as a policy matter.

<div align="center">Tab A</div>

1.      Evaluating Existing Units

a.      The assessment will begin with determining whether the government has taken, or is taking, appropriate remediation measures to resolve all instances of gross violations of human rights (GVHR) that implicate a particular unit.  This assessment, and the assessment of the three components, will be based on the totality of circumstances in each case.

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

Case 1:19-cv-01753-RDM   Document 26-3   Filed 02/12/21   Page 79 of 196

SENSITIVE BUT UNCLASSIFIED

b.     The following factors will be analyzed to assess whether a foreign government has or is taking appropriate remediation measures.

(1)     Investigations.  The first step required to meet the appropriate remediation measures standard is the initiation of a credible investigation.  The investigation in a given case should be conducted by an impartial investigative entity subject to appropriate civilian or military oversight and be completed in a thorough manner.  Credibility assessments for investigations are fact-intensive; relevant factors include:

(a)     Impartiality: An investigative entity can be assessed as "impartial" if it can be reasonably expected to carry out its duties without undue interference.

(b)     Thoroughness:  A thorough investigation will make a reasonable effort to gather and examine all available and relevant evidence.

In cases where investigations have commenced and there are sufficient indicators of credibility, the Departments may determine that an implicated unit will remain eligible for assistance provided the investigation is proceeding without undue delay and the implicated individual(s) do not remain in the operational service of the unit.

(2) Judicial or administrative adjudication: The judicial process or administrative adjudication must address all the GVHRs that a credible investigation has found to have been committed by the unit or individual members in question.  Judicial processes may be carried out in civilian courts, military courts, or special tribunals.  The following factors will be considered in evaluating the credibility of the judicial process or administrative adjudication:

(a)     Credibility of the action:   The prosecuting entity or administrative official, as appropriate, should be assessed for impartiality. The same factors considered above under the impartiality of the investigation will be considered for the prosecuting entity.  The Departments must assess whether the prosecution made an effort to prosecute the actual perpetrators.

(b)     Credibility of the adjudicatory body: In assessing the credibility of the trial or administrative adjudication itself, the proceeding should be assessed to see if it was thorough and carried out before an impartial body.

SENSTIVE BUT UNCLASSIFIED

74

Case 1:19-cv-01753-RDM   Document 26-3   Filed 02/12/21   Page 80 of 196
RELEASED IN FULL U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

c)     Due Process: Assess whether the judicial or administrative process affords due process to the accused.  To the maximum extent possible, the judicial process should not itself compromise or violate the rights of the accused.

(3) Sentencing or Comparable Administrative Actions:  Sentencing or comparable administrative actions must be appropriate and proportional to the misconduct committed, taking into account the legal, judicial, and administrative systems of the foreign government.

c.     DOD and State will assess each of the factors above in accordance with their respective procedures.

d.     Although this guidance reflects generally accepted policy on remediation, the Department of Defense retains the option of determining that "all necessary corrective steps" have been taken with regard to a unit once the alleged GVHR perpetrator(s) has been removed from that unit.  This standard will be utilized only for unique and exceptional circumstances.  When utilizing this standard, to the greatest extent practicable, DOD will encourage the foreign security force to conduct an investigation into the GVHR and take further appropriate remediation measures.

e.     Under the DOD Leahy Law, a report to the appropriate congressional committees is required no later than 15 days after use of the "all necessary corrective steps" exception. Under the State Leahy Law, the prohibition on assistance is lifted, once a determination that the foreign government "is taking effective steps to bring responsible members to justice" and a report to the appropriate congressional committees has been submitted.

If a remediation process finds the accused not culpable, or the allegation unsubstantiated, the Departments may choose to revisit the original GVHR finding, based upon the new information revealed.  No report to Congress is necessary if the Departments determine upon reexamination that the information that a unit or individual members committed a GVHR is not credible.

In national reconciliation and transitional justice processes where customary legal processes, communal justice, or other non-traditional reparative mechanisms mirror the remediation process and rubric (investigations, judicial or administrative adjudication, and sentencing or comparable administrative actions) described above, the Departments will

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

evaluate the totality of circumstances to determine whether they constitute appropriate remediation measures.

2. Evaluating New and Fundamentally Different Units

A determination that a unit is "new" or "fundamentally different" requires an analysis and procedural process distinct from considering whether a government is taking appropriate remediation measures. Each Department should reference its respective procedures in making this assessment.

New and fundamentally different units are not subject to the same Congressional reporting requirements as units for which the Departments have determined that appropriate remediation measures have been taken.

a.     The Departments may determine that, under certain conditions, a newly created unit, or a pre-existing unit that differs fundamentally from its predecessor that was implicated in GVHR, is eligible for assistance under the DOD and State Leahy Law. A determination of eligibility will not be based solely on time having elapsed since the credible information of GVHR was first received; however, the Departments recognize that over time, significant reorganization or personnel changes within a unit may occur, and that those changes may allow for the resumption of assistance based on a determination that the unit is no longer the same unit that was implicated in the GVHR.

b.     In making a determination whether a unit is new or fundamentally different, the following criteria will be applied:

(1)     New Units:   A new unit, by definition, will not have been implicated in any past GVHR. The Departments will assess the below factors to determine whether the unit is a new unit:

(a)     The unit must not have significant numbers of the same personnel who were assigned to a pre-existing unit implicated in GVHR;

(b)     The Departments must not be in possession of credible information that the unit's current members, including its commanders, have committed GVHR;

SENSTIVE BUT UNCLASSIFIED

76

SENSITIVE BUT UNCLASSIFIED

(c)    The unit must serve legitimate institutional, organizational, or operational purposes. Renaming a previously existing unit for the purpose of circumventing remediation for prior suspected GVHR is not an acceptable means of meeting the "new unit" standard.

(2)    Fundamentally Different Units: This term applies when DOD and State, in consultation, conclude that a unit that was previously implicated in a GVHR may now be considered and vetted as a unit not associated with the prior GVHR because the current unit is so fundamentally different from the unit involved in the GVHR.  The Departments will assess the below factors to evaluate whether the unit is fundamentally different in both its role and membership:

(a)    Changes in the role of security force unit would consider factors such as:
a.    function (operational purpose and activities of the unit);
b.    reporting structure (institutional oversight of the unit);
c.    leadership (how the unit is commanded and by whom);
d.    culture (including professionalism and absence of impunity);

(b)  Changes in membership (requires a complete turnover of personnel since the time of the GVHR).

Other circumstances at the national level may exist that contribute to the determination whether a security force unit is new or fundamentally different.  Changes at the national level must be accompanied by changes at the unit level, and the Departments will evaluate the totality of circumstances, including:

(a)    Regime change that resulted in removing the leadership responsible for past GVHR;
(b)    Transitional justice processes, including certain forms of legal pardon, which prevent prosecution or sentencing of certain individuals or units allegedly responsible for past GVHR;

(c)    Respect for human rights within the broader government, as evidenced by its conduct and its demonstrated willingness to institute remediation measures.

Even where a determination has been made that a unit is fundamentally different and that the unit is again eligible to receive DOD-funded and State-funded assistance, the

SENSITIVE BUT UNCLASSIFIED

77

C06808549IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

Departments are encouraged to identify ways to support the establishment of policies, regulations, enforcement mechanisms, and early warning systems in these new organizational entities that will help prevent and punish GVHR. In cases where this guidance would not permit a unit to be considered fundamentally different, but extraordinary factual circumstances are present, the Departments may evaluate the particular circumstances to determine if an alternative basis for considering a unit fundamentally different is feasible.

3.  Assistance to Partner Nations that Seek to Bring Perpetrators to Justice

Section (d) of the State Leahy Law calls for the United States to "assist the foreign government in taking effective measures to bring the responsible members of the security forces to justice." Further guidance on the implementation of this legal requirement will be forthcoming.

SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

Case 1:19-cv-01753-RDM Document 26-3 Filed 02/12/21 Page 84 of 196

SENSITIVE BUT UNCLASSIFIED

## Appendix H

### Standard Procedure When Leahy-Applicable Assistance Is Provided Before Leahy Vetting is Complete

Ref:   (A) 13 STATE 3371 (ALDAC from D, Appendix F)

When Post or Leahy vetting officers in Washington, DC, discover assistance or training covered by the State or DoD Leahy laws was provided before Leahy vetting was completed, they should inform DRL/SHR, the regional bureau, and sponsoring bureau (if applicable). If the batch is still at Post, complete vetting within the mission and enter the results in INVEST. Post should then cancel processing. If the batch is at State in Washington, DC, vetters should cancel processing the batch with an explanatory note.

Post should prepare an information memo from the Deputy Chief of Mission to the Deputy Assistant Secretaries of the applicable geographic bureau and DRL. The memo should explain how the error occurred and the corrective measures that Post has taken in its procedures and workflow to prevent future recurrence. The memo from Post should indicate if any derogatory information is associated with the units or individuals that received assistance.

UNCLASSIFIED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

## Appendix I

## DoD Exception in NDAA 2015 (P.L. 113-291)

SEC. 1206. TRAINING OF SECURITY FORCES AND ASSOCIATED SECURITY MINISTRIES OF FOREIGN COUNTRIES TO PROMOTE RESPECT FOR THE RULE OF LAW AND HUMAN RIGHTS.

(a) IN GENERAL.—The Secretary of Defense is authorized to conduct human rights training of security forces and associated security ministries of foreign countries.

(b) CONSTRUCTION WITH LIMITATION ON USE OF FUNDS.— Human rights training authorized by this section may be conducted for security forces otherwise prohibited from receiving such training under any provision of law only if—

(1) such training is conducted in the country of origin of the security forces;

(2) such training is withheld from any individual of a unit when there is credible information that such individual has committed a gross violation of human rights or has commanded a unit that has committed a gross violation of human rights;

(3) such training may be considered a corrective step, but is not sufficient for meeting the accountability requirement under the exception established in subsection (b) of section 2249e of title 10, United States Code (as added by section 1204(a) of this Act); and

(4) reasonable efforts have been made to assist the foreign country to take all necessary corrective steps regarding a gross violation of human rights with respect to the unit, including using funds authorized by this Act to provide technical assistance or other types of support for accountability.

(c) ROLE OF THE SECRETARY OF STATE.—

(1) CONCURRENCE.—Training activities may be conducted under this section only with the concurrence of the Secretary of State.

C06808549

SENSITIVE BUT UNCLASSIFIED

(2) CONSULTATION.—The Secretary of Defense shall consult with the Secretary of State on the content of the training, the methods of instruction to be provided, and the intended beneficiaries of training conducted under this section.

(d) AUTHORIZED ACTIVITIES.—Human rights training authorized by this section may include associated activities and expenses necessary for the conduct of training and assessments designed to further the purposes of this section, including technical assistance or other types of support for accountability.

(e) ANNUAL REPORTS.—Not later than March 31 each year through 2020, the Secretary of Defense shall submit to the appropriate committees of Congress a report on the use of the authority in this section during the preceding fiscal year.  Each report shall include information on any human rights training (as defined in subsection (f)) or other assistance that was provided during the fiscal year to foreign security forces.

(f) DEFINITIONS.—In this section

(1) The term ''appropriate committees of Congress'' means—

(A) the Committee on Armed Services, the Committee on Foreign Relations, and the Committee on Appropriations of the Senate; and

(B) the Committee on Armed Services, the Committee on Foreign Affairs, and the Committee on Appropriations of the House of Representatives.

(2) The term ''human rights training'' means training for the purpose of directly improving the conduct of foreign security forces to—

(A) prevent gross violations of human rights and support accountability for such violations;

(B) strengthen compliance with the laws of armed conflict and respect for civilian control over the military;

(C) promote and assist in the establishment of a military justice system and other mechanisms for accountability; and

(D) prevent the use of child soldiers.

SENSITIVE BUT UNCLASSIFIED

81

Case 1:19-cv-01753-RDM   Document 26-3   Filed 02/12/21   Page 87 of 196

SENSITIVE BUT UNCLASSIFIED

(g) SUNSET.—The authority in subsection (a) shall expire on September 30, 2020.

SENSITIVE BUT UNCLASSIFIED

## Appendix J

### 9 FAM 303.8-5 (U) Leahy vetting
(CT:VISA-115;  04-20-2016)
(Office of Origin:  CA/VO/L/R)

9 FAM 303.8-5(A) (U) Statutory and Regulatory Authority
9 FAM 303.8-5(A)(1) (U) United States Code
(CT:VISA-1; 11-18-2015)
 (Previous Location:  9 FAM 40.213 Related Statutory Authority CT:VISA-1896; 09-21-2012)
(U) 22 U.S.C. 2378d.

9 FAM 303.8-5(B) (U) Background
(CT:VISA-109; 04-14-2016)
a. (U) The Leahy Amendment prohibits assistance to foreign security force units and members of such units implicated in a gross human rights violations (GVHR). 22 U.S.C. 2378d prohibit training, material or other forms of assistance to foreign security forces units or personnel if the Department has credible information that the unit or personnel has committed a GVHR, unless the Secretary determines that the host government is taking effective measures to bring the responsible members of the security force to justice.

b. (SBU) The Department of State conducts all Leahy Vetting (LV) for both State and DOD assistance and is responsible for informing DOD of any derogatory information discovered during the vetting process that may disqualify the nominee from the specified assistance program. At post, the LV coordinator is typically a political officer or a narcotics affairs officer who would normally also participate in human rights reporting, which is part of the Departments reporting responsibilities under 22 U.S.C. 2304.

c. (SBU) Most LV is conducted for training or assistance that occurs outside of the United States; i.e., for nominees who do not plan to travel to the United States and therefore do not need a visa.  LV procedures must be implemented for all nominees, regardless of whether the training will take place inside or outside the United States.

d. (SBU) The International Vetting and Security Tracking (INVEST) system, operated by DRL's Security and Human Rights (SHR) Office, is the sole official system of record for

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

LV.

B7(E)

e. (SBU) All posts are required to have Leahy Vetting SOPs cleared by DRL/SHR and approved by the DCM. The SOPs should spell out the decision making process for close calls and resolving disputes. If sections other than consular, such as RSO,⬚, the vetting team commonly discusses hits with consular sections.     B7(E)

f. (SBU) The INVEST system was designed so that a consular section does not need to use it and DRL discourages consular sections from entering results directly into INVEST.

B7(E)

h. (SBU) Questions on Leahy review of ⬚ can be directed to Consular Affairs Leahy Vetting portfolio holder in CA/VO/F. Vetting teams can direct workflow questions to DRL-SHR.     B7(E)

9 FAM 303.8-5(C) (SBU) Identifying Derogatory Information for Gross Violations of Human Rights
(CT:VISA-109; 04-14-2016)

SENSITVE BUT UNCLASSIFIED

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

C06808549 IED  U.S. Department of State  Case No. F-2017-17860  Doc No. C06808549  Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

a. (SBU) Under the Department's LV policy, there are several types of gross violations of human rights (GVHR) that automatically disqualify a nominee from receiving training or assistance. Although a GVHR is not defined in the Leahy law, the Department uses the definition in section 502B(D) of the Foreign Assistance Act as a working guide. This provision states that gross violations of internationally recognized human rights include torture or cruel, inhuman or degrading treatment or punishment, prolonged detention without charges and trial, causing the disappearance of persons by the abduction and clandestine detention of those persons, and other flagrant denial of the right to life, liberty or the security of person.

b. (U) The four most common forms of GVHR found during the LV process are extrajudicial killings, forced disappearances, torture, and rape under color of law. The following list is taken from 9 FAM 302.7-2(C)(2) and identifies gross violations of human rights.

B7(E)

B7(E)

SENSTIVE BUT UNCLASSIFIED

85

C06808549

SENSITIVE BUT UNCLASSIFIED

B7(E)

SENSTIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED

B7(E)

9 FAM 303.8-5(E) (U) Procedures for Reporting CLASS Results in Leahy Vetting
(CT:VISA-115; 04-20-2016)

B7(E)

(CT:VISA-1; 11-18-2015)

SENSTIVE BUT UNCLASSIFIED

87

UNCLASSIFIED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

(Previous Location: 9 FAM 40.213 N6 CT:VISA-2143; 07-22-2014)

B7(E)

B7(E)

SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

RELEASED IN FULL Case 1:19-cv-01753-RDM Document 26-3 Filed 02/12/21 Page 94 of 196
U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

SENSITIVE BUT UNCLASSIFIED

B7(E)

SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED U.S. Department of State Case No. F-2017-17860 Doc No. C06808549 Date: 01/16/2020

# EXHIBIT B



An official website of the United States government   Here's how you know

Employees      Job Seekers      Students      Travelers

POLICY ISSUES        COUNTRIES & AREAS        BUREAUS & OFFICES        ABOUT

Bureau Home     About Us     Leadership     Remarks and Releases     Key Topics     Programs     Reports

SECURITY AND HUMAN RIGHTS



# About the Leahy Law

FACT SHEET

BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR

JANUARY 20, 2021

Share

## 1. What is the Leahy law?

◆ The term "Leahy law" refers to two statutory provisions prohibiting the U.S. Government from using funds for assistance to units of foreign security forces where there is credible information implicating that unit in the commission of gross violations of human rights (GVHR). One statutory provision applies to the State

Case 1:19-cv-01753-RDM    Document 26-3    Filed 02/12/21    Page 97 of 196

Department and the other applies to the Department of Defense. The State Department Leahy law was made permanent under section 620M of the Foreign Assistance Act of 1961, 22 U.S.C. 2378d. The U.S. government considers torture, extrajudicial killing, enforced disappearance, and rape under color of law as GVHRs when implementing the Leahy law. Incidents are examined on a fact-specific basis. The State Department Leahy law includes an exception permitting resumption of assistance to a unit if the Secretary of State determines and reports to Congress that the government of the country is taking effective steps to bring the responsible members of the security forces unit to justice.

◆ The DoD Leahy law is similar to the State Leahy law. Since 1999, Congress included the DoD Leahy law in its annual appropriations act. The DoD Leahy law is now permanent in Section 362 of Title 10 of the U.S. Code. It requires that DoD-appropriated funds may not be used for any training, equipment, or other assistance for a foreign security force unit if the Secretary of Defense has credible information that such unit has committed a GVHR. The law allows for two exceptions to this restriction. The first in cases where the Secretary of Defense (after consultation with the Secretary of State) determines that the government of that country has taken all necessary corrective steps. This first exception is also known as "remediation." A second exception exists if U.S. equipment or other assistance is necessary to assist in disaster relief operations or other humanitarian or national security emergencies.

◆ The National Defense Authorization Act for FY2015 authorizes DoD to conduct training to promote respect for the rule of law and human rights, including for otherwise Leahy-ineligible units under certain circumstances. This training may be conducted with the concurrence of the Secretary of State and is withheld from any individual of a unit when there is credible information that such individual has committed GVHR (or has commanded a unit that has committed a GVHR).

# 2. How is the law implemented?

◆ In cases where an entire unit is designated to receive assistance, the Department of State vets the unit and the unit's commander. When

an individual security force member is nominated for U.S.
assistance, the Department vets that individual as well as his or her
unit. Vetting begins in the unit's home country, where the U.S.
embassy conducts consular, political, and other security and human
rights checks. Most often, an additional review is conducted
by analysts at the Department of State in Washington, D.C. The State
Department evaluates and assesses available information about the
human rights records of the unit and the individual, reviewing a full
spectrum of open source and classified records.

- When assessing whether information is credible, the following
  factors should be considered weighing both the credibility of a
  source and the veracity of an allegation:
  - Past accuracy and reliability of the reporting source as well as
    original source, if known;
  - How the source obtained the information (e.g., personal
    knowledge obtained by a witness, witness interviews collected
    by a non-governmental organization (NGO), descriptions
    collected from government records, etc.);
  - Known political agenda of a source (both reporting source
    and/or original source, if known) which might lead to bias in
    reporting;
  - Corroborative information to confirm part or all of the
    allegation;
  - Information that contradicts part or all of the allegation;
  - History of unit and known patterns of abuse/professional
    behavior;
  - Level of detail of the GVHR allegation, including detail in
    identification of the GVHR, perpetrator (or link to an operational
    unit), and victim.

# 3. Can assistance be reinstated to units previously found ineligible for assistance?

- Yes. Consistent with the exception under both Leahy laws, the
  Departments of State and Defense have adopted a joint policy on
  remediation that outlines a process for resuming DoD- and State-

funded assistance to foreign security force units that are ineligible for assistance under the Leahy laws. This can occur when the Secretaries of Defense and State determine that the government of that country has taken, or is taking, effective measures to bring those responsible to justice. Such measures may include impartial and thorough investigations; credible judicial or administrative adjudications; and appropriate and proportional sentencing.



⬇ **DOWNLOAD PP410 INTRODUCTION TO LEAHY VETTING POLICY [693 KB]**

TAGS    Bureau of Democracy, Human Rights, and Labor    Foreign Assistance

Human Rights    Human Rights and Democracy

★ ★ ★

# Related Articles

FEBRUARY 8, 2021

Nicaragua's Foreign Agents Law Drives Nicaragua Toward Dictatorship, Si

FEBRUARY 8, 2021

Secretary Antony J. Blinken with Wolf Blitzer of CNN's The Situation Room

FEBRUARY 8, 2021

U.S. Decision To Reengage with the UN Human Rights Council

READ MORE

# EXHIBIT C



Welcome to
Introduction to Leahy Vetting Policy

Version 2.1



PP410 Introduction to Leahy Vetting Policy, Version 2.1



Introduction

MODULE 1

PP410 Introduction to Leahy Vetting Policy, Version 2.1

# Welcome

Welcome to the **Introduction to Leahy Vetting Policy** course.

This course provides the background, legislative history, and policies for the Leahy law implemented through the U.S. State Department (State) and the Department of Defense (DoD), which govern vetting of foreign security forces before they can receive various types of U.S. government (USG) aid. We strongly recommend completing this course before requesting an account for the International Vetting and Security Tracking-cloud (INVESTc) system, which is the primary workflow management tool and official system of record for Leahy vetting at State and DoD.

While the INVESTc system is largely intuitive, additional support documentation and training are available in the form of context-specific help, printable quick guides, and role-specific training within the application. In-person (D.C. only) and virtual instructor-led training (at post) are also available.

## Audience

This course is designed for direct-hire USG employees and contractors who are involved in implementing Leahy-applicable assistance for foreign security force personnel and units (i.e., military, police, etc.).

PP410 Introduction to Leahy Vetting Policy, Version 2.1

# Course Objective

At the completion of this course, you will be able to:

- Identify the Leahy laws and policies that are the basis of the vetting process.

# Course Information

## Course Structure

This course comprises two modules with review questions at the end of the course. To reinforce your mastery of the material, please answer the review questions.

## Intranet Links

This course provides useful links to the Department of State intranet. You must use a Department of State OpenNet computer to view all intranet sites.

## Review Questions

The review questions are intended to test and reinforce your learning. Question types used in the review may include true/false, multiple choice, and multiple answer questions.

PP410 Introduction to Leahy Vetting Policy, Version 2.1



PP410 Introduction to Leahy Vetting Policy, Version 2.1

# Objectives

This course is designed to give you an understanding of the Leahy law, which prohibits the Department of State (State) and the Department of Defense (DoD) from providing funds for assistance or training to foreign security force units or individuals where there is credible information that these forces have committed a gross violation of human rights (GVHR).

By the end of this module, you will be able to:

- Explain the scope and purpose of the State and DoD Leahy law.
- Define "gross violations of human rights."
- Determine what constitutes "credible information" of a GVHR.
- Define a "unit" in the context of security forces.
- Summarize remediation procedures under the Leahy law.

PP410 Introduction to Leahy Vetting Policy, Version 2.1

# Leahy Law

The term "Leahy law" refers to two statutory provisions prohibiting the U.S. Government from using funds for assistance to units of foreign security forces where there is credible information implicating that unit in the commission of gross violations of human rights (GVHRs). One statutory provision applies to the U.S. Department of State (State) and the other applies to the U.S. Department of Defense (DoD).

| State Leahy Law |
|---|
| *See* Foreign Assistance Act of 1961, Sect. 620M |
| **No assistance shall be furnished … to any unit** of the security forces of a foreign country if the Secretary of State has **credible information** that such unit has committed a **gross violation of human rights**. |

| DoD Leahy Law |
|---|
| *See* Title 10 U.S. Code, Sect. 362 |
| The Secretary of Defense shall, in consultation with the Secretary of State, ensure that **prior to a decision to provide any training, equipment, or other assistance** to a unit of a foreign security force full consideration is given to any **credible information** available to the Department of State relating to **human rights violations** by such unit. |



The Department of State is responsible for informing the Department of Defense of information about GVHRs. For this reason, the Department of State does all Leahy vetting for both Departments.

PP410 Introduction to Leahy Vetting Policy, Version 2.1

## Background Information about the Leahy Law

The State Leahy law was first enacted as a provision in the 1997 Foreign Operations Appropriations Act (P.L. 104-208). Sponsored by Senator Patrick Leahy of Vermont, the amendment prohibited the Foreign Operations, Export Financing, and Related Programs Appropriations Act (FOAA) from assisting foreign security force units implicated in gross violations of human rights (GVHRs), unless the Secretary of State determined that the host government was taking effective measures to bring those responsible to justice.

Initially the amendment focused on the State Department's International Narcotics Control program. It was expanded in 1998 to include all security assistance programs that used funds appropriated through the FOAA.

A separate Leahy amendment was added to the annual Defense Appropriations Act, which requires that no funding under the Act be used to train security force units where there is credible information that they have committed GVHRs. The DoD Leahy law is now in Section 362 of U.S.C. Title 10 and applies to all forms of assistance, not just training.

PP410 Introduction to Leahy Vetting Policy, Version 2.1

# State Leahy Amendment

In 2008, Congress made the State Leahy provision permanent by adding it to the Foreign Assistance Act of 1961, as amended. The new section is titled "Limitation on Assistance to Security Forces" (Sec. 620M).

*The following are sections of the State Leahy Amendment.*

> **(a) IN GENERAL:** No assistance shall be furnished under this Act or the Arms Export Control Act to any unit of the security forces of a foreign country if the Secretary of State has credible information that such unit has committed gross violations of human rights.



> State Leahy prohibits assistance under the Foreign Assistance Act of 1961 (FAA) or the Arms Export Control Act (AECA), and applies to all forms of assistance, including training, equipment and other activities.

> **(b) EXCEPTION:** The prohibition in subsection (a) shall not apply if the Secretary determines and reports to the Committee on Foreign Relations of the Senate, the Committee on Foreign Affairs of the House of Representatives, and the Committees on Appropriations that the government of such country is taking effective measures to bring the responsible members of the security forces unit to justice.

> **(c) DUTY TO INFORM:** In the event that funds are withheld from any unit pursuant to this section, the Secretary of State shall promptly inform the foreign government of the basis for such action and shall, to the maximum extent practicable, assist the foreign government in taking effective measures to bring the responsible members of the security forces to justice.

The 2011 update included seven provisions under Section 620M(d). Three entail new requirements:

> (1) ensure that for each country the Department of State has a current list of all security force units receiving United States training, equipment, or other types of assistance;
> (5) ensure that when vetting an individual for eligibility to receive United States training the individual's unit is also vetted;
> (7) make publicly available, to the maximum extent practicable, the

PP410 Introduction to Leahy Vetting Policy, Version 2.1

identity of those units for which no assistance shall be furnished pursuant to subsection (a).

# DoD Leahy Law

A provision of the Leahy law allows the Secretary of Defense to waive the Leahy law prohibition on provision of assistance to ineligible units; as of November 2019, the Secretary of Defense has never used this waiver.

*The following are sections of the DoD Leahy Amendment.*

(a)  **PROHIBITION:**  Of the amounts made available to the Department of Defense, none may be used for any training, equipment, or other assistance for a unit of a foreign security force if the Secretary of Defense has credible information that the unit has committed a gross violation of human rights.

(b) **COORDINATION:** The Secretary of Defense shall, in consultation with the Secretary of State, ensure that prior to a decision to provide any training, equipment, or other assistance to a unit of a foreign security force full consideration is given to any credible information available to the Department of State relating to human rights violations by such unit.

(c) **WAIVER:** The Secretary of Defense, after consultation with the Secretary of State, may waive the prohibition in subsection (a)(1) if the Secretary determines that the waiver is required by extraordinary circumstances.

(d) **REPORT:** Not later than 15 days after the application of any exception under subsection (b) or the exercise of any waiver under subsection (c), the Secretary of Defense shall submit to the appropriate committees of Congress a report:

(1) in the case of an exception under subsection (b), providing notice of the use of the exception and stating the grounds for the exception; and
(2) in the case of a waiver under subsection (c), describing: (A) the information relating to the gross violation of human rights; (B) the extraordinary circumstances that necessitate the waiver; (C) the purpose and duration of the training, equipment, or other assistance; and (D) the United States forces and the foreign security force unit involved.

10

PP410 Introduction to Leahy Vetting Policy, Version 2.1

**(e) EXCEPTION:** The prohibition in subsection (a)(1) shall not apply if the Secretary of Defense, after consultation with the Secretary of State, determines that the government of such country has taken all necessary corrective steps, or if the equipment or other assistance is necessary to assist in disaster relief operations or other humanitarian or national security emergencies.

Both the State and DoD Leahy laws provide for remediation of units previously identified as tainted (refers to a security force unit for which credible derogatory information regarding gross violations of human rights has been found). See the Joint DoD and State Remediation policy memo.

## Important Leahy Vetting Terms

The Leahy vetting system is based on a policy of vetting security force units and their commanders for unit training. Also, candidates for individual training and the names of their home units are vetted together because if an individual is trained and returns to his unit, he may provide the benefit of that training to his unit.

There are three important Leahy vetting terms that this course will cover:

- Gross violations of human rights (GVHRs)
- Credible information
- Unit

11

PP410 Introduction to Leahy Vetting Policy, Version 2.1

# Gross Violations of Human Rights (GVHRs)

The State and DoD Leahy laws do not explicitly define what constitutes a "gross violation of human rights."

Consequently, the State Department looked to definitions in other sections of the Foreign Assistance Act of 1961 (FAA), including sections 116 and 502B(d)(1), for guidance on the meaning of the term that is instructive in the understanding and application of the Leahy laws.

**In the FAA, Sections 116 and 502B(d)(1) both state that the term "gross violations of internationally recognized human rights" includes "...torture or cruel, inhuman, or degrading treatment or punishment, prolonged detention without charges and trial, causing the disappearance of persons by the abduction and clandestine detention of those persons, and other flagrant denial of the right to life, liberty, or the security of person... ."**

# Gross Violations of Human Rights (GVHRs): Most Common Types

The majority of Leahy law vetting focuses on the following GVHRs that will taint a security force unit if committed under color of law ("under color of law" describes when a security force unit member acts, or appears to be acting, in their capacity as a security force, e.g., wearing a uniforms, identifying themselves as a member of the security force):

*Review the definition of each major GVHR below:*

> **TORTURE:** An act committed while the subject is under the direct custody of the offender that intentionally inflicts severe mental or physical pain or suffering for such purposes as obtaining information or a confession, as punishment, or to intimidate or coerce, or for any reason based upon discrimination of any kind.

> **EXTRAJUDICIAL KILLING:** A deliberate killing of an individual, carried out under color of law, and not authorized by a previous judgment pronounced by a regularly constituted court after a trial affording all requisite fair trial and appeal guarantees.

> **FORCED DISAPPEARANCE:** When government officials, or groups acting on behalf of the government, or with the government's direct or indirect support, consent, or acquiescence (a) arrest, detain, or abduct a

PP410 Introduction to Leahy Vetting Policy, Version 2.1

person, or otherwise deprive a person of liberty, and (b) subsequently refuse to disclose that person's fate, whereabouts, or deprivation of liberty, (c) thereby placing the person outside the protection of the law.

**RAPE (UNDER COLOR OF THE LAW):** An act of rape committed by a member of a unit who is acting, or appears to be acting, in their capacity as a security force, e.g., wearing a uniform, identifying themselves as a member of the security force.

 The list is not exhaustive, and other types of incidents can be examined on the basis of specific facts to assess whether they are GVHRs.

# Credible Information

What constitutes credible information supporting a derogatory account about a gross human rights violation?

## Legislative history shows that evidence:

- Need not be admissible in a court of law.
- Should be deserving of confidence as a basis for decision-making.

## Non-governmental organization (NGO) information or press reports can be sufficient if:

- Sources have a reputation for accurate and impartial reporting.
- Reported information has indicia of reliability.

## Ideally, information is corroborated by multiple sources:

- More than one source is preferred, although it's not necessary.
- It depends on the quality of the source and the information.

PP410 Introduction to Leahy Vetting Policy, Version 2.1

# Seven Criteria for Evaluating Credible Information

1. **Past accuracy and reliability** of the reporting source as well as original source, if known

2. **How the source obtained the information** (e.g., personal knowledge obtained by a witness, witness interviews collected by an NGO, descriptions collected from government records, etc.)

3. **Known political agenda** of a source (both reporting source and/or original source, if known) which might lead to bias in reporting

4. **Corroborative information** to confirm part or all of the allegation

5. **Information that contradicts** part or all of the allegation

6. History of unit and **known patterns of abuse**/professional behavior

7. **Level of detail** of the GVHR allegation, including detail in identification of the GVHR, perpetrator (or link to an operational unit), and victim

PP410 Introduction to Leahy Vetting Policy, Version 2.1

# Unit

For Leahy vetting purposes, a unit may be construed as the smallest operational group in the field that has been implicated in the reported human rights violation.

In the table below, the "units" are highlighted in the lowest row. For each of the security force groups in the table, these units are the lowest organization elements capable of exercising command and discipline over its members, and thus the typical target for Leahy vetting.

| UNIT LEVEL HIERARCHY: INCREASING SPECIFICITY | | | |
|---|---|---|---|
| **ARMY** | **AIR FORCE** | **NAVY** | **POLICE** |
| Division | Wing | Squadron | City or State |
| Brigade or Group | Group | Task Unit or Flotilla | Precinct |
| Battalion | Squadron | Ship, boat, battalion | Sub-unit, SVU, squad |

In the vetting process, clearly identifying the unit should include the entire chain of command and a geographic location:

> **ARMY Unit Example:** *1st Battalion*; Valley X; 3rd Brigade; 9th Division; Army of the Republic of Y;

> **POLICE Unit Example:** *Criminal Investigation Unit*; Police Station A, Precinct 13, City F Police Force.



Clean and tainted units may be part of the same larger group.

PP410 Introduction to Leahy Vetting Policy, Version 2.1

# Remediation

## What do you think?

Are there exceptions to the Leahy law? Once a unit is tainted, is it tainted forever?

    a.  Yes
    b.  No

The answer is "No." Known as "remediation," Leahy law allows the resumption of U.S. assistance to previously restricted security forces units if:

- The host government is taking all necessary corrective steps to bring to justice those responsible for GVHRs.
- Under DoD provision, equipment or assistance is needed for disaster relief, humanitarian aid, or national security emergency.

PP410 Introduction to Leahy Vetting Policy, Version 2.1

# Exceptions

*The following are details of the State and DoD "exceptions" on remediation:*

| State Leahy Law |
| --- |
| **Sub-section (b) of Section 620M ("Limitation on Assistance to Security Forces") of the Foreign Assistance Act of 1961, as amended.** |
| **Exception:** The prohibition in subsection (a) shall not apply if the Secretary determines and reports to the Committee on Foreign Relations of the Senate, the Committee on Foreign Affairs of the House of Representatives, and the Committees on Appropriations that **the government** of such country **is taking effective steps to bring responsible members of the security forces to justice.** |

| DoD Leahy Law |
| --- |
| **Sub-section (b) of Section 362 of Title 10 of the U.S. Code.** |
| **Exception:** The prohibition in subsection (a)(1) shall not apply if the Secretary of Defense, after consultation with the Secretary of State, determines that **the government** of such country **has taken all necessary corrective steps**, or if the equipment or other assistance is **necessary to assist in disaster relief operations or other humanitarian or national security emergencies**. |

17

PP410 Introduction to Leahy Vetting Policy, Version 2.1

# Summary

This course provided a brief introduction to the Leahy law regarding the vetting of foreign security forces for human rights violations before providing them USG training, equipment, or other assistance. You should now have a better understanding of:

- The **scope of the Leahy law** used by the Department of State and Department of Defense.

- The **types of gross violations of human rights (GVHRs)** applicable to the Leahy laws.

- The **definition of "unit"** of security forces used in the Leahy vetting process.

- The **types of credible information** that can back GVHRs.

- The **provisions for remediation** of tainted units under the Leahy laws.

For further resources about the Leahy law and vetting policy, check out Diplopedia's entry for "Leahy Laws and Human Rights Vetting."

Let's go to the Course Wrap-Up to review what you've learned. You will also be provided with resources for the INVESTc Leahy vetting system.

PP410 Introduction to Leahy Vetting Policy, Version 2.1

# Course Wrap-Up: Module 3

## Knowledge Review

### Question 1

Please answer the following questions to test your understanding of the course content.

*Please select the correct answer.*

**Only the State Leahy provision applies to withholding assistance on training for foreign security forces that have committed human rights violations.**

    a.  True
    b.  False

**The correct answer is "False."** Both State and DoD Leahy laws apply to training, material, and financial assistance.

### Question 2

*Please select all that apply.*

**Which of the following actions fall under the Leahy law's understanding of a gross violation of human rights (GVHR)?**

    a.  Torture
    b.  Rape under color of law
    c.  Drug trafficking
    d.  Forced disappearance
    e.  Extrajudicial killing

**The correct answers are a, b, d, and e.** Torture, rape under color of law, forced disappearance, and extrajudicial killing are some of the most common types of gross violations of human rights. Though drug trafficking may fall under another U.S. policy that prohibits assistance, it is technically not considered a GVHR and, therefore, does not trigger the Leahy law.

PP410 Introduction to Leahy Vetting Policy, Version 2.1

## Question 3

*Please select the correct answer.*

**One person claims she witnessed government soldiers torturing civilians from a minority ethnic group during a civil war. This could be considered "credible information" under Leahy vetting policy.**

  a.  True
  b.  False

**The correct answer is "True."** Although multiple people's reports are preferred, they are not absolutely necessary.

## Question 4

*Please select the best answer.*

**For Leahy vetting purposes, the identification of a security force "unit" with a reported human rights violation should include:**

  a.  Only the unit commander's first and last names.
  b.  Both the names of the commander and unit members.
  c.  The entire chain of command and geographic location.
  d.  A clear distinction between clean and tainted units.

**The correct answer is c.** For Leahy vetting purposes, the identification of a security force "unit" with a reported human rights violation should include the entire chain of command and geographic location.

PP410 Introduction to Leahy Vetting Policy, Version 2.1

## Question 5

*Please select all that apply.*

**Under the Leahy law, USG assistance to a previously tainted security force unit can resume if:**

    a.  The responsible government is pursuing justice against those accused of GVHRs.
    b.  The host country needs disaster relief.
    c.  The host country is undergoing a national emergency.
    d.  The host country is undergoing a humanitarian emergency.

**The correct answers are a, b, c, and d.** An exception to the Leahy law can be made under any of the above circumstances, with Secretary-level approval.

# EXHIBIT D

UNCLASSIFIED



ISP-I-19-11                    Office of Inspections                    October 2018

# Inspection of the Bureau of Democracy, Human Rights, and Labor

DOMESTIC OPERATIONS AND SPECIAL REPORTS



ISP-I-19-11

October 2018
OFFICE OF INSPECTIONS
Domestic Operations and Special Reports

**Inspection of the Bureau of Democracy, Human Rights, and Labor**

**What OIG Found**

**What OIG Inspected**
OIG inspected the Bureau of Democracy, Human Rights, and Labor's executive direction, program and policy implementation, resource management, and management controls.

**What OIG Recommended**
This report includes 10 recommendations. OIG made one recommendation to improve strategic planning, one recommendation to promote compliance with legislation mandating Department training on international religious freedom, and eight recommendations to improve Leahy vetting internal controls and operations, visa ineligibility processing, information management systems development, and contract management.

In its comments on the draft report, the Department concurred with all 10 recommendations. OIG considers the recommendations resolved. The Department's response to each recommendation, and OIG's reply, can be found in the Recommendations section of this report. The Department's formal written response is reprinted in its entirety in Appendix B.

- Stakeholders from other Federal agencies and Department of State offices described the Bureau of Democracy, Human Rights, and Labor as effective in advancing human rights issues.
- Staffing shortfalls and the lack of an effective bureau strategic planning process increased internal controls risks for Leahy vetting, visa ineligibility determinations, and foreign assistance management—areas where the bureau faced an expanding workload.
- Insufficient staffing and oversight of information technology systems development increased risks of waste, fraud, and mismanagement and delays in modernizing the bureau's information technology system used to conduct Leahy vetting.
- DRL did not dedicate sufficient staff, training resources, or strategic direction to prepare human rights assessments related to visa processing and sanctions functions.
- Spotlight on Success: The bureau's Office of Policy Planning and Public Diplomacy effectively used social media tools to conduct outreach on human rights issues. The bureau's Facebook page is the Department's second-most popular domestic page, with approximately 2.3 million followers.

_____ Office of Inspector General _____
U.S. Department of State • Broadcasting Board of Governors

UNCLASSIFIED

# CONTENTS

CONTEXT ........................................................................................................................... 1

EXECUTIVE DIRECTION .................................................................................................... 4

    Tone at the Top .............................................................................................................. 4

    Execution of Foreign Policy Goals and Objectives ..................................................... 6

    Adherence to Internal Controls ................................................................................... 7

INTERNATIONAL RELIGIOUS FREEDOM ........................................................................ 7

    Ambassador at Large for International Religious Freedom ....................................... 7

    Office of International Religious Freedom .................................................................. 8

    Partial Progress Made in Implementing Wolf Act ..................................................... 8

SECURITY AND HUMAN RIGHTS .................................................................................... 9

POLICY IMPLEMENTATION ........................................................................................... 14

    Regional Offices .......................................................................................................... 14

    Multilateral and Functional Offices .......................................................................... 16

ADMINISTRATIVE OPERATIONS ................................................................................... 19

    Office of the Executive Director ................................................................................ 19

    Human Resources ....................................................................................................... 19

    Contract Management ................................................................................................ 19

    Bureau Security Program ........................................................................................... 20

INFORMATION MANAGEMENT .................................................................................... 20

RECOMMENDATIONS .................................................................................................... 24

PRINCIPAL OFFICIALS .................................................................................................... 28

APPENDIX A: OBJECTIVES, SCOPE, AND METHODOLOGY .......................................... 29

APPENDIX B: MANAGEMENT RESPONSES ................................................................... 31

APPENDIX C: THE LEAHY VETTING PROCESS ............................................................... 39

ABBREVIATIONS ............................................................................................................. 40

OIG INSPECTION TEAM MEMBERS ............................................................................... 41

UNCLASSIFIED

# CONTEXT

The Bureau of Democracy, Human Rights, and Labor (DRL), established in 1975, leads Department of State (Department) efforts to encourage democracy, defend human rights, and improve labor rights around the world.[1] Since its establishment, DRL's mandate has expanded to include priorities such as child soldier protection, internet freedom, and combatting anti-Semitism. DRL, together with the Bureau of Oceans and International Environmental and Scientific Affairs (OES), also supports administrative operations for the Ambassador at Large for International Religious Freedom, a position established by Congress in 1998.[2]

DRL carries out its mandate to promote human rights and democracy, in part, through policy engagement. DRL engages with partners within the U.S. Government, the United Nations, nongovernmental organizations, and foreign governments to advance human rights issues. DRL produces or contributes to approximately 40 congressionally mandated and other reports annually, including the Annual Country Reports on Human Rights ("Human Rights Reports") that document human rights conditions overseas. The Office of the Ambassador at Large for International Religious Freedom prepares the Annual Report on International Religious Freedom. DRL oversees visa ineligibility and sanctions programs, such as those established under the Global Magnitsky Human Rights Accountability Act,[3] to deter human rights abuses.

DRL also promotes human rights and democracy through foreign assistance programs managed by its Office of Global Programming. The bureau managed more than 450 multi-year awards to approximately 380 nongovernmental organizations focused on supporting human rights organizations, journalists, and other civil society partners. DRL's rapid response programs facilitate protection of human rights activists and other individuals at imminent risk of arrest, torture, or extrajudicial killing. Finally, DRL is responsible for the Leahy vetting program, which screens U.S. security assistance recipients to ensure that no assistance is provided to individuals and units of security forces that have committed gross violations of human rights.[4]

The Department's Joint Strategic Plan[5] identifies promotion of democracy, human rights, and rule of law as key activities to protect American security at home and abroad. At the time of the inspection, DRL was in the process of preparing its FY 2019 – FY 2021 Functional Bureau

---

[1] DRL's policy and program responsibilities are outlined in 1 Foreign Affairs Manual 511.1(2).

[2] International Religious Freedom Act of 1998, 22 U.S. Code (U.S.C.) Chapter 73, §§ 6411 to 6417 (1998).

[3] The Global Magnitsky Human Rights Accountability Act is contained in Section 1261 of the National Defense Authorization Act for Fiscal Year 2017, 22 U.S.C. 2656 (2016).

[4] The term "Leahy law" refers to two statutory provisions prohibiting the U.S. Government from furnishing assistance under the Foreign Assistance Act, the Arms Export Control Act, or Department of Defense authorities to units of foreign security forces where there is credible information implicating that unit in the commission of gross violations of human rights. One statutory provision applies to the Department of State and the other to the Department of Defense. Section 620M of the Foreign Assistance Act of 1961, 22 U.S.C. 2378d, made the Department's Leahy law permanent. The Department of Defense Leahy law is in Section 362 of Title 10 of the U.S. Code.

[5] Department of State and U.S. Agency for International Development, *Joint Strategic Plan FY 2018 – 2022* (2/2018).

Strategy, its primary strategic planning document. However, DRL's FY 2019 Bureau Resource Request—a strategic planning document prepared annually to identify resource needs—identified seven areas of focus: protection of ethnic and religious minorities and marginalized populations; support for human rights defenders and civil society; multilateral efforts to promote human rights; security and human rights; promotion of internationally recognized labor rights; business and human rights; and public diplomacy.

The bureau's authorized staffing ceiling comprised 137 Foreign Service and Civil Service employees organized in 12 offices and supervised by an assistant secretary, a principal deputy assistant secretary, two deputy assistant secretaries, and two senior advisors. The assistant secretary position, the principal deputy assistant secretary position, and one deputy assistant secretary positions had yet to be permanently filled at the time of the inspection. Six offices addressed human rights policy issues in geographic regions. The other six offices addressed, respectively, foreign assistance programs, labor affairs, international religious freedom, multilateral affairs, public diplomacy, and security and human rights. The Office of the Executive Director is a shared administrative office that supports both DRL and OES. The latter bureau formally supervises the Executive Director. Figure 1 details the bureau's organizational structure.

The bureau faced an expanding policy and program management workload while operating under the Department-wide hiring freeze.[6] At the same time, DRL managed $401.9 million in foreign assistance funds in FY 2017, with bureau funding for its two largest accounts—the Human Rights and Democracy Fund and Economic Support Fund—nearly doubling between 2013 and 2018. From 2011 to 2017, the bureau's Leahy vetting workload increased 42 percent. The passage of the Global Magnitsky Human Rights Accountability Act in 2016, which introduced additional authorities to impose economic sanctions, as well as visa ineligibilities, also increased the workload associated with these functions. Total bureau funding in FY 2017 was $415.2 million, including funding appropriated for the National Endowment for Democracy.[7] Bureau-managed funding is shown in Figure 2.

OIG evaluated the bureau's strategic planning, policy implementation, resource management, and management controls consistent with Section 209 of the Foreign Service Act.[8] In addition, OIG evaluated selected policy and program responsibilities for the Ambassador at Large for International Religious Freedom and the Office of International Religious Freedom. This report

---

[6] The Office of Management and Budget first announced a Government-wide hiring freeze on January 23, 2017. While most positions were frozen and could not be filled if vacant, the Secretary approved specific exemptions to the hiring freeze to ensure the Department was able to meet critical needs. The Secretary lifted the hiring freeze in May 2018.

[7] In 1983, the National Endowment for Democracy Act (Public Law (P.L.) 98-164, Stat. 1039 (1983), codified as 22 U.S.C. §§ 4411-4416), established the National Endowment for Democracy. Although it is a nongovernmental organization, Congress provides an annual appropriation which DRL transfers to the Endowment via a grant agreement.

[8] See Appendix A.

UNCLASSIFIED

should be read in conjunction with the companion report on the bureau's management of its foreign assistance resources, prepared concurrently with this report.[9]

## Figure 1. Bureau of Democracy, Human Rights, and Labor Organizational Chart



**Source**: OIG adaptation of DRL information. Supervisory responsibility for the Senior Bureau Official and Deputy Assistant Secretaries is indicated by color shading.

---

[9] OIG, *Inspection of the Bureau of Democracy, Human Rights, and Labor's Foreign Assistance Program Management* (ISP-I-19-12, October, 2018).

UNCLASSIFIED

**Figure 2. FY 2017 Bureau-Managed Resources (in $ thousands)**



**Source:** OIG adaptation of DRL information.

# EXECUTIVE DIRECTION

## Tone at the Top

OIG assessed bureau leadership on the basis of 306 interviews; questionnaires completed by 202 staff members and contractors; 93 surveys completed by overseas posts; OIG's review of documents; and observations of bureau activities during the inspection. OIG also conducted 92 interviews with Department, interagency, and nongovernmental organization partners that elicited comments on DRL's performance on policy and program management.

At the time of the inspection, the Assistant Secretary position had been vacant for 15 months, and two of the three deputy assistant secretary positions also were vacant. The President nominated an Assistant Secretary in June 2018. The bureau's Senior Bureau Official (SBO), a career member of the Senior Executive Service, assumed bureau leadership duties in October 2017 after the retirement of the former acting Assistant Secretary. In prior assignments, the SBO served as the Principal Deputy Assistant Secretary in DRL and in the Bureau of Inter-American Affairs, as Senior Director for Human Rights in the National Security Council, and as U.S. Ambassador to Belarus, among other senior-level assignments.

*Leadership Provided Institutional Continuity During Transition Period*

In interviews with OIG, bureau employees credited the SBO with providing institutional continuity during an extended leadership transition period. The SBO personally supervised seven of the bureau's offices during his tenure in the position. In addition, he undertook the full range of principal deputy assistant secretary responsibilities for managing the bureau and leading on policy issues. During the inspection, he accompanied the Acting Secretary to the public release of the Human Rights Reports and, over a 3-month period, hosted 14 delegations or external meetings with foreign officials and nongovernmental organizations. Bureau employees consistently told OIG that the SBO modeled positive leadership traits set out in 3 FAM 1214, such as taking time to develop and mentor employees. OIG observed an open, collegial working relationship between the Front Office—which included the SBO, a deputy assistant secretary, and an acting deputy assistant secretary—and the office directors.

However, employees below the office director level viewed communication between the SBO and the rest of the bureau as problematic. Specifically, DRL employees told OIG that a lack of personal contact with the SBO and an absence of vision from the Front Office inhibited understanding of the bureau's policy priorities. While crediting leadership with soliciting "bottom up" input from staff, they characterized the bureau's overall approach as reactive rather than strategic. Furthermore, the bureau lacked an effective system for tracking internal daily action items. OIG advised the bureau to identify a chief of staff or office director to assist with managing internal business, including internal daily action items, more effectively. OIG also advised the SBO to attend more staff meetings to share policy perspectives, which he began to do during the inspection.

*Staffing Constraints Prevented Efficient Allocation of Resources*

OIG found that staffing constraints limited DRL's ability to secure and efficiently allocate the resources required to execute core bureau functions, including the management of foreign assistance, Leahy vetting, and assessments required for human rights visa ineligibilities. As discussed below, the bureau's lack of effective strategic planning processes also contributed to this deficiency. DRL employees told OIG the hiring freeze and an associated moratorium on internal organizational changes pending release of the agency's reform plan hindered the bureau's ability to plan and respond to new workload demands.[10] Following the Department's lifting of its hiring freeze in May 2018, the Bureau of Human Resources reduced DRL's Civil Service employment ceiling by 30 positions. During the inspection, DRL formed a working group on staffing and resource allocation and requested assistance from the Bureau of Human Resources to address staffing and organizational issues identified in this report.

---

[10] In March 2017, the President issued Executive Order 13781 with the stated goal of improving the efficiency, effectiveness, and accountability of the executive branch through restructuring and staffing reductions. In April 2017, the Office of Management and Budget set a September 2017 deadline for final agency reform plans, including longer term workforce reductions. As of August 2018, the Department had not publicly released an agency reform plan.

## Execution of Foreign Policy Goals and Objectives

Department senior officials and other agency employees interviewed by OIG said that DRL worked effectively with them to advance human rights issues. In addition, all eight representatives of nongovernmental organizations interviewed by OIG said they had a strong and effective relationship with DRL.[11] The bureau's responsibility for integrating democracy, human rights, and labor affairs into U.S. foreign policy[12] required it to engage in dialogue with regional bureaus and embassies on sensitive human rights issues—a role that sometimes placed it in conflict with these organizations when their views on policy issues differed. Despite this inherent tension, Department senior officials and other agency employees told OIG that DRL's Front Office was pragmatic and generally effective in advancing human rights issues. For example, in at least two cases, DRL elevated to the Secretary issues for decision in which its views differed from those of regional bureaus, resulting in final policy decisions that adopted DRL's position. However, senior officials at five of six regional bureaus interviewed said that DRL's institutional influence had been reduced due to the extended absence of a confirmed Assistant Secretary.

### *Bureau Did Not Use Strategic Planning Processes Effectively*

DRL did not effectively use strategic planning processes to develop policy goals and align resources with priorities. Specifically, OIG found that the bureau lacked systematic processes to develop long-term policy and program goals and monitor results. For example, the bureau's Front Office did not form internal working groups to formulate policy, coordinate efforts, and measure results for key countries, such as China, or for concerns that affect multiple countries, such as labor issues. Effective strategic planning processes were especially important because of DRL's expanding workload and constrained staffing resources during the Department's hiring freeze. Because DRL's offices perform discrete but related roles—such as policy development, media outreach, multilateral engagement, and foreign assistance programming—formal coordination is important to cohesively advance policy goals. DRL employees told OIG that offices did not participate systematically in preparing formal strategic planning documents. Instead, the bureau developed priorities primarily through preparation of annual high-level policy papers written by DRL's regional offices. Staff reported that these documents generally were not useful in prioritizing their work and were designed mainly to guide foreign assistance programming decisions. A lack of clear strategic policy prioritization, in turn, complicated the bureau's ability to meet its expanding policy and program workload. As described in 18 FAM 301.2-4(C)b, senior leaders must institute regular reviews to assess progress against bureau and mission-level objectives to ensure alignment of policy, planning, resources, and program decision making. Without an effective strategic planning process to set priorities and measure results, the bureau risked not accomplishing policy objectives and managing programs efficiently.

---

[11] Soliciting input from nongovernmental organizations is a DRL human rights policy responsibility described in 22 U.S.C. § 262d(d), among other provisions of law.

[12] 1 FAM 511.1(2).

**Recommendation 1:** The Bureau of Democracy, Human Rights, and Labor should institute a formal, periodic process to develop policy goals, monitor results, and align resources with priorities. (Action: DRL)

## Adherence to Internal Controls

In preparing the 2017 Annual Management Controls Statement of Assurance, DRL did not review its bureau programs and processes to identify significant deficiencies or material weaknesses. As a result, it did not develop plans and approaches to mitigate any identified risks, nor did it report any significant deficiencies or material weaknesses in its Statement of Assurance. During the inspection, OIG identified several management control deficiencies and challenges related to Leahy vetting, contract and grants management, and performance of visa ineligibility functions. These deficiencies are discussed later in this report, as well as in the companion foreign assistance program management report.

# INTERNATIONAL RELIGIOUS FREEDOM

## Ambassador at Large for International Religious Freedom

The International Religious Freedom Act of 1998 established the Office of International Religious Freedom and the position of Ambassador at Large for International Religious Freedom. The 2016 Frank R. Wolf International Religious Freedom Act ("Wolf Act") strengthened the authorities and independence of the Ambassador at Large.[13] Among other changes, the Wolf Act assigned responsibility to the Ambassador at Large to coordinate international religious freedom policies across all U.S. Government programs and projects. The Wolf Act also required that the Ambassador at Large report directly to the Secretary. Organizationally, however, the Office of the Ambassador at Large for International Religious Freedom is housed within DRL.

The current Ambassador at Large for International Religious Freedom was sworn in on February 1, 2018. Employees described the Ambassador at Large, a former U.S. senator and a sponsor of the International Religious Freedom Act of 1998, as inclusive, knowledgeable, and clear in articulating policy priorities, such as preventing the spread of extremist ideology and elevating international religious freedom issues in the Department and across the Federal government. The Ambassador at Large reported that he had direct access to the Secretary through senior staff meetings and personal interaction. Under his direction, the Office of International Religious Freedom planned a ministerial conference on international religious freedom, which the Secretary hosted in July 2018.

---

[13] Frank R. Wolf International Religious Freedom Act, 22 U.S.C. Chapter 73, §§ 6411 to 6417 (2016). As stated in the legislation, the Wolf Act is intended to advance religious freedom globally through enhanced diplomacy, training, counterterrorism, and foreign assistance efforts.

UNCLASSIFIED

## Office of International Religious Freedom

OIG found the Office of International Religious Freedom was generally effective in carrying out its policy responsibilities to advance international religious freedom issues. Regional bureau employees told OIG that the office worked effectively with them in preparing the Annual International Religious Freedom Report—the office's main statutory report—and on international religious freedom issues more generally. However, in response to a pre-inspection survey prepared by OIG, 16 of 92 respondents cited concerns about inefficient editorial processes, such as requesting unnecessary information and unfamiliarity by editors with policy issues in their countries. Office of International Religious Freedom employees told OIG that delays in approving a contracting mechanism for contract report staff contributed to some of these frictions in 2018, but they expected to address the problem in the coming year.

## Partial Progress Made in Implementing Wolf Act

OIG determined that DRL and the Office of International Religious Freedom had made partial progress in implementing the Wolf Act. Although the Department implemented key provisions of the Act, OIG identified deficiencies related to training, reporting structure, media support, and foreign assistance coordination, as described below.

### *Religious Freedom Training for Foreign Service Officers Was Behind Schedule*

The Department was behind schedule in meeting requirements to develop international religious freedom training for all Foreign Service officers. The Wolf Act required the Office of International Religious Freedom to make recommendations to the Department's Foreign Service Institute on curriculum for international religious freedom training, with training required to commence by December 2017. During the inspection, the Office of International Religious Freedom prepared two of five proposed modules for an online course to fulfill this requirement but had yet to complete the remaining three modules. Without these additional modules, the Foreign Service Institute was unable to conduct the training, as mandated by law.

> **Recommendation 2:** The Bureau of Democracy, Human Rights, and Labor should direct the Office of International Religious Freedom to complete development of curriculum for mandatory training on international religious freedom required by the Frank R. Wolf International Religious Freedom Act. (Action: DRL)

### *Reporting Structure Not Codified in Foreign Affairs Manual*

DRL did not update the FAM to reflect the Wolf Act's requirement that the Ambassador at Large report directly to the Secretary and that staff assigned to support the production of the Annual International Religious Freedom Report be directly supervised by the Ambassador at Large. OIG advised DRL and the Office of International Religious Freedom to update the FAM to reflect Wolf Act requirements.

UNCLASSIFIED

*Media Support for Ambassador at Large Was Insufficient*

OIG found that the media support DRL provided to the Office of International Religious Freedom was insufficient. To better support its needs in speechwriting, media support, and public outreach planning, the Office of International Religious Freedom in 2016 transferred a direct-hire position to DRL's Office of Policy Planning and Public Diplomacy. However, staffing shortfalls and assignment of collateral duties left the employee who filled the direct-hire position unable to dedicate full resources to supporting the Office of International Religious Freedom. As described in the Wolf Act, the Department is required to provide adequate staff to support the Ambassador at Large for International Religious Freedom. OIG advised DRL and the Office of International Religious Freedom to develop a memorandum of understanding on speechwriting, press support, and public outreach planning to better support unmet needs in these areas.

*Coordination on International Religious Freedom Foreign Assistance Was Inefficient*

DRL employees told OIG that processes for allocating $10 million in FY 2017 Economic Support Fund monies earmarked for international religious freedom required time-consuming and inefficient coordination with regional bureaus and the Department's Office of U.S. Foreign Assistance Resources. Although the Wolf Act empowered the Ambassador at Large to coordinate all programs and projects related to international religious freedom, office employees said that project proposals developed by regional bureaus did not always incorporate the office's policy input. For example, in one instance, a regional bureau characterized an anticorruption program as an international religious freedom program. At the time of the inspection, the Office of U.S. Foreign Assistance Resources and the Office of International Religious Freedom were discussing allocating FY 2018 funding directly to the Ambassador at Large, which OIG determined would sufficiently strengthen his authority over funds related to international religious freedom.

# SECURITY AND HUMAN RIGHTS

According to 1 FAM 519.6, DRL's Office of Security and Human Rights (SHR) is responsible for leading the bureau's efforts to integrate human rights considerations into U.S. policies on international security engagement, security assistance, security cooperation, and counterterrorism. SHR also serves as the Department's lead office in creating policy for and overseeing the implementation of the Leahy laws. It coordinates the Leahy vetting process[14] and manages the International Vetting and Security Tracking (INVEST) system.[15] In addition, SHR reviews the human rights implications of sales and transfers of defense articles, promotes

[14] Appendix C of this report describes the Department's Leahy vetting process.

[15] INVEST is the U.S. Government's system of record for implementing Leahy laws. The system, launched in 2010, is a case management computer application designed to facilitate the vetting process. From 2010 through mid-April 2018, DRL processed 1,338,135 vetting cases in INVEST, of which: 1,202,300 (89.8 percent) were approved; 65,977 were suspended (4.9 percent); 3,228 were rejected (.2 percent); and 66,630 canceled (5 percent). The Department of Defense submits vetting requests for its security assistance to the Department to adjudicate in the INVEST system.

UNCLASSIFIED

policies related to conflict and atrocity prevention and response, leads the bureau's efforts to track and mitigate civilian casualties in armed conflict, and advances policies and plans to end the unlawful use of child soldiers.

## Progress Made in Institutionalizing Leahy Vetting Processes

SHR made progress in institutionalizing Leahy vetting processes since its establishment as an office in 2014. The office spearheaded the development and release of a new Leahy vetting guide[16] in 2017 and coordinated with the Department of Defense on the implementation of a joint policy on remediation.[17] Sixty-eight of 83 overseas posts that responded to OIG's survey said that the office effectively supported their needs.[18] The office processed 214,566 Leahy vetting cases in 2017, enabling the Department to deliver more than $9 billion in security assistance to partner countries, as well as additional security assistance furnished by the Department of Defense. OIG found that the office coordinated effectively with interagency partners on conflict prevention and civilian conflict mitigation. However, OIG identified internal controls, planning, and resource weaknesses that undermined the office's effectiveness, as described below. Additionally, as described in the Administrative Operations section of this report, the office faced significant challenges in developing an IT system to replace the current INVEST system, which is functionally obsolete and at risk of becoming inoperable on the Department's network.[19]

## Lack of Documented Internal Control Procedures Created Program Risks

Although DRL's 2017 Leahy Vetting Guide identified roles and responsibilities, the bureau did not have in place other procedures necessary for an effective internal controls system. Specific internal controls issues that hindered the effectiveness of the office included:

- **Lack of Embassy Compliance Monitoring:** SHR did not have processes to track, review, and analyze embassy vetting performance and compliance with certain Leahy law requirements. The office did not conduct an analysis of the 2016 "duty to inform"[20] Leahy cases—53 cases in which embassies were required to inform the foreign government recipient of reasons for withholding security assistance. A review of 2017 "duty to inform" cases was, however, underway during the inspection.

---

[16] The Leahy Vetting Guide describes how the Department and the Department of Defense Leahy laws should be implemented. It defines key terms, outlines legal considerations and procedures, and provides guidance to overseas and domestic officials who plan, resource, and deliver training or assistance to foreign security forces.

[17] Remediation is the process through which units implicated in gross violations of human rights are reassessed and can be rendered eligible to receive U.S. security assistance.

[18] Ten of 93 posts that responded to the survey listed "not applicable" as a response to support from the SHR office.

[19] Posts that responded to the survey gave low marks to the INVEST system, describing it as cumbersome and difficult to use.

[20] For cases vetted under the Department's Leahy law, a decision to reject requires the relevant embassy to inform the foreign government of a rejection, a requirement known as "duty to inform," as described in 22 U.S.C. § 2378d(c).

UNCLASSIFIED

- **Lack of DRL and Regional Bureau Compliance Monitoring:** SHR did not have processes to assess whether employees performing Leahy vetting in DRL and the six regional bureaus complied with adjudication standards. These standards, detailed in the Leahy Vetting Guide, include specific classified and unclassified checks, which, if not performed, could undermine the integrity of the process.

- **Lack of Data Quality Assurance:** SHR did not have procedures to ensure that the status of all cases the INVEST system was accurately recorded in the system, raising the risk that reports prepared from INVEST data may be inaccurate. During the inspection, SHR staff identified records that reflected up to 23,000 duplicate or otherwise administratively open cases that had accumulated since the creation of INVEST. Additionally, the INVEST system did not include all Department of Defense Leahy cases originating in Afghanistan.

- **Lack of Contract Oversight:** SHR had nine contractors who were primarily assigned responsibility for conducting Leahy vetting. OIG found that SHR did not assess and mitigate risks to ensure that contractors were not performing inherently governmental work[21] or to assess performance through oversight, such as spot checks and file reviews, an issue discussed in the Administrative Operations section of this report.

OIG found that the lack of documented internal controls procedures contributed to these deficiencies. As described in *Standards for Internal Control in the Federal Government,*[22] an effective internal controls system requires risk assessment, control activities, information and communication, and monitoring. During the inspection, the office began drafting standard operating procedures and taking steps to address some of these issues. For example, SHR began coordinating with the Office of the Secretary of Defense to enter relevant Afghanistan vetting information into INVEST on a quarterly basis. SHR also assigned a contractor to track embassy compliance with "duty to inform" cases. However, without a documented internal controls system, the bureau was at risk that Leahy vetting was not performed in accordance with Department guidance.

> **Recommendation 3:** The Bureau of Democracy, Human Rights, and Labor should develop internal control procedures for the Leahy program and monitor compliance with the procedures. (Action: DRL)

---

[21] OIG found that a contractor was the sole action officer for the office's civilian casualties program with duties that included policy liaison with the Department of Defense. Another contractor represented the office in Leahy-related policy and procedural discussions during a temporary duty visit to Embassy Manila, Philippines, and Embassy Phnom Penh, Cambodia.

[22] Government Accountability Office, *Standards for Internal Control in the Federal Government* (GAO-14-704G, September 2014), Section OV2.04.

**Figure 3. Leahy Vetting Caseload, 2011 through 2017**



**Source:** DRL.

*Lack of Performance and Workload Metrics Hampered Program Management*

SHR did not develop performance and workload metrics to assess its performance and identify resource requirements. The number of Leahy vetting cases increased by 42 percent from 2011 through 2017, as shown in Figure 3. Despite this increase, the number of employees and contractors assigned to Leahy vetting declined from 12 to 9 between July 2016 and the time of the inspection.[23] OIG found that DRL developed plans to add staff to enhance office engagement on security assistance, humanitarian law, and training without performance and workload metrics to determine how many staff it required. These plans were postponed during the hiring freeze. Similarly, SHR planned to expand mandatory Leahy vetting to encompass material security assistance[24] to comply fully with Leahy law provisions, but did not define what resources it needed to carry out these responsibilities. SHR employees told OIG they did not prioritize the development of performance and workload metrics. As described in 18 FAM 301.2-4(C), bureau leaders must ensure alignment of planning, resources, and program decision-making. Without performance metrics and workload planning to guide policy and programmatic decisions, the bureau risked being unable to effectively carry out its core duties, particularly in the Leahy vetting program.

> **Recommendation 4:** The Bureau of Democracy, Human Rights, and Labor should develop performance and workload metrics to inform resource requirements for the Office of Security and Human Rights. (Action DRL)

---

[23] During the inspection, the SHR Leahy team included one direct-hire Leahy policy point of contact responsible for remediation, one direct-hire Department of Defense liaison, one direct-hire vetter, and nine contract vetters. Three contract vetters were not replaced when the incumbents departed in January 2017. An additional contract vetter position became vacant during the inspection.

[24] The Leahy Vetting Guide defines material security assistance as equipment, technical support, or other non-training assistance.

### *Staffing Limitations Inhibited Review of Possible Gross Violations of Human Rights*

SHR staff told OIG that staffing limitations prevented them from following up on all Leahy cases in which derogatory information related to gross violations of human rights (GVHR) arose during the vetting process. In cases where DRL or the embassy was unable to conclusively determine that derogatory information met the "credible information" standard in 22 U.S.C. § 2378d(a),[25] Leahy cases were placed in suspended status in INVEST. From 2015 to 2017, a total of 4,842 Leahy cases were suspended on the basis of derogatory GVHR information, while 357 cases were rejected. Although suspended individuals or units cannot receive security assistance subject to the Leahy laws, embassies are not required by Department policy to inform the recipient foreign government of the basis for withholding assistance under these circumstances. Additionally, individuals and units who otherwise could be U.S. Government partners are ineligible for assistance until their suspended status is clarified. DRL employees explained that a lack of personnel resources inhibited their ability to conduct necessary follow up work on Leahy cases, such as seeking additional information from embassies and other sources, to support a conclusive determination that met the "credible information" standard.

### *Slow Resolution of Remediation Cases Partly Attributable to Staffing Limitations*

DRL was slow to resolve remediation cases, in part because of staffing resource limitations.[26] Remediation is a process by which the Secretary of State or the Secretary of Defense, as applicable, determines that a country's government is taking effective steps to bring to justice members of the security forces unit responsible for committing GVHRs, such as torture, extrajudicial killing, enforced disappearance, and rape under color of law. As described earlier in this report, in 2015 the Department and the Department of Defense developed a joint remediation policy to define steps for this process. As of May 2018, DRL had remediated 12 cases rejected on GVHR grounds. DRL employees said that the process of remediation was slower and more labor intensive than originally anticipated in 2015, but also stated the volume of cases was lower than anticipated under the new process. DRL employees also said that staffing limitations were a key reason for slow progress on remediation.

### *Working Capital Fund Mechanism Could Help Address Resource Needs*

Unlike similar service provider organizations, DRL did not have a mechanism to finance Leahy vetting operations through a working capital fund, instead paying for them out of the bureau's

[25] 22 U.S.C. § 2378d(a) states that "no assistance shall be furnished…to any unit of the security forces of a foreign country if the Secretary of State has credible information that such unit has committed a gross violation of human rights."

[26] Remediation decisions are based on an interagency assessment of whether the host government has taken effective steps to bring responsible unit members to justice or whether the unit was restructured in a way that it may be considered a fundamentally different unit and thus not tainted by previously determined ineligibility. Administrative review refers to a separate process in which new, exculpatory information reverses the ineligibility determination.

operating budget.[27] The Department has established more than 30 different cost centers to support business operations through its working capital fund. For example, the Bureau of Administration uses a working capital fund cost center to pay for counterterrorism vetting services. A working capital fund mechanism could generate resources beyond those available in the bureau's operating budget to improve DRL's administration of the Leahy vetting program, to address areas where staffing resource limitations have affected the bureau's ability to implement the Leahy program. In addition to remediation and suspension issues discussed above, OIG observed that the following policy priorities and program management responsibilities were not fully performed, partly due to insufficient staff:

- SHR was unable to conduct regular embassy outreach to improve Leahy vetting performance or develop foreign assistance programs with the Office of Global Programs to improve human rights practices among security forces.
- SHR's deputy director served as the Child Soldiers Prevention Act officer, reducing time for core duties such as personnel management, budget planning, and Leahy vetting contract oversight.[28] The deputy director also served as a Government Technical Monitor for an urgent effort to upgrade the INVEST system. Issues related to the development of a successor system to INVEST are discussed further in the Administrative Operations section of this report.

DRL is not required to use a working capital fund mechanism to fund its Leahy vetting operations. However, OIG noted that use of such a mechanism would allow DRL to charge bureaus and agencies on a fee-for-service model based on its workload, potentially providing a more flexible resource base for operations. As such, OIG advised the bureau to explore the feasibility of a working capital fund model with relevant Department offices.

# POLICY IMPLEMENTATION

## Regional Offices

### Regional Offices Generally Effective, But Internal Coordination Could Be Improved

DRL's six regional offices[29] are responsible for monitoring observance of human rights and democratic practices and providing policy guidance to regional bureaus and embassies overseas, as outlined in 1 FAM 519.3. The regional offices maintained generally good working

---

[27] According to 1 FAM 212.1-3, the Working Capital Fund is a chargeback system managed by the Bureau of Administration's Executive Office. It is a revolving fund and is a repository for revenue collected from income-generating activities.

[28] The Child Soldiers Prevention Act requires identifying offending countries for potential designation by the Secretary of State for inclusion in the annual Trafficking in Persons report. It also requires the President to act on waiver decisions, if any, prior to the beginning of the fiscal year in which restrictions or sanctions would be applied.

[29] These are the Offices for Africa, East Asia and Pacific, Europe, Near East Asia, South and Central Asia, and Western Hemisphere.

relationships with their counterparts in the Department's regional bureaus. Regional bureau employees told OIG that DRL was effective in resolving disagreements pragmatically. Seventy-nine percent of embassies that responded to OIG's survey agreed or strongly agreed that DRL regional offices worked effectively with them on human rights policy matters. However, DRL regional office staff members told OIG they lacked visibility into bureau foreign assistance and multilateral activities, particularly on global and thematic issues. This, in turn, inhibited bureau efforts to present a coordinated policy message to embassies and other bureaus that included the full range of DRL human rights concerns. As discussed earlier in this report and in the companion foreign assistance management report, the bureau took steps during the inspection to enhance internal coordination in these areas.

## Generally Effective Processes Established for Preparing Human Rights Reports

DRL established generally effective processes for preparing the legally mandated Human Rights Reports, which address human rights issues in 199 countries and territories. DRL assigned primary responsibility for preparing the Human Rights Reports to staff in its regional offices.[30] The reports are used by Congress, the executive branch, and the judiciary as a factual resource for decision making in matters ranging from assistance to asylum cases. OIG found that the bureau issued comprehensive guidance on preparing the reports to embassies and established an effective process for producing the reports. Eighty-two percent of embassy respondents to an OIG survey (74 out of 90) agreed or strongly agreed that DRL provided effective feedback and guidance during production of the Human Rights Reports. OIG also interviewed 8 nongovernmental organizations and attended a roundtable meeting with representatives from 26 nongovernmental organizations. These organizations generally described the Human Rights Reports as comprehensive and lauded DRL's willingness to incorporate information from a wide array of sources. OIG reviewed a sample of 10 Human Rights Reports and found that all included content mandated by law, such as discussion of child labor practices, the status of internationally recognized human rights, and violations of freedom of the press. The Human Rights Reports also included non-required topics, such as corruption and lack of transparency in government.

## Office Sizes Were Below Required Minimum Number of Positions

OIG determined that consolidation of the regional offices could promote more efficient resource management and policy execution by reducing supervisory layers. None of the six regional offices met requirements in 1 FAM 014.7d(1) that offices have a minimum of 12 full-time equivalent positions. The then-Under Secretary for Management waived this requirement for five of the six offices in 2014. As a result, at the time of the inspection, DRL's regional offices had 12 supervisory positions—a director and deputy director for each office—overseeing 36 employees. OIG advised the bureau to consider, through its staffing and resource planning working group, whether office consolidation could promote more efficient resource

---

[30] Foreign Assistance Act, 22 U.S.C. 116(d), 502(b) (1971) and Trade Act, 19 U.S.C. 2464, 2467 (1974).

management. OIG also advised the bureau to comply with 1 FAM 014.6d(1) on office organization, which could include seeking a waiver from this policy or restructuring the office.

## Multilateral and Functional Offices

OIG's review of policy implementation in DRL's Offices of Multilateral and Global Affairs, International Labor Affairs, and Policy Planning and Public Diplomacy[31] found that, in general, they adequately performed responsibilities assigned under 1 FAM 510. However, OIG identified issues relating to internal planning and coordination and visa ineligibility processes in the Office of Multilateral and Global Affairs that needed attention, as discussed below.

### Office of Multilateral and Global Affairs Challenged by Complex Responsibilities, Lack of Strategic Direction

Complex responsibilities and a lack of strategic direction contributed to challenges in executing policy responsibilities in the Office of Multilateral and Global Affairs. The office supports diverse policy development and implementation in 10 areas applicable to multiple countries[32] as well as representing the United States in eight multi-stakeholder initiatives[33] and four United Nations bodies and processes.[34] In interviews with OIG, Department and other agency employees credited the office with working effectively with the U.S. Mission to the United Nations in New York, United Nations offices in Geneva, and with the Bureau of International Organization Affairs to advance human rights issues. However, OIG assessed that a lack of strategic direction and unclear lines of authority impeded the office's ability to execute its mission. Eighteen of 22 office employees interviewed (82 percent) told OIG they would benefit from more guidance on

---

[31] The Office of Multilateral and Global Affairs is responsible for formulating and implementing human rights and democracy policies in multilateral forums; developing and implementing policies and processes for civil society organizations and business and human rights; and for coordinating bureau policy on human rights visa ineligibilities and asylum reviews. The Office of International Labor Affairs ensures the appropriate application of U.S. laws and policy in international labor standards and initiates policy approaches to promote the rights and interests of workers in the global economy. The Office of Policy Planning and Public Diplomacy manages the bureau's congressional, media, and public outreach and coordinates DRL's strategic planning for Department and Government-wide policy and resource alignment exercises.

[32] These included democracy; elections; governance; anticorruption; civil society; rights of lesbian, gay, bisexual, transgender, and intersex persons; persons with disabilities; internet freedom; business and human rights; and visa ineligibilities.

[33] Multi-stakeholder initiatives included the Community of Democracies; the Open Government Partnership; the Freedom Online Coalition; the Global Anti-Corruption Consortium; the Equal Rights Coalition; the Voluntary Principles on Security and Human Rights Initiative; the International Code of Conduct for Private Security Services; and the Mega Sporting Events Platform on Human Rights.

[34] United Nations (UN) bodies and processes in which DRL engages include: the UN Human Rights Council; the UN General Assembly Third Committee; the UN Office of the High Commissioner for Human Rights; and the Universal Periodic Review process. The office also engages in the UN Security Council on human rights issues; the UN Economic and Social Council's Committee on Non-Governmental Organizations on restriction issues; reviews and provides input on U.S. reports on implementation of obligations to treaty bodies; and interacts with special rapporteurs, special representatives, and independent experts in human rights areas (special procedures), part of the Human Rights Commission.

planning and strategic priorities from the DRL Front Office and office leadership. Employees also told OIG that layered internal clearance processes and unclear lines of reporting and responsibility contributed to difficulties in managing their workload efficiently. OIG advised the office to identify strategic priorities consistent with the principles set forth in 3 FAM 1214, clarify its business processes, and strengthen coordination within DRL on thematic issues. During the inspection, the office director reassigned portfolios, subdivided the global team to provide greater direction, and announced a strategic planning offsite for employees.

### Bureau Did Not Efficiently Carry Out Visa Ineligibility Responsibilities

DRL did not efficiently carry out its responsibilities for preparing human rights assessments for visa processing, sanctions, and other immigration functions. As described in 1 FAM 519.4, DRL's Office of Multilateral and Global Affairs is responsible for coordinating bureau policy on human rights visa ineligibilities, including preparation of human rights assessments for seven visa ineligibility authorities.[35] Using these authorities, the Department is able to prevent individuals implicated in human rights violations from obtaining a U.S. visa. Specifically, OIG found that the bureau had a pending workload of 109 security advisory opinion cases[36] and 550 advisory opinion cases,[37] some of which dated back to 2009 and 2010. This occurred despite a 2015 agreement with the Bureau of Consular Affairs that set a 30-day processing goal for security advisory opinion cases. OIG previously identified visa backlog issues related to security advisory and advisory opinion delays in its inspections of Embassy Beijing, China, and the Bureau of Consular Affairs' Visa Services Directorate.[38]

The bureau also did not effectively carry out its statutory responsibilities under section 7031(c) of the Consolidated Appropriations Act, 2017, to designate foreign officials involved in GVHR as ineligible for entry to the United States.[39] DRL processed only two 7031(c) human rights-related visa ineligibility cases to completion since the law's passage in May 2017, even though the Act mandated these designations. OIG found that DRL only worked on 7031(c) cases triggered by a visa application or initiated by another bureau. It did not identify or analyze other information—

[35] DRL also works with the Bureau of Consular Affairs and Department of Homeland Security on asylum issues, humanitarian parole, removals, and overseas verification requests.

[36] A security advisory opinion is a special clearance required for certain visa applicants who are listed in the Consular Lookout and Support System or for whom the consular officer has reason to believe may warrant increased scrutiny related to national security concerns. Their use and processes are outlined in 9 FAM 304.2.

[37] An advisory opinion is provided by the Bureau of Consular Affairs on questions related to proper visa classification, specific grounds of visa ineligibility under the Immigration and Nationality Act Section 212(a) (other than certain human rights and security-related ground of ineligibility under INA 222(f)), and other legal issues concerning visa applications. Their use and processes are outlined in 9 FAM 304.3.

[38] OIG, *Inspection of Embassy Beijing and Constituent Posts, China* (ISP-I-18-04, December 2017); *Inspection of the Bureau of Consular Affairs, Visa Services Directorate* (ISP-I-15-01, October 2014).

[39] The Consolidated Appropriations Act, 2017 (P.L. 115-31), Section 7031(c), requires foreign officials involved in gross violations of human rights be designated as ineligible for entry to the United States. Paragraph (1)(B) stipulates such designations be made without regard to whether the individual has applied for a visa.

such as embassy reporting or Leahy vetting information—that could constitute credible information of GVHR by foreign government officials.

OIG determined that three issues contributed to these deficiencies. First, DRL did not dedicate sufficient staff, training, or strategic direction to address visa ineligibility issues. The bureau assigned visa responsibilities to three employees as a part-time duty and typically delegated preparation of human rights assessments to DRL regional offices. The bureau did not, however, sufficiently train staff in the regional offices or the Office of Multilateral and Global Affairs to draft human rights assessments that met the legal standards needed to support ineligibility designations.[40] Second, DRL employees told OIG that the complexity of the visa ineligibility designation process and required evidentiary standards made the process time-consuming and cumbersome to administer. Finally, employees lacked clear guidance on whether information on GVHR available to the Department through the Leahy vetting process or embassy reporting required action under section 7031(c). DRL had not updated or finalized a standard operating procedure for such cases with the Bureau of Consular Affairs and the Office of the Legal Adviser that addressed requirements of the Consolidated Appropriations Act, 2017.

Without strategic direction and appropriate staffing for the visa function, the bureau failed to prepare human rights assessments for visa ineligibility determinations in a timely manner. Without an updated standard operating procedure for Section 7031(c) visas, the bureau lacked clear guidance to enable it to implement statutory requirements. These deficiencies, in turn, presented litigation risks for the Department. For example, the Department was sued in 2016 because of the lack of timely adjudication of a visa related to a forced abortion case. Delays in adjudicating visas are inconsistent with the Department's obligation to provide visa services in a vigilant, efficient, and timely manner.[41]

>**Recommendation 5:** The Bureau of Democracy, Human Rights, and Labor should identify and train dedicated staff to fulfill its statutory responsibilities to provide timely human rights assessments in connection with visa processing. (Action: DRL)

>**Recommendation 6:** The Bureau of Democracy, Human Rights, and Labor, in coordination with the Bureau of Consular Affairs and the Office of the Legal Adviser, should update and issue a standard operating procedure for processing human rights-related visa ineligibilities under Section 7031(c) of the Consolidated Appropriations Act, 2017. (Action: DRL, in coordination with CA and L)

## Spotlight on Success: Increasing Human Rights Outreach Through Social Media

DRL's Office of Policy Planning and Public Diplomacy actively used social media tools to conduct outreach on human rights issues. The bureau's Facebook page is the Department's second-most popular domestic page, with approximately 2.3 million followers, 98 percent of whom live outside the United States. The office produced 70 videos over 12 months, 52 of

---

[40] During the inspection, DRL began work on a training course on human rights-related visa issues.

[41] Bureau of Consular Affairs Functional Bureau Strategy, FY2015-2017, November 2013, Strategic Objective 2.1.

which were part of its Human Rights Heroes Initiative and spotlighted individuals and institutions engaged in human rights work around the world. For example, in December 2017, the office produced a video interview of a North Korean defector, which drew about 11,000 viewers. Its videos, tied to DRL bureau strategic priorities, were viewed 2.2 million times. Finally, the office's May 2018 interactive web chat on media literacy attracted participation by 35 U.S. embassies and other programming venues, the largest number of venues in the Department's history for such outreach, according to information reviewed by OIG.

# ADMINISTRATIVE OPERATIONS

## Office of the Executive Director

The Office of the Executive Director (EX) is the joint administrative platform for DRL and OES. The latter bureau supervises this office, which supports financial management, general services operations, human resources, and information technology (IT) functions for DRL, including the Office of International Religious Freedom. In this inspection, OIG only reviewed EX functions related to DRL. Specifically, OIG reviewed Civil Service appraisals, the Foreign Service assignments process, telework agreements, training and mentoring, contractor oversight and monitoring, property management, unliquidated obligations, and IT systems development and oversight. OIG determined that, overall, EX performed in accordance with Department guidance and policies, with the exceptions discussed below.

## Human Resources

### Training and Professional Development Needed Attention

OIG determined that at the start of the inspection in April 2018, the bureau lacked a formal training policy and plan. As described in 13 FAM 011a, training is essential to build and maintain a skilled workforce—a particular concern for DRL because of its specialized mission and relatively junior workforce. Only 11 percent of the bureau's staff reported more than a decade of Department work experience, while 28 percent had worked in the bureau for less than one year. Partly due to the lack of a formal training policy and plan, the bureau did not systematically monitor mandatory training or training essential to effective performance. For example, 39 percent of employees had not completed or were overdue for mandatory counterintelligence training. During the inspection, the bureau developed and distributed a training policy and plan. Accordingly, OIG did not make a recommendation to address this issue.

## Contract Management

### Contracting Officer's Representatives Did Not Monitor Contractor Performance

DRL's contracting officer's representatives (CORs) did not monitor contractor performance in accordance with Department standards. Guidance in 14 Foreign Affairs Handbook (FAH)-2 H-142b and 14 FAH-2 H-522.9 states that CORs are responsible for developing specifications to

he

_____

m

he

__

measure the quality of labor-hour contracts and ensuring that contractors conduct their duties efficiently and use effective cost controls. DRL spent approximately $6.8 million on labor-hour contracts in FY 2017, with 62 contract staff performing functions such as Leahy vetting, grants management, and administrative support. OIG determined that the CORs oversaw day-to-day activities of contract staff and verified contract invoices. However, OIG found no documentation—such as progress or status reports, contractor outputs, or customer feedback—to confirm that CORs conducted monitoring and assessments of contract staff performance. CORs told OIG they were unfamiliar with methods required to document contractor performance. A lack of monitoring of contract performance increases the risk of waste, fraud, and mismanagement of U.S. Government resources.

> **Recommendation 7:** The Bureau of Democracy, Human Rights, and Labor, in coordination with the Bureau of Oceans and International Environmental and Scientific Affairs, should monitor and document the performance of its labor-hours contracts in accordance with Department standards. (Action: DRL, in coordination with OES)

## Bureau Security Program

The Bureau of Diplomatic Security's designated bureau security officer oversaw DRL's security program and assisted EX and 14 unit security officers in developing policies and procedures to protect classified information and bureau personnel. The bureau security officer also delivered training and provided guidance to unit security officers. OIG reviewed DRL's security program implementation and found the program was in compliance with requirements.

# INFORMATION MANAGEMENT

The EX Information Management Division supported approximately 400 domestic users in DRL and OES. The division also supports development of bureau IT systems, manages mobile devices, performs information systems security officer functions, and interfaces with the Bureau of Information Resource Management's centralized help desk. Additionally, DRL's SHR office managed IT systems development for Leahy vetting-related functions. OIG determined that, overall, the division performed its responsibilities in accordance with Department guidance and policies. However, OIG identified insufficient project planning and oversight for DRL-managed IT projects that raised risks of cost overruns and delays in replacing the current INVEST system. These delays, in turn, raise the risk that the current INVEST system could become functionally inoperable by 2019, potentially compromising the Department's ability to conduct Leahy vetting. These issues are discussed below.

## *Bureau Did Not Follow Department Project Planning Standards*

DRL did not follow Department standards outlined in 5 FAM 615 for IT project planning. Specifically, OIG determined that DRL did not prepare a project plan that included necessary budget and planning elements for the INVESTc system, the system intended to replace the

current INVEST system.[42] DRL spent approximately $4 million on INVESTc development and deployment through FY 2018 but was unable to provide an estimate of overall anticipated costs for the system. Furthermore, DRL was unable to provide a detailed breakdown of costs, including items such as IT security and personnel. According to Office of Management and Budget Circular A-130,[43] agencies must have IT capital investment plans and budgetary requests to ensure that costs are explicitly identified. According to 5 FAM 617.2b(6) and (7), the project manager is responsible for establishing a budget and ensuring that the project operates within budget constraints. However, the bureau lacked a qualified direct-hire project director to perform these duties. Without a complete project plan, DRL cannot effectively control costs, raising the risk of cost overruns and waste of government resources.

> **Recommendation 8:** The Bureau of Democracy, Human Rights, and Labor, in coordination with the Bureau of Oceans and International Environmental and Scientific Affairs, should develop a project plan for the INVESTc project to meet Department and Federal information technology budget planning standards. (Action: DRL, in coordination with OES)

### Bureau Lacked Technically Qualified Project Director to Oversee Complex Acquisition

As stated previously, DRL lacked a technically qualified direct-hire project manager to oversee the development of INVESTc. A technically qualified project manager is especially important to ensure successful achievement of cost, schedule, and performance goals for a multi-million dollar acquisition. The deficiency occurred, in part, because DRL's Acting Assistant Secretary in 2016 transferred responsibility and oversight for INVESTc from the Information Management Division to SHR, without identifying a technically qualified direct-hire project manager to oversee the project. Instead, the bureau designated the SHR deputy office director as the Government Technical Monitor for the project despite his not having the required technical background or training. As stated in 5 FAM 623.2, IT project managers must be direct-hire employees who meet five standards related to training, education, and technical proficiency. Without adequate project oversight, DRL is at elevated risk of cost overruns and insufficient oversight of contractor work.

> **Recommendation 9:** The Bureau of Democracy, Human Rights, and Labor, in coordination with the Bureau of Oceans and International Environmental and Scientific Affairs, should appoint a technically qualified direct-hire project manager to oversee the INVESTc project to

---

[42] In 2014, DRL initiated planning to replace the current INVEST system. DRL initiated a project known as INVEST 2.0 in 2016 to replace the current INVEST system. It terminated the project in 2017, based on an assessment that the system was incompatible with the Department's move to cloud-based computing. It initiated a new system, INVESTc, to continue this effort.

[43] Office of Management and Budget Circular A-130, *Management of Federal Information Resources, dated* July 28. 2016, states that agencies, in accordance with the Federal Information Technology Acquisition Reform Act and related Office of Management and Budget policy, shall have IT capital investment plans and budgetary requests to ensure that costs are explicitly identified and included, with respect to any IT resources.

ensure it meets Department information technology standards. (Action: DRL, in coordination with OES)

## INVEST System Lacked Valid Authorization to Operate

The authorization to operate for the current INVEST system expired in 2013.[44] The Information Management Division did not pursue renewal of the authorization to operate because it had anticipated replacing the current system in the near future. As a result, DRL has operated the INVEST system for more than 5 years without assurance that it met Department and Federal IT security standards. Department standards in 12 FAH-10 H-312.4 state that information systems must undergo reassessment and reauthorization every 3 years. In addition, 5 FAM 1066.1-3c states that all Federal Information Security Management Act reportable information systems within the Department must complete the systems authorization process. Without an updated security assessment and a subsequent authorization to operate, DRL lacked assurance that the INVEST system had IT security controls in place to protect against information housed in the system being compromised.

> **Recommendation 10:** The Bureau of Democracy, Human Rights, and Labor, in coordination with the Bureau of Oceans and International Environmental and Scientific Affairs, should update the INVEST system's authorization to operate, in accordance with Department standards. (Action: DRL, in coordination with OES)

## Noncompliance with Acquisition Planning Processes Led to Waste of Government Funds

Noncompliance with Department IT acquisition planning processes led to the waste of $1.92 million in Government funds for a separate IT system intended to support Leahy vetting functions. DRL initiated the project in 2015 to develop an IT system that would allow the bureau to better integrate, manipulate, and manage data for different reporting tasks related to Leahy vetting. The project was terminated in 2017 without producing a viable system. OIG was unable to identify a complete project plan for this project, as required in 5 FAM 615. The Bureau of Administration's Office of Acquisitions Management awarded a contract on September 14, 2015, with a base year award value of $913,000 and four option years, for a total of award value of $19.9 million. However, neither the contract nor other information OIG reviewed contained the required information on key personnel, performance measures, identification of issues and risks, or an estimation of annual operating costs.

OIG determined that Information Management Division personnel had raised concerns with DRL staff about the project's cost, goals, and feasibility when it was under development. Specifically, staff members were concerned that the project was inaccurately categorized as a low risk

---

[44] The authorization to operate is a formal declaration by the Department's Chief Information Officer—after a security controls assessment—that the system has implemented sufficient IT security controls and that the authorizing official accepts any remaining risks.

UNCLASSIFIED

system, as defined in Federal Information Processing Standards Publication 199.[45] Furthermore, they raised concerns that the vendor's cloud-based computing proposal might not meet Department IT standards.[46] However, DRL assigned project management responsibilities to a contractor and proceeded to develop the system without further interaction with Information Management Division IT staff. The bureau ultimately determined that the system was not technically feasible and terminated the project after expending $1.92 million of the contract's $19.9 million total value. OIG did not make a recommendation in this report because the funds cannot be recovered and the project was terminated.

---

[45] National Institute of Standards and Technology *Standards for Security Categorization of Federal Information and Information Systems*, (2004).

[46] As described in 5 FAH-8 H-351.3a(1), a system owner must perform due diligence to document that a proposed cloud-based computing project complies with Department standards and is submitted to the Cloud Computing Governance Board for approval.

UNCLASSIFIED

UNCLASSIFIED

# RECOMMENDATIONS

OIG provided a draft of this report to Department stakeholders for their review and comment on the findings and recommendations. OIG issued the following recommendations to the Bureau of Democracy, Human Rights, and Labor. The bureau's complete response can be found in Appendix B. The bureau also provided technical comments that were incorporated into the report, as appropriate.

**Recommendation 1:** The Bureau of Democracy, Human Rights, and Labor should institute a formal, periodic process to develop policy goals, monitor results, and align resources with priorities. (Action: DRL)

**Management Response:** In its October 16, 2018, response, the Bureau of Democracy, Human Rights, and Labor concurred with the recommendation.

**OIG Reply:** OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation of the bureau's formal, periodic process to develop policy goals, monitor results, and align resources with priorities.

**Recommendation 2:** The Bureau of Democracy, Human Rights, and Labor should direct the Office of International Religious Freedom to complete development of curriculum for mandatory training on international religious freedom required by the Frank R. Wolf International Religious Freedom Act. (Action: DRL)

**Management Response:** In its October 16, 2018, response, the Bureau of Democracy, Human Rights, and Labor concurred with the recommendation. The bureau noted an estimated compliance date of December 2018.

**OIG Reply:** OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation of the completed curriculum for mandatory training on international religious freedom required by the Frank R. Wolf International Religious Freedom Act.

**Recommendation 3:** The Bureau of Democracy, Human Rights, and Labor should develop internal control procedures for the Leahy program and monitor compliance with the procedures. (Action: DRL)

**Management Response:** In its October 16, 2018, response, the Bureau of Democracy, Human Rights, and Labor concurred with the recommendation.

**OIG Reply:** OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation of the Bureau of Democracy, Human Rights, and Labor's internal control procedures and its compliance monitoring plan.

UNCLASSIFIED

**Recommendation 4:** The Bureau of Democracy, Human Rights, and Labor should develop performance and workload metrics to inform resource requirements for the Office of Security and Human Rights. (Action: DRL)

**Management Response:** In its October 16, 2018, response, the Bureau of Democracy, Human Rights, and Labor concurred with the recommendation. However, the bureau disagreed with OIG's assessment that the slow resolution of remediation cases was due to staffing limitations. The bureau noted that the primary cause of the delay has been the requests of other bureaus for additional, highly detailed information and the difficulties embassies have faced in obtaining such information from host governments.

**OIG Reply:** OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation of the Bureau of Democracy, Human Rights, and Labor's use of performance and workload metrics to inform resource requirements for the Office of Security and Human Rights.

**Recommendation 5:** The Bureau of Democracy, Human Rights, and Labor should identify and train dedicated staff to fulfill its statutory responsibilities to provide timely human rights assessments in connection with visa processing. (Action: DRL)

**Management Response:** In its October 16, 2018, response, the Bureau of Democracy, Human Rights, and Labor concurred with the recommendation.

**OIG Reply:** OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation of the Bureau of Democracy, Human Rights, and Labor designating and training staff to provide timely human rights assessments in connection with visa processing.

**Recommendation 6:** The Bureau of Democracy, Human Rights, and Labor, in coordination with the Bureau of Consular Affairs and the Office of the Legal Adviser, should update and issue a standard operating procedure for processing human rights-related visa ineligibilities under Section 7031(c) of the Consolidated Appropriations Act, 2017. (Action: DRL, in coordination with CA and L)

**Management Response:** In its October 16, 2018, response, the Bureau of Democracy, Human Rights, and Labor concurred with the recommendation.

**OIG Reply:** OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation of the Bureau of Democracy, Human Rights, and Labor's standard operating procedure for processing human rights-related visa ineligibilities under Section 7031(c) of the Consolidated Appropriations Act, 2017.

**Recommendation 7:** The Bureau of Democracy, Human Rights, and Labor, in coordination with the Bureau of Oceans and International Environmental and Scientific Affairs, should monitor and document the performance of its labor-hours contracts in accordance with Department standards. (Action: DRL, in coordination with OES)

**Management Response:** In its October 16, 2018, response, the Bureau of Democracy, Human Rights, and Labor concurred with the recommendation.

**OIG Reply:** OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation of the Bureau of Democracy, Human Rights, and Labor monitoring the performance of its labor-hours contracts in accordance with Department standards.

**Recommendation 8:** The Bureau of Democracy, Human Rights, and Labor, in coordination with the Bureau of Oceans and International Environmental and Scientific Affairs, should develop a project plan for the INVESTc project to meet Department and Federal information technology budget planning standards. (Action: DRL, in coordination with OES)

**Management Response:** In its October 16, 2018, response, the Bureau of Democracy, Human Rights, and Labor concurred with the recommendation.

**OIG Reply:** OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation of the Bureau of Democracy, Human Rights, and Labor's project plan for the INVESTc project that meets Department and Federal information technology budget planning standards.

**Recommendation 9:** The Bureau of Democracy, Human Rights, and Labor, in coordination with the Bureau of Oceans and International Environmental and Scientific Affairs, should appoint a technically qualified direct-hire project manager to oversee the INVESTc project to ensure it meets Department information technology standards. (Action: DRL, in coordination with OES)

**Management Response:** In its October 16, 2018, response, the Bureau of Democracy, Human Rights, and Labor concurred with the recommendation.

**OIG Reply:** OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation of a technically qualified direct-hire project manager appointed to oversee the INVESTc project.

**Recommendation 10:** The Bureau of Democracy, Human Rights, and Labor, in coordination with the Bureau of Oceans and International Environmental and Scientific Affairs, should update the INVEST system's authorization to operate, in accordance with Department standards. (Action: DRL, in coordination with OES)

**Management Response:** In its October 16, 2018, response, the Bureau of Democracy, Human Rights, and Labor concurred with the recommendation.

**OIG Reply:** OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation of the updated authorization to operate for the INVEST system.



# HELP FIGHT

## FRAUD. WASTE. ABUSE.

1-800-409-9926
**www.stateoig.gov/HOTLINE**
If you fear reprisal, contact the
OIG Whistleblower Ombudsman to learn more about your rights:
**WPEAOmbuds@stateOIG.gov**

**www.stateoig.gov**

Office of Inspector General • U.S. Department of State • P.O. Box 9778 • Arlington, VA 22219

# EXHIBIT E



An official website of the United States government   Here's how you know

Employees    Job Seekers    Students    Travelers

POLICY ISSUES        COUNTRIES & AREAS        BUREAUS & OFFICES        ABOUT

| Bureau Home | **About Us** | Leadership | Remarks and Releases | Key Topics | Programs | Reports |

★ ★ ★

# About Us – Bureau of Democracy, Human Rights, and Labor

BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR

Share

The Bureau of Democracy, Human Rights, and Labor was created in 1977 to help advance individual liberty and democratic freedoms around the world.  It addresses the fundamental freedoms set forth in the founding documents of the United States and the complementary articles of the Universal Declaration of Human Rights and other global and regional commitments.  The United States supports the aspirations of those persons who long to live in freedom and under democratic governments as a means of combating terrorism and the spread of authoritarianism and advancing a free, peaceful, and prosperous world on behalf of the American people.

The Department uses a wide range of tools to advance freedom and democracy, including bilateral diplomacy, multilateral engagement, foreign assistance, reporting and public outreach, and economic sanctions.  The United States works with democratic partners, international and regional organizations, non-governmental organizations, and engaged citizens to support the aspirations of those seeking freedom.

White House    USA.gov    Office of the Inspector General    Archives    Contact Us

FOLLOW US    Privacy Policy    Accessibility Statement    Copyright Information    FOIA    No FEAR Act

# EXHIBIT F



An official website of the United States government    Here's how you know

Employees     Job Seekers     Students     Travelers

POLICY ISSUES          COUNTRIES & AREAS          BUREAUS & OFFICES          ABOUT

| Bureau Home | About Us | Leadership | Remarks and Releases | Key Topics | Programs | Reports |

**PROGRAMS AND GRANTS**

★ ★ ★

# Thematic Programming Priorities

BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR

Share

## Advocacy and Public Participation

DRL programs equip civil society with the knowledge and skills to conduct effective advocacy around the world on human rights and governance issues in domestic, regional, and international fora. DRL programs also strengthen civic engagement and participation in democratic processes to hold governments accountable to citizen concerns.

# Anti-Corruption

DRL anti-corruption programs support civil society and investigative journalists in uncovering corruption, demanding reform, and increasing availability of legally actionable information for use by government and law enforcement. DRL is a founding donor of the Global Anti-Corruption Consortium (GACC), a multilateral initiative that promotes a global, transnational approach to combatting corruption.

# Freedom of Expression

DRL assists independent media outlets and journalists in some of the most sensitive environments around the world to build their own capacity and develop high-impact, in-depth news reports covering governance and human rights topics.  DRL programs support media in collaborating across borders while utilizing cutting-edge skills and technology to reveal grand-corruption among public officials and undemocratic practices that decrease the quality of governance in the region.  Recognizing the tremendous risks journalists take in holding some governments accountable, we also provide holistic security trainings that help journalists proactively address and minimize the risks from their work.  Combined with DRL's work to protect freedom of association in these environments, these programs result in better informed citizens that are able to organize and assemble freely to hold their governments accountable.

# Integrated Human Rights

DRL programs protect and defend the universal human rights, fundamental freedoms and dignity for all individuals. DRL takes an intersectional approach and provides targeted support to address barriers created by rising levels of violence, discrimination and criminalization based on religion, sex, disability, race, ethnicity, nationality, and/or sexual orientation and gender identity. These programs are demand-driven, locally led, and leverage common strategies used by civil society to prevent and respond to human rights violations and abuses. DRL requires all of its programming to be inclusive and expects all implementers to demonstrate deliberate analysis, integration, and investment in at-risk or vulnerable individuals

and communities. DRL programs promote the Women, Peace, and Security Act of 2017, by ensuring that women and girls serve as agents of peace via political and social empowerment.  DRL programming promotes women and girls as equal partners in preventing conflict and building peace, while also endeavoring to rectify the adverse impacts of armed conflicts on women and girls.

# Internet Freedom

Promoting Internet freedom is an essential part of the U.S. government's approach to protecting and promoting human rights in the 21st century. The U.S. conceptualizes Internet freedom as the online exercise of human rights and fundamental freedoms – such as freedoms of expression, association, peaceful assembly, religion, or belief – as well as privacy rights, online.  DRL leads the State Department's efforts to promote Internet freedom globally through bilateral and multilateral engagements as well as through foreign assistance programming.  DRL's programs aim to advance Internet freedom globally through integrated support for four pillars of work – technology development, digital safety, policy advocacy, and research.

# Justice and Accountability

DRL programs promote justice and accountability in the context of ongoing lack of justice and impunity in countries and regions with a legacy of gross human rights violations. Through inclusive, community-owned, victim-centered approaches, DRL supports civil society engagement with a wide range of transitional justice and accountability measures – judicial and non-judicial, formal and informal, retributive and restorative – in both conflict and post-conflict environments around the world.

# Labor

DRL programs help to foster a more competitive and level playing field for the American worker by promoting internationally recognized labor rights and empowering workers throughout the world in support of democracy promotion and inclusive economic growth.  Programs work to support core labor standards abroad and focus on issues such as

freedom of association, the right to collective bargaining, combating anti-union labor violence, and protecting the rights of marginalized and vulnerable migrant workers and their access to safe, affordable, and legal migration channels.

# Political Participation

DRL programs enable citizens to participate fully in political life, whether it be as informed voters, candidates, election administrators, or elected officials.  DRL programs provide civic and voter education; improved access to the polls for all voters, including persons with disabilities and other groups; technical assistance for accountable elections; training for journalists on the essentials of political reporting; facilitate grants for civil society organizations to lead inclusive voter campaigns; focus on ensuring that candidates are accountable to their constituents; strengthens inclusive societies as a necessary pillar of strong democracies; and prioritize activities targeting youth, women, and other groups.  Outside of elections, DRL programs provide avenues for improved platform development for political parties, technical assistance to elected officials from all segments of society, and increased engagement between representatives and their constituencies.

# Rapid Response and Emergency Assistance

DRL's rapid response and emergency assistance programs support embattled human rights defenders and civil society organizations around the world through direct financial support and technical assistance. These programs are designed to ensure that human rights defenders and media practitioners in closed and closing spaces can remain resilient, mitigate risks, overcome threats, and continue their important work as safely as possible. DRL also funds a broad range of rapid response interventions to protect and advance the fundamental freedoms of association, assembly, expression, and religion.

# International Religious Freedom

DRL's programs on religious freedom foster inclusive societies for all who

are persecuted on the basis of religion or belief or non-belief. DRL strives to help all communities, especially religious minorities, to enjoy full membership in their societies without compromising their beliefs. DRL's approach is both top down and bottom up, depending on the country context. Programs focus on both intolerance by official actors as well as societal level intolerance, including support for legal reforms, to increase religious freedom protections for all.

## Rule of Law

DRL supports programs that promote due process, just and accountable laws, and access to justice. DRL programs work to strengthen legal frameworks to ensure the protection of human rights; build media capacity in legal reporting to promote community awareness of judicial processes and reforms; foster civil society oversight of application of laws and reforms; and support judicial actors in understanding and applying legal frameworks in line with international human rights standards.

TAGS   Human Rights   Human Rights and Democracy   Internet Freedom   Labor

Political Rights   Religious Freedom   Rule of Law

★ ★ ★

## Related Articles

FEBRUARY 8, 2021                    FEBRUARY 8, 2021                    FEBRUARY 8, 2021

# EXHIBIT G

SENSITIVE BUT UNCLASSIFIED

## POLICY AND PROGRAM IMPLEMENTATION

Embassy Nicosia is a medium-sized embassy, where the dialogue among staff in the sections and interagency is exceptionally collegial. American and LE staff members work in close proximity, consulting daily with each other and with the Ambassador and DCM. Embassy personnel act and speak prudently to avoid sparking sensitivities regarding political divisions on the island. The positive interaction of Greek Cypriot and Turkish Cypriot LE staff is an example for a future, fully integrated Cyprus.

## POLITICAL SECTION

An FS-02 political chief, who speaks both Greek and Turkish, serves in a Greek language designated position. She supervises a tightly knit, productive section comprised of five officers and an office management specialist. An experienced, mid-level officer in a Turkish language designated position serves as deputy chief of the section. He takes primary responsibility for relationships and reporting related to the Turkish Cypriots. Both officers fully reinforce each other, and other employees consider them valued mentors. Two talented Foreign Service nationals (FSN), a Greek Cypriot and a Turkish Cypriot, are integral members of the team. The Turkish Cypriot FSN specialist located in the north office often travels to the main chancery for meetings. The section has an appropriate level of staffing.

The political section provides timely, often same-day, insightful reporting and analyses to guide policymakers about reunification efforts on the island. The section enjoys close relationships with political, academic, religious, and nongovernmental organization representatives of the two communities. Political officers work closely with other diplomatic missions and various UN entities, including the UN Good Offices Mission. The political section does an excellent job managing advocacy and reporting on transnational and multilateral issues, ranging from nonproliferation to counterterrorism, as well as aspects of U.S.-EU cooperation. Workload on transnational and multilateral issues has increased substantially since the accession of Cyprus to the EU in 2004; however, tasks are efficiently allocated and completed. Political officers are well positioned and respond quickly to inquiries from offices in Washington about perspectives on Cypriot developments that circulate in the United States and draw media and congressional attention.

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED

Department offices praise the reporting on human rights, labor exploitation, and trafficking in persons as objective and accurate. The political section, with public affairs and the USAID office, engages Cypriot officials and elements of civil society to raise awareness and take steps to improve human rights practices and reduce human trafficking, a primary mission goal related to deterring the transit of transnational terrorists. The Department rates Cyprus a Tier 2 country for not meeting minimum standards for the elimination of trafficking. The political section advocates regularly with Cypriot officials to demonstrate more vigorous prosecution efforts and convictions against traffickers.

Established policy precludes U.S. military assistance to entities on the island. Cyprus, however, is a refueling and rest stop for U.S. military aircraft and naval vessels and personnel transiting the region. A civilian U.S. Army employee facilitates transit arrangements and conducts antiterrorism protection activities as the chief of the force protection detachment. In addition, this employee works in close cooperation with the political section to manage the U.S. Customs Export Control and Border Security program, which aims to train Cypriot officials on antismuggling and nonproliferation measures.

A political officer serves as the embassy's point of contact for the implementation of Leahy amendments[1] that apply to U.S. Government programs that fund training for host country civilian and military security personnel. The political section annually emails to a small number of embassy officers the Department guidance about Leahy requirements. The embassy process has shortcomings, however, in terms of complying with Leahy provisions. The OIG team found that key Department and other law enforcement personnel did not understand operational aspects of the guidance. They did not know that Cypriot candidates cannot be trained, absent a non-derogatory report from Washington agencies. In addition, the embassy has not retained records, as mandated by Leahy provisions, for a number of Cypriot officials who were beneficiaries of U.S.-funded programs in recent years. An exception was an instance of correct Leahy vetting and record retention conducted in the August-September 2009 period for U.S. Coast Guard training.

An annual in-house training session on the Leahy requirements would foster correct implementation by members of the law enforcement working group. The embassy would benefit from formally designating a political officer to retain the

[1] These amendments to the annual Department of State and Department of Defense appropriations bills prohibit the provision of assistance to foreign security force units that have been implicated in gross violations of human rights. The Department of State is responsible for vetting foreign security units and individuals sponsored by any U.S. Government entity for training, travel, or other assistance-related activities.

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED

mandated records centrally for all sections and agencies which conduct Leahy related activities. It is important that the embassy coordinate with the regional attachés (located in Athens, Greece) of the Federal Bureau of Investigation and U.S. Immigration and Customs Enforcement, who may have occasion to nominate Cypriot candidates. It also would be helpful if the embassy were to inform Cypriot officials about U.S. law requiring approved vetting of candidates before training can occur.

> **Recommendation 2:** Embassy Nicosia should designate an officer to coordinate the Leahy vetting program at the embassy and to retain Leahy records centrally for all sections. (Action: Embassy Nicosia)

> **Recommendation 3:** Embassy Nicosia should create and implement a plan for annually training members of the law enforcement working group, including regional Federal Bureau of Investigation and U.S. Immigration and Customs Enforcement attachés, in the Leahy vetting provisions. (Action: Embassy Nicosia)

# ECONOMIC SECTION

A single FS-01 economic officer is performing exceptionally well. He supervises three FSNs, and they operate cohesively to report on, analyze, and suggest policy approaches on the full portfolio of finance, trade and investment, terrorist financing and money laundering, and transportation issues. They efficiently handle the extensive workload. In the event of a political settlement for Cyprus, the volume of work would increase and would easily justify the addition of a combined political-economic officer position.

Cyprus joined the EU in 2004. As a relatively small economy, Cyprus generally follows the positions of the majority of EU member states. The economic section works to influence the positions of Cypriot officials across a wide spectrum of U.S.-EU issues. The economic officer is also a strong proponent of U.S. policies related to environment, science, and technology. He merits special credit for negotiating a bilateral science and technology agreement, signed in 2008, that has already proven to be a valuable tool for American academics and U.S. science agencies such as the National Institutes of Health and the National Science Foundation.

SENSITIVE BUT UNCLASSIFIED

# EXHIBIT H

C06808181 IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808181  Date: 07/09/2020
UNCLASSIFIED

**UNCLASSIFIED**
SBU



RELEASE IN PART
B7(C),B6

| | |
|---|---|
| **MRN:** | 19 LA PAZ 450 |
| **Date/DTG:** | Jul 24, 2019 / 241236Z JUL 19 |
| **From:** | AMEMBASSY LA PAZ |
| **Action:** | WASHDC, SECSTATE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | PHUM, PREL, PGOV, KJUS, ASEC, BO |
| **Captions:** | SENSITIVE |
| **Subject:** | Bolivia: Leahy Vetting Duty to Inform |

1. (SBU) Summary: During Post vetting for an International Law Enforcement Academy course in May 2019, the commander of one nominated individual was discovered to have been involved in an extrajudicial killing (EJK).  A subsequent investigation revealed that an additional six individuals and three units were credibly involved in the incident.  Post provided information on the ineligible individuals and units to representatives from the National Police and the Ministry of Foreign Affairs (MFA).  End summary.

2. (SBU) An incident between striking miners and national police occurred between August 10 and 25, 2016 throughout various departments in Bolivia which led to the deaths of four miners at the hands of police units.  The Ombudsman's Office published a report detailing its investigation of the incident and concluded that the deaths were "intentional" and constituted "illegal deprivation of life."  (Note: See attached summary for a complete account of the incident. End Note.)  Based on this report and other available information, Post has concluded that credible information of an EJK exists for seven individuals and three units of the Bolivian Police.  The tainted individuals and units are:

Units
Bolivian Police – La Paz District
Delta Unit
Operations Tactical Unit (UTOP)

Individuals

B6
B7(C)

# EXHIBIT I

Public Release of Foreign Security Forces Units Ineligible for Assistance Pursuant to the State Leahy Law - United States Department of State

2/11/21, 9:46 AM



An official website of the United States government    Here's how you know

Employees    Job Seekers    Students    Travelers

POLICY ISSUES        COUNTRIES & AREAS        BUREAUS & OFFICES        ABOUT

★ ★ ★

# Public Release of Foreign Security Forces Units Ineligible for Foreign Assistance Act of 1961 and Arms Export Control Act Assistance Pursuant to the State Leahy Law: CY 2018

OTHER RELEASE

BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR

JULY 15, 2020

⬇ DOWNLOAD LEAHY LIST    [290 KB]    /    Share

Section 620M of the Foreign Assistance Act of 1961 (also referred to as the "State Leahy law") states, in pertinent part:

(a) IN GENERAL. – No assistance shall be furnished under this Act or the Arms Export Control Act to any unit of the security forces of a foreign country if the Secretary of State has credible information that such unit has committed a gross violation of human rights.

\*\*\*

(d) The Secretary of State shall establish, and periodically update, procedures to—

**(7) make publicly available, to the maximum extent practicable, the identity of those units for which no assistance shall be furnished pursuant to subsection (a).**

Consistent with this provision, the list below identifies (in alphabetical order, by country) foreign government security forces units that were proposed for applicable assistance in calendar year 2018 but were denied such assistance pursuant to the State Leahy law based on credible information that the unit committed a gross violation of human rights during any year in the unit's history.  A unit's absence from this list does not mean the unit received security assistance from the United States.  A listed unit may receive assistance in the future if new, exculpatory information is discovered.  In addition, depending on the steps taken by the foreign government to bring the responsible members of the unit to justice, assistance to a unit may resume if the Secretary of State determines and reports to Congress that the government is taking effective steps to bring the responsible members of the unit to justice, in accordance with the State Leahy law.

**Bangladesh**

◆   Investigation Wing, Counter Terrorism and Transnational Crime Unit (CTTCU), Chaka Metropolitan Police, Bangladesh Police

◆   Rapid Action Battalion, Dhaka

**Belize**

◆   San Ignacio Police Station, Belize Police Department

**Bosnia and Herzegovina**

- Bratunac Police Station, Zvornik Police Precinct, Republika Srpska Ministry of Interior

**Cambodia**

- Banteay Meanchey Province Police Commissariat

**Central African Republic**

- Presidential Guard

**Georgia**

- Gurjaani Criminal Police Station
- Zugdidi Patrol Police Station

**Guyana**

- Leonora Police Station
- Turkeyen Police Station

**Honduras**

- Anti-extortion National Force
- Metropolitan Prevention Unit UMEP No. 1, District 2

**Libya**

- Ain Zara Prison, Tripoli, Judicial Police, Ministry of Justice

**Mexico**

- Aguascalientes State Government, Aguascalientes State Attorney General's Office, General Commission of the Ministerial Police
- Attorney General of the Republic, Deputy Attorney General's office of Specialized Organized Crime Investigation, Specialized Unit Investigating Kidnappings
- Baja California Secretariat of Public Security, Direcorate of the Preventive State Police, Operative Sub-Directorate, Operative and Prevention Coordination

- Baja California Secretariat of Public Security, Directorate of the Preventive State Police, Sub-Directorate of Investigation, Coordination for Crime Prevention

- Federal Police, Regional Security Division, Northeast Zone Regional Coordination, Coahuila State Coordination, Torreon Station

- Federal Police, Office of the General Commissioner, Intelligence Division, Coordination of Undercover Operations, General Directorate of Infiltration Operations

- Jalisco State Attorney General's Office, Central Prosecutor's Office, General Directorate of Special Investigations, Directorate of the Investigation Unit Against Kidnapping

- Jalisco State Attorney General's Office, Regional Prosecutor's Office, Directorate of Investigation Against Drug Trafficking

- Oaxaca Secretariat of Public Security, State Police Commission, Head of Staff, Coordination of Plans and Operations, Division of Operations Deployment

- San Luis Potosi State Attorney General's Office, Directorate of the Ministerial Police, Operational Directorate of the Ministerial Police, Homicides Coordination

**Nepal**

- Devi Dutta Battalion, Mid-Division

- No. 2 Jagadal Battalion, Mid-Division

- Rudradhoj Battalion, Far Western Division

---



TAGS   Arms Control   Arms Control   Bangladesh   Belize

Bosnia and Herzegovina   Bureau of Democracy, Human Rights, and Labor

Cambodia   Central African Republic   Exports   Foreign Assistance

Georgia   Guyana   Honduras   Human Rights and Democracy   Libya

# EXHIBIT J

An official website of the United States government    Here's how you know

Employees    Job Seekers    Students    Travelers

POLICY ISSUES        COUNTRIES & AREAS        BUREAUS & OFFICES        ABOUT

ABOUT US – BUREAU OF LEGISLATIVE AFFAIRS

★ ★ ★

# Office of House Affairs

Share

The House Affairs Office is responsible for the Department's liaison with Members and Committees of the U.S. House of Representatives. It facilitates hearings, briefings for Members and staff, outreach to oversight Committees, and communication between the House of Representatives and the Department.

H's "mission" on Capitol Hill is located in B-330 of the Rayburn House Office Building. This liaison office provides a full range of State Department support services to Representatives, Senators, Congressional Committees, and their staffs.

TAGS        Legislative Affairs

# EXHIBIT K

**FY 2016 Report on Government Police Training and Equipping Programs**

This report is provided as requested by House Report (H.Rpt. 114-102), accompanying H.R. 1735, the National Defense Authorization Act for Fiscal Year (FY) 2016 (TAB B) (P.L. 114-92). The report requests that the Secretary of Defense, in coordination with the Secretary of State, the Secretary of Homeland Security, and the Attorney General of the United States, submit an update to the report submitted in 2012 on U.S. Government police training programs outside the United States to the congressional defense committees, the House Committee on Foreign Affairs, the Senate Committee on Foreign Relations, the House Committee on Homeland Security, the Senate Committee on Homeland Security and Government Affairs, the House Committee on the Judiciary, and the Senate Committee on the Judiciary by March 1, 2016.   The report is requested to include the following information:

> (1) A list of all U.S. Government departments and agencies involved in implementing police training and equipping programs;
> (2) A description of the scope, size, and components of all police training and equipping programs for fiscal years 2015 and 2016, to include:
>> (a) the name of each country that received assistance under the program;
>> (b) for each training activity, the number of foreign personnel provided training, their units of operation, location of the training, cost of the activity, the U.S. unit involved, and the nationality and unit of non-U.S. training personnel (if any) involved in each activity;
>> (c) the purpose and objectives of the program;
>> (d) the funding and personnel levels for the program in each such fiscal year;
>> (e) the authority under which the program is conducted;
>> (f) the name of the U.S. Government department or agency with lead responsibility for the program and the mechanisms for oversight of the program; and
>> (g) the metrics for measuring the results of the program;
> (3) An assessment of the requirements for police training and equipping programs, and what changes, if any, are required to improve the capacity of the U.S. Government to meet such requirements;
> (4) An evaluation of the appropriate role of U.S. Government departments and agencies in coordinating on and carrying out police training and equipping programs;
> (5) An evaluation of the appropriate role of contractors in carrying out police training and equipping programs, and what modifications, if any, are needed to improve oversight of such contractors; and
> (6) Recommendations for legislative modifications, if any, to existing authorities relating to police training and equipping programs.
> The report shall be delivered in unclassified form, that is made available to the public, and may include a classified annex, if necessary.

The following information is based on input from the Departments of State, Defense, Justice, and Homeland Security.

**Definitions**

- **Police Training** - any effort in which a U.S. Government law enforcement agency, technical expert, or contracted third party provides instruction, or mentors host-nation law enforcement personnel.
- **Police Equipping** - any material provided directly to the host nation or provided to personnel that is used in the execution of their law enforcement duties.
- **Police** – any organization sanctioned by a host government or accredited international organization to conduct law enforcement operations (examples include but are not limited to national police, state/municipal police, gendarmerie, counternarcotics police, counterterrorism police, formed police units, border security, coast guards, customs, and military units with law enforcement responsibilities).
- **Lead Agency** – the department or agency receiving appropriated funds for police training activities and that ultimately has responsibility for oversight and accountability for those funds.
- **Contractor** – any private individual or organization under contract to a U.S. Federal department or agency to provide goods or services in support of law enforcement programs and projects.

## A. LIST OF ALL U.S. GOVERNMENT DEPARTMENTS AND AGENCIES INVOLVED IN IMPLEMENTING POLICE TRAINING AND EQUIPPING PROGRAMS

- **The Department of State (State)**
  - Bureau of International Narcotics and Law Enforcement Affairs (INL)
  - Bureau of Counterterrorism (CT)
  - Bureau of Political-Military Affairs (PM)
  - Bureau of International Security and Nonproliferation (ISN)
  - Bureau of Diplomatic Security (DS)

- **The Department of Defense (DoD)**
  - U.S. Africa Command (USAFRICOM)
  - U.S. Central Command (USCENTCOM)
  - U.S. European Command (USEUCOM)
  - U.S. Pacific Command (USPACOM)
  - U.S. Southern Command (USSOUTHCOM)
  - U.S. Special Operations Command (USSOCOM)
  - Office of Counternarcotics and Global Threats
  - Defense Threat Reduction Agency

- **The Department of Justice (DOJ)**
  - Office of International Criminal Investigative Training Assistance Program (ICITAP)
  - Office of Overseas Prosecutorial Development, Assistance and Training (OPDAT)

- o   Federal Bureau of Investigation (FBI)
- o   U.S. Marshals Service (USMS)
- o   Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)
- o   Drug Enforcement Administration (DEA)

- **Department of Homeland Security (DHS)**
  - o   Customs and Border Protection (CBP)
  - o   Immigration and Customs Enforcement (ICE)
  - o   U.S. Coast Guard (USCG)
  - o   U.S. Secret Service (USSS)
  - o   Federal Law Enforcement Training Center (FLETC)

## B.  DESCRIPTION OF THE SCOPE, SIZE, AND COMPONENTS OF ALL POLICE TRAINING AND EQUIPPINGPROGRAMS FOR FISCAL YEARS 2015 and 2016

The scope, size, and components of police training and equipping programs for FYs 2015 and 2016 are detailed in the attachment with information collected from the Departments of State, Defense, Justice, and Homeland Security.  The information contains (1) the name of each country that received assistance under the program; (2) the types of recipient nation units receiving the assistance under the program; (3) the purpose and objectives of the program; (4) the funding and personnel levels for the program in each such fiscal year (in cases where administrative costs are a significant portion of the effort, as is the case in Iraq, Afghanistan, and Pakistan, they are included as well); (5) the authority under which the program is conducted; (6) the name of the U.S. Government department or agency with lead responsibility for the program and the mechanisms for oversight of the program; (7) the extent to which the program is implemented by contractors or U.S. Government personnel; and (8) the metrics for measuring the results of the program.  Because final FY 2016 information is not yet available, information provided for FY 2016 is for activities planned or expected, and is thus subject to change.

Overall, the U.S. Government conducted police training in more than 100 countries and obligated more than $2 billion in training programs and $100 million in equipping programs in FY 2015.  More than 94,000 people participated in these training events.

## C.  ASSESSMENT OF THE REQUIREMENTS FOR POLICE TRAINING AND EQUIPPING PROGRAMS, AND WHAT CHANGES, IF ANY, ARE REQUIRED TO IMPROVE THE CAPACITY OF THE U.S. GOVERNMENT TO MEET SUCH REQUIREMENTS

The U.S. Government has long recognized the importance of building the capabilities and enhancing the professionalism of our partner nations' law enforcement agencies to accomplish foreign policy and national security objectives.  The objective of law enforcement training has been to promote the rule of law, to strengthen regional security, and to build law enforcement-to-law enforcement relationships that foster international cooperation on transnational investigations.

The vast majority of funding provided for U.S. Government police training and equipping is appropriated to the Departments of State and Defense, with multiple other Federal departments and agencies, particularly the Departments of Justice and Homeland Security, providing guidance and support for those efforts by developing curriculum and providing subject-matter expertise. The training of international police forces has been intended to support U.S. and international objectives to confront drug trafficking and related threats and to strengthen the rule of law and democratic institutions, particularly in the context of stability operations in post-conflict countries. Accordingly, civilian police training has been a key component of U.S. foreign assistance efforts in Colombia, Central America, Mexico, Haiti, Afghanistan, Pakistan, Central Asia, Iraq, Liberia, Sudan, Lebanon, and the Palestinian territories. Often, these efforts have been carried out in support of designated U.N. or other multinational peacekeeping missions. In the years since the terrorist attacks of September 11, 2001, police training efforts have supported broader U.S. counter-terrorism objectives by enhancing investigative skills and denying safe-havens for terrorists or other violent extremist groups. Due to the growing recognition of the ties between drug trafficking and transnational organized crime and terrorism, insurgency, and other threats to national security, U.S. international police training activities have expanded to include efforts to combat a wide range of illicit activity, including the trafficking of wildlife and other natural resources, people, weapons, and the laundering the proceeds of these illicit activities.

The Department of State (through its Bureau of International Narcotics and Law Enforcement Affairs (INL)) is the U.S. Government's lead agency for developing U.S. foreign policy for countering drug trafficking and transnational organized crime. INL is also responsible for coordinating foreign assistance efforts to build police forces in post-conflict countries. Requirements for Department of State-managed training are derived from the U.S. Embassy's Mission Strategic Plans that support broader regional foreign policy objectives. Department of State-sponsored training is typically carried out by U.S. law enforcement agencies, civilian contractors, or through one of INL's International Law Enforcement Academies located in Bangkok, Thailand; Budapest, Hungary; Gaborone, Botswana; San Salvador, El Salvador; and Roswell, New Mexico.

DoD police training and equipping programs are predominately carried out through the Department's Drug Interdiction and Counterdrug Activities, Defense account, which is centrally managed by the Deputy Assistant Secretary of Defense for Counternarcotics and Global Threats and implemented by the geographic Combatant Command and/or U.S. Special Operations Command. Requirements for DoD police training and equipping programs are derived from the Department's Counternarcotics and Global Threats Strategy and Combatant Command Theater Campaign Plans, in close coordination with the U.S. Embassy's country team. DoD training and equipping can be provided both to ministry of defense and civilian law enforcement partners. Because many foreign militaries have a law enforcement role, for the purposes of this report, the Department has included training or equipping activities that are intended for law enforcement (e.g., counterdrug) purposes, whether support is provided to a civilian or military agency.

Because U.S. police training and equipping programs are important to multiple U.S. Federal departments and agencies, close coordination is essential to ensuring that support provided is not duplicative and supports country and regional objectives. In this regard, U.S.

4

Embassies and country teams in each country serve as a coordinating mechanism for U.S. agencies and facilitate coordination between various U.S. departments and agencies and the host nation in order to validate specific training and equipping needs. Individual country assessments are undertaken at various stages in the life of the country program that inform the sponsoring agency how best to support the host government in its design and implementation of activities that support the institutionalization of democratic governance, peace, and security.

A targeted and coordinated approach based on measurement and evaluation of police assistance programs is necessary to ensure that training objectives are achievable and worth the investment. A robust capacity to support U.S. national security objectives, including mechanisms to ensure that the relevant U.S. Government departments and agencies are able to identify and sponsor the U.S. law enforcement agencies most capable to provide international law enforcement support in a given country, is critical. Multiple U.S. Government departments and agencies have capabilities to contribute to each level and type of effort, but these efforts will only be successful if those roles are clearly established.

Where the U.S. Government is one of several international actors involved in police support, we work with international organizations and multilateral bodies to ensure coordination. Multilateral cooperation is also required to maximize the benefits gained from the finite resources the U.S. Government invests in the host government's law enforcement sector.

## D. EVALUATION OF THE APPROPRIATE ROLE OF U.S. GOVERNMENT DEPARTMENTS AND AGENCIES IN COORDINATING ON AND CARRYING OUT POLICE TRAINING AND EQUIPPING PROGRAMS

The Departments of State and Defense have been provided with statutory authorities and appropriations to develop, coordinate, and implement police training and equipping programs overseas. The Department of State is the lead U.S. agency for the implementation of U.S. foreign assistance programs, and its police training and equipping activities are primarily managed through its INL bureau. Through its various building partnership capacity authorities, DoD provides support to foreign law enforcement agencies as well as military units with law enforcement roles and responsibilities. These departments draw upon technical expertise from various agencies, including, but not limited to, the Departments of Justice, Homeland Security, and Treasury and their subordinate law enforcement agencies, to implement police training and equipping programs overseas. Both State and DoD-funded activities are subject to statutory ("Leahy Law") provisions prohibiting training or equipment support when there is credible information that the individuals or units have committed gross violations of human rights. Vetting of individuals prior to receiving support is the responsibility of the Department of State through its International Vetting and Security Tracking (INVEST) system, managed by the Bureau for Democracy, Human Rights, and Labor (DRL).

No single department or agency has all of the necessary authorities, expertise, or resources to implement all the required U.S. police training worldwide, and interagency collaboration and coordination are essential to ensuring that police training supports U.S. foreign policy and national security objectives. Coordination among U.S. departments and agencies is primarily carried out through the U.S. Embassy Country Team, with the U.S. Ambassador responsible for

resolving any interagency disagreements. Further coordination is carried out in Washington through existing interagency processes led by the National Security Council staff.

## E. EVALUATION OF THE APPROPRIATE ROLE OF CONTRACTORS IN CARRYING OUT POLICE TRAINING AND EQUIPPING PROGRAMS, AND WHAT MODIFICATIONS, IF ANY, ARE NEEDED TO IMPROVE OVERSIGHT OF SUCH CONTRACTORS

The U.S. private sector is an essential partner in international police training and equipping programs. When faced with an urgent requirement to supply personnel for law enforcement assistance, contracted subject matter experts, many of whom are former U.S. Federal, State, or local law enforcement officers, may be relied upon to impart essential technical expertise and experience generally not available in the host nation and the staffing flexibility to build up or draw down as circumstances require. The U.S. Government can use contracted personnel as program advisors for certain programs when the requisite experience is not readily available from within the active ranks of U.S. Government law enforcement personnel.

Oversight of contracted subject matter experts is the responsibility of the implementing agency, and oversight mechanisms and reporting requirements are generally built into contract requirements and into the terms and conditions stipulated in individual contracts. Generally speaking, contracted personnel are required to provide written assessments and summaries of their work and must work within the scope of work delineated in the signed contract. U.S. Government personnel with significant law enforcement training experience and oversight training have direct input into the oversight of any contracts for police training and assistance programs.

U.S. contractors also play a vital role in providing the equipment that is often necessary to complement police training or other assistance to foreign partners. In addition to providing valuable insight on technologies and capabilities, U.S. contractors are also responsible for compliance with U.S. export licensing requirements and other applicable laws.

## F. RECOMMENDATIONS FOR LEGISLATIVE MODIFICATIONS, IF ANY, TO EXISTING AUTHORITIES RELATING TO POLICE TRAINING AND EQUIPPING PROGRAMS

The existing authorities provide the U.S. Government with the tools necessary to carry out police training and equipping programs overseas. We, therefore, do not recommend any legislative changes at this time.

# EXHIBIT L

C06808655 IED U.S. Department of State  Case No. F-2017-17860  Doc No. C06808655  Date: 12/12/2019

https://www.amnesty.org/en/countries/europe-and-central-asia/tajikistan/report-tajikistan/
https://www.hrw.org/world-report/2016/country-chapters/tajikistan.
http://iphronline.org/raise-torture-cases-at-eu-tajikistan-human-rights-dialogue-20150611.html

Respectfully,

Luke

_____

**Luke A. Falcon Sapp** • Foreign Affairs Officer • Democracy, Human Rights and Labor (DRL)
• Security and Human Rights (DRL/SHR) • U.S. Department of State – SA 1 – H430 • 202-663-2678
• www.HumanRights.Gov

SBU
This email is UNCLASSIFIED.

**From:** Tipton, Matthew E
**Sent:** Tuesday, April 12, 2016 3:05 PM
**To:** Berg, James E (Dushanbe); Sherwood, George 'Brandon' (Dushanbe); Steward, Rebecca J (Dushanbe)
**Cc:** Holt, Thomas C; Falcon Sapp, Luke A; Dudley, John A (Dushanbe)
**Subject:** TJKN-1520903

Good morning.  I am working on batch TJKN- 1520903.  I need some additional information concerning the two articles below.  These UN Human Rights Committee articles allege that the Criminal Investigation Department committed two GVHRs.  The derogatory information is:

1.  https://www1.umn.edu/humanrts/undocs/1208-2003.html

   On 15 January 2001, the author's son was arrested and brought to the Operational Search Unit, Criminal Investigation Department, Ministry of Internal Affairs. The police officers allegedly intended to force him to confess guilt in the murder of two policemen. When they were unable to implicate him in the murder, they accused him of committing three robberies. He was detained until 6 February 2001, and allegedly spent 15 days handcuffed to the radiators in police offices. During this time he allegedly was systematically subjected to torture, in form of beatings and electric shocks. He was told that if he did not confess guilt, his relatives would experience "serious problems" and would be "tortured"; indeed, at one stage he learned that one of his brothers had been arrested, although he was subsequently released. The author's son did not confess, however, and was released on 6 February 2001

2.  http://www1.umn.edu/humanrts/undocs/1348-2005.html

   2.1    The author's son was detained by officers of the Criminal Investigation Department of the Tajik Ministry of Interior (hereinafter, MoI) at the family home in Dushanbe at around 5 a.m. on 3 May 2002, in connection with an armed robbery which had occurred on the night of 5 to 6 May 1999 in the apartment of one Sulaymonov. A criminal case under article 249, part 4, paragraphs (a), (b) and (c) of the Tajik Criminal Code (hereinafter, the CC) (2) was opened on 6 May 1999. On 6 July 1999, an investigator

# EXHIBIT M



**DEFENSORÍA DEL PUEBLO**
ESTADO PLURINACIONAL DE BOLIVIA

# INFORME DEFENSORIAL
# SOBRE LOS HECHOS DE AGOSTO DE 2016 - CONFLICTO POR DEMANDAS DE LOS COOPERATIVISTAS MINEROS

## 1. INTRODUCCIÓN

En el mes de agosto de 2016, una movilización de mineros cooperativistas de la Federación Nacional de Cooperativistas Mineras (FENCOMIN), se manifestó reclamando la atención de un pliego petitorio, razón por la que se suscitaron una serie enfrentamientos entre manifestantes y policías, que produjeron varios heridos, la muerte de un total de 5 mineros cooperativistas, 4 fallecidos por impacto de bala, Severino Ichota Poma, Fermín Mamani Aspeti, Rubén Aparaya Pillco, y Pedro Mamani Massi, otro por mala manipulación de dinamita, Freddy Ambrocio Rojas, y del Viceministro de Régimen Interior, Rodolfo Illanes Alvarado.

Frente a esa situación, la Defensoría del Pueblo del Estado Plurinacional de Bolivia, en el marco de las atribuciones y competencias conferidas por los Artículos 218.I, numerales 3), 4) y 5) del Artículo 222 de la Constitución Política del Estado, y los numerales 2), 3), 4) y 14) del Artículo 11 de la Ley Nº 1818, de 17 de diciembre de 1997, determinó investigar la vulneración de derechos humanos durante el desarrollo del conflicto cooperativista minero en agosto de 2016, a través de un Informe que refleje la relación de los hechos acaecidos a partir del análisis de los datos y elementos obtenidos en verificaciones defensoriales, informes, testimonios recabados, así como las declaraciones oficiales sobre lo acontecido.

Consecuentemente, sobre la base de la relación fáctica descrita, se elaboró la fundamentación jurídica acerca de la vulneración de derechos humanos consagrados y garantizados por la Constitución Política del Estado, la legislación nacional, así como por los Convenios, Tratados e Instrumentos internacionales sobre la materia, y finalmente, con base a ello se sustentan conclusiones y recomendaciones al respecto.

> *"(…) había manifestantes, los cuales estaban en los bordes y estábamos relativamente tranquilos, cuando a eso de las nueve, nueve y media nos dan la instrucción de avanzar, más o menos unos dos kilómetros más yendo a Oruro y que en ese lugar sí habría un punto de bloqueo; entonces, a esa hora, más o menos, avanzamos con todo el contingente, y evidentemente en el lugar había un punto de bloqueo en que los manifestantes estaban apostados en los cerros; entonces los manifestantes estaban encima del cerro, nosotros fuimos, tengo entendido que fue el Comandante a hacer un poco de diálogo de persuasión, pero como no hubo respuesta, entonces ahí sí hubo la orden de proceder al desbloqueo. Entonces, en la mañana se realizó el desbloqueo, haciendo uso de gases de agentes químicos (…)"[5].*

Durante la operación de desbloqueo, los policías retrocedieron aproximadamente 3 kilómetros hacia el lado de La Paz, permaneciendo en ese lugar hasta el inicio de la tarde, momento en el cual se reiteró la orden de desbloqueo y retomaron dirección a Mantecani, como describe el siguiente relato:

> *"(…) los jefes se volvieron a reunir, hicieron una planificación, puesto que otra vez el lugar de donde salimos estaba bloqueado, entonces había la instrucción de volver al lugar y volver a habilitar la vía, entonces hubo ahí una reunión de los jefes (…)"[6].*

En esta oportunidad, la orden policial del Comandante Departamental de Policía - La Paz, Cnel. José Luis Araníbar, autorizó el uso de agentes químicos, tal como sostiene el relato de algunos uniformados, que expresan:

> *"(…) mi Coronel Araníbar ha dado la orden de usar los agentes químicos para comenzar a desbloquear, cuando nos hemos hecho rebasar. Yo estaba lado izquierdo, pero hemos logrado el objetivo de desbloquear, entonces nos han rodeado, estábamos haciendo uso de los agentes químicos hasta que se ha terminado las municiones (…)"[7].*

> *"(…) cada uno ya tenía su sector asignado, y a eso de las dos de la tarde ya hubo la orden para que volvamos* [haciendo referencia al desbloqueo

---

[5] T7
[6] T7
[7] T13

educativas donde se encuentran niñas, niños y adolescentes, cerca de personas adultas mayores o nosocomios.

Por otra parte, en lo que hace a la legalidad, se debe tener en cuenta que, por una parte, la Constitución Política del Estado, en su Artículo 9, impone una obligación estatal de garantizar el bienestar, desarrollo seguridad y protección de las personas, razón por la que la Ley N° 400 "Ley de Control de Armas de Fuego, Municiones, Explosivos y Otros Materiales", expresa la prohibición de portación y uso de explosivos, norma que en virtud al principio de reserva legal y jerarquía normativa, sólo podría ser afectada por una disposición de igual rango, más aún cuando están inmersos en el fondo la protección de derechos fundamentales.

Finalmente, el Artículo 10 de la Constitución prescribe que Bolivia es un Estado pacifista, que promueve la cultura de la paz y el derecho a la paz, previsión última que según la Declaración de Oslo sobre el Derecho a la Paz de la UNESCO, se constituye el derecho humano de los individuos y las colectividades a la paz.

Por todo ello, el uso de la dinamita en manifestaciones públicas movilizaciones sociales, marchas, huelgas y mítines en áreas urbanas o rurales, constituye un medio peligroso, desproporcionado, excesivo e inadecuado para la reivindicación de derechos, ya que éste pone en riesgo inminente y grave los derechos de terceros que merecen una especial protección de parte del Estado.

## 6. CONCLUSIONES

- En el mes de agosto de 2016, un grupo de mineros cooperativistas de FENCOMIN, se movilizaron reclamando la atención de un pliego petitorio, razón por la que se suscitaron diversos enfrentamientos entre manifestantes y policías, en los que hubo: decenas de heridos, secuestrados y vejados; la muerte de 4 mineros cooperativistas por impacto de bala, Severino Ichota Poma, Fermín Mamani Aspeti, Rubén Aparaya Pillco, y Pedro Mamani Massi; un deceso por mala manipulación de dinamita, Freddy Ambrocio Rojas; y el fallecimiento del Viceministro de Régimen Interior, Rodolfo Illanes Alvarado.

- En los sucesos motivo del presente informe, se tienen los siguientes elementos respecto del mando jerárquico de la Policía Boliviana:

  - Las órdenes, la dotación de equipos, medios y transporte para

efectivizar las operaciones policiales, no fue materialmente acatada, debido a la insuficiencia de equipos de la Policía Boliviana para situaciones como la presente.

➢ Las órdenes, la dotación de equipos, medios y transporte para efectivizar las operaciones policiales, no podría ser cumplida realmente, ya que no hay una debida dotación de equipos a las y los miembros de la Policía; y muchas veces son los propios efectivos policiales, quienes terminan comprándose y dotándose de equipo y armamento para el ejercicio de sus funciones.

➢ La Re Expresión del Plan de Operaciones N° 19/2016, que dispuso que los policías que hayan pasado los 50 años de edad y personal femenino por ningún motivo deberán ser incluidos en los servicios extraordinarios "antimotines, tampoco fue cumplida, ya que los días 23, 24 y 25 de agosto, aproximadamente 135 mujeres, entre oficiales, clases y policías, participaron de las operaciones relativas al desbloqueo de carreteras en La Paz, Cochabamba y Oruro.

➢ Se observa la aplicación de agentes químicos vencidos, que afectan a la salud de las personas y de la misma Policía Boliviana.

➢ Por lo señalado en los anteriores puntos, se evidencia la vulneración de la "relación especial de sujeción" del Estado para con los efectivos policiales, pues no se habría cumplido el presupuesto básico y fundamental para el desempeño de funciones policiales en conflictos sociales, como es la asignación de todos los recursos materiales, logísticos y humanos que posibiliten el cumplimiento de su misión, y garanticen el goce y ejercicio de derechos fundamentales de los efectivos policiales como son la vida, la integridad, libertad personal y la salud.

➢ Los actos de represión y represalia, como el destrozo de un vehículo automotor, destrucción de pertenencias personales y de víveres, por miembros del Policía Boliviana, con la presencia del Comandante Departamental de Policía - Oruro, Cnel. Juan Luis Torrelio Padilla, al final de la tarde el 24 de agosto, en Lequepampa, constituyeron actos de abuso policial, apartados de los principios del Manual Ampliado de Derechos Humanos para la Policía de las Naciones Unidas, sujetos a responsabilidad, además de vulnerar otras normas humanitarias.

➢ Las órdenes jerárquicas que impartió el Comando Departamental de la Policía Boliviana, y su conducción a cargo del Comandante Departamental de Policía - La Paz, Cnel. José Luis Araníbar los días

11, 12, 23, 24 y 25 de agosto en La Paz, no se ajustaron a los principios del Manual Ampliado de Derechos Humanos para la Policía de las Naciones Unidas.

Es de valorar el cumplimiento de las órdenes por parte del grueso de las y los miembros de la Policía Boliviana en condiciones de desproporcionalidad respecto a dotación de equipamiento de protección ante el número y uso de armas por parte del sector en conflicto, y el cumplimiento de los protocolos y manuales durante gran parte del conflicto.

- La falta de una correcta previsión, planificación y ejecución para las operaciones de la Policía Boliviana, expusieron a la captura a policías, y si bien dichos actos fueron cometidos por civiles, el mando jerárquico tiene responsabilidad por incumplir su obligación de garantizar los derechos humanos de sus miembros, así como en el caso de no llevar a cabo medidas efectivas para investigar y sancionar tales conductas, en el ámbito de su jurisdicción.

- Durante los enfrentamientos descritos ampliamente, varios efectivos policiales de diferente gradación, fueron secuestrados por los mineros cooperativistas. Asimismo, el Viceministro Rodolfo Illanes fue secuestrado para luego ser victimado. Lo cual importa una vulneración del derecho a la libertad física y la obligación del Estado de investigar y determinar responsabilidades, destacando que la gravedad de uno de los secuestros, no puede diluir la responsabilidad de investigación y determinación de responsables de los otros casos.

- Las localidades en las que se suscitaron los episodios de enfrentamiento, afectaron la propiedad privada de comunarias y comunarios del lugar, quienes sufrieron, entre otras cosas: la quema de sus pastizales; quema de acopios de paja; quemaduras en una cancha de pasto sintético; el estruendo de las dinamitas; y la gasificación que incluso implicó agentes químicos vencidos, que afectan a la salud de las personas.

- El secuestro y la privación de la libertad física como un medio para la negociación o adopción de represalias, es un acto que se viene dando en diversos conflictos sociales, por lo que es necesario señalar que ello no sólo vulnera el derecho a la libertad física, sino que además implica la conculcación de un principio valor y derecho como es la dignidad humana,

pues las personas ignoradas como un fin en sí mismo, son instrumentalizadas para el logro de otros fines.

- Los actos de vejación y las lesiones de las que fueron víctimas las y los miembros de la Policía Boliviana, entre ellos el Edecán Linares, así como el Viceministro Illanes, constituyen vejaciones y delitos cuyos responsables, si bien fueron personas particulares, éstas están sujetos a la responsabilidad penal que corresponda a cada caso.

- Durante los enfrentamientos entre cooperativistas mineros y Policía, varias personas resultaron heridas por proyectiles de arma de fuego; asimismo, cuatro personas fallecieron también por traumas ocasionados por proyectiles de arma de fuego, pese a prohibición jerárquica, y hubo infiltración de éstas en doloso apartamiento de las órdenes superiores por parte de determinados miembros de la Policía Boliviana, concretamente en contravención de la Re Expresión del Plan de Operaciones N° 19/2016.

- Entre las personas vulneraron la Re Expresión del Plan de Operaciones N° 19/2016 por portación de arma letal se identificó a los siguientes miembros de la Policía Boliviana: el Comandante Departamental de Policía - La Paz, Cnel. José Luis Aranibar, que se encontraba en Panduro portando arma de fuego reglamentaria el 24 de agosto; el Cnel. Juan Carlos Flores Flores; el Tcnl. Richard Gustavo Olivares Coss; el My. Juan Carlos Vega Gareca; el My. Juan Javier Salgueiro Hurtado; el My. Yoshiro M. Armentia Escobar; y Walter Laguna Saavedra, que se encontraban el 25 de agosto en la localidad de Panduro con armas de calibre 9 m.m.. Asimismo, durante los episodios conflictivos del 11 y el 12 de agosto, hubo testimonios que señalaban el robo de armas de fuego por parte de los mineros: *"Ahora el tema del arma de fuego de los lanza-gases que nos quitaron"[42]*.

- En el caso de la muerte del Viceministro Illanes, que fue perpetrada por personas particulares, éste reporta avance en su investigación. En cambio, en el caso de los mineros fallecidos, el Estado tiene la obligación de investigar y determinar sanciones de orden penal sobre los responsables por la privación ilegal del derecho a la vida de los cooperativistas fallecidos, pues lo contrario no sólo dejaría estas violaciones en la impunidad, sino que propiciaría la repetición de dichos actos.

Por otra parte, se genera una violación al derecho a la integridad, cuando

*[Translation into English of Excerpts of an Original Report from Bolivia in Spanish]*



**DEFENSORÍA DEL PUEBLO**
ESTADO PLURINACIONAL DE BOLIVIA

### OFFICE OF THE OMBUDSMAN

DEFENSE REPORT
RE: EVENTS OF AUGUST 2016 – CONFLICT DUE
TO DEMANDS BY MEMBERS OF THE MINERS' COOPERATIVES

## 1.  INTRODUCTION

During the month of August 2016, a group of miners, members of the National Federation of Mining Cooperatives [*Federación Nacional de Cooperativistas Mineras (FENCOMIN)*]*,* mobilized into a demonstration in order to call attention to a list of demands.  The demonstration caused a series of confrontations between demonstrators and police officers; as a result, several individuals were injured and a total of 5 members of the miners' cooperative were killed, 4 of them after being fatally shot, Severino Ichota Poma, Fermín Mamani Aspeti, Rubén Aparaya Pillco and Pedro Mamani Massi; while another died from the improper handling of dynamite, Freddy Ambrocio Rojas; also killed was Rodolfo Illanes Alvarado, Vice-Minister of Domestic Affairs [*Ministro del Interior*].

In face of this situation, the Office of the Ombudsman of the Plurinational State of Bolivia, within the purview of its authority and jurisdiction as conferred in Articles 218.I, numbers 3), 4) and 5) of Article 222 of the Political Constitution of the State, and numbers 2), 3), 4) and 14) of  Article 11 of Law Nº 1818, of December 17th, 1997, decided to conduct an investigation related to human rights violations during the conflict involving the mining cooperative members in August 2016, through a Report containing an account of the events that took place based on data analysis and information gathered, verified defense accounts, reports, testimonials, as well as official statements regarding the events.

As a result, based on the described factual account, a legal foundation was authored addressing the violation of human rights as enshrined and guaranteed by the Political Constitution of the State, the national laws, as well as international Pacts, Treaties and Instruments on the subject matter, and that, lastly, form the supporting basis for the conclusions and recommendations.

>>>> On this occasion, the police order issued by Colonel José Luis Araníbar, Police Commander of the La Paz Department, authorized the use of chemical agents, as told by some members of the uniformed personnel, who stated: >>>>

*[Translation into English of Excerpts of an Original Report from Bolivia in Spanish]*

## 6. CONCLUSIONS

- During the month of August 2016, a group of members of the FENCOMIN[TN1] miners' cooperative took to the streets calling attention to a list of demands causing several confrontations between demonstrators and police officers which resulted in: dozens of individuals who were injured, abducted and abused; the death of 4 members of the miners cooperative who were fatally shot, Severino Ichota Poma, Fermín Mamani Aspeti, Rubén Aparaya Pillco and Pedro Mamani Massi; one death resulting from the improper handling of dynamite, Freddy Ambrocio Rojas; and the death of Vice-Minister of Domestic Affairs [*Ministro del Interior*], Rodolfo Illanes Alvarado.

- During the events which form the basis of this report, the following facts have been found regarding the hierarchical command structure of the Bolivian Police:

  ➢ The orders, equipment supplies, resources and transportation necessary to implement police operations were found to be materially deficient due to equipment shortages by the Bolivian Police for situations such as this.

  ➢ The orders, gear, resources and transportation necessary to conduct police operations could not be truly implemented due to the lack of equipment for the male and females members of the Police Force; and on many occasions it is the police officers themselves who end up purchasing their own gear and weapons in order to carry out their duties.

  ➢ The Re Statement of Operational Plan N° 19/2016, which set forth that police officers over the age of 50 and female staff should not, for any reason, be included in extraordinary "anti-riot" services, was also not followed, given the fact that on August 23rd, 24th and 25th, approximately 135 women, consisting of senior officers, classes, and rank and file officers, took part in the operations related to the clearing of roadways in La Paz, Cochabamba and Oruro.

  ➢ It should be noted that chemical agents past their expiration date were used, which is detrimental to the health of all persons and the very members of the Bolivian Police, were used.

  ➢ Based on the previously described events, it is evident that the State violated the "special subordination relationship" with its rank and file police officers due to the failure to allocate an adequate and essential budget required for the performance of  police functions during social conflicts, such as: the procurement of all material, logistical and human resources necessary for the fulfillment of their mission, which would guarantee  the enjoyment and exercise of the police officers fundamental rights, such as, their right to life, physical safety, personal freedom and health.

  ➢ The acts of repression and reprisals, such as the destruction of a motor vehicle, as well as the destruction of personal belongings and food items, carried out by

members of the Bolivian Police in the presence of Colonel Juan Luis Torrelio Padilla, Police Commander of the Oruro Department, in the late afternoon of August 24 in Lequepampa, constituted actions of police abuse and a departure from the principles enshrined in the United Nations Expanded Manual on Human Rights for the Police, and are also subject to liability, additionally constituting a violation of other humanitarian standards.

➢ The orders decreed by the Departmental Command of the Bolivian Police Force, and their implementation under the leadership of Colonel José Luis Araníbar, Police Commander of the La Paz Department, on August 11, 12, 23, 24 and 25 in La Paz, did not adhere to the principles of the United Nations Expanded Manual on Human Rights for the Police.

The execution of the orders by the majority of the male and female members of the Bolivian Police is to be commended given the existing conditions of disproportionality in terms of an insufficient supply of protective gear vis à vis the number and use of weapons by the sector involved in the conflict, as well as the officers compliance with the protocols and manuals during a large part of the conflict.

- The lack of appropriate foresight, planning and execution by the Bolivian Police operations exposed police officers to capture; and, while those actions were committed by civilians, the high command is to be held accountable for its failure to fulfill its duty to guarantee the human rights of its members, as well as for not having taken effective measures to investigate and punish such conduct within the scope of its jurisdiction.

- During the fully described confrontations, several police officers of various ranks were abducted by the members of the miners' cooperative. Likewise, Vice Minister Rodolfo Illanes was kidnapped, to be later killed. This represents a violation of the right to physical liberty and the duty on the part of the State to investigate and identify the parties responsible. Highlighting the gravity of one of the kidnappings cannot diminish the responsibility to investigate and identify those responsible for the other cases.

- In the areas where the confrontations took place, said actions impacted the private property of members of the community at these locations, who suffered, among other things: burning of their pasturelands; burning of haystacks; burnt areas of synthetic turf on a playing field; the thundering roar of the dynamite; and gassings through the use of expired chemical agents, which impact the health of the population.

- Abductions and deprivation of physical liberty as means for negotiation or used as reprisal tactics have increasingly become part of various social conflicts, which makes it necessary to underscore that these actions not only constitute a violation of the right to physical liberty, but they also represent an infringement on a value

*[Translation into English of Excerpts of an Original Report from Bolivia in Spanish]*

principle and a right, such as human dignity, given that the individuals so ignored [*sic*] as an end in of itself are thus used in order to achieve other ends.

- The abuse and injuries suffered by the male and female members of the Bolivian Police, among them Aide-de-Camp Linares, as well as Vice-Minister Illanes, constitute offenses and crimes that, although committed by private citizens, make the latter subject to criminal liability as appropriate in each instance.

- During the confrontations between members of the miners' co-op and the Police, several individuals sustained gunshot wounds; likewise, four people died from their injuries when shot with firearms; notwithstanding the high command's orders banning their use, firearms were smuggled by certain members of the Bolivian Police in unlawful disregard of superior orders, specifically in violation of the Re Statement of Operational Plan N° 19/2016.

- Among the individuals [*who*] violated the Re Statement of Operational Plan N° 19/2016 by carrying a lethal weapon, the following members of the Bolivian Police were identified: the Police Commander of the La Paz Department, Colonel José Luis Araníbar, who was in Panduro carrying his regulation firearm on August 24th; Colonel Juan Carlos Flores; Lt. Colonel Richard Gustavo Olivares Coss; Major Juan Carlos Vega Gareca; Major Juan Javier Salgueiro Hurtado; Major Yoshiro M. Armentia Escobar; and Walter Laguna Saavedra, all of whom on August 25th were in the area of Panduro carrying 9 mm. weapons. Likewise, during the conflict events on the 11th and 12th of August, there were testimonials indicating that there was theft of firearms by the miners: "*Now on the subject of the gas-launching firearm taken from us*"[42].

- Some progress has been reported in the investigation into the case of Vice-Minister Illanes' killing committed by civilians. On the other hand, in the dead miners' cases, the State has the duty to investigate and determine the criminal sanctions to be imposed on those responsible for illegally depriving the co-op members who died of their right to life; otherwise, not only would these violations remain unpunished, but rather, impunity would be conducive to a repeat of said actions.

## CERTIFICATE OF ACCURACY

STATE OF FLORIDA                    )
                                    )
COUNTY OF MIAMI-DADE                )

I, _Margarita Lloyd-Godsk_, HEREBY STATE AND AFFIRM THAT I AM A FEDERALLY CERTIFIED COURT INTERPRETER, SO QUALIFIED UPON WRITTEN AND ORAL EXAMINATIONS BY THE ADMINISTRATIVE OFFICE OF THE U. S. COURTS, AS WELL AS A PROFESSIONAL TRANSLATOR, FULLY VERSED IN THE SPANISH AND ENGLISH LANGUAGES; AND THAT, TO THE BEST OF MY ABILITY AND BELIEF, THE FOREGOING FOUR-PAGE DOCUMENT IS A TRUE AND CORRECT TRANSLATION OF EXCERPTS OF AN ORIGINAL DOCUMENT IN SPANISH.

RE: OMBUDSMAN'S OFFICE REPORT, BOLIVIA

FEBRUARY 9, 2020                    _M Lloyd-Godsk_
                                    MARGARITA LLOYD TRANSLATION SERVICES
                                    U.S. COURTS CERTIFIED INTERPRETER
                                    AMERICAN TRANSLATORS ASSOCIATION