**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**100REPORTERS**

and

**DOUGLAS GILLISON**

       Plaintiffs,

   v.

**DEPARTMENT OF STATE**,

      Defendant.

</td><td>

Case No. 1:19-cv-1753

</td></tr>
</table>

<u>**DECLARATION OF DOUGLAS GILLISON**</u>

I, Douglas Gillison, declare as follows:

1.  I am a reporter, writer, and one of the plaintiffs in the above-captioned case. I submit this Declaration in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment. I have personal knowledge of the matters described herein.

2.  I have worked in journalism for two decades, focusing mostly on resource corruption, white-collar crime and international humanitarian law as well as the intersection of human rights and national security. My work has appeared in TIME, Foreign Policy, The Intercept, The New York Times, GlobalPost and The Village Voice among other publications. I am currently Senior Investigator at The Sentry, an investigative human rights organization devoted to uncovering illicit wealth tied to atrocities and corruption in four African nations.[1] Prior to joining The Sentry I was

---

[1] The instant litigation does not involve my current employer and I am pursuing it in my personal capacity.

at the global news wire Agence France-Presse as an economics editor in the Washington bureau where I covered macroeconomic trends, monetary policy and trade.

3.   I began my career as a journalist at The Village Voice in New York City in the spring of 2001. In those early years, I contributed articles on local and national politics and other matters; for instance, I revealed the court-martial of a U.S. Marine Corps recruiter convicted of selling fraudulent identification documents to unlawful migrant applicants at a time when the U.S. military was struggling with falling enlistment, underscoring the unacknowledged role of immigrants, including those who may enter the United States unlawfully, in fighting America's wars.

4.   From 2005 to 2011, I worked at The Cambodia Daily, an English-language newspaper in Phnom Penh, where I was named Executive Editor in 2009. I spent the bulk of my time in Phnom Penh covering the war crimes, genocide and crimes-against-humanity trials of Khmer Rouge leaders at a joint United Nations-Cambodian tribunal. From investigation through trial, sentencing and appeal, I covered the case of Pol Pot's former secret police director Kaing Guek Eav, alias Duch, who confessed to directing the methodical torture and killing of an estimated 14,000 people. I also covered the sprawling investigations of "Brother Number Two" Nuon Chea, head of state Khieu Samphan, foreign minister Ieng Sary and his wife, social action minister Ieng Thirith (Pol Pot's sister-in-law), and their arrests, provisional detentions, indictments and the start of their trial in 2010.

5.   In the early 2000s, Cambodia's nation-wide wave of evictions reached crisis proportions as security forces violently expelled people from coveted land, burning homes, arresting, beating and sometimes shooting those who resisted. Attached hereto as **Exhibit 1** is a true and correct copy of an article I authored in March of 2016 titled *"Sometimes They Burn the Whole Village": In Apparent Violation of the Leahy Law, U.S. Provided Training to Alleged Human Rights Abusers*

*in Cambodia*, which discusses this crisis in further detail, including my investigation into whether American support was flowing to security forces involved in the evictions crisis in violation of the Leahy Laws—federal statutes that prohibit the United States from providing individuals and units of foreign security forces training and assistance if those entities have committed gross violations of human rights.

6.   In my reporting, I showed that platoons of U.S. Marines had offered training in martial arts, detainee handling and urban terrain operations to the Royal Cambodian Armed Forces' 31st Naval Infantry Brigade, even though this unit had earlier sealed off a village to cut off access to food, beaten villagers, denied them medical care and then carted them off in U.S.-supplied cargo trucks. The 31st Naval Infantry had a history of summary executions dating from a 1997 coup in which Hun Sen's men routed troops loyal his co-prime minister, Prince Norodom Ranariddh.

7.   Despite the State Department's assurances that aid recipients were rigorously vetted, I began to use the Freedom of Information Act to test this. U.S. Embassy records showed, for example, that the Department had chosen to interpret the law such that individual service members could qualify as "units" receiving assistance under the Leahy Laws—regardless of how his or her larger brigade, squad or department had actually behaved. Attached hereto as **Exhibit 2** is a true and correct copy of an article I authored in November of 2010 titled *Is U.S. Training Cambodian Troops Linked to Abuses?*, discussing this trend. Thus, individual paratroopers from Hun Sen's trusted 911th Airborne Brigade, implicated in torture and execution in 1997 and violent political suppression, could be photographed proudly on the deck of a U.S. Navy vessel or execute training jumps from U.S. aircraft because the Department did not vet the 911th Airborne, which had the same unsavory commanding officer in 2010 as it had in 1997.

8.   After leaving The Cambodia Daily, I was contracted by Human Rights Watch in part to further examine the disconnect between the intended goals of the Leahy Laws and the reality. I continued to confront substantial evidence showing that either before or after U.S. training, recipients often faced credible accusations of human rights violations.

9.   In 2013, I became an employee of Plaintiff 100Reporters, an investigative non-profit newsroom co-founded by former New York Times reporters and dedicated to public accountability reporting. In collaboration with The Intercept, we designed an investigation using data derived from more than 6,000 State Department cables published by WikiLeaks to plot the origins and destinations of nearly 40,000 units and individuals who underwent human rights vetting to receive U.S. assistance between 2003 and 2010. Attached hereto as **Exhibit 3** is a true and correct copy of an article I co-authored in July of 2016 titled *The Network: Leaked Data Reveals How the U.S. Trains Vast Numbers of Foreign Soldiers and Police With Little Oversight*, discussing this in detail.

10. This reporting showed that U.S. government training occurred at 471 locations in 120 countries—fragile democracies and developed nations alike—and was offered by 150 U.S. defense and civilian agencies and the army national guards of five states, with clear implications for the daily lives of countless civilians around the world, and for the foreseeable future.

11. In 2015, I returned to Cambodia, where my reporting revealed U.S. assistance to top members of the national police credibly accused of kidnapping and multiple murders, and showed that Cambodian sailors burned houses and beat villagers at the foot of a naval base where American sailors frequently publicized their visits. Published State Department cables showed the U.S. Embassy had overlooked this violence when nominating a Cambodian Navy Commodore from the base to attend training with the U.S. Coast Guard. They had done likewise for a Royal Gendarmerie

officer who was chosen to attend counterterrorism training despite having participated in the Spean Ches eviction of 2007, among the most famous and violent of the crisis. *See* **Ex. 1**.

12. This appeared to me to be emblematic of a bigger problem; thus, I continued to investigate the issue. I pieced together evidence indicating that Sok Khemrin, a senior officer in the criminal investigation unit of Cambodia's National Police, had committed public executions, but was cleared by the U.S. to receive instruction in chemical forensics and financial investigations.

13. The State Department already makes public the names of units ineligible for assistance under the Leahy Laws. Likewise, references to and reports of U.S. training and assistance being furnished to foreign security forces abound; I both consult such sources in my work, and produce them, as discussed above. *See supra* ¶¶ 5–7. Access to the names of individuals that have undergone Leahy Vetting will further my investigations and reporting on the State Department's compliance with the Leahy Laws, and will afford the news media and the public an opportunity to examine personal and unit histories to see for themselves whether U.S. assistance is reaching individuals and entities in compliance or in violation of federal law.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of February, 2021 in Washington, D.C.

Douglas Gillison

# EXHIBIT 1

**REPORTAGE** | CAMBODIA

# "SOMETIMES THEY BURN THE WHOLE VILLAGE"

## IN APPARENT VIOLATION OF THE LEAHY LAW, U.S. PROVIDED TRAINING TO ALLEGED HUMAN RIGHTS ABUSERS IN CAMBODIA

### DOUGLAS GILLISON, 100REPORTERS



Gendarmes at the Spean Ches eviction in 2007 appear in this photograph published by the local human rights organization LICADHO. The U.S. Embassy later cleared on-scene commanders from this and other evictions to receive U.S. training.

P REAH SIHANOUK PROVINCE, Cambodia—They were some of the most searing images of violence to emerge from the land crisis that swept Cambodia over the last decade. In scorching dry-season heat, the military shot villagers and torched their homes across this seaside province.

Witnesses said one eviction in April of 2007 at the village known as Spean Ches was particularly brutal. Security forces inflicted gunshot wounds at close range, used live fire to disperse crowds, and beat villagers, sometimes with batons that deliver electric shocks.

A joint force of about 150 members drawn from the police, the army, and the Royal Gendarmerie burned 80 houses and demolished another 26 homes.

"They used a type of fire gun to shoot flames to burn down the houses," said Yeang Ren, 32.

Gendarmes arrested villagers, forced them to lie face down, and repeatedly kicked them in their heads, Ren said. "We felt great distress when we heard our houses being knocked down with an excavator."

That month, a Cambodian navy unit burst into another community 15 miles away, beating one villager unconscious and burning down five houses to seize land that residents now say forms part of the campus of a local training school for the navy.

As property values rose over the last decade, Cambodia's poorer rural and urban communities found themselves locked in land battles with the country's oligarchy, which claimed rights to prime real estate. By 2014, more than half a million people had been affected by evictions, according to the Cambodian League for the Promotion of Defense of Human Rights, a human rights organization known as LICADHO, for its acronym in French.

The scale and violence of evictions at Spean Ches quickly became emblematic of the crisis, drawing the attention of the U.S. Embassy in its 2007 annual report on human rights. And in 2014, the Spean Ches eviction helped form the basis of a private legal action alleging crimes against humanity that was brought before the International Criminal Court.

Yet as the crisis unfolded, Washington intensified its relations with the Royal Cambodian Armed Forces and police.

Congress, in 1997, had outlawed assistance to foreign security forces known to have committed gross violations of human rights. Yet diplomatic files published by WikiLeaks and compiled by the nonprofit investigative journalism group 100Reporters show that American officials overlooked such violations in vetting Cambodian police and military personnel for their eligibility to receive U.S.-funded training—in some cases apparently in violation of the law.

Two years after the violence at Spean Ches, the U.S. Embassy in Phnom Penh recommended Colonel Seng Phok, a deputy commander in the Royal Gendarmerie, for U.S. training, the same man a human rights worker said was among the commanding officers during the eviction.

100Reporters also found that the United States provided training in investigative techniques to senior members of Cambodia's National Police Commissariat who at the time were the subject of detailed murder and kidnapping allegations.

Those allegations were contained in court records and United Nations' files that would have been easily accessible to the U.S. Embassy, which submitted their names to Washington for approval.

In a data-driven investigation carried out over more than a year using the "cablegate" cache of American diplomatic records, 100Reporters developed a navigable database of nearly 60,000 individuals from 129 countries selected for training by nearly 140 U.S. federal agencies.

Suspected narcotraffickers, killers, torturers, and foreign units involved in systematic extrajudicial killings were all found in the database. Many managed to pass through American vetting and receive training.

Ny Chakriya, chief monitor at the U.S.-funded Cambodian Human Rights and Development Association (ADHOC), which began assisting the U.S. Embassy in screening Cambodian offi-

**DOUGLAS GILLISON** is a staff writer for 100Reporters, the investigative news website. This article was produced as part of 100Reporters' data-driven investigation of the human-rights oversight of U.S. training of security forces around the globe.

cials several years ago, said he was concerned by the failure to weed out questionable applicants. "When you see that a person who has violated human rights gets training, it seems he is given encouragement, and this is not a good thing," he said. "It fuels him to violate human rights even more."

At the time of the 2007 evictions in the seaside province, U.S. officials had already suspected that human rights vetting of local security forces was a problem. In January of that year, a team from the U.S. State Department Inspector General's office visited the Phnom Penh Embassy and later reported the screening process had been "cursory and uneven."

In practice, the Congressional vetting requirement, known as the Leahy law after its principal sponsor Vermont Senator Patrick Leahy, has meant that background checks are required for all trainees. But the State Department report found the embassy kept no records of its local checks and used out-of-date guidance. Other agencies involved in the training didn't understand the process and failed to submit the names of trainees for investigation, it said.

The State Department said it could not comment on individual cases. "We take our obligations under the Leahy vetting process seriously," Julia Straker, a spokeswoman, wrote in an email. "Consistent with U.S. law and policy, the Department of State vets its assistance to foreign security forces, as well as certain Department of Defense security assistance programs."

Cambodian officials would not discuss the human rights records of those trained by the United States. Attempts to speak with spokespersons for the Interior and Defense ministries were unsuccessful. Senior military officers referred questions to General Meas Sophea, the infantry commander. Through an assistant, Gen. Sophea declined to comment.

Lork Kheng, a member of the governing Cambodian People's Party and of a National Assembly panel on human rights, defended her country's security forces. "Generally speaking, I believe all commanders carry out their duties in compliance with the law," she said in an interview.

Phay Siphan, spokesman for the Council of Ministers, a civilian policymaking body, said that in Cambodia anyone complaining of abuse by the military could seek legal redress.

"We are a member of the United Nations and have our own rule of law," he said. "We do have lawyers; we do have a court system. Whoever is abused can file to the court. That's the way the rule of law is."

## "CLEARLY IDENTIFIED"

Boun Narith, a local monitor for LICADHO, identified one Cambodian officer he said was involved in forced evictions whose name later appeared in U.S. Embassy cables that granted preliminary clearance to attend training in counterterrorism and seaport security.

Colonel Seng Phok was a deputy commander of the provincial sub-office of Cambodia's Royal Gendarmerie and among the commanding officers Narith saw arriving at the Spean Ches village, which was largely destroyed by fire during the eviction, Narith said.

"There were three who were clearly identified," Narith said. "Seng Phok, Pho Mongsan, and Vong Bunthorn," all of whom are provincial gendarmerie officers. The Royal Gendarmerie is a military law enforcement body that often overlaps with the civilian police force.

Two years after the destruction of Spean Ches, the American Embassy informed Washington that it could find "no credible information" connecting Col. Phok to any gross violation of human rights and granted him preliminary approval to attend training in counterterrorism.

Washington's final determination on training Col. Phok was not included in leaked cables. Attempts to seek comment from local gendarmerie officials were unsuccessful.

But of the hundreds of thousands of foreign personnel and units vetted every year by the U.S. State Department, only a small fraction is ever rejected during second-tier check in Washington, where a team of screeners may have only a few minutes to devote to each case.

When 100Reporters visited the provincial gendarmerie headquarters in March 2015, officers there said Col. Phok was traveling. Contact information for him was unavailable. Brigadier General Kheng Tito, a spokesman for the Royal Gendarmerie at the national level, said that he was not sufficiently familiar with the evictions to offer any comment. "I do not know these cases, how they happened from the beginning," he said.

On the morning of the eviction, residents at first tried to keep the security forces out. Brawls and rock throwing broke out, according to former residents.

"They shot straight towards the people, low to the ground, to clear the way where it was crowded," said Ren.

"They beat us while we were lying face down. They stomped on us, and they used their feet to step on our heads," he said. "Then we were tied up with rope before being put on trucks. It was the gendarmerie uniforms."

Nearly a decade after the eviction, the seized plot of land sat empty when 100Reporters visited last year. Of the more than 100 families originally at the eviction site, 75 have refused compensatory offers of plots in a nearby district, according to Ek Vithean, a man who was elected a community representative in 2010. They now live a few hundred yards from their former village in a roadside shanty encampment, perhaps 10 feet wide, comprised of lean-tos and shacks cobbled together with spare planks and corrugated roofing.

Ren, who said he had recently been laid off as a gardener at a beachfront bar, said he was one of seven men to spend a year in jail following the eviction.

Inside, as many as 30 people were sometimes confined to a space of just 260 square feet. Ren developed rashes and had difficulty bathing and sleeping.

Late dry season temperatures can approach 100 degrees Fahrenheit. The food consisted of a broth of morning glories with rancid fish and rice. "Rotten. Stinky. Sometimes I did not see the fish, the meat. I saw only the bones," he said. "Sometimes I felt I wanted to kill myself. I was dissuaded by other detainees."

In April of 2007, the same month as the Spean Ches eviction, huts went up in flames elsewhere in Preah Sihanouk province. Troops

## SOME OF THE LAND WHERE THE BURNED HOUSES ONCE STOOD IS NOW OCCUPIED BY A SCHOOL FOR THE ROYAL CAMBODIAN NAVY.

burst into Kbal Hong, a small village abutting Ream Navy Base, Cambodia's most important naval installation, which sits on a stretch of coast not quite 20 miles outside of town.

Nam Then, a former village resident and local land activist, read to visiting reporters from notes he had kept from the event. "On April 24, 2007 at 3 p.m., there were a mixture of soldiers from Battalions 8 and 9. There were about 60 armed forces with sticks, knives, axes, and guns led by Mr. Hong Morn and Mr. Hing Puth Dara," he said.

The soldiers burned down five houses that day. (Some of the land where the burned houses once stood is now occupied by a school for the Royal Cambodian Navy, villagers said.) They allegedly beat unconscious a man named Samrith Lai, whom they mistakenly suspected

REPORTAGE | CAMBODIA



LICADHO

Another image from Spean Ches shows a gendarme brandishing a stave over subdued villagers, including Ken Neou, center, who said he was beaten for attempting to open his eyes and later spent a year in prison.

of attempting to alert outsiders to the event. According to Then, Lai had in fact been taking a feverish child to get medical attention.

Then said he had seen a man at the scene giving orders, who he later learned was Rear Admiral Puth Dara, then a deputy commander of the navy base. "I saw him standing, pointing fingers back and forth," said Then.

Leaked diplomatic records show that in 2009, just two years after the house burnings, the American Embassy approved Puth Dara, who then held the rank of commodore, to receive training from the U.S. Coast Guard in advanced maritime operations.

The base itself sits at the foot of Ream National Park, a 60-square-mile conservation area on the Gulf of Thailand. At a kind of garrison village next door, Cambodian naval personnel strutted proudly in crisp white uniforms. American sailors and marines are frequent guests and have regularly conducted joint exercises as part of "Cooperation, Afloat Readiness, and Training," or CARAT, a program of the U.S. Pacific Fleet intended to build rapport with the navies of Southeast Asia. In 2009, navy personnel from Ream were selected to attend a basic "boarding officer" course in Charleston, South Carolina.

"The U.S. ships and sailors you see here demonstrate the American people's commitment to sustaining a strong bilateral defense relationship with Cambodia," the American Embassy's deputy chief of mission, Julie Chung, said in a speech at the base in 2014.

But the camaraderie shown to the Americans does not extend to Kbal Hong village. Residents described living with the persistent antagonism of navy personnel, which has continued at a slow burn in the years since the destruction of the houses.

"They won't allow me to farm my land," said a 53-year-old woman who said that her plot was next to a navy battalion and asked that her name not be used. "Yesterday there was a big argument. Two sailors came to stop me from clearing brush to work on my house."

As in so many other villages in the dry season, a piebald path runs down the center of Kbal Hong, the grass worn away by foot and motorbike traffic. In the noonday heat, villagers take shelter together to eat, watch television, and talk.

In early 2007, navy personnel called village residents to a meeting that quickly turned hostile. Villagers complained that no road had been built to access the hillside relocation site known as O'Kampuchea, which the navy was offering to replace the land they would lose in an eviction.

According to Then, one of the navy men present brandished a knife and told the villagers that if they wanted a road to "use your mother's ass" to bulldoze it.

Another, whom Then identified only as "Krouch," later saw Then taking photographs and then cocked an AK-47 assault rifle, as if preparing to shoot Then, but was prevented from doing so by fellow sailors. A brawl ensued which Then said was captured in photographs by Sok Tith, another villager.

By April, the navy had decided on a forcible resolution. As 60 men were approaching the village along a road on April 24, they encountered Samrith Lai who says he was beaten unconscious and briefly detained along with Sok Tith.

Uniformed men entered the village and began tearing down fence posts and setting houses alight, according to Then. He said he managed to photograph the burning remains of the small house that had belonged to a villager named Leng Yeung, who he said has since gone to live near the local airport.

Attempts to speak to Rear Admiral Puth Dara, the naval base deputy commander, in person and by telephone were unsuccessful.

## "LOTS OF KILLINGS"

The 100Reporters database of training records shows that by 2008, the United States was seeking clearance to train hundreds of Cambodian police officers, notably those from the Criminal Investigation Department, which was then led by Mok Chito.

Chito had worked his way to the upper levels of Cambodia's National Police hierarchy from the Phnom Penh Municipal Police in the 1990s, a raucous time when the city's fractious security forces were widely suspected of sustaining themselves through deadly extortion and drug rackets. A close associate of Chito's during that time was Sok Khemarin, who later became director of the National Police criminal department.

In 2008, and again in 2009, leaked records show Khemarin was cleared by the American

## "WE DON'T WANT TO BE REWARDING BAD BEHAVIOR, EVEN WITH OUR ALLIES."

Embassy for training in Bangkok on chemical forensics and in financial investigations in Phnom Penh. Indeed, in November of 2008, Khemarin passed the second tier of vetting in Washington, clearing him to attend.

But municipal court records obtained by 100Reporters show that by 2008 both Chito and Khemarin were the subject of multiple torture and murder allegations. Human Rights Watch in 2012 published excerpted interviews in which a former government official and a former covert operative claimed Chito had overseen kidnappings and was "involved in lots of killings."

Some allegations may have been made by rival members of the police who faced similar allegations of criminality or who had ulterior

REPORTAGE | CAMBODIA

motives arising from internal power struggles. But their allegations were nevertheless detailed, serious, and open to the scrutiny of American officials.

Just five months before Khemarin was cleared by the embassy in 2008, Om Samkheng, the former head of misdemeanor cases in the Phnom Penh police, lodged a complaint from detention in Prey Sar prison, saying he had seen both Chito and Khemarin in the act of a murder committed 13 years earlier in Kandal province, just outside Phnom Penh. He wrote by hand:

> When we were almost at the Boeng Snaor school, we heard gunshots, about two to three shots. Then, my friend and I stopped our motorcycle at a distance of about 50 meters. We immediately saw Mr. Mok Chito holding a gun in his hand and Sok Khemarin holding a gun in his hand—I don't know which model—open fire on a person who was handcuffed, causing death, on a slope leading to the Boeng Snaor school.

Samkheng wrote that he was later arrested and tortured into confessing to committing a string of high-profile murders and attempted murders on the orders of Heng Pov, the now-disgraced former Phnom Penh police chief and longtime foe of Mok Chito. Pov is himself serving a jail sentence of nearly 100 years (for several of the very same crimes to which Samkheng claimed he was forced to blame Pov).

In a 2004 interview conducted outside Cambodia by a U.N. human rights officer, a copy of which was obtained by 100Reporters, a former Cambodian policeman connected to a rival political party said that in 1996 he had seen both Chito and Khemarin murder a man named Heng Ra in Phnom Penh's Meanchey district.

"He was killed near Chba Ampov. Mok Chito was in the car when Ra was pushed out and shot by Sok Khemarin," according to the statement, which was shown to 100Reporters by a former U.N. official on the condition that the author's identity be protected.

Lieutenant General Mok Chito rubbished the allegations against himself and Sok Khemarin. He also said that both he and Khemarin had attended American training, specifically from the FBI. "I have attended several training courses in Phnom Penh and outside the country, but I can't recall the dates," he added that the courses covered money laundering, counterterrorism, human trafficking investigations, and human rights.

Chito said that the court had dropped the complaints against him, finding that Om Samkheng had been lying. "The allegations were baseless. It came from Heng Pov's personal vendetta," he said. "If the U.S. government believed all this, it would be crazy and silly." He said Samkheng had died in prison but that he could not recall the nature of his illness. "Don't believe him. He lied," said Chito.

## "A SLIPPERY SLOPE"

The State Department and Defense Department believe they encourage other countries to take on the burdens of maintaining international order by building up peacekeeping forces from poorer nations, making other countries more compliant, improving intelligence sharing, and smoothing the passage of American forces through friendly territory when needed.

Pentagon officials have sometimes chafed at restrictions under the Leahy law. Sen. Patrick Leahy has tussled with the State Department. The senator has accused State Department officials of ignoring a legal obligation to vet entire units, not merely individual candidates for training.

Mu Sochua, a lawmaker from the opposition Cambodia National Rescue Party, said she felt the American hope of reforming Cambodia's security forces by engaging with them, almost without restriction, was "unrealistic." "Sometimes they burn the whole village. There are pictures of that," she said. "The United States cannot close its eyes to this and at the same time preach democracy, human rights."

"I say it to each U.S. ambassador to Cambodia," said Sochua, who is herself a U.S. citizen. "Training, hoping that these armed forces will be ... neutralized without some form of conditions to aid is totally unrealistic."

"The leverage of behind-closed-doors diplomacy is zero," she said. "So you have to change the strategy."

Patrick M. Cronin, senior director of the Asia-Pacific Security Program at the Center for a New American Security, said in an interview that the United States had little choice but to be present and active in Southeast Asia: "The United States has to be tethered to a rising Asia, otherwise we will lose."

But he added that security cooperation pursued at any price undermines American goals. "I would be doing as little as possible to cast in a good light people who we think have done things that are criminal," he said. "If we become ultra-realists, it's a slippery slope, so that we're no longer defending the things we think we're defending."

Cronin said the "Cobra Gold" military exercises the U.S. conducts in neighboring Thailand, where a military junta has been in power since 2014, were "very problematic." "We don't want to be rewarding bad behavior, even with our allies."

The Thai junta has been accused of detaining hundreds of people in secret, some of whom were allegedly tortured, and bringing political opponents to trial in military courts.

"Can we be part of the solution without dirtying ourselves, without forsaking our own values? Those are all fair questions," said Cronin. "There are pluses and minuses in any policy implementation." ●

*Phann Ana, Phorn Bopha, and Lon Nara contributed reporting.*

*Editor's note: In 2012, the author served as a consultant to Human Rights Watch on matters related to the subject of this story.*

# EXHIBIT 2

| HOME | TIME MAGAZINE | PHOTOS | VIDEOS | SPECIALS | SUBSCRIBE | Mobile Apps | Newsletters | RSS | @TIME | Like | 324K |

NewsFeed | U.S. | Politics | **World** | Business | Money | Tech | Health | Science | Entertainment

# TIME **World**

*Subscribe to TIME » Give a Gift »*

SEARCH TIME.COM

Main | Global Spin | Middle East | Travel | Intelligent Cities | Videos


The **TIME** Android App is Here
»»» GET IT NOW from Android Market

## Is U.S. Training Cambodian Troops Linked to Abuses?

By **DOUGLAS GILLISON** / PHNOM PENH   Friday, Nov. 19, 2010


Subscribe to get a FREE gift!

**Newsfeed**

- Randy Moss Retires: A Drama King Who Belongs in the Hall of Fame
- Missouri Law: Teachers and Students Can't Be Facebook Friends
- Tourists Foot the Bill to Keep Venice Above Water

**Sponsored Links**

**Mortgage Rate Drops to 3.8% FIXED!**
$200,000 loan for $708/month. Free Quotes - No SSN... Mortgage.RefinanceFr...

**Groupon™ Deals**
Save in hundreds of cities worldwide w/ the original daily deal site! www.Groupon.com

Buy a link here

**More on TIME.com**



Top 10 Unforgettable Shark Moments


ENLARGE PHOTO+
A U.S. Army sergeant, left, talks to Cambodian troops during a U.S.-led military exercise outside Phnom Penh in June 2007
*Tang Chhin Sothy / AFP / Getty Images*

PRINT   EMAIL   REPRINTS   SHARE

Like   0

The U.S. State Department was watching closely two years ago when Cambodian troops were called for evictions in two of coastal Kampot province's villages. According to accounts by human-rights workers and reporting by the U.S. embassy in Phnom Penh, naval infantry sealed off one village and refused to allow in food when residents resisted the dismantling of their homes, 100 of which had been burned down by forestry officials to make way for soldier housing. Though military officials denied this, the State Department reported that several inhabitants were arrested and badly beaten by troops who denied them immediate medical care. Hundreds of families were evicted and some were carted off in military cargo trucks supplied by the U.S.

Ugly as that scene may have been, in June of this year the same unit, the 31st Naval Infantry Brigade of the Royal Cambodian Armed Forces, which according to Human Rights Watch has a history of human-rights abuses including the summary executions of political enemies in 1997, participated in a week of training staged in Cambodia by the U.S. Two platoons of U.S. Marines taught the Cambodians, among other things, about military operations in urban terrain, detainee handling and martial arts. **(See pictures of Cambodia's Khmer Rouge.)**

Since 1997, federal law has barred U.S. forces from offering assistance to foreign military units if there is evidence that they have gone unpunished after committing human-rights violations.


Introducing **LightBox**
A New Blog from the Photo Editors of TIME
See it now »

**Most Popular »**                    Full List »

MOST READ    MOST EMAILED

1. Earth's Little Sidekick: A Tugboat Asteroid
2. Box Office: Why *Cowboys & Aliens* Got Smurfed
3. It Just Doesn't Work: Why New Tech Products Are Increasingly Unsatisfying
4. The Dark Side of Murdoch's Russian Billboard Business
5. Indian Women Take SlutWalk to New Delhi's Streets
6. The Night El Bulli Danced: The World's Most Influential Restaurant Shuts Down
7. The Boy Who Lived Forever
8. U.S.-Pakistan Relations Are Increasingly a Game of Spy vs. Spy
9. The City of Angels Who Never Sleep: Can Downtown Los Angeles Be Manhattanized?
10. Norway PM: Think Before You Speak

**More News from Our Partners**

- Unrest casts pall over Ramadan
- Libyans brace for uncertain month ahead
- Acid attack victim rejects 'eye for an eye' punishment

 LIVE UPDATES: Debt Ceiling Deal Reached

 Days Away From Default, Democrats Nervously Eye Constitutional Route

 9/11 Health Czar: No Cancer Link To Ground Zero



Europe's Right Wing: A Nation-By-Nation Guide to Political Parties and Extremist Groups



Top 10 Fake TIME Magazine Covers

But the question of how Washington should interpret that law is far from settled. The U.S. has been frequently accused of violating or undermining this law around the world in its eagerness to pursue security cooperation in Africa, South America and Asia.

In Cambodia, human-rights workers say service personnel from problematic Cambodian units have regularly participated in U.S. military training programs, which began in Cambodia five years ago. But the U.S. embassy says it thoroughly screens all Cambodian personnel who receive U.S.-sponsored military training and assistance. "The U.S. government provides training to Cambodian security forces to advance our goals of creating a more professional force and to advance U.S. objectives in areas such as counterterrorism and peacekeeping operations," says embassy spokesman Mark Wenig. "Every individual who is trained is thoroughly vetted both in Phnom Penh and Washington in accordance with U.S. law and department regulations."

However the embassy declined to discuss individual instances of vetting and did not answer specific questions about how it interprets the legal requirement, known as the Leahy Amendment after its sponsor, Vermont Democratic Senator Patrick Leahy, that all foreign units receiving aid must be vetted.

But State Department records released under the Freedom of Information Act appear to give credence to a long-standing complaint from congressional staff and human-rights workers: that, to get around the frustrations of the military vetting law, American embassies around the world sometimes vet individual foreign soldiers and sailors, but not the units they are drawn from. By law, assistance is barred "to any unit" of a foreign military suspected of abuses, but State Department records show that U.S. foreign-service officers in Cambodia may have read *unit* as meaning individual soldiers.

Former ambassador Joseph Mussomeli told all embassy staff in a 2007 management notice, which was released under the Freedom of Information Act, that the embassy was responsible for vetting of "units and/or individuals." In unclassified cables last year, the U.S. embassy in Phnom Penh notified the offices of the U.S. Secretaries of State and Defense, the chairman of the Joint Chiefs of Staff and the commander of U.S. forces in the Pacific that it had vetted 61 individuals, not units, from the Cambodian navy for training events staged between August and November of that year. The embassy "has reviewed its files and finds that as of this date it possessed no credible information of gross violations of rights by the above individuals," said each of the three cables, which were also released under the Freedom of Information Act.

According to Tim Rieser, a foreign-policy aide to Senator Leahy who drafted the foreign-military vetting statute, the practice of vetting individuals instead of units is both "inconsistent with the letter and intent of the law" and the subject of a long-standing disagreement with the State Department. "If the unit is ineligible, then the members of that unit are ineligible unless the foreign government is taking effective measures to bring the individuals responsible for violating human rights to justice," he says.

Human-rights advocates agree. According to Sophie Richardson, Asia advocacy director at Human Rights Watch, the Leahy Amendment has not been applied in Cambodia, where "members of units we have tracked for years — which continue to conduct gross human-rights violations with impunity — continue to turn up in U.S. training programs."

How Was The Joker Potty Trained? Mental Health Experts Psychoanalyze Batman Villains

Alaska's Alleged Sea Monster Caught On Film

WATCH: Exploding manhole Tosses Car In The Air

- RT on DVD & Blu-Ray: Exporting Raymond & Rio
- Box Office Smurf Wrapup: Cowboys & Aliens Gets Smurfed
- Weekly Ketchup: Harrison Ford To Play Wyatt Earp in Black Hats



In addition to the Cambodian marines trained in June, Human Rights Watch's concerns extend in particular to the country's 911th Airborne Brigade, which was also implicated in the "torture and execution" of rival military commanders in 1997 and the violent suppression of political rallies the following year, and Cambodia's 70th Infantry Brigade, the new National Counterterrorism Task Force commanded by Brigadier General Hun Manet, son of Prime Minister Hun Sen. The counterterrorism task force, which human-rights workers say is composed of individual soldiers drawn from problematic units, was trained by U.S. Marines in hand-to-hand combat and marksmanship in 2007.
**(Read about corruption in Asia.)**

Colonel Yin Chumnith, deputy commander of the 911th Airborne Brigade, says that during U.S. combat training in 2006 and 2007, one American service member had acknowledged legal concerns about the military's human-rights record in Cambodia but said that military cooperation was also important: "It is a government policy, but the soldiers need to cooperate with each other," he recalls the American as having said. "From my personal point of view, we are government troops who are trained to protect the government," says Chumnith. "So we always protect the government and we don't care about the allegations."

According to Bonnie Glaser, an expert on China and security policy at the Center for Strategic and International Studies, U.S. officials may fear that shunning foreign militaries on human-rights grounds would cause the U.S. to miss out on opportunities to gain influence and, ironically, to promote better human-rights practices in the process. But in July, U.S. officials sent a very strong signal of how they intended to proceed when they lifted a 10-year ban on military contact with Indonesia's special forces, known as Kopassus, which have been accused by human-rights workers of assassinations, disappearances and torture across Indonesia. "It seems to be a bellwether of how we're going to behave in the future," says Glaser. "If you're looking at U.S. interests in the region, you have to ask yourself if you want to opt out of a country because you're standing up for human rights ... There is only so much influence you can have by standing outside and upholding the principled point of view," she says. "These are very tough calls to make."

*— With reporting by Phann Ana / Phnom Penh*

**Sponsored Links**

**100% - 1000% Stock Gains**
Think thats unrealistic? It's possible with penny stocks
www.MadPennyStocks.com

**$39 Auto Insurance?**
Special Online Rates As Low As $39 a month From Top Firms. Free Quotes
AutoInsurance.Insure.com

**Groupon™ Deals**
Save in hundreds of cities worldwide w/ the original daily deal site!
www.Groupon.com

**Buy a link here**

PRINT | EMAIL | REPRINTS | SHARE

Real-time updating is **enabled**.

# EXHIBIT 3

**The Intercept_**

# THE NETWORK

Leaked Data Reveals How the U.S. Trains Vast Numbers of Foreign Soldiers and Police With Little Oversight

  

Douglas Gillison, Nick Turse, Moiz Syed
July 13 2016, 10:00 a.m.

At 9:30 a.m. on a gray winter Monday, the State Department officials began certifying the names at a rate of one every two minutes and 23 seconds.

In rapid succession, they confirmed that 204 police officers, soldiers, sailors, and airmen from 11 countries had committed no gross human rights violations and cleared them to attend one of more than 50 training efforts sponsored by the U.S. government. The programs were taking

place at a wide variety of locations, from Italy, Albania, and Jordan to the states of Louisiana and Minnesota.

Thirty-two Egyptians were approved for instruction in, among other things, Apache helicopter gunship maintenance and flight simulators for the Sikorsky UH-60 Black Hawk. Azerbaijanis were cleared for a U.S. Army course on identifying bio-warfare agents in Maryland and underwater demolition training with Navy SEALs in San Diego. Thirty-three Iraqis were certified to attend a State Department training session for bodyguards, held in Jordan. Bosnians were bound for Macedonia to prepare for deployment to Afghanistan. Ukrainian police were selected for peacekeeping training in Italy. Romanians would study naval operations in Rhode Island and counterterrorism in Skopje.

This was only the beginning of one day's work of vetting security personnel for U.S. training. A joint investigation by *The Intercept* and *100Reporters* reveals the chaotic and largely unknown details of a vast constellation of global training exercises, operations, facilities, and schools — a shadowy network of U.S. programs that every year provides instruction and assistance to approximately 200,000 foreign soldiers, police, and other personnel. The investigation exposes the geographic and political contours of a U.S. training system that has, until now, largely defied thorough description.



Visualization shows partial data where training locations were available. Source: WikiLeaks Cablegate, 2003-2010.

The data show training at no fewer than 471 locations in 120 countries — on every continent but Antarctica — involving, on the U.S. side, 150 defense agencies, civilian agencies, armed forces colleges, defense training centers, military units, private companies, and NGOs, as well as the National Guard forces of five states. Despite the fact that the Department of Defense alone has poured some $122 billion into such programs since 9/11, the breadth and content of this training network remain virtually unknown to most Americans.

The contours of this sprawling system were discovered by analyzing 6,176 diplomatic cables that were released by WikiLeaks in 2010 and 2011. While the scope of the training network may come as a surprise, the most astounding fact may be that it is even larger than the available data show, because the WikiLeaks cables are not comprehensive. They contain, for example, little information on training efforts in Colombia, the single-largest recipient of U.S. training covered by the human rights vetting process that produced these records. Other large recipients of U.S. security assistance, such as Pakistan, are vastly underrepresented in the cables for reasons that remain unclear.

"What you have stumbled across is a systematic lack of strategic thinking, a systematic lack of evaluation, but a massive commitment of people and money and time in a growing number of countries," said Gordon Adams, formerly a senior White House official for national security and foreign policy budgets. "I think the word 'system' is a misnomer. This is a headless system," he said.

The investigation raises serious questions about U.S. government oversight, safeguards, and accountability. The investigation found:

• A global training network without any coherent strategy, carried out by scores of agencies and offices with no effective oversight, centralized planning, or a clear statement of objectives.
• The lack of any means of testing and evaluation, let alone a comprehensive way to count or track foreign trainees.
• Vetting procedures designed to weed out human rights abusers that examine trainees so rapidly that experts question their worth.



U.S. Special Forces members advise and assist soldiers assigned to the Belize Special Assignment Group during a marksmanship range exercise near Belize City, Belize, April 12, 2010. Photo: U.S. Department of Defense

A Rand Corp. analysis from 2013 found that the Pentagon alone has 71 different authorities under which it provides foreign aid as a means of "building partner capacity," or BPC — part of a system that the report criticized as akin to "a tangled web, with holes, overlaps, and confusions." The Pentagon, for example, maintains no master list of the people it trains nor does it keep aggregate figures.

"The way we do security cooperation has been a patchwork that we've added to over and over," said Rachel Kleinfeld, a senior associate at the Carnegie Endowment for International Peace and former member of the State Department's Foreign Affairs Policy Board. "There are more than 180 authorities and scores of agencies working in these areas, and the way it has evolved over time has made it absolutely impossible for anyone to know what's going on. … There really is no oversight."

Details on the U.S. government's training programs have long been lacking. In 2012, the Obama administration submitted a one-time report to Congress on foreign police training that covered just two fiscal years — and it was never made public. Annual disclosures by the State Department about foreign military training programs cover many volumes but are often vague and difficult to analyze, with information frequently missing or reported inconsistently.

The diplomatic cables that were mined for this investigation were written between December 1999 and February 2010 and were among a far larger batch of documents leaked by Army Pfc. Chelsea Manning; a military court subsequently sentenced Manning to 35 years in prison. The cables provide the identities of nearly 60,000 trainees and units from 129 countries (today, the number stands at more than 150 countries) who were selected by U.S. government entities as varied as the FBI, the Defense Department Fire Academy, the Patent and Trademark Office, the National Geospatial-Intelligence Agency, and the National Park Service. Only some of the cables contained enough information to appear on the accompanying map, which depicts the planned movements of just under 39,300 people and units between 2003 and 2010.

The cables also reveal that more than two-thirds of the State Department's vetting approvals were granted for training programs carried out overseas rather than in the United States. Domestically, training was conducted in 39 U.S. states as well as Puerto Rico, Guam, and the District of Columbia. At least 57 domestic Army, Air Force, Navy, and Marine Corps bases were involved in these domestic training efforts. Additional research by *The Intercept* and *100Reporters* indicates that little has changed in the years since the cables were released; the global U.S. training system remains sprawling, opaque, and in disarray.

William Hartung, a senior adviser to the Security Assistance Monitor, which tracks American military aid around the globe, said the scale of

the training efforts was "just mind boggling."

"It's sort of a question of, 'Where aren't we training people?'" he said. "It's hard to imagine any other country in the world being in a position to do all this and to do it with so little scrutiny."



A soldier of the Iraqi army's 16th Division kicks in a door during a training exercise at Be-smaya Range Complex, Iraq, March 21, 2015. Photo: U.S. Army Central

The WikiLeaks cables examined in this investigation were written to comply with the so-called Leahy Law — a vetting process meant to weed out foreign trainees or units implicated in "gross human rights viola-tions." While the Leahy Law has prevented some aid from reaching units in countries like Pakistan and Indonesia, it has been routinely crit-icized as ineffective and filled with loopholes that are used to circum-vent the law's intent. Its implementation has also been hobbled by a lack of funding. As Lora Lumpe, a senior policy analyst at the Open Soci-

ety Foundations, has observed, the State Department office that controls the Leahy vetting operated on a budget of just $2.75 million in 2014, while the security projects it oversaw were worth as much as $15 billion. The number of cases it vetted in 2015 was astounding — 191,899. The total number of individuals trained is certainly higher: According to the State Department, a single case can comprise thousands of individuals.

"When you say we have to look at every individual and every unit and you actually have to do the vetting, you get far too many people who are technically vetted, but who we actually know very little about," said Kleinfeld of the Carnegie Endowment. "So you build a haystack where you're looking for a needle. And as you build that haystack, the vetting necessarily becomes worse."

Questions about the vetting process are accompanied by concerns about the effectiveness of the training programs. Last year, a $500 million Pentagon effort to train and equip Syrian rebels, slated to produce 15,000 fighters over three years, yielded just a few dozen before being scrapped by the Obama administration. A 13-year effort in Afghanistan has resulted in an army filled with "ghost" soldiers, wracked by desertions and continuing to suffer setbacks and lose territory to a relatively unpopular insurgency. And then there was the spectacular collapse of the Iraqi army in 2014 to the much smaller forces of the Islamic State (though the territory lost at the time is beginning to be won back).

These failures call into question whether these far-flung programs "can ever achieve their desired effects," according to a 2015 report by the Congressional Research Service. "Despite the increasing emphasis on, and centrality of, BPC in national security strategy and military operations, the assumption that building foreign security forces will have tangible U.S. national security benefits remains a relatively untested proposition."

A 2015 report by the Center for a New American Security similarly concluded that many "security assistance and cooperation interventions fail to accomplish U.S. objectives as a result of both strategic and structural deficiencies." It found that training goals are often poorly articulated and sometimes in conflict with each other. In 2013, a State Department advisory panel also found that American security aid had no coherent system of planning or evaluation and no overall strategy. It compared the "baffling" array of federal funding sources to "a philanthropic grant-making process by an assemblage of different foundations with different agendas."

That year, the Obama administration attempted to bring order to foreign security assistance through a directive that, according to the Congressional Research Service, calls on national security agencies "to improve, streamline, and better organize" all American international security assistance and cooperation. According to the National Security Council, the administration directed the State Department to "synchronize" foreign security aid programs. The State Department, in response, has said it "continues to play a leadership role" in carrying out the still-unpublished 2013 directive, but the results have been murky and basic information from various agencies is still lacking. The Department of Justice, for example, said it does not track foreign training at the department-wide level.

The failure of the State and Justice departments to meaningfully manage and track their training programs is mirrored by similar deficiencies at the Department of Defense. Despite its claims that programs are "closely overseen," the Pentagon can't even say how many foreign troops it mentors. According to Lt. Col. Joe Sowers, a Department of Defense spokesperson, "Because training is provided through multiple authorities, appropriations accounts, and geographic combatant commands, there is currently no single database that provides a total figure for the number of foreign security forces trained."

Kleinfeld, from the Carnegie Endowment, describes the situation as a strategic failure. "No one knows how many people are being trained because of the lack of centralization — because State does some training, National Guard does some, the FBI, the DOD," she said. "No one has any idea what's going on."

*This story was co-published with 100Reporters as part of its series investigating chronic failures in the U.S. training of foreign police and military personnel.*

*Story by Douglas Gillison and Nick Turse. Data visualization by Moiz Syed.*

*Research: Lewam Dejen, Aishvarya Kavi, Chloee Weiner, and Drew Williams of 100Reporters.*

**WAIT! BEFORE YOU GO** on about your day, ask yourself: How likely is it that the story you just read would have been produced by a different news outlet if The Intercept hadn't done it?

Consider what the world of media would look like without The Intercept. Who would hold party elites accountable to the values they proclaim to have? How many covert wars, miscarriages of justice, and dystopian technologies would remain hidden if our reporters weren't on the beat?

The kind of reporting we do is essential to democracy, but it is not easy, cheap, or profitable. The Intercept is an independent nonprofit news outlet. We don't have ads, so we depend on our members — 70,000 and counting — to help us hold the powerful to account. Joining is simple and doesn't need to cost a lot: You can become a sustaining member for as little as $3 or $5 a month. That's all it takes to support the journalism you rely on.

**Become a Member** →

## LATEST STORIES