UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| 100REPORTERS, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-1753 (RDM) |
| | ) | |
| U.S. DEPARTMENT OF STATE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

CHANNING D. PHILLIPS
D.C. Bar #415793
Acting United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

KATHLEENE MOLEN
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
Tel: (202) 803-1572
E-mail:Kathleene.Molen@usdoj.gov

*Counsel for Defendant*

# TABLE OF CONTENTS

ARGUMENT ...................................................................................................................... 1

I.  The Department conducted an adequate search with respect to FOIA Request F-2017-17860.. ………………………...……………………………………………1

II.  The Department properly withheld information pursuant to FOIA Exemption 5……………………………………………………………………………...3

    A.  The Department has adequately shown that Documents 1 and 45 are predecisional…………………………………………………………………..5

    B.  The Department has adequately shown that the "NOTES" cells in Documents 31-44 are both predecisional and deliberative………………………………..6

    C.  The Department has adequately shown that the portions of Document 12 withheld pursuant to Exemption 5 are deliberative…………………………..8

    D.  The Department's deliberative process privilege withholdings in Documents 6, 11, 23 and 29 are proper because the withheld information predates any final determination about whether certain Leahy vetting candidates should be deemed eligible to receive U.S. assistance……………………………………9

    E.  The Department stands by the foreseeable harm representations in its original briefing and has provided additional clarifying representations in the Revised *Vaughn* Index……………………………………………………………...10

III.  The information withheld by the Department pursuant to Exemption 7 was compiled for a law enforcement purpose………..………………………………11

IV.  The Department properly withheld vetted individuals' identifying information pursuant to Exemptions 6 and 7(C), because those individuals' substantial privacy interests in non-disclosure significantly outweighs any public interest in disclosure………………………………………………………...…….…….13

    A.  Plaintiffs' arguments discount out of hand the substantial privacy interests Leahy vetted individuals have in the non-disclosure of their identities……...14

    B.  Plaintiffs fail to establish that any public interest lies in the release of vetted individuals' identifying information…………………………………………15

    C.  Plaintiffs' foreseeable harm arguments ignore the Department's briefing materials, which set out in sufficient detail the harms that would foreseeably occur upon disclosure of the vetted individuals' identities…………………..17

V.    The Department properly withheld information pursuant to Exemption 7(E)…..18
      A.  Disclosure of the information withheld by the Department pursuant to
          Exemption 7(E) would reveal non-public information and/or information
          unsegregable from sensitive non-public information, as well as undermine the
          effectiveness of certain law enforcement techniques and procedures……….19

      B.  The Department has shown a risk that circumvention of the Leahy Laws could
          occur and has therefore met its burden under Exemption 7(E)……………...21

      C.  Plaintiffs' foreseeable harm challenges rely on the faulty premise that all
          details about the Leahy vetting process are public…………………………..22

VI.   The additional Exemptions 6, 7(C), and 7(F) withholdings applied to the two
      spreadsheets inadvertently produced on January 17, 2020, are proper, and
      Plaintiffs should be directed to return or destroy those inadvertently released
      documents in order to safeguard the safety and physical well-being of the
      individuals identified…………………………………………….……..……...22

CONCLUSION…………………………………………………………………………..24

# TABLE OF AUTHORITIES

**Cases**

*Abramson v. FBI,*
    456 U.S. 615 (1982) ............................................................................................. 12, 13

*Access Reports v. Dep't of Just.,*
    926 F.2d 1192 (D.C. Cir. 1991) .......................................................................... 4

*Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.,*
    626 F.3d 678 (2d Cir. 2010) ................................................................................ 21

*Associated Press v. Dep't of Just.,*
    559 F.3d 62 (2d Cir. 2008) .................................................................................. 17

*Beck v. Dep't of Just.,*
    997 F.2d 1489 (D.C. Cir. 1993) .......................................................................... 16

*Campbell v. Dep't of Just.,*
    164 F.3d 20 (D.C. Cir. 1998) .............................................................................. 3

*Citizens for Responsibility & Ethics in Wash. v. Dep't of Homeland Sec.,*
    Civ. A. No. 20-1400 (CRC), 2021 WL 950415 (D.D.C. Mar. 12, 2021) ........... 17

*Coastal States Gas Corp. v. Dep't of Energy,*
    617 F.2d 854 (D.C. Cir. 1980) .......................................................................... 4, 8, 9

*Gold Anti-Trust Action Comm. v. Bd. of Governors,*
    762 F. Supp. 2d 123 (D.D.C. 2011) ................................................................... 4

*Graff v. FBI,*
    822 F. Supp. 2d 23 (D.D.C. 2011) ..................................................................... 17

*Hamdan v. Dep't of Just.,*
    797 F.3d 159 (9th Cir. 2015)............................................................................... 21

*Heggestad v. Dep't of Just.,*
    182 F. Supp. 2d 1 (D.D.C. 2000) ....................................................................... 4

*Herrernan v. Azar,*
    317 F. Supp. 3d 94 (D.D.C. 2018) ..................................................................... 5

*Hersh & Hersh v. Dep't of Health & Human Servs.,*
    Civ. A. No. 06-4234, 2008 WL 901539 (N.D. Cal. Mar. 31, 2008) ................... 20

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ................................................................................ 4

*Judicial Watch v. Export-Import Bank*,
    108 F. Supp. 2d 19 (D.D.C. 2000) ....................................................................... 7, 8

*Judicial Watch, Inc. v. Dep't of Com.*,
    337 F. Supp. 2d 146 (D.D.C. 2004) ............................................... 18-19, 19, 20

*Lepelletier v. FDIC*,
    164 F.3d 37 (D.C. Cir. 1999) ................................................................................ 16

*Mayer Brown LLP v. IRS*,
    562 F.3d 1190 (D.C. Cir. 2011) ............................................................................ 21

*Mittleman v. Off. of Pers. Mgmt.*,
    76 F.3d 1240 (D.C. Cir. 1996) (per curiam) ....................................................... 13

*Morley v. CIA*,
    508 F.3d 1108 (D.C. Cir. 2007) (per curiam) ............................................... 13, 14

*NLRB v. Sears, Roebuck & Co*,
    421 U.S. 132 (1975) ............................................................................................. 10

*Oglesby v. Dep't of Army*,
    920 F.2d 57 (D.C. Cir. 1990) ............................................................................. 3, 4

*People for the Am. Way Found. v. Nat'l Park Serv.*,
    503 F. Supp. 2d 284 (D.D.C. 2007) ...................................................................... 5

*Performance Coal Co. v. Dep't of Labor*,
    847 F. Supp. 2d 6 (D.D.C. 2012) ..................................................................... 3, 17

*Petroleum Info. Corp. v. Dep't of Interior*,
    976 F.2d 1429 (D.C. Cir. 1992) .............................................................................. 5

*Sack v. Dep't of Defense*,
    823 F.3d 687 (D.C. Cir. 2016) .............................................................................. 18

*Skinner v. Dep't of Just.*,
    806 F. Supp. 2d 105 (D.D.C. 2011) ..................................................................... 17

*Tax Analyst v. IRS*,
    294 F.3d 71 (D.C. Cir. 2002) ............................................................................... 12

*Taxation With Representation Fund v. IRS,*
  646 F.2d 666 (D.C. Cir. 1981) ........................................................................................ 9

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.,*
  141 S. Ct. 777 (2021) ............................................................................................. 4, 5

**Statutes**

5 U.S.C. § 552 ............................................................................. 1, 10, 11,12, 13

## INTRODUCTION

Defendant United States Department of State (the "Department" or "State") respectfully submits this reply memorandum of law in further support of its motion for summary judgment and in opposition to Plaintiffs' cross-motion for summary judgment.  As demonstrated in its opening brief, the Department conducted a reasonable search for records responsive to Plaintiffs' Freedom of Information Act ("FOIA") requests and properly withheld specific and limited information pursuant to 5 U.S.C. § 552(b)(5), (b)(6), 7(C), 7(E), and 7(F).  For the reasons set forth in its opening memorandum and the additional grounds discussed below, the Department is entitled to summary judgment.  The Department submits the Second Declaration of Charles O. Blaha ("Blaha 2nd Decl."), and the Declaration of Susan C. Weetman ("Weetman Decl.") along with a revised *Vaughn* index, Weetman Decl. ¶ 4, Ex. A ("State's Revised *Vaughn* Index"), in further support of its motion for summary judgment.

## ARGUMENT

I.    **The Department conducted an adequate search with respect to FOIA Request F-2017-17860.**

Contrary to Plaintiffs' assertions, the Department conducted an adequate search for records responsive to the second subpart of FOIA Request F-2017-17860, which sought "The 'Report on Government Police Training and Equipping Programs' submitted to Congress pursuant to §1235(c) of the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 and copies of all 'Reports on Government Police Training and Equipping Programs' submitted to Congress in subsequent fiscal years."  Weetman Decl. ¶ 5.  Plaintiffs assert that "[i]t is undisputed that at least one such 'Report on Government Police Training and Equipping Programs' was submitted from State to Congress in FY 2016," and further allege that any such "*final* reports transmitted to

Congress" would likely be found elsewhere than the offices searched by the Department, "including in the Bureau of Legislative Affairs."  Pls.' Opp'n at 9–10.

Plaintiffs' argument rests on the incorrect assumption that State submitted to Congress final versions of reports matching the description in Plaintiffs' FOIA request.  But Section 1235(c) of the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 (Public Law 111-383) ("Ike Skelton Act") —the statutory provision cited by Plaintiffs in their request—stipulates only that "*the President* shall submit to the appropriate committees of Congress a report on United States Government police training and equipping programs outside the United States." (emphasis added).   Similarly, House Report 114-102, which accompanied the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114-92) states that "[i]n 2012, the [House Armed Services C]ommittee received a one-time Presidential report on U.S. Government police training and equipping programs outside the United States," and "direct[ed] the *Secretary of Defense*, in coordination with the Secretary of State, the Secretary of Homeland Security, and the Attorney General of the United States, to submit an update to this report." (emphasis added)

Not only does House Report 114-102 confirm that only one report consistent with the requirements in section 1235(c) of the Ike Skelton Act was submitted to Congress prior to 2016, it also imposes no direct congressional reporting requirement on the Department.  Rather, it imposes such a requirement upon the Department of Defense, which is directed to coordinate with the Departments of State, Homeland Security, and Justice.   Thus, the available congressional records cited by Plaintiffs in their request in no way indicate that the Department was responsible for providing the sought-after reports to Congress, nor have Plaintiffs pointed to any other evidence purporting to show that the Department would have submitted any such final reports to Congress. *See generally* Weetman Decl. ¶ 8.

Plaintiffs argue that the draft and final reports they seek would likely be in the possession of the Department's Bureau of Legislative Affairs ("H"), Pls.' Opp'n at 9–10, which coordinates legislative activity for the Department; advises the Secretary, the Deputy Secretary, the Under Secretaries, and the Assistant Secretaries on legislative strategy; and facilitates effective communication between State officials and the Members of Congress and their staffs, Weetman Decl. ¶ 7. However, H's involvement in Department action is limited to situations where the Department itself communicates directly with Congress." *Id.* Where, as here, the Department was not tasked with communicating and submitting a report to Congress, it was therefore reasonable for the Department to determine that H was not likely to maintain records responsive to Plaintiffs' request and to limit its searches to the Bureau of Democracy, Human Rights, and Labor ("DRL"), the Bureau of International Narcotics and Law Enforcement Affairs ("INL"), and the Bureau of Counterterrorism ("CT"). *Id.* ¶¶ 5-6, 9; *see also Campbell v. Dep't of Just.*, 164 F.3d 20, 28 (D.C. Cir. 1998) (noting that "FOIA demands only a reasonable search tailored to the nature of a particular request"); *Performance Coal Co. v. Dep't of Labor*, 847 F. Supp. 2d 6, 12–13 (D.D.C. 2012) (finding agency's search "reasonably tailored" when it identified the two of its eighteen regional offices that were most likely to possess responsive records and searched those offices' files). For these reasons, the Department "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested," *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990), and is entitled to summary judgment as to the adequacy of its search.

## II.     The Department properly withheld information pursuant to FOIA Exemption 5.

Plaintiffs raise five challenges to the Department's Exemption 5 withholdings. First, Plaintiffs argue that the Department has failed to establish the predecisional nature of the information withheld from Documents 1 and 45. Pls.' Opp'n at 12. Second, Plaintiffs assert that

the Department has failed to demonstrate the predecisional and deliberative nature of the "NOTES" cells in Documents 31–44.  *Id.* at 12–13.  Third, Plaintiffs contend that the Department's description of Document 12 "merely discusses the [Department's] positions of law or policy" and is therefore not deliberative.  *Id.* at 14.  Fourth, Plaintiffs maintain that the Department has improperly withheld Documents 6, 11, 23, and 29, because those records "consist of email chains applying the Leahy [v]etting process to various units and personnel."  *Id.* at 14–15.  Fifth, Plaintiffs claim that the Department failed to satisfy the FOIA's foreseeable harm provision as to its Exemption 5 withholdings.  *Id.* at 16–18.  These arguments lack merit and should be rejected for the reasons set forth below.

To invoke the deliberative process privilege, an agency must show that the exempt document is both predecisional and deliberative.  *Access Reports v. Dep't of Just.*, 926 F.2d 1192, 1194 (D.C. Cir. 1991); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980).  "Documents are 'predecisional' if they were generated before the agency's final decision on the matter, and they are 'deliberative' if they were prepared to help the agency formulate its position."  *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777 (2021); *see also In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) ("The deliberative process privilege does not shield documents that simply state or explain a decision the government has already made[. . . .]").

To show that a document is predecisional, however, the agency need not identify a specific final agency decision; it is sufficient to establish "'what deliberative process is involved, and the role played by the documents at issue in the course of that process.'"  *Heggestad v. Dep't of Just.*, 182 F. Supp. 2d 1, 7 (D.D.C. 2000) (quoting *Coastal States*, 617 F.2d at 868); *see also Gold Anti-Trust Action Comm. v. Bd. of Governors*, 762 F. Supp. 2d 123, 135–36 (D.D.C. 2011) ("[E]ven if an internal discussion does not lead to adoption of a specific government policy, its protection

4

under Exemption 5 is not foreclosed as long as the document was generated as part of a definable decision-making process." (citing *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992))).  Drafts are therefore "commonly found exempt under the deliberative process exemption," *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 303 (D.D.C. 2007), "because calling something a draft communicates that it is not yet final." *U.S. Fish & Wildlife Serv.*, 141 S. Ct. 777.

A.     **The Department has adequately shown that Documents 1 and 45 are predecisional.**

Document 1 is a draft memorandum titled "Department of State Submission: Report to Congress on U.S. Government Police Training and Equipping Programs."  *See* State's Revised *Vaughn* Index, Doc. 1.  It is undated, uncleared, and contains bracketed markings from the template upon which it is based.  *Id*.  Similarly, Document 45 is a draft letter addressed from the Department to the United Nations Office on Drugs and Crime that contains edits in redline and comment bubbles.  *Id.*, Doc. 45.  In both cases, the markings contained on the face of the documents make clear that they were "preliminary version[s] of . . . piece[s] of writing subject to feedback and change."  *U.S. Fish & Wildlife Serv.*, 141 S. Ct. 777.

Nonetheless, Plaintiffs argue that the Department's descriptions of Documents 1 and 45 "ignore the doctrine of agency adoption" and fail to satisfy the Department's "burden of demonstrating that records designated as drafts have not subsequently been adopted" as a final agency decision.  Pls.' Opp'n at 12.  Plaintiffs' argument is undermined by their own cited authority, *Herrernan v. Azar*, 317 F. Supp. 3d 94, 122 (D.D.C. 2018), which held that the agency "does not carry the burden of proving that each withheld document was not adopted formally or informally."  In any event, the Department has sufficiently shown that both documents have markings that are only contained on draft documents and that neither document would have been

5

adopted as a final agency decision in that form.  Further, specifically as to Document 1, the Department has already explained above that the Department of Defense is required to submit to Congress the final version of the report that is the subject of the draft memorandum,[1] which logically means that State's draft memorandum could not have expressed a final policy decision due to State's position within the administrative review process.

The Department has therefore carried its burden of showing that both Document 1 and Document 45 are predicisional and have therefore been properly withheld under Exemption 5.

### B.   The Department has adequately shown that the "NOTES" cells in Documents 31–44 are both predecisional and deliberative.

Plaintiffs further argue that the Department has failed to establish that the "NOTES" columns in the fourteen INVEST spreadsheets produced in response to Plaintiffs' requests, *see* State's Revised *Vaughn* Index, Docs. No. 31-44, are protected by the deliberative process privilege.  Specifically, Plaintiffs object to the Department's withholdings on three grounds.  First, Plaintiffs argue that the Department's "generalized assertion" that the information in the "NOTES" cells was entered before any final decision about eligibility fails to demonstrate that the information contained in those cells is predecisional.  Pls' Opp'n at 12–13.  Second, Plaintiffs further speculate that "it is highly likely that some—if not all" of those cells reflect a final decision that must be disclosed.  *Id.* at 13.  Third, Plaintiffs claim that the Department failed to provide sufficient information about "the specific deliberative process" purportedly at stake with regard to the information within the "NOTES" cells, or the role those notes play in that deliberative process. *Id.* at 14.  The Department will address each of those arguments in turn.

---

[1]      *See supra* Part I.

First, Plaintiffs' criticism of the Department's "generalized" "NOTES" entry descriptions overlooks the fact that the Department's categorical approach to those descriptions is born out of necessity.   The combined fourteen INVEST spreadsheets contain more than 160,000 rows of information.  Blaha 2nd Decl. ¶ 6.  Approximately 45,000 of those rows include an entry in the "NOTES" column.  *Id.*  It would be overly burdensome for the Department to review and describe each separate entry.  *Id.*  Thus, the Department's use of a categorical approach is proper.  *See Judicial Watch v. Export-Import Bank,* 108 F. Supp. 2d 19, 34 (D.D.C. 2000) ("There is no set format for a *Vaughn* index; it is the function of the document that matters, not the form.").

Second, the vast majority of the "NOTES" cells at issue in this case do not contain information compiled after a *final* vetting determination has been made.  Weetman Decl. ¶ 11; Blaha 2nd Decl. ¶¶ 8-9.  A final vetting determination is one that results in the vetting candidate either being approved or rejected.  Blaha 2nd Decl. ¶ 8.  However, the Department also frequently makes interim vetting determinations, which result in the vetting process either being cancelled or suspended.  *Id.* ¶ 9.  In both of these instances, no final decision has been made with regard to the individual's eligibility to receive U.S. assistance, because the vetting process may restart or resume if additional clarifying information becomes available.  *Id.*  Accordingly, to the extent that a row in an INVEST spreadsheet lists the candidate's status as either "Cancelled" or "Suspended," any information about the vetting process contained in the corresponding "NOTES" field would be predecisional as no final vetting determination has been made.  Further, to the extent a final vetting determination has been made, the vast majority of "NOTES" entries will predate that final determination and will instead reflect the various milestones achieved during the vetting process prior to a final determination.  Weetman Decl. ¶ 11.  And in cases where the "NOTES" cells do contain such entries the segregation and disclosure of those entries is either exempted under the

FOIA or would not be reasonable given such disclosure would provide no additional substantive information beyond what the Department has already released. *Id.* ¶¶ 12-16.

Third, the specific deliberative process implicated by the vast majority of the "NOTES" entries is the process through which Department officials gathered information potentially relevant to a Leahy vetting determination, discussed and evaluated that information in light of both statutory and internal guidance related to the Leahy vetting procedure as well as applicable definitions regarding the forms of conduct that could constitute a gross violation of human rights, and formulated their rationale for making both interim and final Leahy vetting determinations. *Id.* ¶ 11. That information is not factual, but "reflects the give-and-take of the consultative process" because it both assesses the merits of a particular viewpoint and articulates the process used by the Department in making both interim and final Leahy vetting determinations. *Coastal States*, 617 F.2d at 867 (holding that the deliberative process privilege covers, *inter alia*, "recommendations, . . . proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency").

Based on the above, the Department has provided information sufficient for the Court to conclude that the "NOTES" entries are indeed both predecisional and deliberative and have therefore correctly been withheld pursuant to FOIA Exemption 5.

### C.   The Department has adequately shown that the portions of Document 12 withheld pursuant to Exemption 5 are deliberative.

Plaintiffs assert that Document 12 "merely discusses the agency's position of law or policy," and therefore is not deliberative and must be disclosed. Pls.' Opp'n at 14. As shown by both State's Revised *Vaughn* Index and the Weetman Declaration, Plaintiffs' characterization of Document 12 is inaccurate. In fact, the Department's withholdings from Document 12 reflect three categories of deliberative information—including information related to the drafting of a

non-finalized letter, discussion surrounding the propriety and utility of providing certain Department officials with additional information access rights, and recommendations and opinions about practices certain offices could implement to better navigate the Leahy vetting process. Weetman Decl. ¶¶ 17-18; State's Revised *Vaughn* Index, Doc. 12.  All three of those categories of information consist of candid and uncleared discussions and recommendations shared among Department officials as part of a continuing decisionmaking process and prior to the adoption of any final policy.  *Id.*  The Department's Exemption 5 withholdings from Document 12 are therefore proper.

       **D.**       **The Department's deliberative process privilege withholdings in Documents 6, 11, 23, and 29 are proper because the withheld information predates any final determination about whether certain Leahy vetting candidates should be deemed eligible to receive U.S. assistance.**

Plaintiffs also challenge the Department's Exemption 5 withholdings with respect to Documents 6, 11, 23 and 29, arguing that the information withheld from those documents pursuant to Exemption 5 is not deliberative because they "appear to do nothing more than reflect an application of preexisting agency policy, in contrast to reflecting that policy's development."  Pls.' Opp'n at 14–15.  In support of their position, Plaintiffs assert that "because the deliberative process privilege's fundamental purpose is to protect the quality of deliberations integral to the development of agency policy, . . . it does not 'protect communications that *implement* an established policy of an agency."  *Id.* at 14 (quoting *Taxation With Representation Fund v. IRS*, 646 F.2d 666, 677 (D.C. Cir. 1981)).

Plaintiffs' argument both misconstrues the facts and misapplies the law.  In *Taxation With Representation Fund*, the D.C. Circuit recognized a limitation over the use of the deliberative process privilege to exempt communications that implement an established policy not because such communications are unlikely to be *deliberative*, but because they would tend not to be

*predecisional* given that they constitute "'communications made after the decision [and that are] designed to explain it.'"  646 F.2d at 677 (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151–52 (1975)).  But the decisions at issue in Documents 6, 11, 23, and 29 do not relate to the Department's determinations about how to define the term "gross violation of human rights," how Leahy vetting should generally proceed, what sorts of information Department personnel should consider during that process, or any of the other procedural considerations suggested by Plaintiffs. Pls.' Opp'n at 15.  Rather, the withheld portions of these documents are predecisional because they predate any final determination about whether a particular Leahy vetting candidate should be deemed eligible for U.S. assistance in light of those definitions and procedures.  In other words, even if the Department had made a final decision as of the time of these communications about the *process* that Leahy vetting should take and the types of behaviors that *in the abstract* may constitute gross violations of human rights, the withheld communications contained in these four documents are nonetheless predecisional because they are focused on how a real-life fact pattern should be treated within the context of those established definitions and processes, and predate any final determination on that issue.

> ### E. The Department stands by the foreseeable harm representations in its original briefing and has provided additional clarifying representations in the Revised *Vaughn* Index.

Finally, Plaintiffs argue that the Department did not address FOIA's foreseeable harm provision and that all its Exemption 5 withholdings are improper on that basis. Pls.' Opp'n at 16–18.  Once again, Plaintiffs have misstated crucial facts.

Although the Department did not specifically cite to 5 U.S.C § 552(a)(8) nor include the phrase "foreseeable harm" in its original briefing, the Department did identify the harms that would foreseeably result from disclosure of each of the 50 records listed in its original *Vaughn* Index and specifically connected those harms to both the substance of the withheld information and the

interest protected by Exemption 5.  Thus, while the Department did represent that disclosure of several relevant communications would "chill the open and frank exchange of ideas and recommendations" between State officials, the Department also included language tailoring that chilling effect to the subject-matter of the withheld material.  *See, e.g.*, State's *Vaughn* Index, ECF No. 25-5, Doc. 1 (connecting the chilling effect to situations where "Department officials are drafting documents to share within the Executive Branch"); *id.*, Docs. 2-5 (connecting the chilling effect to situations where "Department officials are drafting ALDACs to provide Department-wide guidance on policy, legal, or other topics"); *id.*, Doc. 6 (connecting the chilling effect to situations where "Department officials . . . exchange information and conduct analyses of whether particular individuals or units have been implicated in gross violations of human rights" and noting that "it is of paramount importance that officials be able to engage in open and frank conversations about their Leahy vetting determinations without fear that their preliminary recommendations will routinely become public").

Thus, although the Department did not use the specific term "foreseeable harm," the Department did nonetheless comprehensively address the harms that would result from disclosure of the disputed documents.  In any event, the Department is providing a Revised *Vaughn* Index herein, which further elaborates on the foreseeable harm the agency would expect if the withheld information were released.  Weetman Decl. ¶ 20.  Those additional explanations leave no doubt that releasing any of the 14 documents to which the Department applied an Exemption 5 withholding would foreseeably harm the Department's deliberative process.  *Id.*

III.    **The information withheld by the Department pursuant to Exemption 7 was compiled for a law enforcement purpose.**

Plaintiffs argue that (1) the Department's prior briefing did not adequately describe why the information withheld pursuant to Exemption 7 in this case met that exemption's threshold

requirement; and (2) in any event, the Department's Exemption 7 withholdings are necessarily improper because "records related to the process of Leahy [v]etting simply are not eligible for protection under Exemption 7." Pls.' Opp'n at 18–20. Plaintiffs' argument misses the mark. Exemption 7's threshold requirement turns on an assessment of "how and under what circumstances" the requested files or information were compiled "and whether the files [or information] sought relate to anything that can fairly be characterized as an enforcement proceeding." *Tax Analyst v. IRS,* 294 F.3d 71, 78 (D.C. Cir. 2002); *see also* 5 U.S.C. § 552(b)(7) (stipulating that Exemption 7 applies to both "records [and] information compiled for law enforcement purposes"). Importantly, "information initially contained in a record made for law enforcement purposes continues to meet the threshold requirements of Exemption 7 where that recorded information is reproduced or summarized in a new document . . . ." *Abramson v. FBI*, 456 U.S. 615, 631–32 (1982).

As explained by the Department in the first Declaration of Charles O. Blaha, ECF No. 25-4 ("Blaha 1st Decl.") the "Leahy Laws" refer to two statutory provisions prohibiting the U.S. Government, and more specifically State and the Department of Defense, from furnishing assistance, including training or equipment, to a foreign security force unit where there is credible information that the unit has committed a gross violation of human rights, such as torture, extrajudicial killing, or enforced disappearance. *See* Blaha 1st Decl., ¶¶ 4–5. The Leahy vetting process the Department conducts pursuant to the Leahy Laws both on its own behalf and on behalf of the Department of Defense, entails soliciting information on possible criminal conduct from U.S. Government agencies and subjecting potential recipients to vetting to ensure that no unit that has committed a gross violation of human rights receives U.S. Government-funded foreign assistance. *Id.* ¶¶ 6, 8.

Leahy vetting involves several steps, and typically begins with an assessment of available information by the Embassy, Consulate, or other Department Post with responsibility over the vetted individual's or unit's geographic region.  *Id.* ¶¶ 6, 9–10.  That assessment may include publicly-available information, classified information, and/or law enforcement sensitive information, including information derived from databases maintained by local host nations, if they permit.  *Id.* ¶¶ 6, 12.  Most often, when the request has finished processing in the vetted individual's home country, it is then sent to DRL analysts in Washington, D.C.  *Id.* ¶¶ 6, 9.  DRL then conducts additional searches of, *inter alia*, Executive Branch agency law enforcement and classified databases, before rendering an interim or final vetting determination in consultation, as appropriate, with the relevant country team or desk, the Office of the Legal Adviser ("L"), and others.  *Id.* ¶¶ 8, 10.  Many of the databases utilized throughout the course of the Leahy vetting process contain information the unauthorized disclosure of which could be expected to cause damage to the national security of the United States or to endanger intelligence sources and methods.  *Id.* ¶ 8.

Thus, because the vetting conducted both at Post and by DRL utilizes databases compiled for a law enforcement purpose, conducting that vetting constitutes a law enforcement activity and documents and information compiled for the purpose of describing, conducting, or reflecting that vetting checks have been compiled for a law enforcement purpose.  *See* S. Conf. Rep. No. 93-1200, at 12 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6267, 6291 (stipulating that the term "intelligence" in 5 U.S.C. § 552(b)(7)(D) is intended to apply to, *inter alia*, "background security investigations by governmental units which have authority to conduct such functions"); *Morley v. CIA*, 508 F.3d 1108, 1128–29 (D.C. Cir. 2007) ("Background investigations conducted to assess

13

an applicant's qualification . . . inherently relate to law enforcement." (citing *Mittleman v. Off. of Pers. Mgmt.*, 76 F.3d 1240, 1243 (D.C. Cir. 1996) (per curiam))).

### IV.   The Department properly withheld vetted individuals' identifying information pursuant to Exemptions 6 and 7(C), because those individuals' substantial privacy interests in non-disclosure significantly outweigh any public interest in disclosure.

Plaintiffs raise three arguments in support of their position that the Department improperly withheld pursuant to Exemptions 6 and 7(C) the names of foreign law enforcement officers who were being or who had been vetted pursuant to the Leahy Laws.  First, Plaintiffs contend that "disclosure of the withheld names would not constitute a clearly unwarranted invasion of personal privacy" because (1) the Department uses unclassified and open sources to conduct aspects of the Leahy vetting process, Pls.' Opp'n at 21–22, and (2) Leahy vetting is conducted as to all foreign security forces proposed to receive U.S. assistance, is therefore akin to a "background check for a new hire or lessee," and therefore is not associated with any stigma, *id.* at 22–23.  Second, Plaintiffs assert that the "public interest in disclosure vastly outweighs any privacy interest that may exist" because revelations about "mistakes and irregularities" in the vetting process "can *only* take place if members of the press and public have access to the names of individual subject to Leahy [v]etting." *Id.* at 23–24.  Third, Plaintiffs argue that "State has not demonstrated that reasonably foreseeable harm . . . would result from disclosure of the names of individuals who have undergone Leahy [v]etting." *Id.* at 25.

### A.   Plaintiffs' arguments discount out of hand the substantial privacy interests Leahy vetted individuals have in the non-disclosure of their identities.

Plaintiffs first point to the Department's use of, *inter alia*, unclassified and open sources in order to conduct Leahy vetting as apparent support for the proposition that the release of the identities of vetted individuals would not implicate "any meaningful privacy interest[]." *Id.* at 21–

14

22.  To begin with, it is not the case that the Department only uses unclassified and open sources in the vetting process.  *See* Blaha 1st Decl. ¶¶ 6, 8, 10, 12; *see also supra* Part III.  But even if it was, that fact would have no bearing whatsoever on and in no way explains away the substantial privacy interest vetted individuals—at least some of whom are not aware that they or their units are being or have been Leahy vetted, *see id.* ¶ 13—have in not being publicly associated with a vetting process the stated purpose of which is to identify members of foreign security force units have committed a gross violation of human rights.

Plaintiffs' second argument—that Leahy vetting carries no stigma because it is conducted whenever units of a foreign security force are proposed as recipients for U.S. assistance, Pls.' Opp'n at 22–23—fares no better.  Leahy vetting is not, as Plaintiffs suggest, as routine or well-known as an employment or tenancy background check.  Whereas those decentralized checks are conducted into an individual's general background by one of the parties to a proposed contract and are a widely understood and expected prerequisite to entering into certain contracts, Leahy vetting is focused specifically on whether a gross violation of human rights has been committed by a member of a foreign security force unit who may have never heard of the Leahy Laws or even know that they are the subject of a vetting action, and is conducted in a centralized fashion by a U.S. Government agency using, *inter alia*, classified and non-public law enforcement databases. Given those circumstances, a Leahy vetting action resembles far more a criminal investigation than a routine background check and, as the Department noted in the Second Declaration of Eric F. Stein, ECF No. 25-3 ("Stein 2nd Decl.") "would therefore constitute an unwarranted invasion of public privacy in much the same way that associating an individual with an ongoing criminal investigation would invade their personal privacy even if, and perhaps especially if, the individual is ultimately cleared of any wrongdoing."  Stein 2nd Decl. ¶ 72.

15

Further, Plaintiffs' arguments fail to address the Department's representation that disclosure of the vetted foreign officers' names and other identifying information could, in certain circumstances, expose them to harassment by making public their affiliation with the United States Government. Blaha 1st Decl. ¶ 14.  That possibility for harassment as a result of disclosure in this context would in no way be affected by any of the points Plaintiffs raise.

**B.    Plaintiffs fail to establish that a public interest lies in the release of vetted individuals' identifying information.**

In the context of the FOIA balancing analysis, "the only relevant public interest . . . [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'"  *Lepelletier v. FDIC*, 164 F.3d 37, 47 (D.C. Cir. 1999) (quoting *Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 497 (1994)).  "Information that 'reveals little or nothing about an agency's own conduct' does not further the statutory purpose; thus the public has no cognizable interest in the release of such information."  *Beck v. Dep't of Just.*, 997 F.2d 1489, 1493 (D.C. Cir. 1993).

Plaintiffs argue that there is a public interest in the release of the names of individuals required to be vetted as a prerequisite to receiving U.S. training or assistance, because such release will reveal "mistakes and irregularities" in the Leahy vetting process.  Pls.' Opp'n at 23–24.  However, Plaintiffs fail to convincingly argue why the vetted individuals' names and other identifying information specifically are essential to that process, particularly since the Department has already released, to the extent available and subject to certain rare exceptions in order to protect the physical safety of the vetted individuals, each foreign security officer's unit name, unit alias, location, and branch/organization.  State's Revised *Vaughn* Index, Docs. 31-42; Stein 2nd Decl. ¶ 71.  The INVEST spreadsheet data already released provides Plaintiffs with more than sufficient

16

information to evaluate the Department's performance of its statutory duties under the Leahy Laws; with the unit-level information the Department has released, Plaintiffs have the ability to conduct the investigative reporting and cross-checking of the Department's vetting determinations they envision in their brief.  *See* Pls.' Opp'n at 23–24.

Further, even assuming that the release of the vetted individuals' names and other identifying information would incrementally impact Plaintiffs' ability to uncover mistakes in the Department's Leahy vetting process, that incremental increase would not outweigh the considerable privacy interests which the Department has identified with regard to that information and which, in comparable situations, multiple courts have recognized as giving rise to substantial privacy interests.  *See, e.g.*, *Performance Coal Co. v. Dep't of Labor*, 847 F. Supp. 2d 6, 17–18 (D.D.C. 2012) (finding that defendant agencies properly withheld, *inter alia*, miners' names contained in law enforcement records); *Skinner v. Dep't of Just.*, 806 F. Supp. 2d 105 (D.D.C. 2011) (holding that agencies properly withheld names and identifying information related to law enforcement personnel); *Associated Press v. Dep't of Just.*, 559 F.3d 62, 65 (2d Cir. 2008) ("Personal information, including a citizen's name . . . , has been found to implicate a privacy interest cognizable under the FOIA exemptions."); *see also Graff v. FBI*, 822 F. Supp. 2d 23, 34 (D.D.C. 2011) ("[C]ourts in our Circuit have held that foreign nationals are entitled to the same privacy protections rights under FOIA as United States citizens.").  The balancing test therefore weighs decidedly against disclosure in this case.

**C.      Plaintiffs' foreseeable harm arguments ignore the Department's briefing materials, which set out in sufficient detail the harms that would foreseeably occur upon disclosure of the vetted individuals' identities[2].**

Plaintiffs' foreseeable harm-related challenges to State's Exemption 6 and 7(C) withholdings fatally overlook, confuse, and/or misstate the representations made by the Department in its original briefing materials.    *Compare* Pls.'Opp'n at 25 ("State has not demonstrated that reasonably foreseeable harm . . . would result from disclosure of the names of individuals who have undergone Leahy [v]etting . . . [because it] is not enough for an agency to speculate that harm *could* result from disclosure." (internal quotation marks and citations omitted)), *with* Stein 2nd Decl. ¶ 62 ("Release of those individuals' names within the context of Leahy vetting procedures *would* associate them publicly with inquiries into possible [gross violations of human rights]— even in cases when the officers were not involved in any derogatory incidents and/or when the officers themselves were unaware they were being vetted—and *would* therefore constitute an unwarranted invasion of personal privacy in much the same way that associating an individual with an ongoing criminal investigation would invade their personal privacy even if, and perhaps especially if, the individual is ultimately cleared of any personal wrongdoing." (emphasis added)). Plaintiffs' boilerplate objections to the Department's foreseeable harm representations should therefore be rejected.

**V.      The Department properly withheld information pursuant to Exemption 7(E).**

---

[2]      The Department notes that the foreseeable-harm requirement of the FOIA Improvement Act of 2016 that Plaintiffs raise with respect to the Department's redactions under FOIA Exemption 7(C) and 7(E), has been mostly applied in the context of FOIA Exemption 5 and the deliberative-process privilege. *Citizens for Responsibility & Ethics in Wash. v. Dep't of Homeland Sec.,* Civ. A No. 20-1400 (CRC), 2021 WL 950415, at *6 n.4 (D.D.C. Mar. 12, 2021) ("Unlike Exemption 5, the statutory text of Exemption 7 predating the FOIA Improvement Act already contained an explicit requirement that the agency show a reasonable nexus between the withheld information and a predicted harm.")

Plaintiffs offer three arguments in support of their position that the Department has improperly withheld information from ten records pursuant to Exemption 7(E).  First, Plaintiffs contend that certain of the techniques and procedures withheld by State—namely, the sources from which the Department gathers potentially derogatory information (Documents 6 and 11); the processes used to assess whether a remediation has occurred (Documents 19 and 27); situations when Posts are not required to submit individual names for vetting (Documents 20, 21, and 23); how the vetting process is conducted and varies between Posts (Document 22); common forms of gross violations of human rights (Document 25); and procedures for determining whether rejected units would be named in a publicly-available list (Document 50)—"are well known to the public." Pls.' Opp'n at 26–27.  Second, Plaintiffs dispute that disclosure of certain Leahy vetting techniques and procedures would undermine the vetting process by allowing for circumvention of the Leahy Laws.  *Id.* at 28.  Third, Plaintiffs argue that State's Exemption 7(E) withholdings are "improper under the foreseeable harm provision," because State's claims of harm are undermined by the fact that "detailed information about the process of Leahy [v]etting is already public."  *Id.* at 28–29.

**A.    Disclosure of the information withheld by the Department pursuant to Exemption 7(E) would reveal non-public information and/or information unsegregable from sensitive non-public information, as well as undermine the effectiveness of certain law enforcement techniques and procedures.**

As to Documents 6, 11, 19, 22, and 27, Plaintiffs rely on cherry-picked portions of certain published materials in a misguided attempt to claim that *all* of the sources State uses to compile potentially derogatory information and evaluate possible remediations at Posts around the world are publicly available and unclassified.  Pls.' Opp'n at 27; Singh Decl. Exs. A–C.  They are not. *See* Blaha 1st Decl. ¶¶ 6, 8, 10, 12; *see also supra* Part III.  Also not available publicly, as the Department makes clear in its Revised *Vaughn* Index, are the provisions from the Department's Foreign Affairs Manual cited in Document 25.  *See* State's Revised *Vaughn* Index, Doc. 25 ("These

19

redactions cover sensitive, *non-publicly-available* provisions from the Department's Foreign Affairs Manual . . . ." (emphasis added)).

But even assuming for the sake of argument that information was publicly available, State's Revised *Vaughn* Index makes clear that the information identified by Plaintiffs is unsegregable from other non-public information that the Department has withheld pursuant to Exemption 7(E) and which withholdings Plaintiffs do not challenge:

- **Documents 6 and 11** – The information withheld from these documents not only relates to "the sources from which the Department gathers potentially derogatory information," but also "how the Department assesses the credibility of those sources, how the Department determines whether individuals and units . . . were involved in the potentially derogatory incidents, and how the Department decides to respond to any particular incident."  State's Revised *Vaughn* Index, Docs. 6 and 11.
- **Documents 19 and 27** – The information withheld from these documents not only describes State's remediation processes, but also the factors considered in rendering a remediation decision and "recommendations and advice for managing that process."  *Id.* at Docs. 19 and 27.
- **Document 22** – The withheld information relates not only to "how the Department conducts Leahy vetting," but also how those procedures vary among Posts and "who at each Post has access to the INVEST system."  *Id.* at Doc. 22.
- **Document 25** – The withheld Foreign Affairs Manual entries include not only information about "common forms of [gross violations of human rights]," but also, *inter alia*, different systems used during vetting, details on INVEST workflow and data conversion, the transferability of derogatory information uncovered during vetting.  *Id.* at Doc. 25.

Because the information challenged by Plaintiffs is intertwined and comingled with non-public information, such that it would be impossible to segregate and release any additional information without disclosing non-public law enforcement information.

Furthermore, Plaintiffs' challenges to the Exemption 7(E) withholdings in all ten documents—and in particular to the withholdings in Documents 20, 21, 23, and 50—discount that it is not improper to withhold information pertaining to known law enforcement techniques and procedures if the disclosure of such information could limit or nullify the effectiveness of the

technique or procedure. *See, e.g.*, *Sack v. Dep't of Def.*, 823 F.3d 687, 694–95 (D.C. Cir. 2016) (release of reports concerning polygraphs could undermine effectiveness of such examination); *Judicial Watch, Inc. v. Dep't of Com.*, 337 F. Supp. 2d 146, 181 (D.D.C. 2004) ("[E]ven commonly known procedures may be protected from disclosure if the disclosure could reduce or nullify their effectiveness."). Thus, while the challenged portions of Documents 20 and 21 relate to the publicly-acknowledged "One Year Good For" practice, for example, disclosure of the particular information contained within those documents would reveal sensitive information about the specific application and effect of that principle that, if publicly acknowledged, could undermine its effectiveness. The same would be true were the Department to disclose the challenged portions of Document 23—in which Department officials apply publicly-known standards for determining whether or not specific groups of security force unit members should be subject to vetting—and Document 50—in which Department officials discuss the application of publicly-known standards for determining whether rejected units should be included on a publicly available list.

Therefore, disclosure of any of the challenged portions of these ten documents would reveal sensitive information about the vetting and remediation processes that would impede the Department in its enforcement of the Leahy Laws. Stein 2nd Decl. ¶ 76.

**B.     The Department has shown a risk that circumvention of the Leahy Laws could occur and has therefore met its burden under Exemption 7(E).**

Plaintiffs speculate that "a member of a foreign security force who has committed an extrajudicial killing" or, presumably, some other gross violation of human rights, would not "be preoccupied" with circumventing Leahy vetting procedures.[3] Pls.' Opp'n at 28. The Department

---

[3]     Notably, several courts have held that the "risk of circumvention" standard only applies to the second clause of Exemption 7(E), which deals with law enforcement guidelines, rather than the law enforcement techniques and procedures applicable in this case. *See, e.g.*, *Hamdan v. Dep't of Just.*, 797 F.3d 759, 778 (9th Cir. 2015) (finding that an agency need not show risk of circumvention as to disclosure of law enforcement techniques); *Allard K. Lowenstein Int'l Human*

disagrees. In fact, those proven bad actors strike the Department as *precisely* the types of individuals that, if apprised of the Leahy vetting process and the procedures used to, for example, evaluate remediations, would be most likely to attempt to abuse the system, circumvent the Leahy Laws, and moot their effect. That risk of circumvention follows from the Department's representations and is more than sufficient to meet the FOIA's "relatively low bar" on that issue. *See Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2011) ("Rather than requiring a highly specific burden of showing how the law will be circumvented, [E]xemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law." (internal quotation marks and citation omitted)).

### C. Plaintiffs' foreseeable harm challenges rely on the faulty premise that all details about the Leahy vetting process are public.

Resting on the flawed premise that "detailed information about the process of Leahy [v]etting is already public," Plaintiffs jump to the erroneous conclusion that release of the information withheld pursuant to Exemption 7(E) could not reasonably be expected to result in circumvention or abuse of the Leahy vetting process. As already noted above,[4] not all details about the Leahy vetting process have been publicly released, and those details the Department has elected to hold back have been identified for that treatment precisely because State expects their release could result in the foreseeable harms identified in its briefing materials. Plaintiffs' objections do not provide any rational basis for contradicting the Department's conclusions and should therefore be rejected.

---

*Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 681–82 (2d Cir. 2010) (finding "no ambiguity" in Exemption 7(E)'s application of risk of circumvention standard to "guidelines" prong, but not "techniques and procedures" prong).

[4]   *See* Blaha 1st Decl. ¶¶ 6, 8, 10, 12; *see also supra* Parts III, V.A.

**VI.    The additional Exemption 6, 7(C), and 7(F) withholdings applied to the two spreadsheets inadvertently produced on January 17, 2020 are proper, and Plaintiffs should be directed to return or destroy those inadvertently released documents in order to safeguard the safety and physical well-being of the individuals identified in those documents.**

As stated in the Department's opening brief, on January 17, 2020, the Department inadvertently released information exempt from disclosure pursuant to FOIA Exemptions 6, 7(C), and 7(F).  Stein 2nd Decl. ¶ 17.  By email dated January 24, 2020, the Department, through Justice Department counsel, notified Plaintiffs of the inadvertent release and requested that Plaintiffs return or destroy the two spreadsheets at issue.  *Id.* ¶ 18.  Following extended discussions, Plaintiffs' counsel indicated that no legal basis had been provided for either the return or the destruction of the two spreadsheets which had been obtained in response to Plaintiffs' FOIA request.  *Id.*  On February 19, 2020, the Department, through Justice Department counsel, sent Plaintiffs a corrected version of the spreadsheet corresponding to Leahy vetting in Egypt.  *Id.* ¶ 19.  And, on April 9, 2020, a corrected version of the spreadsheet corresponding to Leahy vetting in Iraq was also sent to Plaintiffs.  *Id.*  ¶ 20.

The Department continues to maintain that it correctly asserted FOIA Exemption 7(F), in conjunction with FOIA Exemptions 6 and 7(C), to withhold information that, if released, could be used to identify Iraqi nationals who have been considered or approved to receive training or some sort of assistance from the U.S. Government.  *Id.* ¶ 80.  The public identification of these individuals within the context of Leahy vetting procedures would reveal their affiliation with the U.S. Government and place them at an increased risk of being targeted by ISIS or Iran-backed militias.  *Id.*  Similarly, the release of information spreadsheet cells 929 and 930 in Document 43 could also reasonably be expected to endanger the life or physical safety of these individuals.  *Id.* ¶ 79.

If the Court finds that Defendant correctly asserted FOIA Exemptions 6, 7 (C) and 7(F) to withhold this information, Defendant respectfully requests that the Court direct Plaintiffs to return or destroy the Department's January 17, 2020, production of these two spreadsheets. *Cf. Hersh & Hersh v. Dep't of Health & Human Servs.*, Civ. A. No. 06-4234, 2008 WL 901539, *9 (N.D. Cal. Mar. 31, 2008) (ordering plaintiff to return in whole defendants' inadvertent initial production).

## <u>CONCLUSION</u>

For these reasons, the Department respectfully requests that the Court grant summary judgment in its favor and deny Plaintiff's cross-motion for summary judgment.

Dated:  March 26, 2021                    Respectfully submitted,

                                          CHANNING D. PHILLIPS
                                          D.C. Bar #415793
                                          Acting United States Attorney

                                          BRIAN P. HUDAK
                                          Acting Chief, Civil Division

                                          KATHLEENE MOLEN
                                          Assistant United States Attorney
                                          555 4th Street, N.W.
                                          Washington, D.C. 20530
                                          Tel: (202) 803-1572
                                          E-mail:Kathleene.Molen@usdoj.gov

                                          *Counsel for Defendant*