UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| 100REPORTERS, *et al.*, </br></br> *Plaintiffs*, </br></br> v. </br></br> U.S. DEPARTMENT OF STATE, </br></br> *Defendant*. | ) </br> ) </br> ) </br> ) </br> ) </br> ) Case No. 1:19-01753-RDM </br> ) </br> ) </br> ) </br> ) </br> ) |

## DECLARATION OF SUSAN C. WEETMAN

Pursuant to 28 U.S.C. § 1746, I, Susan C. Weetman, declare and state as follows:

1. I serve as the Deputy Director of the Office of Information Programs and Services ("IPS") of the United States Department of State (the "Department" or "State"), a capacity in which I have served since August 4, 2019. Prior to serving in this capacity, I served as the Chief of the Programs and Policies Division of IPS since May 15, 2016, and prior to that, I was the Branch Chief for Litigation and Appeals within the Programs and Policies Division of IPS since March 10, 2013.

2. I am familiar with the efforts of Department personnel to process the Freedom of Information Act ("FOIA") request that is the subject of this litigation, and I am in charge—together with IPS Director Eric F. Stein—of coordinating the agency's search and processing efforts with respect to that request. I make the following statements based upon my personal knowledge, which in turn is based upon information furnished to me in the course of my official duties.

3. IPS Director Eric F. Stein previously filed a declaration in this case on January 6, 2021, in support of the Department's motion for summary judgment ("State's MSJ"). *See generally* ECF No. 25-3 ("Second Stein Declaration"). The Second Stein Declaration and attached *Vaughn* index, ECF No. 25-5 ("State's *Vaughn* Index"), provided specific details regarding the administrative processing of Plaintiffs' FOIA requests, the Department's search for records in response to those requests, and the FOIA exemptions used to withhold certain information from documents responsive to those requests.

4. This declaration and attached revised *Vaughn* index, *see* Exhibit A ("State's Revised *Vaughn* Index"),[1] respond to certain of the arguments raised in Plaintiffs' memorandum in opposition to State's MSJ ("Plaintiffs' Opposition") and Plaintiffs' cross-motion for summary judgment ("Plaintiffs' Cross-Motion"). In particular, they provide additional relevant detail about (1) the Department's searches in response to the second subset of Plaintiffs' request numbered F-2017-17860, which seeks certain Leahy Law-related congressional reports; and (2) the legal basis for certain of the Department's Exemption 5 withholdings.

## I. THE SEARCH PROCESS IN RESPONSE TO THE SECOND SUBPART OF REQUEST F-2017-17860

5. The second subpart of Plaintiffs' request numbered F-2017-17860 seeks "[t]he 'Report on Government Police Training and Equipping Programs' submitted to Congress pursuant to §1235(c) of the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 and copies of all 'Reports on Government Police Training and Equipping Programs' submitted to Congress in subsequent fiscal years." *See* ECF No. 25-9 ("Request F-2017-17860"). As

---

[1] Information newly added to State's Revised *Vaughn* Index has been set apart from the information contained in State's *Vaughn* Index using underlined and italicized font.

explained in the Second Stein Declaration and as Plaintiffs concede in their Opposition and Cross-Motion, *see* Pls.' Opp'n at 9, the Department conducted searches for materials potentially responsive to that request that were in the possession of the Bureau of Democracy, Human Rights, and Labor ("DRL"), the Bureau of International Narcotics and Law Enforcement Affairs ("INL"), and the Bureau of Counterterrorism ("CT").

6. Plaintiffs do not raise any arguments challenging the sufficiency of the Department's searches of DRL, INL, or CT, nor do they question the search terms and keywords used to conduct those searches. However, I have been informed that Plaintiffs nonetheless contend that the Department conducted an inadequate search in response to Request F-2017-17860 because it did not search for potentially responsive records in the possession of the Department's Bureau of Legislative Affairs ("H").

7. H coordinates legislative activity for the Department. It advises the Secretary, the Deputy Secretary, the Under Secretaries, and the Assistant Secretaries on legislative strategy, and facilitates effective communication between State officials and the Members of Congress and their staffs. Crucially, H's involvement in Department action is limited to situations where the Department itself communicates directly with Congress. Thus, even in situations where other Executive Branch agencies tasked with communicating to Congress reach out to State subject-matter experts for their views or input on a particular issue, it would be unreasonable to expect H's involvement in any subsequent Department action unless State was required to and actually did communicate directly with Congress.

8. Section 1235(c) of the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 (Public Law 111-383)—the statutory provision cited by Plaintiffs in their request—

stipulates that "the President shall submit to the appropriate committees of Congress a report on United States Government police training and equipping programs outside the United States." On its face, that statute imposes no reporting requirement or other burden on the Department of State. The police training programs report is also referenced in House Report 114-102, which accompanied the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114-92). Recalling that "[i]n 2012, the [House Armed Services C]ommittee received a one-time Presidential report on U.S. Government police training and equipping programs outside the United States," H.R. 114-102 "direct[ed] the Secretary of Defense, in coordination with the Secretary of State, the Secretary of Homeland Security, and the Attorney General of the United States, to submit an update to this report." Not only does that language suggest that no other related reports were provided to Congress between 2011 and 2016, it also imposes no direct congressional reporting requirement on the Department. Rather, it dictates that requirement to the Department of Defense ("DOD")—possibly implying that DOD was also the agency that submitted the original report in 2011—and directs DOD to coordinate with State and a few other agencies in preparing the revised report. In other words, the available congressional records cited by Plaintiffs in their request in no way indicate that State was responsible for providing the sought-after reports to Congress, and in fact suggest to the contrary that another Executive Branch agency was responsible for compiling and communicating those reports.

9. In light of the above, there is no reason to expect H to possess any documents responsive to the second subpart of Request F-2017-17860, since State was not tasked with communicating the sought-after reports to Congress. Furthermore, because the congressional reporting requirements referenced in Plaintiffs' request suggest that DOD, not State, was

4

responsible for submitting the reports, there is no reason to expect that the Department would necessarily possess a final copy of those reports. The Department's searches of DRL, INL, and CT were therefore sufficient to capture all of the files reasonably likely to contain documents responsive to the second subpart of Request F-2017-17860.

## II. EXEMPTION 5 WITHHOLDINGS

### "NOTES" Entries

10. I have been informed that, in their Opposition and Cross-Motion, Plaintiffs argue that the Department has failed to adequately show that the "NOTES" cells within the INVEST spreadsheets released in connection with Plaintiffs' request are both predecisional and deliberative. *See* Pls.' Opp'n at 12–14; *see also* State's Revised *Vaughn* Index, Docs. 31–44; Second Blaha Decl. ¶¶ 4–10. Given the number of "NOTES" entries at issue in this case, *see* Second Blaha Decl. ¶ 6, it would be impossible to review and fulsomely characterize each one. However, after reviewing a sample of those "NOTES" entries, I have determined that they appear to generally contain four broad categories of information.

11. First, the vast majority of the cells contain descriptions of major milestones in the vetting process dated prior to a final vetting determination, if any. Those entries are properly withheld under Exemption 5 pursuant to the deliberative process privilege for the reasons set out in State's Revised *Vaughn* Index. *See* Docs. 31–44. The specific deliberative process implicated by those "NOTES" entries is the process through which Department officials gathered information potentially relevant to a Leahy vetting determination, discussed and evaluated that information in light of both statutory and internal guidance related to the Leahy vetting procedure as well as applicable definitions regarding the forms of conduct that could constitute a

5

gross violation of human rights, and formulated their rationale for making both interim and final Leahy vetting determinations.

12. Second, certain "NOTES" entries noted a candidate's final vetting determination, if any (*i.e.*, whether a given candidate was "Approved" or "Rejected"). The Department concedes that information, which is also reported as the candidate's "STATUS" in Column D of the INVEST spreadsheets, would not be predecisional insofar as it reflects the Department's final determination. However, individually reviewing each entry within the "NOTES" cells in order to segregate any final determination information for release would require an enormous investment of Department resources, and the end result would not reveal any additional information because each candidate's final determination, if any, has already been provided to Plaintiffs in the "STATUS" column.

13. Third, certain "NOTES" cells contained, along with a description of a final determination on the Leahy vetting action, information about the Department's rationale for approving or rejecting the candidate. That information is properly withheld on two distinct grounds.

14. Like all of the personally-identifying information within the INVEST spreadsheets, the Department's rationale for its final vetting determination is properly withheld pursuant to Exemptions 6 and 7(C), because revealing that rationale could identify specific acts committed by the individual and considered in connection with the Leahy vetting process, and could therefore reveal information sufficient to identify the vetted individuals and to associate them with alleged misconduct, including conduct amounting to gross violations of human rights. That is true even for approved vetting actions—certain Leahy vetting candidates could

theoretically have been approved despite allegations of misconduct if that misconduct did not rise to the level of a gross violation of human rights, and the release of Department notes related to that alleged misconduct would still inflict a substantial, foreseeable harm on the discussed individuals' personal privacy. On the other side of the balance, while there is public interest in the fact that Leahy vetting is being conducted and in the fact that the government is providing assistance in particular countries, there is less public interest, if any, in the identities of the specific law enforcement officers who were being vetted through the Leahy process. As explained in more detail in State's *Vaughn* Index, the Department has reason to believe that revealing that information would foreseeably harm the privacy interests of the identified individuals by tying them to alleged gross violations of human rights, even in situations where they committed no such acts. Accordingly, the privacy interests outweigh any public interest in disclosure of that information.

15.     The Department's rationale for making final vetting determinations is also properly withheld pursuant to Exemption 7(E). As explained elsewhere in State's briefing materials, the INVEST spreadsheets were compiled for the purpose of enforcing the Leahy Laws and therefore satisfy Exemption 7's threshold law enforcement requirement. Disclosing why and how the Department makes individual vetting determinations would reveal information about how State uses specific law enforcement techniques—both those that have been acknowledged publicly and those that have not been acknowledged—to assess whether individuals and units are eligible for assistance under the Leahy Law. Even in situations where a technique or procedure itself may be known to the public, the Department has not made public how that technique or procedure is specifically applied during Leahy vetting, nor has it made any public representations

7

about the varying weight and importance of the various techniques or procedures to the vetting process. Revealing that information in this context would foreseeably harm the effectiveness of those law enforcement techniques by publicizing which specific information is given more or less weight in assessing eligibility for assistance, which in turn could provide a means for possible bad actors to circumvent and manipulate the Leahy vetting process in violation of U.S. law.

16.     Fourth, a small subset of the entries in certain "NOTES" cells reflect deliberations that occurred as a final vetting determination was being made but that related to further intra-agency deliberations, such as about whether and how to convey that final determination to foreign government officials. Such information would not be rendered post-decisional by the existence of a predating final vetting determination, because they are not deliberative with regard to that determination but with regard to a further determination not yet made by the Department (*i.e.*, whether and how to convey that determination to an external third party). That information has therefore also properly been withheld under Exemption 5 pursuant to the deliberative process privilege because it is both predecisional (it predates any final decision about whether and how to convey the final vetting determination to an external third party) and deliberative (it reflects discussions and debate between Department officials about the propriety and timing of such a notification). Release of that information would cause a foreseeable harm not just to the integrity of the Department's internal deliberative processes, but also to the relations between the Department (and, by extension, the United States) with the implicated external third party entities.

### Document 12 (C06808463)

17. I have further been informed that Plaintiffs object to certain of the Department's Exemption 5 withholdings in Document 12 (C06808463), arguing that C06808463 "merely discusses the agency's positions of law or policy [and therefore] is not entitled to protection." Pls.' Opp'n at 14; *see also* State's *Vaughn* Index Doc. 12.

18. The Department stands by the representations made in its *Vaughn* Index, MSJ, and the Second Stein Declaration, and maintains that those representations provide sufficient support for its Exemption 5 withholdings within C06808463. Nonetheless, to the extent the Court determines that additional information is required to confirm the predecisional and deliberative nature of the information withheld from C06808463, I have prepared and attach as Exhibit A to this declaration a revised version of State's *Vaughn* Index, with additional language in underlined and italicized font specifically addressing the foreseeable harm issue as to Document 12.

### Foreseeable Harm

19. Finally, I have been informed that Plaintiffs intend to challenge the Department's Exemption 5 withholdings for failing to satisfy the FOIA's foreseeable harm standard.

20. The Department stands by the representations made about its Exemption 5 withholdings in its *Vaughn* Index, MSJ, and the Second Stein Declaration, and maintains that those representations provide a sufficient basis for finding that the Department reasonably foresees that disclosure of the withheld material would harm an interest protected by that exemption. However, to the extent the Court determines that additional information is required, I have prepared and attach as Exhibit A to this declaration a revised version of State's *Vaughn*

Index, with additional language in underlined and italicized font specifically addressing the foreseeable harm issue as to all of the 14 documents that contain disputed Exemption 5 withholdings (*i.e.*, Documents 1, 6, 11–12, 14, 16, 19, 23–24, 28–30, 45, and 50).

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, and that the accompanying Revised *Vaughn* Index is true and correct.

Executed this \_\_26th\_\_ day of March 2021, Washington, D.C.

*Susan C. Weetman*

Susan C. Weetman