## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

100REPORTERS, *et al.*,

        *Plaintiffs*,

  v.

UNITED STATES DEPARTMENT OF
STATE,

        *Defendant.*

Civil Action No. 19-1753 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs 100Reporters, a nonprofit investigative news organization, and Douglas

Gillison, a journalist, bring this action against the United States Department of State

("Department") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  In December

2017, Plaintiffs submitted two FOIA requests to the Department seeking records related to the

vetting of foreign security personnel pursuant to two statutes commonly referred to as the "Leahy

Laws," 22 U.S.C. § 2378d and 10 U.S.C. § 362.  Plaintiffs' first request sought all records

"pertaining to the nomination and/or vetting of foreign military and security personnel and/or

units for U.S. training or assistance pursuant to . . . the Leahy laws," Dkt. 25-3 at 3 (2d Stein

Decl. ¶ 5), although Plaintiffs subsequently narrowed that request to records from the

International Vetting and Security Tracking system created on or after January 1, 2017, that

relate to Iraq, Afghanistan, Egypt, Colombia, Philippines, Cambodia, Mexico, and Bangladesh,

*id* at 4 (2d Stein Decl. ¶ 8).  Plaintiffs' second request sought "all guides, manuals, instruction or

directions pertaining to" Leahy vetting; the "'Report on Government Police Training and

Equipping Programs' submitted to Congress pursuant to § 1235(c) of the Ike Skeleton National

Defense Authorization Act for Fiscal Year 2011;" and any similar reports "submitted to Congress in subsequent fiscal years." *Id.* at 6–7 (2d Stein Decl. ¶ 21). Defendants searched for records responsive to both requests and disclosed some records in full or in part and withheld other records in full. Those withholdings are described in a *Vaughn* index, which includes fifty entries. *See* Dkt. 30-3.

Pending before the Court are the Department's motion for summary judgment, Dkt. 25, and Plaintiffs' cross-motion for partial summary judgment, Dkt. 26. Plaintiffs do not contest the Department's decision to withhold twelve of the records identified in the *Vaughn* index or to redact certain information, including telephone numbers and email addresses; nor do they challenge the adequacy of the Department's search for records responsive to Plaintiffs' first FOIA request. Dkt. 26-1 at 7 n.1. That leaves two general categories of dispute: (1) whether the Department adequately searched for the reports to Congress that Plaintiffs requested, and (2) whether the Department has lawfully withheld all or part of thirty-eight records pursuant to FOIA Exemptions 5, 6, 7(C), 7(E), and 7(F).

For the reasons explained below, the Court concludes that the Department's search for the reports to Congress was inadequate but that the Department has met its burden with respect to some, although not all, of the withheld and redacted records. The Court, accordingly, will **GRANT** in part and **DENY** in part the Department's motion for summary judgment and **DENY** Plaintiffs' cross-motion for partial summary judgment.

## I.  BACKGROUND

### A.    The Leahy Laws

First introduced in an amendment to the 1997 Foreign Operations Appropriations Act sponsored by Senator Patrick Leahy, *see* Dkt. 26-3 at 108, the "Leahy Laws" consist of two

provisions: one that applies to the Department of Defense ("DOD"), 10 U.S.C. § 362 ("Defense

Leahy Law"), and another that applies to the Department of State, 22 U.S.C. § 2378d ("State

Leahy Law").  The Defense Leahy Law prohibits the use of DOD funds for "any training,

equipment, or other assistance for a unit of a foreign security force if the Secretary of Defense

has credible information that the unit has committed a gross violation of human rights."  10

U.S.C. § 362(a)(1).  The prohibition in the Defense Leahy Law, however, does not apply in cases

where "the Secretary of Defense, after consultation with the Secretary of State, determines that

the government of such country has taken all necessary corrective steps, or if the equipment or

other assistance is necessary to assist in disaster relief operations or other humanitarian or

national security emergencies."  *Id.* § 362(b).  The Secretary of Defense may also waive the

prohibition on funds if such a waiver is "required by extraordinary circumstances."  *Id.* § 362(c).

The Defense Leahy Law requires "consultation with the Secretary of State" to ensure that "full

consideration is given to any credible information available to the Department of State relating to

human rights violations."  *Id.* § 362(a)(2).  In addition, if DOD withholds funds from a foreign

security force under the Defense Leahy Law, the Secretary of Defense must inform "the

appropriate committees of Congress."  *Id.* § 362(e).

 The State Leahy Law contains a prohibition on funding that closely resembles the

Defense Leahy Law: it provides that "[n]o assistance shall be furnished [under Chapter 32 of

Title 22, 'Foreign Assistance'] or the Arms Export Control Act to any unit of the security forces

of a foreign country if the Secretary of State has credible information that such unit has

committed a gross violation of human rights."  22 U.S.C. § 2378d(a).  This prohibition does "not

apply," however, "if the Secretary [of State] determines and reports to" the Senate Committee on

Foreign Relations, the House Committee on Foreign Affairs, and the Senate and House

Committees on Appropriations "that the government of such country is taking effective steps to bring the responsible members of the security forces unit to justice." *Id.* § 2378d(b). The Secretary of State is required to establish and maintain procedures to collect, validate, and preserve vetting information. *Id.* § 2378d(d). Those procedures must also "ensure that when an individual is designated to receive United States training, equipment, or other types of assistance[,] the individual's unit is vetted as well as the individual." *Id.* § 2378d(d)(5). If aid is withheld under the State Leahy Law, the Secretary of State must, "to the maximum extent practicable, assist the foreign government in bringing the responsible members of the security forces to justice." *Id.* § 2378d(c). In addition, the Secretary of State is required to adopt procedures for making "publicly available, to the maximum extent practicable, the identity of those units for which no assistance shall be furnished pursuant to" the State Leahy Law. *Id.* § 2378d(d)(7).

Implementation of both Leahy Laws—known as "Leahy vetting"—begins with the State Department. Dkt. 25-4 at 3 (Blaha Decl. ¶ 6). The Office of Security and Human Rights, within the Bureau of Democracy, Human Rights, and Labor, acts as the "lead contact . . . for Leahy vetting policy and workflow issues." *Id.* at 4 (Blaha Decl. ¶ 9). Each U.S. embassy also has a "point of contact with responsibility for oversight of, and compliance with, Leahy vetting procedures." *Id.* When a foreign security force or one of its members is nominated to receive assistance from DOD or the State Department, the U.S. embassy in the unit's home country opens a case in the International Vetting and Security Tracking ("INVEST") system, which serves as the "official system of record and medium for conducting Leahy vetting." Dkt. 26-3 at

21.[1]  The embassy then conducts "consular, political, and other security and human rights checks," including checks on the credibility of derogatory information.  Dkt. 25-4 at 3 (Blaha Decl. ¶ 6).  If a unit is designated for U.S. assistance, the State Department, "at a minimum, vets the unit and the unit's commander."  *Id.*  If an individual is designated for such assistance, the State Department "vets that individual as well as his or her unit."  *Id.*  In most cases, "an additional review is conducted by [State] Department analysts in Washington, D.C." after embassy officials have conducted checks.  *Id.*  When DOD-funded assistance is at issue, the State Department "conducts Leahy vetting and provides DOD with pertinent derogatory information," but "DOD is ultimately responsible for [its] compliance with the [Defense] Leahy law."  *Id.*

## B.      Plaintiffs' FOIA Requests

Plaintiff 100Reporters is a nonprofit investigative news organization in Washington, D.C. Dkt. 1 at 2 (Compl. ¶ 3).  Plaintiff Douglas Gillison is a journalist who previously reported for 100Reporters; he now reports for Agence France-Presse.  *Id.* (Compl. ¶ 5).  According to Plaintiffs, their reporting has "revealed instances in which United States assistance or training was given to individuals or units of the security forces of a foreign country despite credible information that the individual or unit committed a gross violation of human rights, contrary to the Leahy Laws' requirements."  *Id.* at 6 (Compl. ¶ 19).  Through FOIA requests and this suit, Plaintiffs "seek to inform the public about Leahy [v]etting generally, specific examples of

---

[1] The INVEST system was replaced with a different system in October 2019.  Dkt. 30-4 at 2 & n.1 (2d Blaha Decl. ¶ 5).  The responsive records at issue in this case predate that transition, however.  For present purposes, then, the Court refers to the INVEST system as the relevant database for conducting Leahy vetting.

individuals or units that have undergone Leahy [v]etting, and possible violations of the Leahy Laws." *Id.* at 8 (Compl. ¶ 23).

On December 15, 2017, Plaintiffs filed two FOIA requests with the State Department.  In their first request, Plaintiffs sought "all records prepared, collected or maintained by the [State Department] pertaining to the nomination and/or vetting of foreign military and security personnel and/or units for U.S. training or assistance pursuant to . . . the Leahy Laws."  Dkt. 25-6 at 2 (Ex. B).  This request included "[a]ll entries in the State Department's International Vetting and Security Tracking [s]ystem, also known as INVEST, . . . and all records [that] system[] may contain."  *Id.*  On March 19, 2018, Plaintiffs narrowed their first request to records from the INVEST system "from January 1, 2017 to present that are responsive to their original FOIA request for the following countries: Iraq, Afghanistan, Egypt, Mexico, Colombia, Philippines, Cambodia, and Bangladesh."  Dkt. 25-7 at 2 (Ex. C).

In their second FOIA request, Plaintiffs sought:

[1.] Copies of all guides, manuals, instructions or directions pertaining to the vetting of foreign military and security personnel and/or units under statutes commonly known as the Leahy Laws provided by the Bureau of Democracy, Human Rights and Labor at the U.S. Department of State . . . to State Department staff and/or to U.S. embassies, consulates, missions, or other foreign posts from January 1, 2014 to the date on which processing of this request commences; and

[2.] The "Report on Government Police Training and Equipping Programs" submitted to Congress pursuant to § 1235(c) of the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 and copies of all "Reports on Government Police Training and Equipping Programs" submitted to Congress in subsequent fiscal years.

Dkt. 25-9 at 2 (Ex. E).

On July 19, 2018, Plaintiffs filed an administrative appeal with respect to both FOIA requests, asserting that the Department had unlawfully failed to make determinations within the

statutory time limits prescribed in FOIA.  Dkt. 25-3 at 5 (2d Stein Decl. ¶ 12).  In response, the

Department informed Plaintiffs that the requests were not subject to administrative appeal

because the Department had not "denied any information in response to [Plaintiffs'] requests."

*Id.* (2d Stein Decl. ¶ 13).  On June 17, 2019, Plaintiffs brought this FOIA action.  *See* Dkt. 1

(Compl.).

 Between October 15, 2019 and December 31, 2020, the Department processed and

released records related to Plaintiffs' second FOIA request.  *See* Dkt. 25-3 at 8–9 (2d Stein Decl.

¶¶ 27–37).  As relevant here, the Department invoked FOIA Exemptions 5, 6, 7(C), and 7(E) to

withhold certain records in full or in part.  Dkt. 26-3 at 1 (Singh Decl. ¶ 3).

 With respect to Plaintiffs' first FOIA request, on January 17, 2020, the Department

released fourteen Excel spreadsheets from the INVEST system for the eight countries that

Plaintiffs had identified.  *Id.* at 1–2 (Singh Decl. ¶ 4).  The Department invoked Exemptions 5, 6,

and 7(C) to withhold certain information from those spreadsheets.  *Id.*  A week later, the

Department informed Plaintiffs that it had inadvertently failed to redact information from two of

the spreadsheets released on January 17, which should have been withheld pursuant to FOIA

Exemption 7(F) on the ground that "disclosure would endanger the life or physical safety of

an[y] individual." Dkt. 25-8 at 11 (Ex. D).  Those two spreadsheets contained information

regarding Leahy vetting in Egypt and Iraq.  *Id.*  The Department asked Plaintiffs to "delete or

destroy all copies of those two spreadsheets," including any copies posted on "any websites."  *Id.*

In response, Plaintiffs asserted that the Department had not "provided a legal basis for . . .

insist[ing] that [they] destroy or return any records they obtained from the agency in response to

their FOIA request," and they "d[id] not believe there [was] a legal basis for the agency to make

such an extraordinary request."  *Id.* at 4 (Ex. D).  Plaintiffs further represented that they

"intend[ed], in good faith, to take [the Department's concerns] into consideration when

determining how, if at all, to use the Iraq and Egypt spreadsheets released to them on January 17

in connection with their reporting." *Id.* On February 19 and April 9, 2020, the Department sent

corrected versions of the Egypt and Iraq spreadsheets and reiterated its request that Plaintiffs

delete the unredacted versions or, "at a minimum, do not distribute or publicly release the now-

redacted information." *Id.* at 2 (Ex. D).

The matter is now before the Court on the parties' cross-motions for summary judgment.

Dkt. 25; Dkt. 26.

## II.  LEGAL STANDARD

The "general philosophy" of FOIA is "full agency disclosure." *U.S. Dep't of Def. v. Fed.*

*Labor Rels. Auth.*, 510 U.S. 487, 494 (1994) (quoting *Dep't of the Air Force v. Rose*, 425 U.S.

352, 360 (1976)).  Upon receiving a FOIA request, an agency must disclose all responsive

records to the requestor unless those records fall within one of nine statutory exemptions. *Id.*;

*see* 5 U.S.C. § 552(b).  "These exemptions are 'explicitly made exclusive' and must be 'narrowly

construed.'" *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011) (first quoting *EPA v. Mink*,

410 U.S. 73, 79 (1973); then quoting *FBI v. Abramson*, 456 U.S. 615, 630 (1982)).

When an agency withholds records based on a FOIA exemption, it bears the burden of

justifying its withholding. *See Fed. Open Mkt. Comm. of the Fed. Rsrv. Sys. v. Merrill*, 443 U.S.

340, 352 (1979); *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008).  That requires the

agency to submit either "relatively detailed and non-conclusory" affidavits or declarations

explaining why a document was withheld, *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200

(D.C. Cir. 1991) (quotation marks omitted), or an index that further elucidates, on a document-

by-document basis, the rationale for the FOIA exemptions claimed (a "*Vaughn* index"), *Vaughn*

*v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973).  "The description and explanation the agency offers should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection."  *Oglesby v. U.S. Dep't of the Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996).

"To withhold a responsive record, an agency must show both that the record falls within a FOIA exemption . . . and," in most cases, "that the agency 'reasonably foresees that disclosure would harm an interest protected by [the] exemption.'"  *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020) (alteration in original) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)).  Moreover, because "the focus of . . . FOIA is information, not documents, . . . an agency cannot justify withholding an entire document simply by showing that it contains some exempt material."  *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  Rather, FOIA requires the agency to release "[a]ny reasonably segregable portion of a record . . . after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  "Before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld."  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007).

FOIA cases are typically resolved on motions for summary judgment.  *See, e.g., Beltranena v. U.S. Dep't of State*, 821 F. Supp. 2d 167, 175 (D.D.C. 2011).  To prevail on a summary judgment motion, the moving party must demonstrate that there are no genuine issues of material fact and that she is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In FOIA cases, "summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory

evidence in the record or by evidence of agency bad faith." *Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) (quotation marks and alterations omitted).  Accordingly, "[s]ummary judgment is warranted when the agency's affidavits 'describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Elec. Frontier Found. v. U.S. Dep't of Just.*, 739 F.3d 1, 7 (D.C. Cir. 2014) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)).

The Court reviews an agency's decision to withhold records or portions thereof *de novo*. *See* 5 U.S.C. § 552(a)(4)(B).

## III.  ANALYSIS

In its motion for summary judgment, the Department argues that (1) it undertook a good faith effort to search for all records responsive to Plaintiffs' FOIA requests, and (2) it "released all reasonably segregable records and withheld only information that is properly exempt from release under FOIA Exemptions 5, 6, 7(C), 7(E)[,] and 7(F)."  Dkt. 25-1 at 8–9.  In support, the Department proffers the declaration of Eric F. Stein, Director of the Office of Information Programs and Services at the State Department, Dkt. 25-3; the declaration of Charles O. Blaha, the Director of the Office of Security and Human Rights ("SHR") within the Bureau of Democracy, Human Rights, and Labor ("DRL") at the State Department, Dkt. 25-4; and other materials, including a thirty-page *Vaughn* index, Dkt. 25-5 (Ex. A).

In response, Plaintiffs argue that the Department (1) failed to conduct an adequate search for the "Report on Government Police Training and Equipping Programs" submitted to Congress pursuant to section 1235(c) of the Ike Skelton National Defense Authorization Act for Fiscal

Year 2011 and all such "Reports on Government Police Training and Equipping Programs"

submitted to Congress in subsequent fiscal years; (2) improperly withheld records pursuant to

FOIA Exemption 7 because they were not compiled for a "law enforcement purpose;" (3)

improperly invoked Exemptions 5, 6, 7(C), and 7(E) to withhold responsive records in full and in

part; and (4) failed to satisfy FOIA's "foreseeable harm" provision with respect to each of its

withholdings.  Dkt. 26-1 at 6–7.  In addition, Plaintiffs argue that the Department's motion for

summary judgment with respect to information inadvertently released in the Iraq and Egypt

spreadsheets is moot in light of the Department's inadvertent release of the information at issue.

*Id.* at 7.

     The Court first considers whether the Department conducted an adequate search for the

congressional reports Plaintiffs requested and then turns to whether the Department properly

withheld all or portions of the thirty-eight records that remain in dispute.

## A.    The Adequacy of the Department's Search

     "An agency has an obligation under FOIA to conduct an adequate search for responsive

records."  *Ewell v. U.S. Dep't of Just.* 153 F. Supp. 3d 294, 301 (D.D.C. 2016).  The adequacy of

an agency's search "is judged by a standard of reasonableness."  *Weisberg v. U.S. Dep't of Just.*,

745 F.2d 1476, 1485 (D.C. Cir. 1984).  In other words, the agency must conduct a search that is

"reasonably calculated to uncover all relevant documents."  *Valencia-Lucena v. U.S. Coast

Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542

(D.C. Cir. 1990)).  The agency bears the burden of showing "that it made a good faith effort to

conduct a search for the requested records, using methods which can be reasonably expected to

produce the information requested."  *Oglesby*, 920 F.2d at 68.  It need not demonstrate, however,

that it located every document that the FOIA requester expected (or hoped) the agency might

find; that is, "the adequacy of a search is 'determined not by the fruits of the search, but by the appropriateness of [its] methods.'" *Hodge v. FBI*, 703 F.3d 575, 579 (D.C. Cir. 2013) (alteration in original) (quoting *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)). But, "if an agency has reason to know that certain places might well contain responsive documents, it is obligated under FOIA to search [those places] barring an undue burden." *Valencia-Lucena*, 180 F.3d at 327.

In their second FOIA request, Plaintiffs sought:

> The "Report on Government Police Training and Equipping Programs" submitted to Congress pursuant to §1235(c) of the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 and copies of all "Reports on Government Police Training and Equipping Programs" submitted to Congress in subsequent fiscal years.

Dkt. 26-5 at 4 (Ex. 1). In developing its search plan, the Department determined that three bureaus were "reasonably likely to have documents responsive to [this] request." Dkt. 25-3 at 10 (2d Stein Decl. ¶ 40). First, the Department identified DRL, which includes SHR, which is "the component within DRL responsible for managing and conducting the Department's Leahy vetting procedures." *Id.* at 11 (2d Stein Decl. ¶ 42). Within SHR, a "Leahy Advisor . . . conducted a search of DRL's shared electronic drive using the following separate search terms: 'Manuals'; 'Guides'; 'Instructions' or 'Directions,'" using the date range January 1, 2010, to August 12, 2019, "the date on which the searches were conducted." *Id.* (2d Stein Decl. ¶ 44).

Second, the Department identified the Bureau of International Narcotics and Law Enforcement Affairs, which works to "reduce the amount of crime and illegal drugs reaching U.S. shores." *Id.* at 12 (2d Stein Decl. ¶ 45). Four officials in the Bureau's "Office of Knowledge Management" conducted searches of their "unclassified email records," "individual electronic drive[s]," and "the office's shared electronic drive" using some combination of the

following search terms: "'Leahy guide'; 'Leahy manual'; 'Leahy instructions'; 'Leahy directions'; or 'Report on Government Police Training and Equipping Programs.'"  *Id.* at 12–13 (2d Stein Decl. ¶¶ 46–49).  Those officials used the date range January 1, 2011, to August 7, 2019.  *Id.*

Finally, the Department identified the Bureau of Counterterrorism as a source "reasonably likely" to have responsive records.  *Id.* at 10 (2d Stein Decl. ¶ 40).  The Deputy Director of that Bureau manually reviewed her "classified and unclassified email records" in subfolders titled "legal issues," "implementers," and "admin."  *Id.* at 14 (2d Stein Decl. ¶ 51).  She also conducted searches of her individual electronic drive and the office's shared electronic drive using the following search terms: "Leahy; 'Leahy guide'; 'Leahy manual'; 'guidance on vetting'; Skelton; 'Report on Government Police Training and Equipping Program'; 'Danen' (the last name of the . . . officer who circulated the report for clearance in May 2016); or 'Report on Police Training.'"  *Id.*  The Deputy Director used the date range September 2015, "the date [she] began in her position," to August 12, 2019, the date she conducted her search.  *Id.*

According to the Department's *Vaughn* index, these searches turned up only one document even arguably relevant to Plaintiffs' request for Reports on Government Police Training and Equipping Programs submitted to Congress: an "undated draft memorandum from the former Executive Secretary of the Department . . . to the former Executive Secretary of [DOD]."  Dkt. 30-3 at 2.  The subject of the memorandum is "Department of State Submission: Report to Congress on U.S. Government Police Training and Equipping Programs."  *Id.*  According to the *Vaughn* index, the document "is in draft form: it is undated, uncleared, and contains markings from the template on which it was based."  *Id.*  The Department withheld the document pursuant to FOIA Exemption 5, invoking the deliberative process privilege.  *Id.*

13

Plaintiffs argue that the Department's search for the reports to Congress that Plaintiffs described in their FOIA request was inadequate because the Department failed to search the Bureau of Legislative Affairs.  Dkt. 26-1 at 13–15.  According to Plaintiffs, "[i]t is undisputed that at least one such 'Report on Government Police Training and Equipping Programs' was submitted from State to Congress in FY 2016," *id.* at 14, yet the Department failed to search the files of the Bureau of Legislative Affairs, which is the office in which "final reports transmitted to Congress are likely to be found," *id.* (emphasis omitted).  In support of their contention that the State Department submitted the Report on Government Police Training and Equipping Programs to Congress, Plaintiffs cite a report from the House Committee on Armed Services, H.R. Rep. No. 114-102 (2015), which accompanied the Fiscal Year 2016 National Defense Authorization Act, *see* Dkt. 26-1 at 14.

Plaintiffs misread the House Committee report.  As the Department explains, the House Committee report first notes that, in 2012, Congress "received a one-time Presidential report on U.S. Government policy training and equipping programs" pursuant to Section 1235(c) of the Ike Skelton National Defense Authorization Act for Fiscal Year 2011.  Dkt. 30 at 8; *see also* H.R. Rep. No. 114-102, at 256.  After highlighting the "value of this report in providing the relevant congressional committees with a comprehensive, whole-of-government survey and assessment" of the relevant programs, the House Committee report "directs the Secretary of Defense, in coordination with the Secretary of State, the Secretary of Homeland Security, and the Attorney General of the United States, to submit an update to this report to the congressional defense committees."  H.R. Rep. No. 114-102, at 256.  In sum, the 2011 legislation required *the President* to submit the required congressional report, Pub. L. No. 111-383, § 1235(c), and the subsequent House Committee report directed *the Secretary of Defense* "to submit an update

report," H.R. Rep. No. 114-102, at 256.  Thus, in the words of the State Department's declarant, the "congressional records cited by Plaintiffs . . . in no way indicate that *State* was responsible for providing the sought-after reports to Congress, and in fact suggest to the contrary that *another Executive Branch agency* was responsible for compiling and communicating those reports."  Dkt. 30-2 at 4 (Weetman Decl. ¶ 8) (emphasis added).

Having dispensed with the premise of Plaintiffs' argument, the State Department goes on to explain that the Bureau of Legislative Affairs "advises the Secretary [of State], the Deputy Secretary, the Under Secretaries, and the Assistant Secretaries on legislative strategy, and facilitates effective communication between State officials and Members of Congress and their staffs."  *Id.* at 3 (Weetman Decl. ¶ 7).  It does not, however, coordinate communications between other Executive Branch agencies and Members of Congress; rather, the Bureau of Legislative Affairs' "involvement in Department action is limited to situations where the Department itself communicates directly with Congress."  *Id.*  As a result, the State Department posits that "it would be unreasonable to expect [Bureau of Legislative Affairs] involvement . . . unless State was required to and actually did communicate directly with Congress," *id.*—and there is no evidence that the State Department was, in fact, required to or did communicate directly with Congress regarding the reports at issue.

Against this background, the Court is persuaded that the Department reasonably determined that it was unlikely that any responsive records were maintained by the Bureau of Legislative Affairs.  Indeed, Plaintiffs seem to concede as much in their reply brief, shifting their argument (without acknowledging their change of direction) to complain that the Department erred by failing to "search the Office of the Secretary of State."  Dkt. 32 at 7.  That late-raised argument has greater currency, because the President could only have prepared the initial Report

on Government Police Training and Equipping Programs with input from the State Department, Pub. L. No. 111-383, § 1235(c), and because the House Committee report directed the Secretary of Defense to prepare his report "in coordination with the Secretary of State," along with two other cabinet officers, H.R. Rep. No. 114-102, at 256.  The Department responds to this new argument in a sur-reply, arguing that Plaintiffs waived the argument and that, in any event, Plaintiffs offer no "reason to second-guess" the Department's assessment of the offices likely to have had any involvement in the drafting process.  Dkt. 35 at 1–2.

Although raised late, the Court will nevertheless consider Plaintiffs' contention that the Department should have conducted a search of the Office of the Secretary for copies of the Reports on Government Police Training and Equipping Program for three reasons.  First, the Department filed a sur-reply and, accordingly, has had the opportunity to respond to Plaintiffs' argument.  Second, "[i]n order to obtain summary judgment the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested," *Oglesby*, 920 F.2d at 68, and, here, Plaintiffs timely invoked the House Committee report, which requires the Secretary of Defense to coordinate with the Secretary of State, Dkt. 26-1 at 14.  As a result, the record before the Court does not unambiguously support the Department's motion for summary judgment.  That matters because Rule 56 "makes clear[] [that] judgment [should be] granted only after the District Court satisfies itself that the record and any undisputed material facts justify granting summary judgment," *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 507 (D.C. Cir. 2016).  Third, even when a party "fails to properly address another party's assertion of fact," Rule 56(e) authorizes the Court to provide that party with "an opportunity to properly support or address the fact."  Fed. R. Civ. P. 56(e).

On the existing record, the Court cannot conclude that the Department has carried its burden of demonstrating that copies of the requested reports are unlikely to be found in the Office of the Secretary.  The House Committee on Armed Services directed the Secretary to work in coordination with the Secretary of Defense in preparing the 2016 report, and, even if this direction was not enacted into law, *see INS v. Chadha*, 462 U.S. 919 (1983), it undoubtedly drew the attention of responsible Executive Branch officials.  The substance of the report, moreover, touches on sensitive matters of foreign policy and the ongoing role of the State Department as "the lead U.S. agency for the implementation of U.S. foreign assistance programs," including "police training and equipping activities."  Dkt. 26-3 at 181.  It is thus far from evident that the offices that the Department did search were more likely to maintain copies of the reports than the Office of the Secretary.  But, on the other hand, because Plaintiffs raised this issue late in the process, arguably limiting the Department's ability to offer controverting evidence, the Court cannot conclude that Plaintiffs are entitled to summary judgment at this stage of the proceeding.

The Court will, accordingly, deny both the Department's motion and Plaintiffs' cross-motion for summary judgment with respect to the adequacy of the search in this one limited respect.[2]  In all other respects, the Court concludes that the Department's searches were adequate.

---

[2] The Court notes that Plaintiffs' second FOIA request seeks only the reports "submitted to Congress" and does not request drafts or proposed inserts.  Dkt. 26-5 at 4.  As a result, the further search required by this decision is unlikely to impose any significant burden on the Department.

**B.     The Agency's Withholdings**

Plaintiffs challenge the Department's withholding of thirty-eight responsive records pursuant to FOIA Exemptions 5, 6, and 7.[3]  The Court will consider each exemption in turn.

1.     *Exemption 5*

Plaintiffs argue that the Department improperly invoked FOIA Exemption 5 to withhold twenty-eight documents: Documents 1, 6, 11–12, 14, 16, 19, 23–24, 28–44, 45, and 50. Exemption 5 permits the withholding of "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  Courts have construed this exemption to encompass "the privileges available to Government agencies in civil litigation." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 783 (2021); *see also Tax'n with Representation Fund v. IRS*, 646 F.2d 666, 676 (D.C. Cir. 1981).  This includes "materials which would be protected under the attorney-client privilege, the attorney work-product privilege, or the executive 'deliberative process' privilege." *Id.* (citations omitted) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980)).  In this case, the Department relies on the deliberative process privilege to justify its invocation of Exemption 5.

The deliberative process privilege protects "documents 'reflecting advisory opinions, recommendations[,] and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150

---

[3] The Department's *Vaughn* index describes fifty documents, each of which is assigned a number from 1 to 50. *See* Dkt. 30-3 (revised *Vaughn* index).  In their cross-motion for partial summary judgment, Plaintiffs clarify that they do not challenge the Department's withholding of twelve records reflected in the index as Documents 2–5, 7–10, 13, 15, and 48–49. *See* Dkt. 26-1 at 7 n.1.  To avoid confusion, however, the Court will continue to reference each document according to the number it is assigned in the *Vaughn* index.

(1975) (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966)).  The "privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions, by protecting open and frank discussion among those who make them within the Government."  *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (quotation marks and citations omitted).  "Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions."  *Sears*, 421 U.S. at 151.

To properly invoke the privilege, an agency must demonstrate that the withheld record is both predecisional and deliberative.  *See U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 785–86.  In practice, these requirements "tend to merge."  *Access Reps. v. Dep't of Just.*, 926 F.2d 1192, 1195 (D.C. Cir. 1991).  A record is predecisional if it was "generated before the adoption of agency policy," *Coastal States Gas Corp.*, 617 F.2d at 866, and "if it was prepared in order to assist an agency decisionmaker in arriving at his decision, rather than to support a decision already made," *Petrol. Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quotation marks omitted).  A record is deliberative, meanwhile, if it "reflects the give-and-take of the consultative process."  *Coastal States Gas Corp.*, 617 F.2d at 866; *see also Tax Analysts v. IRS*, 117 F.3d 607, 616 (D.C. Cir. 1997); *Jud. Watch, Inc., v. Dep't of Energy*, 412 F.3d 125, 129 (D.C. Cir. 2005).  When invoking the privilege, therefore, an "agency must establish what deliberative process is involved, and the role played by the documents in issue in the course of that process."  *Senate of P.R.ex rel. Judiciary Comm. v. U.S. Dep't of Just.*, 823 F.2d 574, 585–86 (D.C. Cir. 1987) (quotation marks omitted).  The agency must also explain "the nature of the decisionmaking authority vested in the office or person issuing the disputed

document(s), and the positions in the chain of command of the parties to the documents." *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258 (D.C. Cir. 1982) (quotation marks and citations omitted).  Finally, the foreseeable-harm requirement applies with special force to deliberative process withholdings under Exemption 5, which Congress viewed as posing particular risks of "overuse." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (quoting H.R. Rep. No. 114-391, at 10 (2016)).

   "[A] document can lose its predecisional character—and the protections of the privilege—if an agency adopts the document as its own." *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017).  "To adopt a deliberative document," however, "it is not enough for an agency to make vague or equivocal statements implying that a position presented in a deliberative document has merit; instead, the agency must make an '*express*[]' choice to use a deliberative document as a source of agency guidance."  *Id.* (quoting *Sears*, 421 U.S. at 161); *see also Afshar v. Dep't of State*, 702 F.2d 1125, 1142 (D.C. Cir. 1983).  Documents that reflect an agency's "working law"—that is, "opinions and interpretations which embody the agency's effective law and policy"—also remain unshielded by Exemption 5.  *Sears*, 421 U.S. at 153 (quotation marks omitted); *see also Tax'n with Representation Fund*, 646 F.2d at 667 (explaining that Exemption 5 does not "protect communications that implement an established policy of an agency").  As the D.C. Circuit has explained, an agency may not develop a "a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final.'" *Schlefer v. United States*, 702 F.2d 233, 244 (D.C. Cir. 1983) (quoting *Coastal States Gas Corp.*, 617 F.2d at 867).  Finally, Exemption 5 does not, of course, protect "final agency actions that

constitute statements of policy or final opinions that have the force of law, or which explain actions that an agency has already taken." *Tax'n with Representation Fund*, 646 F.2d at 677.

a.   *Documents 1 and 45*

Documents 1 and 45 are draft documents that the Department withheld in full pursuant to Exemption 5.  Document 1 is an undated draft memorandum from the former Executive Secretary for the State Department to the former Executive Secretary for DOD.  Dkt. 30-3 at 1. The subject of the memorandum is "Department of State Submission: Report to Congress on U.S. Government Police Training and Equipping Programs."  *Id.*  According to the Department's *Vaughn* index, the memorandum "is in draft form: it is undated, uncleared, and contains markings from the template on which it was based."  *Id.*  The Department invokes the deliberative process privilege to withhold Document 1 in its entirety "because it is both predecisional (it predates any final memorandum sent to [DOD]) and deliberative (it reveals the drafter's preliminary, uncleared thoughts about what information should be included in the memorandum)."  *Id.*

Document 45 is a draft letter from an official within the Department's Bureau of International Narcotics and Law Enforcement Affairs to an official at the U.N. Office on Drugs and Crime ("UNODC").  *Id.* at 27.  The draft letter "provides an update on Leahy vetting requirements for specific participants of a certain UNODC program."  *Id.*  It is "in draft form and contains edits in redline and comment bubbles."  *Id.*  The Department maintains that the letter is subject to the deliberative process privilege because "it is both predecisional (it predates any final letter sent to UNODC) and deliberative (it reveals the drafter's preliminary, uncleared thoughts about what information should be included in the letter.)"  *Id.* at 28.

Plaintiffs contend that the Department has failed to meet its burden with respect to these records because it has not "specif[ied] whether th[e] records or portions thereof have been adopted as the agency's final position or policy." Dkt. 26-1 at 17.  Relying on the doctrine of agency adoption, *see Afshar*, 702 F.2d at 1142, Plaintiffs argue that because the Department has failed to specify whether the agency adopted all or portions of Documents 1 and 45, the Court will be "unable to determine whether the record or portions thereof have lost their predecisional status," Dkt. 26-1 at 17.  Plaintiffs assert that the Department "bears the burden of demonstrating that records designated as drafts have not subsequently been adopted," and, according to Plaintiffs, the Department failed to carry that burden here.  *Id.*

In response, the Department argues that Plaintiffs mischaracterize its burden with respect to agency adoption; it contends that "the agency 'does not carry the burden of proving that each withheld document was not adopted formally or informally.'"  Dkt. 30 at 11 (quoting *Heffernan v. Azar*, 317 F. Supp. 3d 94, 122 (D.D.C. 2018)); *see also Sec. Fin. Life Ins. Co. v. Dep't of Treasury*, Civil No. 03-102, 2005 WL 839543, at *7 (D.D.C. Apr. 12, 2005); *United States v. Phillip Morris USA, Inc.*, 218 F.R.D. 312, 317 (D.D.C. 2003).  The Department further argues that, "[i]n any event, [it] has sufficiently shown that both documents have markings that are only contained on draft documents and that neither document would have been adopted as a final agency decision in that form."  Dkt. 30 at 11–12.

The parties fail to join issue on the dispositive question as to the allocation of the burden of proof.  Plaintiffs are correct that, in general, an agency that withholds a record based on a FOIA exemption bears the burden of justifying that withholding.  *See Fed. Open Mkt. Comm. of the Fed. Rsrv. Sys.*, 443 U.S. at 352.  And the Department is correct that a handful of decisions from this Court have held that an agency does not bear the burden of proving that each document

that it has withheld pursuant to Exemption 5 was not adopted in a final agency decision or

policy.  *See Heffernan*, 317 F. Supp. 3d at 122; *Sec. Fin. Life Ins. Co.*, 2005 WL 839543, at *7;

*Phillip Morris USA*, 218 F.R.D. at 317.  Any apparent tension between these propositions is

resolved by the understanding that, yes, the agency bears the burden of justifying its withholding,

and that, no, that does not mean that the agency must trace the lineage of each draft or evidently

deliberative record to ensure that the agency did not, at some point, adopt the predecisional

record, "formally or informally, as the agency position on an issue or . . . in its dealings with the

public."  *Coastal States Gas Corp.*, 617 F.2d at 866.

What the agency must do to carry its burden is provide the Court with a reasoned and

sound basis for concluding that the record at issue was—and remained—predecisional.  As Judge

Katzmann explained for the Second Circuit in *National Council of La Raza v. Department of*

*Justice*, 411 F.3d 350 (2d Cir. 2005), that inquiry is necessarily context specific, *id.* at 358–59.

In that case, the Second Circuit drew a distinction between the facts of *Renegotiation Board v.*

*Grumman Aircraft Engineering Corp.*, 421 U.S. 168 (1975), and the *La Raza* case.  In *Grumman*

*Aircraft*, the Supreme Court held that the Renegotiation Board had not adopted "reports prepared

by two subordinate divisions" of the agency because (1) the Board was not bound to accept those

recommendations or the reasoning contained in them; (2) the Board merely reached a "'yes or

no' determination without providing any reasoning at all;" and (3) there was no reason to infer—

and no evidence to show—that the Board adopted the reasoning of either report, even if it agreed

with its conclusion.  411 F.3d at 358–59.  In *La Raza*, in contrast, the Second Circuit held that

the Department of Justice had adopted an Office of Legal Counsel memorandum, when it (1)

"embraced the [Office of Legal Counsel's] reasoning as its own;" (2) "repeatedly invoked the

[Office of Legal Counsel] [m]emorandum to assure those outside of the agency that its policy

was lawful;" and (3) used the memorandum "to justify what a third party—'state and local law enforcement'—*should* and *could* lawfully do." *Id.* at 359.

Against this backdrop, the Court concludes that garden-variety deliberative records will not, in most cases, invite a reasonable inference that the draft or recommendation was ultimately adopted by the agency and, accordingly, will not put the agency to the "burden" of tracing the records' lineage to put any doubt to rest. When an agency employee who is separated by multiple levels of review from the ultimate decisionmaker, for example, sends an email to a colleague raising questions about a proposal in its early stages of review—at least in most cases—the agency can safely assume that the email was not adopted by the agency in a final decision or operative policy. On the other end of spectrum, a memorandum prepared for the decisionmaker's signature that bears the date of the final decision, that is on letterhead, and that contains no edits or marginalia might reasonably invite further inquiry as to whether the unsigned memorandum constituted, as a matter substance if not form, the operative agency decision or policy. *Cf. Canning v. U.S. Dep't of State*, 346 F. Supp. 3d 1, 26 (D.D.C. 2018). Finally, on rare occasion, an agency might, after diligent investigation, be unable to determine whether such a seemingly final or near-final document was ultimately issued, without change, as the agency's final decision or policy. Under those unusual circumstances, "[r]equiring disclosure based on that lack of knowledge would have the precise chilling effect on the 'uninhibited' exchange of views and recommendations that the deliberative process privilege is designed to protect," *Canning v. U.S. Dep't of State*, 453 F Supp. 3d 332, 338 (D.D.C. 2020) (quoting *Coastal States Gas Co.*, 617 F.2d at 866), and might therefore support invocation of the deliberative process privilege.

Applying these principles here, the Court concludes that the Department must do more to support its contention that Document 1 is protected by the deliberative process privilege but that it has done enough to satisfy its burden with respect to Document 45. Document 1 is an undated draft memorandum from the State Department's Executive Secretary to the Defense Department's Executive Secretary titled "Department of State Submission: Report to Congress on U.S. Government Police Training and Equipping Programs." Dkt. 30-3 at 2. That title refers (at least in part) to the precise report that Plaintiffs sought in the second FOIA request. Moreover, because the role of the State Department's Executive Secretariat includes "handl[ing] . . . relations with . . . other Cabinet agencies," About Us – Executive Secretariat, https://www.state.gov/about-us-executive-secretariat/ (last visited Apr. 22, 2022), and does not include implementation of the Leahy Laws, *see* Dkt. 25-3 at 10 (2d Stein Decl. ¶ 40), one might reasonably infer that the Executive Secretary was merely charged with conveying the State Department's "[s]ubmission" to DOD for inclusion in the final report. To be sure, it is possible that changes were made before the submission was sent to DOD, and it is not at all clear that DOD merely inserted the State Department's submission in the report that was submitted to Congress. *See* 5 U.S.C. § 552(b)(5) (stating that the exemption extends to "inter-agency . . . memorandums"). But the prospect that the State Department's "submission" was submitted to Congress without change warrants further investigation by the Department and requires further evidence before the Court can conclude that the Department has carried its burden for purposes of summary judgment.

The Department's description of Document 45, in contrast, is sufficient to support the Department's motion for summary judgment. Unlike Document 1, it is clear from that description that the letter is, in fact, a working draft. As the *Vaughn* index explains, the draft

letter "contains edits in redline and comment bubbles."  Dkt. 30-3 at 27.  The Department

represents, moreover, that the comments reflect the "drafter's preliminary, uncleared thoughts

about what information should be included in the letter."  *Id.*  Comments of that type fall

squarely within the deliberative process privilege, and the Court can discern no basis to infer (or

even to suspect) that the Department adopted the "drafter's preliminary, uncleared thoughts" as

its final decision or policy.  Indeed, even if the deciding official agreed with each of the

comments, revealing the back-and-forth that led to that decision differs in dispositive respects

from revealing the final decision or policy; it shows where the drafter agreed and disagreed with

the earlier version of the letter.  Revealing that back-and-forth would run counter to "the obvious

realization that officials will not communicate candidly among themselves if each remark is a

potential item of discovery and front page news."  *Klamath*, 532 U.S. at 8–9.

The Court also agrees with the Department that disclosure of the withheld materials

would cause foreseeable harm, potentially chilling agency discussion on sensitive topics related

to Leahy vetting that may follow as a result.  Finally, the Court is persuaded that the Department

conducted a sufficient review of Document 45 to determine whether any portion may be

segregated from exempt portions and released.

The Court will, accordingly, deny the Department's motion for summary judgment

without prejudice with respect to Document 1; grant the Department's motion with respect to

Document 45; deny Plaintiff's motion for summary judgment without prejudice with respect to

Document 1; and deny Plaintiff's motion with respect to Document 45.

> b.  *Documents 31–44*

Documents 31 through 44 are spreadsheets exported from the Department's INVEST

database for Afghanistan, Mexico, Colombia, Philippines, Cambodia, Bangladesh, Egypt, and

Iraq.  Dkt. 30-3 at 24–26.  Until October 2019, the INVEST database was "the official system of record and medium for conducting Leahy vetting."  Dkt. 26-3 at 25; *see also* Dkt. 30-4 at 2 n.1 (2d Blaha Decl.).  When a Leahy vetting began, "a corresponding case would be opened in the . . . INVEST database."  Dkt. 30-4 at 2 (2d Blaha Decl. ¶ 5).  The spreadsheets exported from the INVEST database contain 24 columns of information.  *See* Dkt. 30-3 at 24.  The Department has redacted information from four columns in the spreadsheets with the following labels: "INDV ID/UNIT ID"; "NAME"; "JOB TITLE/RANK"; and "NOTES."  *Id.* at 24–26.  The Department invokes Exemption 5 only with respect to the "NOTES" columns.  *Id.*; *see also* Dkt. 30-4 at 2 (2d Blaha Decl. ¶ 5).  According to one declaration, the "NOTES" columns contain information relating to: "(1) the status of the vetting action; (2) any milestones reached during the vetting process; (3) any substantive or logistical issues encountered while processing; and/or (4) an interim or final determination and the rationale underlying that interim or final determination."  Dkt. 30-4 at 2 (2d Blaha Decl. ¶ 5).

Another of the Department's declarants, Susan Weetman, reviewed a sample of entries in the "NOTES" columns and elaborated on the kinds of information they contain.  First, "the vast majority of the cells contain descriptions of major milestones in the vetting process dated prior to a final vetting determination, if any."  Dkt. 30-2 at 5 (Weetman Decl. ¶ 11).  Second, "certain 'NOTES' entries noted a candidate's final vetting determination, if any (*i.e.* whether a given candidate was 'Approved' or "Rejected')."  *Id.* at 6 (Weetman Decl. ¶ 12).  Notably, the Weetman declaration concedes that this information "would not be predecisional insofar as it reflects the Department's final determination" but argues that "individually reviewing each entry within the 'NOTES' cells in order to segregate any final determination information for release would require an enormous investment of Department resources, and the end result would not

reveal any additional information" because each candidate's final determination also appears in the "STATUS" column, which was disclosed in full.  *Id.* (Weetman Decl. ¶ 12).  Third, some cells contain "information about the Department's rationale for approving or rejecting the candidate."  *Id.* (Weetman Decl. ¶ 13).  The Weetman declaration states that this information is properly withheld under Exemptions 6, 7(C), and 7(E).  *Id.* at 6–7 (Weetman Decl. ¶¶ 14–15).  Finally, a "small subset of the entries in certain 'NOTES' cells reflect deliberations that occurred as a final vetting determination was being made but that related to further intra-agency deliberations, such as about whether and how to convey that final determination to foreign government officials."  *Id.* at 8 (Weetman Decl. ¶ 16).

Plaintiffs raise three challenges to the Department's invocation of Exemption 5 to withhold the "NOTES" columns.  Plaintiffs first take issue with the Department's statement that the notes are "*generally* entered" before final decisions about eligibility are made.  Dkt. 26-1 at 18 (quoting Dkt. 30-3 at 24).  That "generalized assertion," according to Plaintiffs, "does not demonstrate that [the notes] are, in fact, predecisional."  *Id.*  Relatedly, Plaintiffs further argue that the Department's explanation that the notes "assist[] the Department in tracking and reaching a final decision about [an] individual's eligibility for [funding]," shows that it is "highly likely that some—if not all—of [the] information [in the 'NOTES' columns] has been adopted by the agency, or otherwise reflects a 'final decision' of the agency" that must be disclosed.  *Id.*  Finally, Plaintiffs argue that the Department has failed to demonstrate that the information in the "NOTES" columns is deliberative because it has provided "no information[] whatsoever[] about the specific deliberative process purportedly at stake, or the role these notes purportedly play in that process."  *Id.* at 19.

In response, the Department does not dispute that at least some of the entries in the notes field were made after a final decision was made.  But, in the Department's view, that does not end matters because its "categorical approach" was "born out of necessity:" the spreadsheets contain "more than 160,000 rows of information," and "[a]pproximately 45,000 of those rows include an entry in the 'NOTES' column."  Dkt. 30 at 13; *see also* Dkt. 30-4 at 3 (2d Blaha Decl. ¶ 6).  Given this volume, the Department maintains that "[i]t would be overly burdensome for [it] to review and describe each separate entry" in its *Vaughn* index.  Dkt. 30 at 13.  The Department also takes issue with Plaintiffs' suggestion that much, "if not all," of the material in the notes field has been adopted in final, agency determinations.  *Id.*; *see also* Dkt. 26-1 at 18.  To the contrary, it insists that "the vast majority of the 'NOTES' cells . . . do not contain information compiled after a *final* vetting determination has been made" and that the Department "frequently makes interim vetting determinations, which result in the vetting process either being cancelled or suspended."  Dkt. 30 at 13.  When the process is cancelled or suspended, "no final decision has been made with regard to the individual's eligibility to receive U.S. assistance, because the vetting process may restart or resume if additional clarifying information becomes available."  *Id.*; *see also* Dkt. 30-4 at 3–4 (2d Blaha Decl. ¶¶ 8–10).  Finally, the Department disputes Plaintiffs' contention that its invocation of the deliberative process privilege lacks sufficient detail to sustain the privilege.  Citing the Weetman declaration, the Department explains that "[t]he specific deliberative process implicated by [most of the notes field entries] is the process through which Department officials gathered information relevant to a Leahy vetting determination, discussed and evaluated that information in light of both statutory and internal guidance related to the Leahy vetting procedure as well as applicable definitions regarding the forms of conduct that could constitute a gross violation of human rights, and formulated their

rationale for making both interim and final Leahy vetting determinations."  Dkt. 30 at 14 (citing Dkt. 30-2 at 5–6 (Weetman Decl. ¶ 11)).

The Department's position faces two hurdles, either of which is sufficient to preclude entry of summary judgment in the Department's favor.  First, according to the Department, "the vast majority of [the] entries [in the notes field] . . . predate the final determination and . . . instead reflect the various milestones achieved during the vetting process prior to a final determination."  Dkt. 30 at 13.  What this assertion leaves unanswered is whether some or all of this information is factual.  There is a significant difference, for example, between an entry indicating that a criminal history check was completed and an entry expressing an opinion about the criminal history check or making a recommendation based upon it.  "Factual material that does not reveal the deliberative process," of course, "is not protected," *Morley v. CIA*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983)), and it seems unlikely that every "milestone" in the vetting process, regardless of how routine it is, would reveal agency deliberations.

Second, the Court is unpersuaded by the Department's contention that it was not required to review potentially responsive and non-exempt records because doing so "would be overly burdensome."  Dkt. 30 at 13.  To start, the Department's reference to the 160,000 rows of information contained in the INVEST spreadsheets is impressive but irrelevant for present purposes.  As the Department concedes, only "45,000 of those rows include an entry in the 'NOTES' column," *id.*, and neither the Department nor Plaintiffs have even hinted that there is reason to review all 160,000 rows.  To be sure, 45,000 rows is still substantial, but it is not uncommon for a FOIA request to impose a substantial burden on the responding agency.  Indeed, in another FOIA case pending before this Court, a government agency has been tasked with

reviewing a spreadsheet containing 57,000 rows and 50 columns of information. *See Supplemental Declaration of Fernando Pineiro at 4–5, Am. First Legal Found. v. U.S. Dep't of Homeland Sec.*, Civil No. 21-2168 (D.D.C. filed Apr. 1, 2022) (Dkt. 13-1). In that case, the government maintains that it will take almost 500 hours for it to complete the review, but— unlike here—it has not argued that the magnitude of that task renders the FOIA request unenforceable. *See id.* at 7 n.8.

More importantly, the only precedent the Department cites in support of its undue-burden argument stands for the unremarkable proposition that "[t]here is no set format for a *Vaughn* index; it is the function of the document that matters, not the form." Dkt. 30 at 13 (quoting *Jud. Watch v. Exp.-Imp. Bank*, 108 F. Supp. 2d 19, 34 (D.D.C. 2000)). Although true, that does nothing to advance the Department's argument. The Court agrees that preparing a *Vaughn* index containing tens of thousands of entries may prove unduly burdensome and that the Department can likely explain and justify any withholdings by addressing categories of entries. But that does not relieve the Department of its obligation to ensure that it is withholding only those records that fall within a FOIA exemption. Nor is the Court persuaded that it is unnecessary for the Department to review the entries in the notes field because a separate column in the "INVEST spreadsheet[s] lists the candidate's status as 'Cancelled' or 'Suspended.'" *Id.* By the Department's own account, the notes field, at least at times, includes the agency's "rationale for making . . . final Leahy vetting determinations." *Id.* at 14. The information is not otherwise available, and it lies at the core of what Plaintiffs seek to discover. Burden alone cannot relieve the Department of its obligation to sort the predecisional from the postdecisional entries and to release the latter.

The Court will, accordingly, deny the Department's motion for summary judgment with respect to the non-deliberative material contained in the notes field of the INVEST spreadsheets. But because much of the material at issue is likely deliberative, the Court will also deny Plaintiffs' cross-motion for summary judgment without prejudice.  Until the Department conducts the necessary review, which the Court recognizes may take months if not years to complete, it is premature for the Court to pass on which, if any, materials are deliberative.

        c.    *Document 12*

Document 12 is an "intra-agency email exchange between officials in [DRL, including SHR] and [the Bureau of International Narcotics and Law Enforcement Affairs]."  Dkt. 30-3 at 8. In the only portion of the email chain that Plaintiffs challenge, *see* Dkt. 32 at 11 n.4, an SHR official gives "practical and logistical advice . . . about certain practices [a] Foreign Service Officer and her office may want to implement in order to help navigate the Leahy vetting process," Dkt. 30-3 at 9.  According to the Department's *Vaughn* index, "[t]hose discussions do not reflect official Department guidance about how the Leahy vetting process works, but rather reflect candid, uncleared, and unofficial discussions and recommendations between Department officials about practical techniques that may help them navigate the vetting process."  *Id.*

Plaintiffs contend that this withheld portion of the email chain should be disclosed because the Department has not described "what deliberative process is involved, the role played by the document[] in issue in the course of that process, [and] the nature of the decisionmaking authority vested in the . . . person issuing the disputed document[]."  Dkt. 32 at 11 (quoting *Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 243 F. Supp. 3d 155, 168 (D.D.C. 2017) (cleaned up)).  According to Plaintiffs, "navigating the Leahy vetting process is not a discrete decision making process, [and] the privilege does not protect government employees'

conversations about best practices for ensuring compliance with existing policies." *Id.* (quotation marks omitted).  Rather, "it protects 'deliberations comprising part of a process by which governmental . . . policies are formulated.'" *Id.* (quoting *Hardy*, 243 F. Supp. 3d at 164). Thus, "[t]o the extent [Document 12] merely discusses the agency's positions of law or policy it is not entitled to protection and must be disclosed."  Dkt. 26-1 at 19.

Because the portion of the email chain at issue does not merely discuss law or policy already adopted but, rather, provides "uncleared[] and unofficial discussions and recommendations . . . about practical techniques [for] the vetting process," Dkt. 30-3 at 9, the Department's reliance on Exemption 5 is well founded.  As explained above, the deliberative process privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance 'the quality of agency decisions,' by protecting open and frank discussion among those who make them within the Government."  *Klamath Water Users Protective Ass'n*, 532 U.S. at 8–9 (citation omitted) (quoting *Sears,* 421 U.S. at 150)).  Consistent with that purpose, the privilege protects the "exercising [of] policy-implicating judgment," *Petrol. Info. Corp.*, 976 F.2d at 1435, and not merely recommendations relating to "a discrete" decision or "comprising part of" a specific policy-making process, Dkt. 32 at 11–12 (quotation marks omitted).  The purpose of facilitating "open and frank discussion among those who make" decisions within the government, *Klamath Water Users Protective Ass'n*, 532 U.S. at 9, would not be served by exposing candid, subjective advice shared between Department officials about how best to apply the Leahy Laws, *see 100Reporters LLC v. DOJ*, 316 F. Supp. 3d 124, 152 (D.D.C. 2018) ("Documents that provide suggestions regarding ongoing agency processes are more likely to be predecisional.").  The Court also agrees with the Department that disclosure of

the withheld materials would cause foreseeable harm, potentially chilling agency discussion on sensitive topics related to Leahy vetting that may follow as a result.  Finally, the Court is persuaded that the Department has released all segregable portions of Document 12.

The Court will, accordingly, grant the Department's motion and deny Plaintiff's motion with respect to Document 12.

d.       *Documents 6, 11, 23, and 29*

Documents 6, 11, 23, and 29 are email chains in which State Department personnel discuss ongoing Leahy vetting processes for particular units and individuals.  Document 6 is an "intra-agency email exchange between officials in DRL and officials at Embassy Rangoon" in which the officials "discuss the ongoing Leahy vetting process for certain Burmese law enforcement personnel, including discussions about whether the Department has credible intelligence indicating that the law enforcement personnel should be cleared to receive assistance or should be rejected."  Dkt. 30-3 at 4.  "In particular, the officials discuss potentially derogatory information that one of the Department's Leahy vetters found in connection with specific units and individuals who had been nominated to receive assistance, including discussions about the credibility of that information and the impact that the information would have on the results of the Leahy vetting."  *Id.*  Document 11 is a similar exchange "between officials in DRL, [the Bureau of International Narcotics and Law Enforcement Affairs], and at Embassy Hanoi," in which "the officials discuss the ongoing Leahy vetting process for specific Vietnamese law enforcement personnel."  *Id.* at 6.  Document 23 is a similar exchange in which Department officials seek advice about "the criteria for determining whether the Leahy Laws apply to a

34

particular group of prosecutors."[4]  *Id.* at 16.  Finally, Document 29 "is an email chain among Department officials regarding certain units and/or sub-units allegedly associated with potential [gross violations of human rights] in Tajikistan.  The discussion primarily relates to the Tajik Drug Control Agency . . . and the Tajik Criminal Investigation Department."  *Id.* at 21.

Plaintiffs argue that the deliberative process privilege does not apply to these email chains because the records "appear to do nothing more than reflect an application of preexisting agency policy, in contrast to reflecting that policy's development."  Dkt. 26-1 at 19–20.  As Plaintiffs explain, "[t]he State Department has a detailed, comprehensive policy that dictates how it conducts Leahy [v]etting prior to approving the provision of training or other assistance to foreign personnel [and] that policy outlines, *inter alia*, who must be vetted and how information about gross violations of human rights . . . is determined to be credible."  *Id.* at 20.  Thus, according to Plaintiffs, "[e]ven assuming it is predecisional, such material is not deliberative; it merely reflects application of preexisting, clearly defined State Department policy."  *Id.* at 20.

The Department counters that "the decisions at issue in Documents 6, 11, 23, and 29 do not relate to the Department's determinations about how to define the term 'gross violation of human rights,' how Leahy vetting should generally proceed, what sorts of information Department personnel should consider during that process, or any of the other procedural considerations suggested by Plaintiffs."  Dkt. 30 at 16.  But, "even if the Department had made a final decision as of the time of these communications about the *process* that Leahy vetting should take and the types of behaviors that *in the abstract* may constitute gross violations of human rights, the withheld communications contained in these four documents are nonetheless

---

[4] Plaintiffs do not challenge a portion of this document in which officials discuss proposed changes to the Leahy Vetting Guide.  Dkt. 32 at 12 n.5.

[deliberative] because they are focused on how a real-life fact pattern should be treated within the context of those established definitions and processes, and predate any final determination on that issue." *Id.*

The Department has the better of the arguments. As an initial matter, the Court notes that Exemption 5 does not merely protect deliberations over the formulation of generally applicable agency policies; it also protects deliberations regarding discrete agency decisions applying those policies, at least where those decisions involve some exercise of discretion. *See, e.g.*, *Wash. Rsch. Project, Inc. v. Dep't of Health*, 504 F.2d 238, 249–52 (D.C. Cir. 1974) (holding that the deliberative process privilege covered documents reviewed by National Institute of Mental Health personnel in a grant application and approval process, applying their "personal perspective on the material being summarized"). The deliberative process privilege, accordingly, protects the Department's predecisional, deliberative communications regarding whether specific security units should be approved in Leahy vetting.

To be sure, if the application of the established policy to the facts were purely mechanical, involving no judgment or discretion, the Department would be hard pressed to characterize that process as deliberative. But that is not the case here. Rather, as the 2017 Leahy Vetting Guide explains:

> Under the State Leahy Law, no assistance authorized under the Foreign Assistance Act or the Arms Export Control Act "shall be furnished . . . to any unit of the security forces of a foreign country if the Secretary of State has credible information that such unit has committed a gross violation of human rights." . . . .
>
> State has interpreted the term "credible information" to mean information that is sufficiently believable that a reasonable person would rely on such information in their decision making process. . . . The term "credible information" has appeared in other provisions of law and is a low evidentiary standard. . . . .

No single factor should be considered determinative own its own. *A credibility determination with respect to a particular piece of information is a judgment call based on all the facts and circumstances relevant to that piece of information.* Information from a single source can be found to be credible, and corroboration from additional sources is not required. Information which appears credible on its face can be rebutted by equally credible contrary information. When concerns about the credibility of an allegation arise, Post should make efforts to obtain supplemental information, including from foreign sources, where appropriate.

Dkt. 26-3 at 14–15 (emphasis added). The guide then goes on to outline seven factors the reviewer should consider in assessing the credibility of a source, including past accuracy and reliability, known political agenda, contradictory information, and the level of detail offered. *Id.* at 15.

That process is far from mechanical, as the Department's *Vaughn* index confirms. In describing Document 6, for example, the Department notes that the email chain includes "discussions about whether the Department has credible intelligence indicating that the law enforcement personnel should be cleared;" discussions regarding "*potentially* derogatory information;" and "discussions about the credibility of that information." Dkt. 30-3 at 4 (emphasis added). The *Vaughn* index then explains that the withheld material reflects "certain officials' *opinions* about whether unites and individuals should be approved or rejected, and discussion of the factors the Department considers when making that decision." *Id.* (emphasis added). The Department's description of the material withheld from Documents 11, 23 and 29, similarly, reflects intra-agency deliberations and opinions about potentially derogatory information, Dkt. 30-3 at 6, application of the State Leahy Law "to a particular group of prosecutors," *id.* at 16, and the process for assessing the credibility of a source, *id.* at 21–22. Discussions of this type fall squarely within the deliberative process privilege.

The Court also agrees with the Department that disclosure of the withheld materials would cause foreseeable harm, potentially chilling agency discussion on sensitive topics related to Leahy vetting that may follow as a result.  Finally, the Court is persuaded that the Department has released all segregable portions of Documents 6, 11, 23, and 29.

For those reasons, the Court will grant the Department's motion for summary judgment, and will deny Plaintiffs' cross-motion, with respect to the portions of Documents 6, 11, 23, and 29 that the Department withheld pursuant to Exemption 5.

   e. *Documents 14, 16, 19, 24, 28, 30, and 50*

Plaintiffs challenge the Department's withholding of a number of documents under Exemption 5 only on the ground that the Department failed to satisfy FOIA's requirement that an agency withhold information "only if" it "reasonably foresees that disclosure would harm an interest protected by an exemption."  5 U.S.C. § 552(a)(8)(A)(i)(I).  The foreseeable-harm requirement was introduced to FOIA in 2016.  *See FOIA Improvement Act of 2016*, Pub. L. No. 114–185, § 2, 130 Stat. 538, 539.  The foreseeable-harm requirement "impose[s] an independent and meaningful burden on agencies."  *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (quotation marks omitted).  To satisfy this burden, agencies must do more than "rely on mere speculative or abstract fears, . . . fear of embarrassment," or "generalized assertions" of harm.  *Id.* (cleaned up).  They must, instead, "specifically and thoughtfully determine whether [they] 'reasonably foresee[] that disclosure of each particular record would harm an interest protected by [the] exemption.'"  *Id.* at 372 (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)).  Plaintiffs argue that the Department has failed to satisfy this requirement with respect to Documents 14, 16, 19, 24, 28, 30, and 50.

After Plaintiffs raised the foreseeable-harm requirement in their cross-motion for partial summary judgment, *see* Dkt. 26-1 at 21–23, the Department updated its *Vaughn* index to add detail about the foreseeable harm that would result from disclosure of the specific withheld material, *see generally* Dkt. 30-3.  Document 14, for example, is draft press guidance titled "Joint State-DOD Policy on Remediation and the Resumption of Assistance."  *Id.* at 10.  That document "contains draft talking points for use by members of the Department who receive press inquiries about the topic of the guidance."  *Id.*  The "Approval" line of the draft was been left blank.  *Id.*  The Department's *Vaughn* index contains a detailed explanation of why the deliberative process privilege applies.  *Id.*  It then goes on to explain:

> Disclosure of this draft document could reasonably be expected to chill the open and frank discussions in which Department officials engage when they draft documents for internal use to prepare other officials for communicating policy decisions to the public, as well as the willingness of officials to make suggestions to regarding press guidance.  Specifically, release of this document would foreseeably harm the Department's deliberative process by leading Department officials to believe that every edit or comment they propose in a draft document may be released to the public, thus curbing the candid exchange of ideas between Department officials and curtailing creativity in the compilation and explanation of Department policy.  Furthermore, releasing press guidance documents such as this one would interfere with the Department's stated procedure for preparing and making public statements to members of the press, and would risk confusing the public to the extent this draft press guidance does not match up precisely with the actual public statements made by Department officials.

*Id.*

The Court has reviewed each entry in the Department's *Vaughn* index for Documents 14, 16, 19, 24, 28, 30, and 50, and it concludes that the Department has carried its burden of establishing that it was "reasonably foreseeabl[e] that disclosure would harm an interest protected by" Exemption 5.  5 U.S.C. § 552(a)(8)(A)(i)(I).  Far from the type of "perfunctory state[ment] that disclosure of all the withheld information—regardless of category or substance—would jeopardize the free exchange of information" that the D.C. Circuit has

admonished "will not suffice," *Reps. Comm. for Freedom of the Press*, 3 F.4th at 370 (quotation marks omitted), the Department's revised *Vaughn* index addresses each individual document with specific reasons why disclosure would cause foreseeable harm.  These reasons, moreover, are sensible: the withheld materials include draft documents, proposed talking points, and email chains among Department personnel that reflect internal deliberations about the application of the Leahy Laws, involving and addressing, among other sensitive topics, legal interpretation of the Leahy Laws, possible remediation of human rights violations by particular units, and non-final vetting decisions.  In each case, the Department's revised *Vaughn* index addresses the specific harm that would result from disclosure of the specific information.

In response to the Department's revised *Vaughn* index, Plaintiffs argue that "it is implausible that Department personnel would be 'chill[ed]' from engaging in an 'open and frank exchange of ideas' about Leahy [v]etting because, years later, their words may be revealed to the public."  Dkt. 32 at 14.  The Court disagrees.  It is entirely plausible that the knowledge or belief that internal agency deliberations regarding sensitive matters of national security and foreign policy might be disclosed (even "years later") would chill the very discussions that the deliberative process privilege is designed to protect.  *Cf. Machado v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) (holding that, where an agency "focused on 'the information at issue' . . . and it concluded that disclosure of that information 'would' chill future internal discussions," the agency "correctly understood the governing legal requirement and reasonably explained why it was met").

The Court, accordingly, will grant the Department's motion for summary judgment with respect to Documents 14, 16, 19, 24, 28, 30, and 50, and will deny Plaintiffs' cross-motion for partial summary judgment.

2.      *Exemption 6*

The Department invokes FOIA Exemption 6 to withhold from twenty-two records the names of foreign security officials who either underwent Leahy vetting or who were discussed by officials who were vetting the individuals' security force unit. *See* Dkt. 30-3 (Docs. 6, 11, 17–18, 26, 31–47). Under Exemption 6, an agency need not disclose "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The Supreme Court has construed the phrase "and similar files" to reach "information which applies to a particular individual" that is contained in government files. *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982). For present purposes, Plaintiffs do not dispute that the documents at issue constitute "similar files" within the meaning of Exemption 6.

The presence of "personal, identifying information" on its own, however, "is not enough to invoke Exemption 6;" instead, the information must be "of such a nature that its disclosure would constitute a clearly unwarranted privacy invasion." *Jud. Watch, Inc. v. U.S. Dep't of State*, 282 F. Supp. 3d 36, 49–50 (D.D.C. 2017) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)). To make that determination, the Court must first evaluate whether "disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest," *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989), and must then "balance the privacy interest in non-disclosure against the public interest" in disclosure, *Consumers' Checkbook, Ctr. for the Study of Servs. v. U.S. Dep't of Health & Human Servs.*, 554 F.3d 1046, 1050 (D.C. Cir. 2009).

With respect to the potential privacy interests, the parties rely on competing analogies. For its part, the Department argues that releasing the names of individuals who have undergone

Leahy vetting would stigmatize them by "associat[ing] them publicly with inquiries into possible gross violations of human rights," which would constitute an invasion of privacy "in much the same way that associating an individual with an ongoing criminal investigation would invade their personal privacy even if, and perhaps especially if, the individual is ultimately cleared of any personal wrongdoing." Dkt. 25–3 at 18 (2d Stein Decl. ¶ 62). More specifically, the Department contends that revealing the identities of individuals who have undergone Leahy vetting could "expose them to harassment by making public their affiliation with the United States Government." Dkt. 30 at 22. Plaintiffs, on the other hand, contend that because Leahy vetting is conducted in all cases in which an individual or security unit is nominated for U.S. training or assistance, and not just in those cases that raise suspicion, there is no risk of stigmatization. Dkt. 26-1 at 28. Thus, according to Plaintiffs, "[m]uch in the same way a new job or rental unit will often require a background check for a new hire or lessee," no harm would result from exposing the names of individuals who have undergone Leahy vetting. *Id.*

Neither analogy is particularly helpful. On the one hand, Leahy vetting—standing alone—does not involve even implicit allegations of wrongdoing. But, on the other, that vetting does—at least in some circumstances—implicate privacy interests far more substantial than disclosing the fact that someone has submitted an application to lease an apartment or has applied for a job, although even that information might at times implicate a more-than-*de-minimis* privacy interest. The difficulty with both parties' positions regarding the identity of individuals subject to Leahy vetting, however, goes beyond their choice of analogies.

According to the Department, "releasing the names of members of foreign security forces who were submitted for Leahy vetting would have a number of negative effects." Dkt. 25-4 at 5 (Blaha Decl. ¶ 14). Those effects include:

> First, release would harm the personal privacy of the vetted individuals, who
> have a privacy interest in their names and other identifying information. Second,
> releasing the names of vetted individuals could expose those individuals to
> harassment and retaliation either by making public their affiliation with a unit
> that may be receiving assistance from the U.S. Government or by implicitly
> tying them to possible commissions of [gross violations of human rights]. Third,
> release could discourage host governments from submitting necessary vetting
> information in the future, which could detract from State's ability to implement
> the Leahy Laws and could harm both State's and DOD's ability to conduct
> security assistance programming vital to U.S. national security interests. . . .
> [F]or both foreign policy and personal privacy reasons, the Department does not
> make public the names of foreign security force members that participate in U.S.
> Government security assistance programs.

*Id.* at 5–6 (Blaha Decl. ¶¶ 14–15). None of these asserted effects, however, is sufficient to

support the Department's motion to summary judgment with respect to Exemption 6. The Court

will address those asserted effects, starting with the two effects that are most readily dispatched.

The first asserted effect—the "privacy interest in . . . names and other identifying

information" of those subject to Leahy vetting—lacks sufficient specificity or support to sustain

the Department's reliance on Exemption 6. To start, the Department does not indicate what

"other identifying information" it has in mind. Even more importantly, the Department's

assertion that the individuals at issue have a "privacy interest" in the withheld information is too

conclusory to support its invocation of Exemption 6; indeed, it is difficult to imagine a case in

which an agency might invoke Exemption 6 where that assertion would not apply. Nor does the

Department address whether different subjects of vetting are differently situated in relevant

respects. Does the longstanding and well-known commander of a particular unit, for example,

have the same privacy interest in his name as a new recruit? Without additional detail, the

Department's sweeping contention that all subjects of Leahy vetting have a privacy interest in

their names and identifying information is unhelpful.

43

The Department's third concern—that "release could discourage host governments from submitting necessary vetting information in the future"—is even less availing.  To be sure, this assertion might support a finding of *foreseeable harm*, but it does not support a finding that the individuals at issue have a non-de-minimis *privacy interest*.  Disclosing the names of those subject to vetting, for example, might well dissuade host governments from submitting necessary information, but that is not a privacy interest.  And, for similar reasons, the fact that "at least some individuals are not aware that they or their units are being or have been Leahy vetted," *id.* at 5 (Blaha Decl. ¶ 13), does not directly implicate the privacy of those individuals.  The act of letting an individual know that she was the subject of an investigation does not undermine her right to privacy.  What would do so is letting her friends, family, neighbors, or co-workers know.  But that is not the risk raised by the Department's third concern.

The Department's second concern—"releasing the names of vetted individuals could expose those individuals to harassment and retaliation"—raises a more traditional privacy interest, and thus the Department's argument comes closer to the mark.  It still falls short, however, for lack of sufficient detail.  The Court has little doubt that disclosing the names of foreign personnel vetted to participate in U.S. training or assistance programs in Iraq, Afghanistan, Egypt, Mexico, Colombia, Philippines, Cambodia, or Bangladesh could, at least at times, expose those individuals to "harassment and retaliation."  *Id.* at 5 (Blaha Decl. ¶ 14).  Nor does the Court doubt that this concern, at least at times, will constitute a privacy interest of the highest order.  The problem the Department faces, however, is that it is neither categorical nor specific in pressing its point.  As the Department puts it in its reply brief: "disclosure of the vetted foreign officers' names and other identifying information could, *in certain circumstances,* expose them to harassment by making public their affiliation with the United States

Government." Dkt. 30 at 22 (emphasis added).  The question that the Department leaves

unanswered is "under what circumstances" does that risk exist?  Does the Department's concern

extend to all the countries at issue?  All the units in each of those countries?  All the individuals

screened for each of those units?  Is it possible to distinguish between these risks?  What

information is already public?  Without specific answers to these and other questions, the Court

cannot assess the nature and extent of the privacy interest—or distinct privacy interests—at

stake.[5]

Plaintiffs, for their part, fail to grapple with the real-world risk of harassment or

retaliation that at least some of these individuals might face if the Department were to release all

of the names and identifying information that the Plaintiffs seek.  They merely observe that some

of the information that they seek to uncover is already public and that, in most cases, the

individual's name will appear along with an "approved" signation, removing any implication of

wrongdoing.  Dkt. 32 at 19.  But neither of those assertions addresses the risk that some—and

perhaps many—of those identified in the records at issue could face serious consequences if their

association with U.S. training and assistance was made public.

The lack of the necessary evidence also precludes the Court from engaging in the

balancing required under Exemption 6.  As just explained, the Court is persuaded that, in at least

some cases, the requested disclosures could pose a serious risk to the individuals at issue.  The

---

[5] This is not to say that the Department must provide a distinct factual basis for each
withholding.  But it must provide, at a minimum, the necessary factual support for the relevant
categories of persons, *see*, *e.g.*, *Matthews v. Fed. Bureau of Investigation*, Civil No. 16-569,
2019 WL 1440161, at *8 (D.D.C. Mar. 31, 2019), such as members of units that received
undisclosed (or not widely known) training from the United States in a specific region inhabited
by a group or groups who are hostile to the United States and who might threaten or harass those
particular individuals if their association with the United States was made known (or better
known).  The greater the specificity that the Department can offer, however, the better equipped
the Court will be to weigh the competing interests in privacy and disclosure.

Court is also persuaded that Plaintiffs have identified a substantial public interest in disclosure; in particular, they observe that disclosure of the vetted individuals' names is necessary to "examine and illuminate State's compliance with the Leahy Laws."  Dkt. 26-1 at 30.[6]  In short, this is one of those Exemption 6 cases in which "the interests on both sides of the relevant balance are weighty," *Brennan Ctr. for Just. v. U.S. Dep't of Just.*, Civil No. 18-1860, 2021 WL 2711765, at *2 (D.D.C. July 1, 2021) ("this is a case with anvils on both sides of the scales")—or at least possibly so.  But, without more specific information, the Court cannot weigh those competing interests.

Although the Department bears the burden of justifying its invocation of Exemption 6, it has failed to do so, and FOIA favors the expeditious release of non-exempt records, the Court

---

[6] In their cross-motion, Plaintiffs provide some examples of how exposure of individuals' names will serve this interest:

> Plaintiffs' work to date underscores the public's interest in the names of individuals required to be vetted as a prerequisite to receiving U.S. training or other assistance. Colonel Seng Phok of Cambodia's Royal Gendarmerie was among the commanding officers whose men "burned 80 houses" to the ground to forcibly evict villagers from their homes in Spean Ches, Preah Sihanouk Province, Cambodia. Yet, the U.S. Embassy in Cambodia "could find 'no credible information' connecting Col. Phok to any gross violation of human rights and granted him preliminary approval to attend training in counterterrorism," despite his commanding role in the Spean Ches incident in which the military also "inflicted gunshot wounds at close range, [and] used live fire to disperse crowds."  In Kbal Hong, a small village also in Preah Sihanouk Province, Rear Admiral Hing Puth Dara commanded his soldiers to burn down homes and beat unconscious a man taking his sick child to the doctor. Nevertheless, Puth Dara was also approved by the Embassy to receive training from the U.S. Coast Guard in advanced maritime operations.  These examples are emblematic of the revelations that can only take place if members of the press and public have access to the names of individuals subject to Leahy [v]etting.

Dkt. 26-1 at 28–29 (citations omitted).  Without the names of vetted individuals, Plaintiffs argue, they cannot comprehensively analyze the Leahy vetting decisions that the Department has made on an individual level.  *See id.* at 29.

will provide the Department with another opportunity to meet its burden because this case implicates the interests of third parties, who bear no responsibility for any shortcomings in the Department's initial motion.  Under similar circumstances, this Court has held that protecting the substantial interests of innocent third parties provides sufficient basis to permit a motion for reconsideration, *see id*. at *8–*9; *Changzou Laosan Grp. v. U.S. Customs & Border Prot. Bureau*, 374 F. Supp. 2d 129, 132 (D.D.C. 2005); *Delta Ltd. v. U.S. Customs & Border Prot. Bureau*, 393 F. Supp. 2d 15, 17 (D.D.C. 2005); *see also* 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1 (3d ed. 2022) (such motions are to "be granted if necessary to prevent manifest injustice"), and, short of that, the similar (and also weighty) third party interests at issue here are more than sufficient to permit the Department the opportunity to offer more complete and detailed evidence in support of its invocation of Exemption 6.

The Court will, accordingly, deny the Department's motion for summary judgment on this issue without prejudice and will also deny Plaintiffs' cross-motion without prejudice.

3.    *Exemption 7*

The Department asserts that it properly withheld portions of thirty records pursuant to FOIA Exemptions 7(C), 7(E), and 7(F).  Those exemptions apply to records "compiled for law enforcement purposes," the disclosure of which (1) "could reasonably be expected to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C) (Exemption 7(C)); (2) "would disclose techniques and procedures for law enforcement investigations," *id.* § 552(b)(7)(E) (Exemption 7(E)); or (3) "could reasonably be expected to endanger the life or physical safety of any individual," *id.* § 552(b)(7)(F) (Exemption 7(F)).  The Department invokes Exemption 7(C) to withhold the names of foreign individuals who were the subject of, or discussed in relation to, Leahy vetting.  *See, e.g.*, Dkt. 30-3 at 5, 7, 12.  It invokes Exemption

7(E) to withhold material from email chains about ongoing Leahy vetting processes, *see, e.g.*,
Dkt. 30-3 at 4–5; discussions and memoranda about implementation of the Leahy Laws, *id.* at
13–14; an internal Department guide to Leahy vetting titled "Tainted: The Average Joe's Guide
to Leahy Vetting," *id.* at 15–16; portions of the 2017 Leahy Vetting Guide, *id.* at 18–19; and a
cable from the Secretary of State to "all diplomatic and consular posts" describing the
Department's procedures for implementing the State Leahy Law's reporting requirements, *id.* at
31–32.  And, the Department invokes Exemption 7(F) to withhold information from the INVEST
spreadsheets for Iraq and Egypt relating to the identities of vetted individuals or that the
Department contends could be used to identify such individuals.  *Id.* at 25–27.

Before assessing the Department's withholdings on a document-by-document basis, the
Court must first determine whether the records at issue were "compiled for law enforcement
purposes," a requirement that applies to all "categories of documents" subject to Exemption 7.
*Shem-Tov v. Dep't of Just.*, 531 F. Supp. 3d 102, 110 (D.D.C. 2021).  "The term 'law
enforcement' in Exemption 7 refers to the act of enforcing the law, both civil and criminal."
*Pub. Emps. for Envtl. Resp. v. U.S. Section, Int'l Boundary & Water Comm'n,* 740 F.3d 195, 203
(D.C. Cir. 2014) ("*PEER*").  In considering whether records have been compiled for a "law
enforcement purpose," "it is not the nature of the agency that controls, but the character of the
records withheld."  *Elkins v. Fed. Aviation Admin.*, 99 F. Supp. 3d 90, 98 (D.D.C. 2015).

The Department's *Vaughn* index cites the same purported "law enforcement purpose" for
each record for which it invokes Exemption 7: each record, according to the Department, serves
the purpose of "enforcing the Leahy Laws by vetting foreign individuals and units before they
receive training or other assistance from the U.S. Government."  Dkt. 30-3 at 4; *see also, e.g.*, *id.*
at 7 (same); *id.* at 14 (same); *id.* at 16 (same).  The State Department's principal function is not

law enforcement, *see Schoenman v. FBI*, 573 F. Supp. 2d 119, 146 (D.D.C. 2008), and the Department does not suggest otherwise.  That fact invites "some skepticism" of the Department's invocation of Exemption 7, *PEER*, 740 F.3d at 203, but it is not dispositive, and, indeed, there is little doubt that the State Department at times compiles records for law enforcement purposes, *see*, *e.g.*, *Jud. Watch*, 282 F. Supp. 3d at 43.  As the D.C. Circuit has observed, what is most important is the statutory text, and the relevant text requires the Court to assess whether the particular documents at issue were, in fact, "compiled for law enforcement purposes."  *PEER*, 740 F.3d at 203 (quoting 5 U.S.C. § 552(b)(7)).

Although a novel question, the Court is persuaded that the Department compiles Leahy vetting records for law enforcement purposes.  Decisions holding that "[b]ackground investigations conducted to assess an applicant's qualifications" are typically compiled for law enforcement purposes, *Morley*, 508 F.3d at 1128–29, provide a helpful starting point.  As the D.C. Circuit has explained, "[t]he principal purpose of a background investigation is to ensure that a prospective employee has not broken the law or engaged in other conduct making her ineligible for the position," although the investigation "also helps 'to determine whether there are any law enforcement or security issues in her past that could affect her ability to carry out' the position."  *Mittleman v. Off. of Pers. Mgt.*, 76 F.3d 1240, 1243 (D.C. Cir. 1996) (alterations omitted); *see also Jud. Watch*, 282 F. Supp. 3d at 43.  The ultimate results of the background investigation—that is, whether the investigation uncovers an actual violation of the law—is "immaterial to those objectives."  *Mittleman*, 76 F.3d at 1243.  Nor does it matter that background investigations are often performed for both law and non-law-enforcement reasons. What matters is whether the investigations were conducted, at least in significant part, to "prevent criminal activity and to maintain security;" "to deter illegal activity and ensure national

security;" to determine whether the subject is "suitable for work in . . . law enforcement" and related fields; or to ferret out criminal misconduct.  *Sack v. U.S. Dep't of Def.*, 823 F.3d 687, 694 (D.C. Cir. 2016).

Significantly, Exemption 7 is not limited to federal law enforcement purposes.  Rather, "[t]he language of the statute makes no distinction between" federal and state or between "foreign and domestic enforcement purposes."  *Bevis v. Dep't of State*, 801 F.3d 1386, 1388 (D.C. Cir. 1986).  Consistent with that understanding, the D.C. Circuit has applied Exemption 7 to federal, *see, e.g.*, *Sack*, 823 F.3d at 694, state, *see, e.g.*, *Shaw v. Fed. Bureau of Investigation*, 749 F.2d 58, 64 (D.C. Cir. 1984), and foreign law enforcement purposes, *Bevis*, 801 F.2d at 1388, at least when the federal agency's inquiry serves a "federally authorized purpose," *id.* (quoting *Shaw*, 749 F.2d at 64).

Applying this framework here, the Court is persuaded that the State Department compiles Leahy vetting records "for law enforcement purposes."  The State Leahy Law provides that if the funds must be withheld based on a finding that the security unit at issue engaged in gross violations of human rights, the Secretary must, "to the maximum extent practicable, assist the foreign government in *bringing the responsible members of the unit to justice*."  22 U.S.C. § 2378d(c) (emphasis added).  The State Department's 2017 Leahy Vetting Guide, which Plaintiffs have submitted as an exhibit in support of their cross-motion, further highlights the goal of bringing those responsible for committing gross violations of human rights to justice. The guide explains: "The Leahy Law aims to incentivize foreign governments to take action to *bring to justice* those members of security forces who have committed gross violations of human rights . . . by cutting off assistance to units that have been implicated in such offenses.  If the foreign government strongly desires U.S. Government assistance, cutting off the unit alleged to

have been involved may lead [that] government to undertake an investigation and [to] *bring those responsible to justice*." Dkt. 26-3 at 10 (emphases added).

Any doubt about whether the statutory phrase "law enforcement purposes" is capacious enough to encompass the goal of bringing those responsible for gross violations of human rights to justice, moreover, is put firmly to rest by the Department's list of "the four most common forms of" gross violations of human rights, which includes torture, extrajudicial killing, enforced disappearance, and rape under the color of law. *Id.* at 10–11. Those are among the most serious crimes known to international and foreign law, *see*, *e.g.*, *Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2d Cir. 1980) (describing "the torturer" as "an enemy of all mankind"), and, in many circumstances, an offender may be criminally or civilly liable in a U.S. court for committing such a grave offense even outside the United States, *see*, *e.g.*, 18 U.S.C. § 2340A; 28 U.S.C. § 1350 note. And, to the extent FOIA demands a "federally authorized purpose" for the investigation or a "strong U.S. policy interest in facilitating [a foreign state's] efforts to bring to justice" those suspected of gross violations of human rights, *Bevis*, 801 F.2d at 1388, the interest in ensuring that U.S. training and assistance are not used to support torture, murder, enforced disappearance, rape, or similar crimes is compelling.

According to Plaintiffs, the Leahy vetting process "cannot fairly be characterized as an enforcement proceeding" because the State Leahy Law "is not a criminal law, nor does it involve the imposition of civil or any other type of penalty." Dkt. 26-1 at 24 (quotation marks omitted). One might say the same thing, of course, about a law or rule requiring that government employees submit to background investigations. But, in any event, Plaintiffs are incorrect that the State Leahy Law does not involve "any . . . type of penalty"—a finding of gross violations of human rights can lead both to the loss of U.S. training and assistance and to efforts to bring the

responsible individuals to justice.  *See* 22 U.S.C. § 2378d(a), (c).  Nor is the Court persuaded by

Plaintiffs' contention that holding that Leahy vetting records are compiled for law enforcement

purposes would effectively read the law-enforcement-purposes requirement out of FOIA.

According to Plaintiffs, if the Department is right, "it is hard to know what records of an agency

within the executive branch . . . would not constitute records 'compiled for law enforcement

purposes.'"  Dkt. 26-1 at 24.  But, for the reasons explained above, Leahy vetting differs in

material respects from garden-variety implementation of "laws enacted by Congress."  The

purpose of the Leahy Laws and the State Department's enforcement efforts is to prevent grave

violations of international, foreign, and (at times) domestic law, including acts of torture, murder,

and rape.  Those efforts bear no resemblance to the type of day-to-day administrative actions

implementing statutes that Plaintiffs invoke.

Having concluded that the State Department compiles Leahy vetting records "for law

enforcement purposes," the Court must determine whether the Department has satisfied the

subsidiary requirements of Exemptions 7(C), 7(E), and 7(F).

a. *Exemption 7(C)*

In light of the Court's preceding analysis of Exemption 6, the Department's invocation of

Exemption 7(C) requires little additional discussion.  Exemption 6 applies to "personnel and

medical files and similar files the disclosure of which would constitute a clearly unwarranted

invasion of personal privacy," 5 U.S.C. § 552(b)(6), while Exemption 7(C) applies to records

"compiled for law enforcement purposes" if their release "could reasonably be expected to

constitute an unwarranted invasion of personal privacy," *id.* § 552(b)(7)(C).  The latter "is more

protective of privacy than Exemption 6' and thus establishes a lower bar for withholding

material."  *ACLU v. U.S. Dep't of Just.*, 655 F.3d 1, 6 (D.C. Cir. 2011) (quoting *U.S. Dep't of*

*Def. v. FLRA*, 510 U.S. 487, 496 n.6 (1994)).  To justify withholding under either exemption,

however, the agency must identify a substantial privacy interest, and the D.C. Circuit has

"deemed the privacy inquiry of Exemptions 6 and 7(c) to be essentially the same." *Jud. Watch*,

365 F.3d at 1125.

For each entry in the Department's *Vaughn* index that invokes Exemption 7(C), the

Department also invokes Exemption 6.  *See* Dkt. 30-3 at 5, 7, 12–13, 19, 24–26, 27–31.  With

respect to Exemption 6, the Court has already concluded that the Department's assertions of a

privacy interest fail for lack of sufficient detail.  Because the privacy inquiry is the same under

Exemption 7(C), the Court reaches the same conclusion with respect to that exemption.

For the same reasons given with respect to Exemption 6, the Court will, accordingly,

deny the Department's motion for summary judgment without prejudice on this issue and will

also deny Plaintiffs' cross-motion without prejudice.

      b.    *Exemption 7(E)*

Plaintiffs challenge the Department's withholding of information from ten documents

under Exemption 7(E).  That exemption permits an agency to withhold "records or information

compiled for law enforcement purposes" if the release of those records "would disclose

techniques and procedures for law enforcement investigations or prosecutions, or would disclose

guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably

be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).

In its discussion of Exemption 7(E), the second Stein Declaration avers that the

Department withheld:

> information about the sources from which it gathers potentially derogatory
> information; the systems and workflow procedures the Department employs in
> conducting Leahy vetting; the officers at each Post who have access to the
> INVEST database; the Department's methods for assessing and evaluating the

credibility of those sources; the Department's internal procedures for determining whether vetted individuals and units were involved in potentially derogatory incidents as well as whether remediation should occur following a negative determination; the circumstances in which Leahy vetting rules and restrictions applied to particular Posts in certain countries; State's internal procedures for determining which units rejected pursuant to the Leahy Laws would be named in a publicly-available list in accordance with the Leahy Laws' reporting requirements; and internal recommendations and advice from Department officials for better managing those processes.

Dkt. 25-3 at 23 (2d Stein Decl. ¶ 75).  The declaration goes on to explain that release of that information—"none of which [is] well-known to the public"—could "reasonably be expected to risk circumvention of the law[] by allowing individuals and units that are either seeking or that expect to one day require Leahy approval to see what specific information is given more or less weight in assessing eligibility for assistance."  *Id.* at 23–24 (2d Stein Decl. ¶ 75).  The declaration further asserts that "[r]elease of the nonpublic details of these techniques would nullify their effectiveness, risk circumvention of the Leahy Laws, and undermine the U.S. Government's interest in ensuring that training and assistance are [not] furnished to units of foreign security forces credibly believed to have committed [gross violations of human rights]."  *Id.* at 24 (2d Stein Decl. ¶ 76).

As an initial matter, the Court concludes that the records withheld under Exemption 7(E) were compiled for "law enforcement purposes."  The Court has already concluded that records compiled as part of the Leahy vetting process itself, such as Documents 6 and 11, *see* Dkt. 30-3 at 4, 6, satisfy Exemption 7's threshold requirement.  By the same token, documents that describe Leahy vetting procedures more generally, such as Document 20, which describes the Department's procedures for "assess[ing] whether individuals and units are eligible for assistance under the Leahy Laws," *id.* at 14, were also compiled for "law enforcement purposes" because they "assist [Leahy vetters] in taking 'proactive steps' to deter illegal activity," *Sack*,

823 F.3d at 694 (concluding that "reports about polygraph use" were compiled for law enforcement purposes because the reports "help ensure that law enforcement officers optimally use an important law enforcement tool").

The central question, then, is whether release of the withheld information "would disclose techniques and procedures for law enforcement investigations" and "would reasonably be expected to 'risk circumvention of the law.'" *Id.* (quoting 5 U.S.C. § 552(b)(7)(E)).  In the analogous context of background checks, the D.C. Circuit has held that Exemption 7(E)'s requirements were satisfied when an agency sought to withhold "information [that] could 'provide insight' into . . . security clearance procedure[s]." *Morley*, 508 F.3d at 1129.  As the court explained, "[i]t is self-evident that information revealing security clearance procedures could render those procedures vulnerable and weaken their effectiveness at uncovering background information on potential candidates." *Id.*  The same is true in the context of Leahy vetting: Exemption 7(E)'s requirements are satisfied if disclosure of Leahy vetting procedures could weaken their effectiveness, thereby weakening the government's efforts to bring perpetrators of gross violations of human rights to justice.

The Department has adequately supported its invocation of Exemption 7(E) with respect to most of the information at issue.  The Court credits the Department's explanation that the disclosure of information that would allow individuals to "see what specific information is given more or less weight in assessing eligibility for assistance," Dkt. 25-3 at 23–24 (2d Stein Decl. ¶ 75), would create "a 'chance of a reasonably expected risk'" of circumvention of the law, *Jud. Watch*, 282 F. Supp. 3d at 46 (quoting *Mayer Brown LLP v. IRS*, 52 F.3d 1190, 1193 (D.C. Cir. 2009)).  Accordingly, because Documents 6, 11, 20–23, and 27 all include information bearing

on the procedures used to vet foreign individuals and security force units under the Leahy Laws, those records fall within Exemption 7(E) and were properly withheld.[7]

The Court is also persuaded that the Department's redaction of one sentence from Document 50 pursuant to Exemption 7(E) was justified.  That document is a cable from the Secretary of State to all diplomatic and consular posts that, among other things, "announces the Department's intention to make public the names of units denied assistance during calendar year 2017, as required by the Leahy Laws."  Dkt. 30-3 at 31.  The Department withheld one sentence in the document because "the information in that sentence reveals sensitive, non-public law enforcement procedures used by the Department in implementing the Leahy Laws' reporting requirements and determining which units rejected pursuant to the Leahy Laws would be named in a publicly-available list."  *Id.* at 32.  Exemption 7(E) sets a relatively low bar, requiring the Department to show only that disclosure "might increase the risk 'that a law will be violated or that past violators will escape legal consequences.'"  *PEER*, 740 F.3d at 205 (quoting *Mayer Brown*, 562 F.3d at 1193).  Because publicly identifying those units that have engaged in gross violations of human rights is one of the sticks used to enforce the law and to discourage human rights violations, disclosure of how the Department decides "which units rejected pursuant to the Leahy Laws would be named in a publicly-available list," Dkt 30-3 at 32, "could reasonably be

---

[7] The Department also invokes Exemption 7(E) to withhold information from Document 19, but the Department's *Vaughn* index explains that "[t]his same information" was redacted pursuant to Exemption 5.  Dkt. 30-3 at 13–14.  Because the Court has already concluded that the Department properly invoked Exemption 5 with respect to Document 19, the Court need not consider whether the Department properly invoked Exemption 7(E) with respect to that document.

expected to risk circumvention of the law," 5 U.S.C. § 552(b)(7)(E), by providing pointers for how an offending unit might evade one important feature of the law.[8]

The Court cannot reach the same conclusion, however, with respect to at least portions of Documents 21 and 25.  Taking these in reverse chronological order, Document 25 is the 2017 Leahy Vetting Guide.  The Department's *Vaughn* index states that the Department has withheld information identifying "particular system[s] used during the Leahy vetting process;" "details on workflow within the INVEST database and specifics about data conversion and data entry within that system;" "common forms of [gross violations of human rights];" "whether, how, and to what extent non-[gross violations of human rights] derogatory information uncovered during Leahy vetting can or should be used in the vetting process;" "procedures for reporting data from certain systems in the Leahy vetting process;" "whether and how to utilize certain systems with respect to individuals with possible claims to U.S. citizenship;" and "how the Leahy vetting process affects other Department programs."  Dkt. 30-3 at 18.  The Court cannot discern from this list how each item withheld from Document 25 pursuant to Exemption 7(E) could reasonably lead to circumvention of the law.  It is not clear, for example, how the disclosure of "specifics about data conversion and data entry within [the INVEST] system" could weaken the effectiveness of Leahy vetting.  Similarly, the Department does not explain what it means by "common forms of [gross violations of human rights];" if this simply refers to "the four most common forms of"

---

[8] Congress recently amended the State Leahy Law to clarify that the identity of "units for which no assistance shall be furnished" must "be made publicly available unless the Secretary of State, on a case-by-case basis, determines and reports to the appropriate congressional committees that the public disclosure is not in the national security interest of the United States and provides a detailed justification for such determination, which may be submitted in classified form." Consolidated Appropriations Act 2022, Pub. L. 117-103, Div. K, Title VII, § 7035(b)(6), 136 Stat. 629.  Neither party has requested that the Court consider whether this amendment has any bearing on the question presented.

gross violations of human rights identified within the 2017 Leahy Vetting Guide, *see* Dkt. 26-3 at 10–11, it unlikely that further disclosure would risk circumvention of the law.  If, on the other hand, the Department has withheld more granular information relating to, for example, red flags that typically help Department officials detect gross violations of human rights, then Exemption 7(E) would likely apply.  But without further detail, the Court cannot conclude that the Leahy Vetting Guide should be withheld under Exemption 7(E).

Finally, the Department has withheld various portions of Document 21.  For the reasons explained above, most of these withholdings are well-supported.  One withholding, however, is not adequately supported on the present record.  In particular, according to the revised *Vaughn* index, the Department redacted "procedural information related to the proper workflow and use of the Department's [INVEST] database."  Dkt. 30-3 at 15.  As with Document 25, it is unclear how disclosing information relating to the use of this database—the existence of which is public—"could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E); *see also PEER*, 740 F.3d at 205.  Accordingly, the Department must do more to carry its burden with respect to this one redaction from Document 21.

The Court is unpersuaded, however, by Plaintiffs' more sweeping challenge to the Department's invocation of Exemption 7(E), arguing that the withheld records "do little more than discuss publicly available information."  Dkt. 26-1 at 33.  In support, Plaintiffs point to certain publicly available sources that provide "ample information . . . about State's policies for implementing Leahy vetting, ranging from what constitutes a credible source of information to which individuals and units must be vetted."  *Id.* at 32–33.  The Department, of course, does not dispute that much information is publicly available about how Leahy vetting works and about units that have been rejected.  The problem with Plaintiffs' argument, however, is that they offer

no reason to doubt the Department's good-faith representations that the withheld information is not public and that the disclosure of those non-public details would risk circumvention of the law. As explained above, the Department has carried its burden of showing that disclosure of the information in Documents 6, 11, 20–23, 27, and 50, and most of Document 21, could reduce or nullify the effectiveness of the procedures the Department employs to detect and to prevent violations of the prohibition on training or assisting units that have engaged in gross violations of human rights.

The Court also agrees with the Department that disclosure of the withheld materials in Documents 6, 11, 20–23, 27, and 50, and most of Document 21 would cause foreseeable harm. Although the D.C. Circuit has yet to opine on what an agency must do to show foreseeable harm under Exemption 7(E), courts have acknowledged on at least two occasions that the foreseeable-harm requirement is similar to (and was not intended to heighten) Exemption 7(E)'s "circumvention of the law" requirement. *See Citizens for Resp. & Ethics in Wash. v. DHS*, 525 F. Supp. 3d 181, 192 n.4 (D.D.C. 2021); *see also Reps. Comm. for Freedom of the Press v. FBI*, 548 F. Supp. 3d 185, 196–97 (D.D.C. 2021). The Court therefore concludes that the Department has satisfied the foreseeable-harm requirement for Documents 6, 11, 20–23, 27, 50, and most of Document 21.

The Court will, accordingly, grant Department's motion with respect to Documents 6, 11, 20–23, 27, 50, and all portions of Document 21 (except with respect to the information "related to the proper workflow and use of the Department's [INVEST] database"), and the Court will deny Plaintiffs' cross-motion with respect to those withholdings. The Court will also deny without prejudice the Department's motion with respect to the outstanding portion of Document

21 and Document 25 without prejudice, and it will deny Plaintiffs' cross-motion without prejudice with respect to those withholdings.

c.   *Exemption 7(F)*

The Department invokes Exemption 7(F) to withhold material from two spreadsheets containing data from the INVEST database for Egypt and Iraq.  *See* Dkt. 30-3 at 25–27.  The information that the Department seeks to withhold was inadvertently disclosed to Plaintiffs, however, and is the subject of a separate dispute over whether the Court should order Plaintiffs to return or to destroy the inadvertently disclosed records.  The Court's resolution of that dispute, discussed below, obviates the need for the Court to determine whether the Department's withholdings satisfy Exemption 7(F)'s substantive requirements.

## C.   Return of Records Mistakenly Released

On January 17, 2020, the Department disclosed fourteen Excel spreadsheets containing data from the Department's INVEST database, while asserting FOIA Exemptions 5, 6, and 7(C) to withhold portions of the spreadsheets.  Dkt. 30-1 at 1–2 (Def. Resp. to Pl. SUMF ¶ 38).  A week later, counsel for the Department informed Plaintiffs that the previously disclosed spreadsheets "corresponding to Iraq and Egypt may contain information that should have been redacted under FOIA Exemption [7(F)]."  Dkt. 25-8 at 11.  Counsel for the Department requested that Plaintiffs destroy all copies of the previously disclosed spreadsheets.  *Id.*  Plaintiffs refused to do so.  *Id.* at 7–8.  On February 19, 2020, and on April 9, 2020, the Department, through counsel, provided two corrected spreadsheets for Egypt and Iraq, asserting FOIA Exemptions 5, 6, 7(C), and 7(F).  Dkt. 30-1 at 2 (Def. Resp. to Pl. SUMF ¶ 39).

The Department now seeks to assert Exemptions 6, 7(C), and 7(F) to withhold the information in the spreadsheets that has already been disclosed to Plaintiffs, requesting that the

Court "direct Plaintiffs to return or destroy the Department's January 17, 2020, production of the[] two spreadsheets." Dkt. 30 at 30. The Court can quote the Department's argument in support of its request for the return or destruction of the inadvertently released records in full:

> If the Court finds that Defendant correctly asserted FOIA Exemptions 6, 7 (C) and 7(F) to withhold this information, Defendant respectfully requests that the Court direct Plaintiffs to return or destroy the Department's January 17, 2020, production of these two spreadsheets. *Cf. Hersh & Hersh v. Dep't of Health & Human Servs.*, Civ. A. No. 06-4234, 2008 WL 901539, *9 (N.D. Cal. Mar. 31, 2008) (ordering plaintiff to return in whole defendants' inadvertent initial production).

*Id*. That argument—at least as developed to date—is unconvincing.

To start, the Department places the cart before the horse in arguing that the Court should first consider whether its asserted withholdings are proper, and, then, if so, the Court should consider whether the records must be returned. But absent legal authority indicating that the Court has the authority to order that a FOIA recipient return records that were inadvertently released without redactions, the Court has no reason to consider whether the proposed redactions would be proper, were the Department allowed a mulligan.

The even more substantial difficulty that the Department faces is that it fails to identify any authority that the Court has to order Plaintiffs to return the unredacted versions of the spreadsheets. Rather, the Department cites a single decision from the Northern District of California directing a FOIA plaintiff to return a production that include "inadvertently produced documents," *Hersh & Hersh*, 2008 WL 901539, at *9, but that decision offers no legal analysis and cites no precedent in support of that directive. More importantly, if the Department believes that there is a sound basis for the Court to take the extraordinary step of ordering a news organization and a journalist to return materials to a government agency, which they obtained through no unlawful or improper action, it must do far more than include a single sentence on the

61

final page of a reply brief.  The questions posed by the Department's request are of great importance, and, if the Department wants to pursue the issue, they deserve more serious treatment than that.

The Court will, accordingly, deny without prejudice the Department's request that the Court order the return of the inadvertently released records and, pending any further efforts by the Department to secure the return of those records, the Court will deny the Department's motion for summary judgment with respect to the Exemption 7(F) withholdings without prejudice as moot.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the Department's motion for summary judgment, Dkt. 25, is **GRANTED** in part and **DENIED** in part, and that Plaintiffs' cross-motion for partial summary judgment, Dkt. 26, is **DENIED**; it is further

**ORDERED** that, with respect to the adequacy of the Department's search for the reports to Congress that Plaintiffs requested in their second FOIA request, the Department's motion for summary judgment is **DENIED** without prejudice and Plaintiffs' cross-motion is **DENIED** without prejudice; it is further

**ORDERED** that, with respect to the Department's withholding of Document 1, the Department's motion for summary judgment is **DENIED** without prejudice and Plaintiff's cross-motion for partial summary judgment is **DENIED** without prejudice; it is further

**ORDERED** that, with respect to the portions of Document 45 that the Department withheld pursuant to Exemption 5, the Department's motion is **GRANTED** and Plaintiffs' cross-motion is **DENIED**; it is further

**ORDERED** that, with respect to the portions of Documents 31 through 44 that the Department withheld pursuant to Exemption 5, the Department's motion is **DENIED** without prejudice and Plaintiffs' cross-motion is **DENIED** without prejudice; it is further

**ORDERED** that, with respect to Document 12, the Department's motion is **GRANTED** and Plaintiffs' cross-motion is **DENIED**; it is further

**ORDERED** that, with respect to the portions of Documents 6, 11, 23, and 29 that the Department withheld pursuant to Exemption 5, the Department's motion is **GRANTED** and Plaintiffs' cross-motion is **DENIED**; it is further

**ORDERED** that, with respect to the portions of Documents 14, 16, 19, 24, 28, 30, and 50 that the Department withheld pursuant to Exemption 5, the Department's motion is **GRANTED** and Plaintiffs' cross-motion is **DENIED**; it is further

**ORDERED** that, with respect to the portions of documents that the Department withheld pursuant to Exemptions 6 and 7(C), the Department's motion is **DENIED** without prejudice and Plaintiffs' cross-motion is **DENIED** without prejudice; it is further

**ORDERED** that, with respect to the portions of Documents 6, 11, 20–23, 27, 50, and all but one portion of Document 21 that the Department withheld pursuant to Exemption 7(E), the Department's motion is **GRANTED** and Plaintiffs' cross-motion is **DENIED**; it is further

**ORDERED** that, with respect to the remaining portions of documents that the Department withheld pursuant to Exemption 7(E)—the portions withheld from Document 25 and one redaction from Document 21—, the Department's motion is **DENIED** without prejudice and Plaintiffs' cross-motion is **DENIED** without prejudice; it is further

**ORDERED** that, with respect to the portions of records that the Department seeks to withhold pursuant to Exemption 7(F), the Department's motion is **DENIED** as moot pending any further efforts by the Department to secure the return of those records; and it is further

**ORDERED** that, with respect to the Department's request that the Court order the return of inadvertently released records, the Department's motion is **DENIED** without prejudice.

**SO ORDERED**.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  April 26, 2022